**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FILED
HARRISBURG, PA
OCT 18 2002
MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

| | |
|---|---|
| JACK MARRONE, KAREN MARRONE, both individually and in their capacity as parents and guardians for VIDA MARRONE, a minor, and MATTHEW MARRONE <br><br> Plaintiffs <br><br> v. <br><br> ALLSTATE INSURANCE COMPANY, LINDA M. EDLEMAN, FRED SCHAFER, MT. GRETNA REALTY, and HOUSEMASTER <br><br> Defendants | CIVIL ACTION - LAW <br><br> CASE NO.: 1:CV-01-0773 <br><br> JURY TRIAL DEMANDED <br><br> (JUDGE KANE) |

### DEFENDANT HOUSEMASTER'S
### STATEMENT OF UNDISPUTED FACTS

Defendant HouseMaster respectfully submits this Statement of Undisputed Facts in support of its Motions for Summary Judgment on Counts VIII through XI of Plaintiffs' Amended Complaint and Plaintiffs' claims for personal injury damages in those counts. In accordance with Local Rule 7.3, Defendant HouseMaster also submits an Appendix containing those portions of the Record supporting the following facts and those referred to in the summary judgment motion and brief.

1. Plaintiffs, Jack and Karen Marrone reside at 11673 Highway P.P., Dixon, Missouri, with their daughter, Vida Marrone. (Appendix A, Amended Complaint, ¶¶2, 3; Appendix C, Jack Marrone Depo., p. 10; Appendix F, Vida Marrone Depo., p. 5.)

2. Plaintiff Matthew Marrone resides at 716 Wood Street, Lebanon, Missouri. (Appendix E, Matthew Marrone Depo., p. 6.)

3. HouseMaster, an independently owned franchise, is located at 203 West Caracas Avenue, Hershey, Pennsylvania. (Appendix A, Amended Complaint, ¶9; Appendix B, HouseMaster Answer, ¶9.)

4. Chuck Berthoud is the owner/operator of the HouseMaster franchise and is a certified home inspector. (Appendix G, Chuck Berthoud Depo., pp. 10-11.)

5. In June of 1999, Plaintiffs traveled to Pennsylvania from Missouri to find a home. (Appendix A, Amended Complaint, ¶11.)

6. Plaintiffs engaged Chip Stanilla from ReMax of Lebanon County to serve as their real estate agent. (Appendix C, Jack Marrone Depo., p. 15; Appendix D, Karen Marrone Depo., p. 54.)

7. On July 7, 1999, Plaintiffs entered into an Agreement to Purchase Real Estate with Linda Edelman. (Appendix C, Jack Marrone Depo., p. 18.)

8.  The subject property was located at 354 Timber Road, Mt. Gretna, Pennsylvania. (Appendix A, Amended Complaint, ¶13.)

9.  Plaintiffs toured the subject property on approximately two occasions prior to purchasing the home. (Appendix D, Karen Marrone Depo., pp. 169-170.)

10. Karen Marrone did not notice any dampness in the basement during her tours of the home. (Appendix D, Karen Marrone Depo., pp. 169-170.)

11. Ms. Edelman provided Plaintiffs with a property disclosure statement which specifically denied dampness or water problems in the basement of the home. (Appendix A, Amended Complaint, ¶19.)

12. In July of 1999, Chip Stanilla, on behalf of Plaintiffs, engaged HouseMaster to conduct a specific element inspection of the home on July 30, 1999. (Appendix G, Chuck Berthoud Depo., pp. 21-22, 59; Appendix I, Inspection Order Agreement; Appendix J, Express Report.)

13. HouseMaster was hired to perform a structural inspection of the home, including the foundation, and radon testing. (Appendix D, Karen Marrone Depo., p. 190; Appendix G, Chuck Berthoud Depo., pp. 21-22, 59; Appendix I, Inspection Order Agreement.)

14. On July 30, 1999, Chuck Berthoud from HouseMaster arrived at the subject property for the limited inspection. (Appendix D, Karen Marrone Depo., p. 72; Appendix I, Inspection Order Agreement; Appendix J, Express Report.)

15. Present for the inspection were Jack and Karen Marrone, Chip Stanilla and Ms. Edelman. (Appendix G, Chuck Berthoud Depo., pp. 32-33; Appendix J, Express Report, p. 1.)

16. Chuck Berthoud presented Plaintiffs with the Inspection Order Agreement at the time of inspection. (Appendix D, Karen Marrone Depo., p. 72.)

17. Karen Marrone signed the contract acknowledgment on the Inspection Order Agreement, acknowledging that the terms and conditions on both sides of the Agreement were both read and understood by her. (Appendix G, Chuck Berthoud Depo., p. 19; Appendix I, Inspection Order Agreement.)

18. Chuck Berthoud was asked by Plaintiffs at the time of inspection to include "wet basement" as part of his specific element inspection on the subject property, which he agreed to do. (Appendix D, Karen Marrone Depo., p. 72; Appendix G, Chuck Berthoud Depo., p. 32; Appendix J, Express Report, p. 1.)

19. The total inspection fee was $195.00, $95.00 for the specific element inspection, and $100.00 for the radon testing. (Appendix G, Chuck Berthoud Depo., p. 19; Appendix I, Inspection Order Agreement.)

20. Paragraph 1 of the Agreement, "Inspection Limitations", provides, in pertinent part:

> The company can only inspect and report unspecified, visible and accessible elements of the house proper. The Inspection is not intended to detect latent conditions or concealed defects. It will be performed according to recognized industry standards - a copy is available upon request. The inspection will not involve destructive testing...**any related services performed by the Company are subject to the terms and conditions of this Agreement but are not covered by any guarantee.**

(Appendix I, Inspection Order Agreement, ¶1.)

21. Paragraph 4 of the Agreement "Liability", sets forth limitations on HouseMaster's liability in bold typeface. It states, in pertinent part:

> The inspection should be considered a technically exhaustive inspection or an insurance policy against unexpected house repair/replacement needs. The Client acknowledges that there is risk involved in purchasing a property and that the purpose of the inspection and the Guarantee is to reduce that risk but not eliminate it ....
>
> No legal action, including those alleging negligence, may be commenced the Company after one year from the date of the Inspection.
>
> **The Company assumes no responsibility or liability for personal or bodily injury or fatalities caused by any of the property's components or conditions or their effects, regardless of the cause. The Client agrees to maintain adequate liability insurance to cover this potential liability.**

> **The Company's liability for any Client post-inspection claims, beyond the 90 day Guarantee, is limited to a maximum of the home inspection fee paid.**

(Appendix I, Inspection Order Agreement, ¶4.)

    22.    Paragraph 5 of the Agreement, "Environmental Concerns", states:

> **The Client acknowledges that what is being contracted for is a home inspection and not an environmental evaluation.** The inspection is not intended to detect, identify or disclose any health or environmental concerns regarding this house or property, such as the presence of...fungi, or any other potentially toxic materials or gases, etc., in the air, water, soil or house materials.

(Appendix I, Inspection Order Agreement, ¶5.)

    23.    Paragraph 10 of the Agreement, "Client Responsibility", provides in pertinent part:

> Should a concern or dispute arise over the condition of an inspected element after closing of title, **the Client agrees to notify the Company in writing and provide it with the opportunity to assess the element's condition prior to any repair/replacement work.** Failure to provide such written notification and access for reinspection will release the Company of any and all liability concerning this Inspection or Guarantee.
>
> **Should the Client initiate legal action against the Company and such action is terminated in a manner not adverse to the Company and/or the Company is subsequently relieved of liability, the Client will be responsible for the Company's defense costs, including attorney fees and expert witness fees.** ...

(Appendix I, Inspection Order Agreement, ¶10.)

6

24. During the limited inspection, Chuck Berthoud visually assessed the walls and ceiling of the home's basement. (Appendix C, Jack Marrone Depo., pp.76-77, 205.)

25. Chuck Berthoud inspected the outside of the home, pointing out waterproofing material on the foundation walls. (Appendix D, Karen Marrone Depo., pp. 70-71.)

26. Chuck Berthoud verbally advised Plaintiffs to slope soil away from the house and to extend the gutters and downspouts away from the side of the house. (Appendix D, Karen Marrone Depo., pp. 72, 199.)

27. At the end of the inspection, Chuck Berthoud handed Plaintiffs a copy of the Express Report. (Appendix D, Karen Marrone Depo., pp. 72, 199.)

28. With regard to water penetration, the Report noted indications of water penetration conditions, namely water marks/stains as well as indications of possible prior remedial work, namely construction/coatings. (Appendix J, Express Report, p. 11.)

29. The Report recommended that Plaintiffs "slope soil away from home; keep downspouts clean and flowing, or consider extending spouts on to surface." (Appendix J, Express Report, p. 11.)

30. Jack Marrone had no idea why these recommendations were made by HouseMaster. (Appendix C, Jack Marrone Depo., pp. 79-84.)

31. The Report also reiterated the limits on the scope of HouseMaster's inspection of the subject property. (Appendix J, Express Report.)

32. For example, the Report provides:

> The purpose of this Report is to render an opinion as to the condition of the major inspected elements of the referenced property on the date of inspection. Report findings are based on a limited time/scope inspection performed according to Terms and Conditions of the Inspection Order Agreement and in a manner consistent with home inspection industry standards. . . .
>
> Evaluations are basically limited to a visual assessment, are not technically exhaustive and only include installed and specified structural, mechanical and electric systems components, unless otherwise stated.
>
> Furthermore, no engineering, geological, design, environmental, or code compliance evaluations of the property were performed. . . .
>
> Due to the normal and stated limitations of a home inspection, no representations or guarantees are made with respect to latent deficiencies or any future conditions. The report, including all SUPPLEMENTAL INFORMATION and any addenda, should be reviewed in its entirety.

(Appendix J, Express Report, p. 2 "Environmental Exclusions.")

33. Under "GENERAL INSPECTION GUIDELINES", the Report states:

> **ENVIRONMENTAL EXCLUSIONS** - The reported/actual health effects of many potentially harmful, toxic, or environmentally

> hazardous elements that may be found in the air, soil, water or building materials in and around any house are varied, and in some cases controversial. A home inspection does not include the detection, identification or analysis of any such element....An environmental specialist should be contacted for evaluation of any potential health or environmental concerns.

(Appendix J, Express Report, p. 11, Note.)

34. With regard to water penetration, the Report's Note reads, in pertinent part:

> This section is limited to an assessment of At-Grade/Subgrade moisture/water penetration conditions readily visible at time/date of inspection. Moisture/water penetration conditions are subject to unpredictable changes; future conditions can not be determined. Confirm past history/status of any concerns with owner and local authorities.

(Appendix J, Express Report, p. 11, Note.)

35. The Report's "SUPPLEMENTAL INFORMATION" regarding to water penetration provides:

> **GENERAL CONSIDERATIONS** - Most houses have the potential for surface or subsurface water penetration. Regardless of any specific report comments, it would be prudent in all cases to discuss local conditions and concerns with the present owner and local authorities. Any comments made in this report are based on evidence/indication present at the time of inspection only. It is not possible to accurately determine the extent of past conditions or to predict future concerns. If there are indications of prior remedial work intended to reduce water penetration concerns, documentation should be obtained from the owner and/or installer.

9

> Experience indicates that the majority of water penetration concerns are due to a combination of factors commonly related to inadequate foundation grading and drainage provisions. In many situations, relatively straightforward measures may have a direct effect on the condition; in other cases, the remedy may be more complex or impossible to achieve. Any specific recommendations in the Report should be considered; however, be aware that they do not necessarily represent a complete or permanent solution to the condition.

(Appendix J, Express Report, p. 12 "Water Penetration - General Considerations.")

37. Plaintiffs settled on the subject property on August 30, 1999 and took possession of the home immediately. (Appendix A, Amended Complaint, ¶20; Appendix D, Karen Marrone Depo., p. 83.)

37. Once they moved in, Plaintiffs sloped the soil away from the home and diverted the downspouts, as recommended by HouseMaster. (Appendix D, Karen Marrone Depo., p. 90; Appendix E, Matthew Marrone Depo., pp. 67-68.)

38. Karen Marrone found a black, slimy substance on the wall behind the refrigerator in the Fall of 1999. Plaintiffs did not contact HouseMaster concerning this condition. (Appendix C, Jack Marrone Depo., pp. 126-127; Appendix D, Karen Marrone Depo., pp. 87-88.)

39. Plaintiffs made no observations of watermarks, dampness or mold in the basement until July, 2000. (Appendix C, Jack Marrone Depo., pp. 249-250; Appendix D, Karen Marrone Depo., pp. 93-94, 151-152, 178-179.)

40. Jack Marrone separated from his wife, Karen Marrone, and lived in West Virginia from January through May, 2000. (Appendix D, Karen Marrone Depo., pp. 184-185; Appendix F, Vida Marrone Depo., p. 42.)

41. Matthew Marrone moved from Mt. Gretna to Springfield, Missouri in April, 2000. (Appendix D, Karen Marrone Depo., p. 91; Appendix E, Matthew Marrone Depo., p. 72.)

42. Plaintiffs, Jack, Karen and Vida Marrone, left the subject property in July, 2000 for Missouri, sometime after the July 4th holiday. (Appendix A, Amended Complaint, ¶22; Appendix D, Karen Marrone Depo., p. 144.)

43. Prior to leaving on vacation, Plaintiffs closed up the home, shutting down the air conditioning units and leaving water in the basement hot tub. (Appendix C, Jack Marrone Depo., pp. 259-260; Appendix D, Karen Marrone Depo., p. 145; Appendix H, Larry Miller Depo., pp. 57-58.)

44. Plaintiffs returned home to Mt. Gretna from vacation approximately one week later in July, 2000. (Appendix A, Amended Complaint, ¶22; Appendix D, Karen Marrone Depo., p. 144.)

45. Several days after their return home, Jack Marrone found the basement floor, walls, ceiling and furniture covered in mold. (Appendix A, Amended Complaint, ¶22; Appendix D, Karen Marrone Depo., pp. 145-147.)

46. Plaintiffs did not notify HouseMaster in writing or otherwise concerning this occurrence. (Appendix C, Jack Marrone Depo., pp. 240-241; Appendix D, Karen Marrone Depo., p. 203.)

47. Plaintiffs notified their realtor, Chip Stanilla, as well as the Environmental Protection Agency and the Pennsylvania Department of Health concerning the mold condition in the basement. (Appendix D, Karen Marrone Depo., p. 30.)

48. Plaintiff contacted their insurance carrier, Allstate, on or about August 8, 2000. (Appendix H, Larry Miller Depo., pp. 20-22.)

49. According to Allstate's claim log, Jack Marrone reported the date of loss as July 11, 2000. Jack Marrone stated that the basement floor, paneling and ceiling of the home had been damaged by water, apparently from a broken pipe. (Appendix H, Larry Miller Depo., pp. 20-22, 25-26.)

50. Allstate Senior Claims Representative, Larry Miller, inspected the home on August 10, 2000 and determined that the claim was not a covered loss. (Appendix H, Larry Miller Depo., pp. 29-30.)

51.     Shortly thereafter, Jack Marrone began demolition on the basement, removing the paneling, insulation, and drywall from the basement walls and ceiling.  (Appendix C, Jack Marrone Depo., pp. 132-134; Appendix D, Karen Marrone Depo., p. 151.)

52.     Plaintiffs contacted Advanced Applied Sciences, Inc., hiring the firm to perform a bio-aerosol survey of the home.  (Appendix A, Amended Complaint, ¶30; Appendix D, Karen Marrone Depo., p. 154.)

53.     On August 28, 2000, Robert A. Pfromm, a certified industrial hygienist, met with Plaintiffs and conducted an indoor air quality/indoor environmental quality survey on the home.  (Appendix A, Amended Complaint, ¶30; Appendix D, Karen Marrone Depo., p. 154; Appendix K, 10/15/00 Report of Robert A. Pfromm, p. 1.)

54.     Karen Marrone received a verbal report from Advanced Applied Sciences, Inc., on September 29, 2000.  At that time, she learned that the basement contained fungal contaminants.  (Appendix A, Amended Complaint, ¶¶32-33; Appendix D, Karen Marrone Depo., pp. 156, 159-161.)

55.     Karen Marrone was told to stop the demolition work in the basement and to seal off the basement from the rest of the home.  (Appendix A, Amended Complaint, ¶¶32-33; Appendix D, Karen Marrone Depo., pp. 156, 159-161.)

56.  Advanced Applied Sciences, Inc. issued their written report on the survey results on October 15, 2000. The Report found fungal contaminants in the home and made recommendations regarding remediation of the basement. (Appendix K, 10/15/00 Report.)

57.  Notably, the Report did not recommend that Plaintiffs leave the home. It merely recommended that Plaintiffs seal off the basement until the mold condition was reduced/removed. (Appendix K, 10/15/00 Report, p. 7.)

58.  No one recommended that Plaintiffs vacate the home. (Appendix C, Jack Marrone Depo., p. 242; Appendix D, Karen Marrone Depo., p. 162.)

59.  Plaintiffs moved out of the home on October 14, 2000 abandoning it. (Appendix D, Karen Marrone Depo., p. 162.)

60.  Plaintiffs allege that they have suffered various physical and psychological damages as a result of exposure to fungal contaminants in the home. (Appendix A, Amended Complaint, ¶¶35-38.)

61.  In particular, Jack Marrone claims personal injury damages including memory loss, mood swings, depression, severe fatigue and sexual dysfunction. (Appendix A, Amended Complaint, ¶35.)

62.  Jack Marrone has been a smoker for 40 years and has a history of post-traumatic stress disorder, chloracne due to Agent Orange exposure, a gunshot

wound to the finger and shrapnel in his leg, COPD, prostate problems and diabetes. (Appendix M, Dr. Holland's Report on Jack Marrone.)

63.  Jack Marrone's alleged health problems are not due to exposure to the indoor air environment at the Mt. Gretna home. (Appendix M, Michael G. Holland, M.D.'s Expert Report on Jack Marrone, p. 1.)

64.  Karen Marrone claims to suffer from, among other things, hair loss, abdominal cramping, diarrhea, sinusitis, phlegm and coughing, fever, dry and itching skin, loss of concentration, loss of cognitive functions, severe fatigue and severe loss of voice. (Appendix A, Amended Complaint, ¶36.)

65.  Karen Marrone has been a smoker for the past 25-30 years and has a history of Multiple Sclerosis, post-traumatic stress disorder, sinusitis, gastric ulcer disease, neuritis, sore throat, asthma, multiple gallbladder attacks and abdominal pain. (Appendix N, Michael G. Holland, M.D.'s Expert Report on Karen Marrone, p. 3.)

66.  No treating physician has told Karen Marrone that her alleged conditions were caused by or are in any way related to the mold or fungal contaminants in the Mt. Gretna home. (Appendix D, Karen Marrone Depo., pp. 109, 175.)

67.     Karen Marrone's alleged health problems are not due to exposure to the indoor air environment at the Mt. Gretna home. (Appendix N, Michael G. Holland, M.D.'s Expert Report on Karen Marrone, p. 1.)

68.     Matthew Marrone complains of severe fatigue, loss of concentration and memory loss. (Appendix A, Amended Complaint, ¶38.)

69.     Matthew Marrone has a history of knee problems with questionable arthritis. He has also lived in the home with smokers for most of his life. (Appendix O, Michael G. Holland, M.D.'s Expert Report on Matthew Marrone, p. 2.)

70.     No treating physician has told Matthew Marrone that his alleged conditions were caused by or were in any way related to the mold in the home. (Appendix E, Matthew Marrone Depo., pp. 40-41.)

71.     Matthew Marrone's alleged health problems are not due to his exposure to the indoor air environment at the Mt. Gretna home. (Appendix O, Michael G. Holland, M.D.'s Expert Report on Matthew Marrone, p. 1.)

72.     Vida Marrone complains of hair loss, sinusitis, continuous headaches, diarrhea, cramping, severe fatigue, dry and itching skins, headaches, itchy eyes, and other respiratory problems. (Appendix A, Amended Complaint, ¶36.)

73.     Vida Marrone is a smoker. (Appendix F, Vida Marrone Depo., p. 48.)

74. No treating physician has told Vida Marrone that her conditions were caused by or were in any way related to the mold condition in the Mt. Gretna home. (Appendix F, Vida Marrone Depo., pp. 26-27.)

75. Vida Marrone's alleged health problems are not due to exposure to the indoor air environment at the Mt. Gretna home. (Appendix P, Michael G. Holland, M.D.'s Expert Report on Vida Marrone, p. 1.)

Date: October 18, 2002

DUANE MORRIS LLP

_____
Paul E. Scanlan, Esquire
Attorney ID No. 75733
Jennifer L. Murphy, Esquire
Attorney ID No. 76432
305 North Front Street, 5th Floor
P.O. Box 1003
Harrisburg, PA 17108-1003
(717) 237-5500

Attorneys for Defendant HouseMaster

HBG\104866.1

## **CERTIFICATE OF SERVICE**

AND NOW, this 18th day of October, 2002, I, Denise L. Huber, an employee of Duane Morris LLP, hereby certify that I have served a copy of the Defendant HouseMaster's Statement of Undisputed Facts on the following by depositing a true and correct copy of the same in the U.S. Mail at Harrisburg, Pennsylvania, postage prepaid, addressed to:

> James G. Nealon, III, Esquire
> Nealon & Grover, P.C.
> 2411 North Front Street
> Harrisburg, PA 17110
>
> Edward A. Monsky, Esquire
> Fine, Wyatt & Carey, P.C.
> 425 Spruce Street
> Scranton, PA 18501-0590
>
> John Flounlacker, Esquire
> Thomas, Thomas & Hafer, LLP
> 305 North Front Street
> Harrisburg, PA 17108
>
> Louis M. Tarasi, Jr., Esquire
> 510 Third Avenue
> Pittsburgh, PA 15219

By: _/s/ Denise L. Huber_
Denise L. Huber