**ORIGINAL**

THOMAS, THOMAS & HAFER, LLP
305 North Front Street
P.O. Box 999
Harrisburg, PA 17108

John Flounlacker, Esquire
Attorney I.D. 73112
(717)237-7134
Attorneys for Defendant Edleman

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JACK MARRONE, husband, KAREN MARRONE, wife, both individually and in their capacity as parents and guardians for VIDA MARRONE, a minor, and MATTHEW ADAM MARRONE | : NO.: 1:CV-01-0773 <br> : <br> : <br> : <br> : |
| Plaintiffs | : |
| | : JUDGE KANE |
| v. | : |
| | : Civil Action Law |
| ALLSTATE INSURANCE COMPANY, LINDA M. EDLEMAN, FRED SCHAFER, MT. GRETNA REALTY, and HOUSEMASTERS | : <br> : <br> : |
| Defendants | : Jury Trial Demanded <br> : |

FILED
HARRISBURG, PA

OCT 1 8 2002

MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

## DEFENDANT LINDA M. EDLEMAN'S
## MOTION FOR SUMMARY JUDGMENT

AND NOW, Defendant Linda M. Edleman, by and through her attorneys, Thomas, Thomas & Hafer, LLP, hereby file this Motion for Summary Judgment, and in support thereof aver as follows:

### I.    **Factual Background**

1.    On August 31, 1999, Plaintiffs purchased a home located at 354 Timber Road, Mount Gretna, Pennsylvania, from moving-Defendant Linda M. Edleman (hereinafter "Defendant"), and took immediate possession. A copy of the Amended Complaint, where this information was obtained, may be found in the Appendix as Exhibit A.

1

2. Approximately eleven (11) months later, in July of 2000, Plaintiffs went on a week long vacation. Exhibit A, para. 22.

3. When Plaintiffs returned, they found mold in the basement of their home. Exhibit A, para. 22.

4. This was the first time Plaintiffs had noted any problem with mold. Exhibit A, para. 22.

5. On or about August 28, 2000, Plaintiffs had their home inspected by Advanced Applied Sciences, Inc., which consisted of a bioaerosol survey. Exhibit A, para. 30.

6. The results found that at the time of testing, there was a fungal contamination. Exhibit A, para. 33. A copy of Robert A. Pfromm's report may be found in the Appendix as Exhibit B.

7. The report of the industrial hygienist, Robert A. Pfromm, also found that such contamination could possibly be at symptomatic concentrations, depending on the sensitivity of the exposed person to the species found. Exhibit B, p. 6.

8. Pfromm also suggested that Plaintiffs seek "appropriate medical testing" by "qualified medical personnel" to determine the Plaintiffs' susceptibility to any such contamination. Exhibit B, p. 6.

9. Upon receiving Pfromm's report, Plaintiffs' vacated the home. Exhibit A, para. 34.

10. On November 2, 2001, Plaintiff's filed their Amended Complaint alleging causes of action for Misrepresentation (Count III), Negligence (Count VI), and Breach of Contract (Count V) against Linda M. Edleman. Exhibit A, para. 57 - 75.

11.    As against Defendant Edleman, Plaintiffs claimed damages for physical and emotional damages as well as pecuniary losses. Exhibit A, para. 63, 69 and 75.

12.    On August 12, 2002, Tom Moore, a home inspector, inspected the home in question at Plaintiffs request.  A copy of Tom Moore's report may be found in the Appendix as Exhibit C, p. 1.

13.    At the time of the inspection, the house had been vacant for approximately two (2) years.  Exhibit C, p. 1.

14.    Moore found that, as of the date of the inspection, there was a small pipe leak and evidence of pipe condensation.  Exhibit C, p. 1.

## II.    Summary Judgment As To Counts III, IV, And V

15.    Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Smith v. CGU, 179 F.Supp.2d 425, 427 (M.D. Pa. 2001).

16.    Plaintiffs have failed to produce any proof whatsoever that the condition which caused the injuries they claim was a preexisting one that was either known, or reasonably knowable by, Defendant.

17.    Additionally, Plaintiffs have failed to prove that assuming *arguendo* there was an intentional or negligent misrepresentation or breach of warranty, that the injuries they claim resulted from said misrepresentation or breach.

18.    As such, Plaintiffs cannot meet the elements of Misrepresentation, Negligent Misrepresentation or Breach of Contract on a breach of warranty theory.

19.    Defendant submits that there are no genuine issues of material fact as she relies upon the facts as alleged by Plaintiffs in their Amended Complaint and the reports of their experts.

WHEREFORE, Defendant respectfully submits for these reasons and the reasons set forth at length in the brief supporting this motion, that there are no genuine issues of material fact, that she is entitled to judgment as a matter of law and as such, judgment should be entered in Defendant's favor as to Counts III, IV, and V.

## III.  Partial Summary Judgment As To Plaintiffs' Claims For Personal Injury

20.    Paragraphs 1 through 17 are incorporated herein as if set forth in full.

21.    In the alternative, the deadline for the production of expert reports has passed pursuant to the case management order, and there is no medical evidence whatsoever regarding the Plaintiffs' alleged physical injuries.

22.    Pennsylvania law is clear that with regard to claims of physical injury or impairment, expert medical testimony is necessary to establish the causal nexus of the injury to the tortious conduct.  Maliszewski v. Rendon, 374 Pa.Super. 109, 113, 542 A.2d 170, 172 (1988).

23.    Plaintiffs have no medical evidence that any of their alleged injuries resulted from the mold in question.

24.    Defendant submits that there are no genuine issues of material fact as she relies upon the facts as alleged by Plaintiffs in their Amended Complaint and the information, or lack thereof, contained in the reports of their experts.

WHEREFORE, Defendant respectfully submits for these reasons and the reasons set forth at length in the brief supporting this motion, that there are no genuine issues of material fact, that she is entitled to judgment as a matter of law and as such, Plaintiffs should be foreclosed from making any claims for bodily injury as a result of the alleged actions of Defendant.

## IV. **Partial Summary Judgment As To Plaintiffs' Claim For Emotional Damage For Breach Of Contract**

25.   Paragraphs 1 through 22 are incorporated herein as if set forth in full.

26.   In the alternative, Defendant submits that Plaintiffs are not entitled to receive such damages under a Breach of Contract theory.

27.   As a general rule, damages for emotional disturbance and distress are not allowed in breach of contract cases. Rodgers v. Nationwide Mut. Ins. Co., 344 Pa.Super. 311, 319-320, 496 A.2d 811, 815 (1985).

28.   Additionally, since based on the above Defendant is entitled to judgment regarding any claim for bodily injury, there is no arguable exception for emotional injuries under contract law.

29.   Defendant submits that there is no genuine issue of material fact, as she relies upon the facts as set forth in the Amended Complaint and the lack of expert discovery produced.

WHEREFORE, Defendant respectfully submits for these reasons and the reasons set forth at length in the brief supporting this motion, that there are no genuine issues of material fact, that she is entitled to judgment as a matter of law and as such, Plaintiffs should be foreclosed from making any claims for emotional damages under a Breach of Contract theory as set forth in Count V.

Respectfully submitted,

**THOMAS, THOMAS & HAFER, LLP**

By:_____

John Flounlacker, Esquire
Attorney I.D. # 73112
P.O. Box 999
Harrisburg, PA  17108-0999
(717)237-7134

Date: 10/18/02

5

**THOMAS, THOMAS & HAFER, LLP**
305 North Front Street
P.O. Box 999
Harrisburg, PA  17108

**John Flounlacker, Esquire**
Attorney I.D.  73112
(717)237-7134
Attorneys for Defendant Edleman

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JACK MARRONE, husband, KAREN
MARRONE, wife, both individually and
in their capacity as parents and guardians
for VIDA MARRONE, a minor, and
MATTHEW ADAM MARRONE
          Plaintiffs

      v.

ALLSTATE INSURANCE COMPANY,
LINDA M. EDLEMAN, FRED SCHAFER,
MT. GRETNA REALTY, and
HOUSEMASTERS
          Defendants

: NO.: 1:CV-01-0773
:
:
:
:
:
:
: JUDGE KANE
:
: Civil Action Law
:
:
:
: Jury Trial Demanded
:

## CERTIFICATE OF CONCURRENCE / NON CONCURRENCE

I certify that counsel for the Linda M. Edleman contacted all counsel of record on October 11, 2002, regarding Defendant's Motion for Summary Judgment. Plaintiffs' counsel and counsel for Defendant Allstate did not reply. Counsel for Defendants, Fred Schafer and Mt. Gretna Realty, indicated that they take no position on the Motion and Counsel for Defendant Housemasters concurs with the Motion.

Respectfully submitted,

**THOMAS, THOMAS & HAFER, LLP**

By: _____
John Flounlacker, Esquire
Attorney I.D. # 73112
P.O. Box 999
305 N. Front Street
Harrisburg, PA  17108-0999
(717)237-7134

Date: 10/18/02

**THOMAS, THOMAS & HAFER, LLP**
305 North Front Street
P.O. Box 999
Harrisburg, PA 17108

John Flounlacker, Esquire
Attorney I.D. 73112
(717)237-7134
Attorneys for Defendant Edleman

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JACK MARRONE, husband, KAREN
MARRONE, wife, both individually and
in their capacity as parents and guardians
for VIDA MARRONE, a minor, and
MATTHEW ADAM MARRONE
      Plaintiffs

      v.

ALLSTATE INSURANCE COMPANY,
LINDA M. EDLEMAN, FRED SCHAFER,
MT. GRETNA REALTY, and
HOUSEMASTERS
      Defendants

: NO.: 1:CV-01-0773
:
:
:
:
:
:
:
: JUDGE KANE
:
: Civil Action Law
:
:
:
: Jury Trial Demanded
:

# <u>APPENDIX</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JACK MARRONE, husband, KAREN
MARRONE, wife, both individually and
in their capacity as parents and guardians
for VIDA MARRONE, a minor, and
MATTHEW ADAM MARRONE,
                              Plaintiffs

vs.

ALLSTATE INSURANCE COMPANY,
LINDA M. EDLEMAN, FRED SCHAFER,
MT. GRETNA REALTY, and
HOUSE MASTERS
                              Defendants

Civil Action No.       1: CV-01-0773

JURY TRIAL DEMANDED

## AMENDED COMPLAINT

AND NOW COMES, the Plaintiffs, by and through their counsel, Stevens & Johnson, and for their Complaint states and alleges the following:

## JURISDICTION

1.      Plaintiffs seek jurisdiction of this Court under Diversity of Citizenship pursuant to 28 U.S.C. § 1332. Plaintiffs are citizens of the State of Missouri. Defendant Allstate Insurance Company, is duly incorporated in the State of Delaware, with its corporate headquarters located in

Illinois. Defendant Linda M. Edleman is a citizen of Pennsylvania, Defendant, Mt. Gretna Realty is located in Pennsylvania, Defendant Housemasters is an independently owned franchise located in Pennsylvania. The matter in controversy exceeds, exclusive of interests and costs, the sum specified by 28 U.S.C. § 1332.

## PARTIES

2.    Plaintiffs, Jack Marrone and Karen Marrone, are both adults, who are husband and wife, and reside at 11673 Highway PP, Dixon, Missouri. They are the natural guardians of Vida Marrone, their daughter.

3.    Plaintiff, Vida Marrone, is a sixteen (16) year old minor, and daughter of Jack and Karen Marrone and resides with her parents at 11673 Highway PP, Dixon, Missouri.

4.    Plaintiff, Matthew Adam Marrone, is an adult residing at 308 Sherman Avenue, Lebanon, Missouri.

5.    Defendant, Allstate Insurance Company is a corporation, duly incorporated in the State of Delaware, with its corporate headquarters located at Allstate Plaza, 2775 Sanders Road, Northbrook, Illinois.

6.    Defendant, Linda M. Edleman, is an adult woman residing at 82 Norway Lane, Lebanon, Lebanon County, Pennsylvania.

7.    Defendant, Fred Schafer, was Defendant Edleman's real estate agent and is located at 83 Columbia Avenue, Mt. Gretna, Lebanon County, Pennsylvania.

8.    Defendant, Mt. Gretna Realty, is located at 83 Columbia Avenue, Mt. Gretna, Lebanon County, Pennsylvania.

2

9.    Defendant, HouseMasters, is an independently owned franchise, located at 203, West Caracas Avenue, Hershey, Dauphin County, Pennsylvania.

10.    At all relative times hereto, Defendants Allstate, Mt. Gretna Realty, and HouseMasters, were acting through their respective agents, servants, employees, and ostensible agents who were acting within the course and scope of their employment with the above listed Defendants and under the exclusive control of said Defendants.

## BACKGROUND

11.    On or about June of 1999, the Plaintiffs came to Pennsylvania to look for a home.

12.    On or about July of 1999, the Plaintiffs found the home at issue, located at 354 Kimber Road, Mt. Gretna, Lebanon County, Pennsylvania, owned at that time by Defendant Linda M. Edleman.

13.    Mt. Gretna Realty, at all relevant times, acted as the agent of the seller, Linda M. Edleman, in the sale of the property at issue, and as such knew, or should have known, due to previous experience in the sale of homes in the neighborhood, of the potential for water/dampness and mold problems with the house at issue.

14.    On or about July 30, 1999, the Plaintiffs hired Defendant HouseMasters, to inspect said home, who did so through their agent, servant, employee, or ostensible agent.

15.    Said inspection was for any problems associated with the purchase of a dwelling.

16.    Said inspection noted water stains in the basement and without further inspection HouseMasters recommended to "slope soil away from house; keep down spouts clean and flowing, or consider extending spouts onto surface."

3

17.    Plaintiffs, relying on said report, complied fully with said recommendation.

18.    Defendant Allstate issued an insurance policy covering the property at issue which became effective August 25, 1999.

19.    Prior to completing the purchase, Defendant Edleman, pursuant to 68 P.S. §1024, provided a Seller's Property Disclosure Statement specifically denying any basement dampness/water problems or leakage problems.

20.    On or about August 31, 1999, Plaintiffs completed the purchase of said home and the Plaintiffs immediately took possession and occupied said property relying on the representations of all of the Defendants except Defendant Allstate.

21.    All of the contracts referred to in this suit have in addition to the other terms, the implied covenant of "good faith."

22.    On or about July of 2000, the Plaintiffs went away on vacation, and returned one (1) week later to find the basement covered in mold. Said mold covered the walls, ceiling, floor, and furniture. This was the first time that the Plaintiffs had any notice of this problem.

23.    Plaintiffs immediately contacted Defendant Allstate and filed an insurance claim.

24.    Defendant Allstate's agent, servant, employee, or ostensible agent, at all times acting in the course and scope of his employment, performed only a cursory and superficial inspection, and in a letter dated August 10, 2000, denied coverage claiming said damage was the result of a "preexisting condition" and therefore not covered by Plaintiffs' policy.

25.    The cause of the "so called" preexisting condition was not stated.

26.    There was also no statement that Plaintiffs should have somehow been aware of the

4

condition.

27.    Despite Defendant Allstate's involvement in similar litigation concerning the health hazards posed by mold, at no time did Defendant Allstate, or its agents, servants, employees, or ostensible agents, who now had actual knowledge of the mold problem, inform or otherwise make known to the Plaintiffs the possibility of potential health problems related to the growth of mold, or other organic toxins.

28.    Plaintiffs, being unaware of the potential catastrophic dangers created by mold remained in the home.

29.    As between Plaintiffs and Defendant Allstate, an unknown condition, does not meet the test of a preexisting condition; or in the alternative, the test for preexisting condition in this policy is either ambiguous or unenforceable.

30.    On or about August 28, 2000, the Plaintiffs had their home inspected by Advanced Applied Sciences, Inc., whose corporate headquarters is located at 4400 Linglestown Road, Harrisburg, Pennsylvania.

31.    Said inspection consisted of a bioaerosol survey.

32.    On or about September 29, 2000, as a result of a telephone conversation with Advanced Applied Sciences, Inc., the Plaintiffs learned the results of the aforementioned testing.

33.    Plaintiffs learned that there was a finding of "fungal contaminations in the house" consisting of, but not limited to, Aspergillus, Stachybotrys, Penicillium, Alternaria, Chrysosporium, Epicoccum, and Cladosporium, said inspection also revealed a relative humidity level in    the basement 21% higher than that found outside the house.

34.    Having learned that the toxic levels in the house were unsafe, the Plaintiffs, as a result, were forced to vacate the premises.

35.    As a direct and proximate result of exposure to said fungal toxins, Plaintiff, Jack Marrone has suffered and will continue to suffer from among other things:

   (a)    memory loss

   (b)    mood swings

   (c)    depression

   (d)    severe fatigue

   (e)    sexual dysfunction

36.    As a direct and proximate result of exposure to said fungal toxins, Plaintiff, Karen Marrone has suffered and will continue to suffer from among other things:

   (a)    hair loss

   (b)    abdominal cramping

   (c)    diarrhea

   (d)    sinusitis

   (e)    phlegm and coughing

   (f)    fever

   (g)    dry and itching skin

   (h)    loss of concentration

   (i)    loss of cognitive functions

   (j)    severe fatigue

    (k)     severe loss of voice

37.    As a direct and proximate result of exposure to said fungal toxins, Plaintiff, Vida Marrone has suffered and will continue to suffer from among other things:

    (a)     hair loss

    (b)     sinusitis

    (c)     continuous headaches

    (d)     diarrhea

    (e)     cramping

    (f)     severe fatigue

38.    As a direct and proximate result of exposure to said fungal toxins, Plaintiff, Matthew Adam Marrone has suffered and may continue to suffer from among other things:

    (a)     severe fatigue

    (b)     loss of concentration

    (c)     memory loss

39.    As a direct and proximate result of exposure to said fungal toxins, the Plaintiffs have suffered and will continue to suffer embarrassment, humiliation, and psychological trauma.

40.    As a direct and proximate result of said fungal toxins, the Plaintiffs have suffered financial damages, including but not limited to, the economic loss of their home.

41.    To this date, the house at 354 Kimber Road is still standing, vacant and unsalable.

42.    At all times material hereto, the Plaintiffs have met all of their obligations acquired under all contracts mentioned below.

43.    Plaintiffs now bring this action for damages caused by the Defendants bad faith, breach of contract, misrepresentations, negligence, and violations of statutes.

## COUNT I

### PLAINTIFFS v.  ALLSTATE INSURANCE COMPANY
### BAD FAITH

44.    The Plaintiffs hereby incorporate paragraphs 1 through 43 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

45.    Defendant Allstate Insurance Company failed to handle the Plaintiffs' claims in a reasonable manner by failing to perform a complete and detailed investigation as to the cause of said fungal toxins.

46.    Defendant Allstate Insurance Company violated the provisions of 42 Pa. C.S.A. §8371; the Unfair Insurance Practices Act, 40 P.S. § 1171.1 et al., and the Unfair Claims Settlement Practices, Title 31, Subsection 146.1 et al.

47.    An action for bad faith may arise from an insurer's inadequate investigations. *O'Donnell v.  Allstate Insurance Co.,* 734 A.2d 901 (Pa.  Super.  1999).

48.    Defendant Allstate Insurance Company also acted in bad faith by failing to inform the Plaintiffs of possible health risks associated with exposure to fungal toxins, which the Defendant was or should have been aware of from such claims which were known to Defendant Allstate previously.

49.    In addition to all other monetary demands heretofore made, in order to punish Defendant Allstate Insurance Company for their bad faith and to deter other insurers from engaging

in similar activities, and to compensate Plaintiffs for the complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars together with attorneys' fees, interests, costs, and punitive damages in excess of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against Defendant Allstate Insurance Company for payment in excess of One Hundred Thousand ($100,000.00) Dollars, plus attorneys' fees, costs, and punitive damages in excess of One Hundred Thousand ($100,000.00) Dollars.

## COUNT II

### THE PLAINTIFFS v.  ALLSTATE INSURANCE COMPANY
### BREACH OF CONTRACT

50.     The Plaintiffs hereby incorporate paragraphs 1 through 49 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

51.     The Plaintiffs, Jack and Karen Marrone, contracted with Defendant Allstate Insurance Company to provide homeowners insurance coverage for the Plaintiffs' property which included an express or implied requirement for Defendant Allstate to fairly, in good faith, and with the exercise of reasonable care, without bad faith, to adjust covered claims by Plaintiffs.

52.     Defendant Allstate, through its agents, representatives, and employees breached the contract by performing the most simple of inspections, then coming to the immediate determination

that the mold infestation of the house at issue was a pre-existing condition, despite the fact that there was nothing which would indicate that Plaintiffs were aware of any alleged preexisting problem.

53.     Defendant Allstate failed to properly evaluate and pay Plaintiffs' claim within a reasonable period of time, which constituted a breach of its contract with the Plaintiffs, to properly adjust claims by the Plaintiffs.

54.     Defendant Allstate also failed to warn the Plaintiffs of the potential danger associated with mold.

55.     Defendant Allstate failed to properly apply the terms and conditions of the policy.

56.     As a direct and proximate result of Defendant Allstate's breach of contract, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against Defendant Allstate Insurance Company for payment in excess of One Hundred Thousand ($100,000.00) Dollars.

## COUNT III

### PLAINTIFFS v. LINDA M. EDLEMAN
### MISREPRESENTATION

57.     The Plaintiffs hereby incorporate paragraphs 1 through 43 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

58.     Defendant Edleman had a duty to disclose all material defects relating to the property at issue, pursuant to the Real Estate Seller Disclosure Act (68 P.S. § 1021 et seq.).

59.     In the Seller's Property Disclosure Statement, required pursuant to 68 P.S. § 1024, Defendant Edleman intentionally misrepresented the conditions associated with the property at issue when she indicated that there was no basement dampness/water problems or leakage problems.

60.     Defendant Edleman knew, or should have known, that said basement was prone to dampness and water problems and disclosed same as required by law.

61.     At all times material hereto, the Plaintiffs relied upon the misrepresentations of Defendant Edleman.

62.     These undisclosed problems lead to the formation of the mold in July of 2000.

63.     As a direct and proximate result of Defendant Edleman's failure to disclose said information, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, as set forth supra., and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against Defendant Edleman  for payment in excess of One Hundred  Thousand ($100,000.00) Dollars, Plaintiffs also request Rescission of the subject transaction for the sale of the property at issue and complete restitution together with a judgment ordering other incidental and consequential costs, prejudgment interest, attorneys' fees, and cost of suit.

## COUNT IV

### PLAINTIFFS v LINDA M. EDLEMAN
### NEGLIGENCE

64.    The Plaintiffs incorporate paragraphs 1 through 41 and 57 through 63 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

65.    Defendant Edleman had a legally imposed duty to disclose all known defects to the property at issue prior to settlement.

66.    Defendant Edleman knew or should have known of said defects to the property, in the form of dampness/water leakage in the basement.

67.    Defendant Edleman negligently breached this duty when she failed to disclose said information as was required by law.

68.    These undisclosed problems lead to the formation of the mold in July of 2000.

69.    As a direct and proximate result of Defendant Edleman's failure to disclose said information, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against Defendant Edleman for payment in excess of One Hundred Thousand ($100,000.00) Dollars, Plaintiffs also request Recision of the subject transaction for the sale of the property at issue and

12

complete restitution together with a judgment ordering other incidental and consequential costs, prejudgment interest, attorneys' fees, and cost of suit.

## COUNT V

### PLAINTIFFS v. LINDA M. EDLEMAN
### BREACH OF CONTRACT

70.    The Plaintiffs hereby incorporate paragraphs 1 through 43 and 57 through 69 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

71.    The Plaintiffs, Jack and Karen Marrone, contracted with Defendant Edleman for the purchase of her house.

72.    When Defendant Edleman agreed to said contract, she made express or implied warranties concerning the condition of said house.

73.    Defendant Edleman breached her contract with the Plaintiffs by failing to disclose relevant information concerning the condition of the basement prior to the sales transaction.

74.    These undisclosed problems lead to the formation of the mold in July of 2000.

75.    As a direct and proximate result of Defendant Edleman's breach of contract, the Plaintiffs, Jack and Karen Marrone, have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred  Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone and Karen Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against Defendant Edleman  for payment in

13

excess of One Hundred Thousand ($100,000.00) Dollars, Plaintiffs also request Recision of the subject transaction for the sale of the property at issue and complete restitution together with a judgment ordering other incidental and consequential costs, prejudgment interest, attorneys' fees, and cost of suit.

**COUNT VI**

**PLAINTIFFS v. FRED SCHAFER AND MT. GRETNA REALTY
MISREPRESENTATION**

76.    The Plaintiffs incorporate paragraphs 1 through 43 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

77.    Defendants Fred Schafer and Mt. Gretna Realty were at all relevant times the agent, servant, employee, or ostensible agent of Defendant Linda M. Edleman, and acted through its agents, servants, employees, and ostensible agents.

78.    Defendants Fred Schafer and Mt. Gretna Realty were, and have been an agent for, other homes in the area and as such, due to their experience and expertise, knew or should have know that the property in question, and the area was prone to said dampness/water problems.

79.    Defendants Fred Schafer and Mt. Gretna Realty had a duty to disclose, as well as a duty to make sure that the seller, their principle, disclosed all known defects in the property at issue prior to sale.

80.    Defendants Fred Schafer and Mt. Gretna Realty breached that duty by failing to disclose, and acted in concert with Defendant Edleman to not reveal said known defects relating to dampness/water.

14

81.     These undisclosed problems lead to the formation of the mold in July of 2000.

82.     As a direct and proximate result of Defendants Fred Schafer and Mt. Gretna Realtys'

failure to disclose said information, the Plaintiffs have suffered a complete disruption of their lives,

physical and emotional damage and distress, and loss of their home and personal possessions, and

therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred

Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida

Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against

Defendants Fred Schafer and Mt. Gretna Realty for payment in excess of One Hundred Thousand

($100,000.00) Dollars, Plaintiffs, Jack and Karen Marrone, also request Recision of the subject

transaction for the sale of the property at issue and complete restitution together with a judgment

ordering other incidental and consequential costs, prejudgment interest, attorneys' fees, and cost of

suit.

## COUNT VII

### PLAINTIFFS v. FRED SCHAFER AND MT. GRETNA REALTY
### UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW (UTPCPL)

83.     Plaintiffs incorporate paragraphs 1 through 43 and 76 through 82 of their Amended

Complaint, inclusive, as though the same were set forth herein at length.

84.     In view of the foregoing, the Plaintiffs believe and therefore aver that the Defendants,

Fred Schafer and Mt. Gretna Realty, have engaged in unfair and/or deceptive acts or practices as

contemplated by the Pennsylvania Unfair Trade Practice and Consumer Protection Law (hereinafter

15

sometimes referred to as "UTPCPL") which include but are not limited to the following:

(a)    Using deceptive representations in connection of the condition of the aforesaid sale of subject property;

(b)    In representing that said property was not defective when they knew, or should have known, it was not;

(c)    Engaging in fraudulent conduct which created a likelihood of confusion and/or misunderstanding in the Plaintiffs' purchase, ownership, and maintenance of the subject property;

(d)    Defendants engaged in the foregoing conduct for the sole purpose of concealing the seriousness and gravity of the defective conditions of said property and thus preventing any further action to rectify the serious and defective condition of the subject property which was reckless, malicious, and in gross disregard of the Plaintiffs' rights.

85.    As a direct and proximate cause of the Defendants' violation of the UTPCPL, the Plaintiffs have  suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars, and are entitled to treble damages and attorneys' fees.

WHEREFORE, Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against the Defendants Fred Schafer and  Mt.  Gretna Realty, in excess of One Hundred Thousand ($100,000.00) Dollars, costs, treble damages, and punitive damages.

## COUNT VIII

16

## PLAINTIFFS v. HOUSEMASTERS
## NEGLIGENCE

86.    The Plaintiffs hereby incorporate paragraphs 1 through 43 of their Amended

Complaint, inclusive, as though the same were set forth herein at length.

87.    At all relative times hereto, Defendant HouseMasters acted through its agents,

employees, servants, and ostensible agents, including but not limited to, Chuck Berthound, the

HouseMasters inspector who inspected the Plaintiffs home.

88.    Due to concerns of the Plaintiffs regarding water spots in the basement, they

contracted with and hired HouseMasters to perform an inspection of what became the fungal toxin

infested house prior to their purchasing the same.

89.    On or about July 30, 1999, Defendant HouseMasters performed an inspection of the

home.

90.    The HouseMasters report noted water stains in the basement, and recommended

sloping the soil away from the house, keeping the down spouts clean, or to consider extending the

spouts onto the surface.

91.    Defendant, HouseMasters, through its agent Mr. Berthound, was and is a professional

house inspection company and therefore holds itself out as expert in said field.

92.    Defendant, HouseMasters, while noting the water stains, did not identify the source

of said stains, nor did they recommend further investigation, nor did they refer the Plaintiffs to other

professionals who may have been of assistance.

93.    In reliance of the HouseMasters report, which was void of any warnings of potential

problems, the Plaintiffs purchased the house at issue.

94.     Defendant HouseMasters had a duty to inspect said home for defects and to then notify the potential purchasers of said defects.

95.     As a direct and proximate result of Defendant HouseMasters's failure to disclose said information, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against Defendant HouseMasters for payment in excess of One Hundred Thousand ($100,000.00) Dollars, interest, and costs of this suit.

## COUNT IX

### PLAINTIFFS v. HOUSEMASTERS
### MISREPRESENTATION

96.     The Plaintiffs hereby incorporate Paragraphs 1 through 43 and 86 through 95 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

97.     Defendant HouseMasters misrepresented the conditions of the house at issue to the Plaintiffs when it failed to inform them of the source of the water damage and/or of any current or potential problems related to water damage.

98.     The Plaintiffs' justifiably relying on said information purchased the house at issue.

18

99.    As a direct and proximate result of Defendant HouseMasters's failure to disclose said information, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against Defendant HouseMasters for payment in excess of One Hundred Thousand ($100,000.00) Dollars.

## COUNT X

### PLAINTIFFS v. HOUSEMASTERS
### BREACH OF CONTRACT

100.    The Plaintiffs hereby incorporate paragraphs 1 through 43 and 86 through 99 of their Complaint, inclusive, as though the same were set forth herein at length.

101.    Plaintiffs, Jack and Karen Marrone, contracted with HouseMasters to perform an inspection of the property at issue, in order to determine any defects or potentially hazardous conditions on the property prior to the Plaintiffs purchasing the same.

102.    The Plaintiffs specifically contracted with HouseMasters regarding potential water/dampness problems with the house.

103.    Defendant, HouseMasters, while noting water damage, failed to identify the source of said damage, the severity of said source, nor did they identify or notify the Plaintiffs regarding any potential health problems pertaining to said water/dampness prior to the purchase of what became

19

the fungal toxin infested home.

104.    As experts in the field of home inspection, Defendant HouseMasters knew, or should have known, that fungal growth was a potential result of said water/dampness.

105.    As experts in the field of home inspection, Defendant HouseMasters knew, or should have known, that said fungal growth was potentially toxic and harmful to human health.

106.    Despite their contractual arrangement with the Plaintiffs to inform them of potential hazards associated with their prospective home, Defendant HouseMasters at no time informed them of any potential fungus or potential harm which could result therefrom.

107.    As a direct and proximate result of Defendant HouseMasters breach of contract with the Plaintiffs, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone and Karen Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against the Defendant HouseMasters in excess of One Hundred Thousand ($100,000.00) Dollars.

## COUNT XI

### PLAINTIFFS v. HOUSEMASTERS
### UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW (UTPCPL)

108.    The Plaintiffs incorporate paragraphs 1 through 43 and 86 through 107 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

109.    In view of the foregoing, the Plaintiffs believe and therefore aver that the Defendant, HouseMasters, has engaged in unfair and/or deceptive acts or practices as contemplated by the Pennsylvania Unfair Trade Practice and Consumer Protection Law (hereinafter sometimes referred to as "UTPCPL") which include but are not limited to the following:

(a)    Using deceptive representations in connection of the condition of the aforesaid sale of subject property;

(b)    In representing that said property was not defective when they knew, or should have known, it was not;

(c)    Engaging in fraudulent conduct which created a likelihood of confusion and/or misunderstanding in the Plaintiffs' purchase, ownership, and maintenance of the subject property;

(d)    Fraudulently representing to Plaintiffs that suggested repairs regarding property at issue would mitigate and/or prevent said leakage and/or other defects or damage which occurred.

(e)    Defendant engaged in the foregoing conduct for the sole purpose of concealing the seriousness and gravity of the defective conditions of said property and thus preventing any further action to rectify the serious and defective condition of the subject property which was reckless, malicious, and in gross disregard of the Plaintiffs' rights.

110.    As a direct and proximate cause of the Defendant's violation of the UTPCPL, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars, and are entitled to treble damages and attorneys' fees.

WHEREFORE, Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida

WHEREFORE, Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against the Defendant HouseMasters, in excess of One Hundred Thousand ($100,000.00) Dollars, costs, treble damages, punitive damages, and attorneys' fees.

STEVENS & JOHNSON

By: _____
Richard F. Stevens, Esquire
I.D. No: 08073
Attorneys for the Plaintiffs,
Jack Marrone,
Karen Marrone,
Matthew Marrone, and
Vida Marrone

740 Hamilton Mall
Allentown, Pennsylvania 18101
(610) 439-1451

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that a true and correct copy of the attached Amended Complaint, will be served upon all parties, by placing the same in the United States Postal Service, first class, postage prepaid, and mailed to the following upon return receipt from the U.S. District Court for the Middle District of Pennsylvania:

James G. Nealon, III, Esquire
Nealon & Grover
2411 North Front Street
Harrisburg, PA 17110

John Flounlacker, Esquire
Thomas, Thomas & Hafer, LLP
305 North Front Street
P.O. Box 999
Harrisburg, PA 17108

Edward A. Monsky, Esquire
Fine, Wyatt & Carey, PC
425 Spruce St.
P.O. Box 590
Scranton, PA 18501-0590

Robert E. Kelly, Jr., Esquire
Duane, Morris & Heckscher, LLP
305 North Front Street, 5th Floor, .
P.O. Box 1003
Harrisburg, PA 17108-1003

Date: 11/01/01

By: Richard F. Stevens

Richard F. Stevens, Esquire
I.D. No: 08073
Attorneys for the Plaintiffs
Jack Marrone, Karen Marrone,
Matthew Marrone and Vida Marrone

740 Hamilton Mall
Allentown, Pennsylvania 18101
(610) 439-1451



SEP 18 2002

LOUIS M. TARASI, JR.
CERTIFIED CIVIL TRIAL ADVOCATE BY THE NATIONAL
BOARD OF TRIAL ADVOCACY. A PENNSYLVANIA
SUPREME COURT APPROVED AGENCY.
ELIZABETH M. TARASI
CRAIG L. FISHMAN

# TARASI, TARASI & FISHMAN, P.C.

### ATTORNEYS AND COUNSELORS AT LAW

CHRISTINA K. HURNYAK
C. WILLIAM KENNY
GIANNI FLORO

510 THIRD AVENUE
PITTSBURGH, PENNSYLVANIA 15219-2191
(412)391-7135 FAX: (412)471-2673
WEBSITE: WWW.TARASILAW.COM
E-MAIL: LAWYERS@TARASILAW.COM

**Via Telefax (717) 237-7105**
**and U.S. Mail First Class**

September 13, 2002

John Flounlacker, Esquire
Thomas, Thomas & Hafer, LLP
305 North Front Street, 6th Floor
Harrisburg, PA 17108-0999

> Re:  <u>Jack Marrone, husband, Karen Marrone, wife, both individually and in
> their capacity as parents and natural guardians for Vida Marrone, a minor,
> and Matthew Adam Marrone v. Allstate Insurance Company, Linda M.
> Edleman, Fred Schafer, Mt. Gretna Realty and House Masters</u>
> In the United States District Court for the Middle District of Pennsylvania
> Civil Action No. 1: CV-01-0073

Dear Mr. Flounlacker:

Enclosed please find the Expert Report of Tom Moore, Home Inspector.

If you should have any questions or comments regarding this matter, please do not
hesitate to contact me directly.

Very truly yours,

TARASI, TARASI & FISHMAN, P.C.

Gianni Floro

Enclosure

cc:  James G. Nealon, Esquire (w/encl. *via telefax 717-236-9119 and U.S. Mail First Class*)
    Edward A. Monsky, Esquire (w/encl. *via telefax 570-343-9538 and U.S. Mail First Class*)
    Paul E. Scanlan, Esquire (*w/encl. via telefax 717-232-4015 and U.S. Mail First Class*)

# *Multi-Spec*

## Home Inspection Services

421 Redgate Rd. Sewickley, Pa. 15143        Fax (412) 741-5465        Bus. (412) 749-0626

*INSPECTION REPORT 8-12-02*

Prepared for:

Gianni Floro
Tarasi, Tarasi & Fishman, P.C.
510 Third Avenue
Pittsburgh, PA   15219-2191

Prepared by:
Tom Moore
8-31-02

### Purpose of the Report

An inspection was done on August 12, 2002 at a residential property at 354 Timber Road, Mt. Gretna, PA. The purpose of the inspection was to examine the house for moisture and water problems that possibly may have contributed to a mold and mildew condition resulting in the occupants having to move out of the house.

### Current Conditions

Weather was clear, temperature in the 80's. Electric was off and could not operate the water since the source was a well and power is needed to operate the pump.

### Observations and Findings

The house is a single story ranch style house with a full basement and integral garage underneath. The exterior and grounds inspection found some low areas and negative slope at the front and sides. (photos 5,7,8,9,10) The ground should be graded to slope away from the house so surface water is diverted. The gutters were found to have leaves and debris in them and they need to be cleaned out. The front center downspout had black corrugated piping attached to it to carry the discharge water around the side and to the rear of the house. (photo 4) The driveway slopes toward the garage and has inadequate drainage in front of the door. (photo 15,16) There was evidence of water entering under the garage door and path way into the garage. (photo 29) Proper drainage needs to be installed to handle all rain conditions. The right rear downspout was smashed almost closed and needs to be repaired.

The house is currently vacant and has been for approximately 2 years.

The first floor of the house had no evidence of mold or mildew growth.

The basement had remnants of a drywall ceiling that had been removed and the fiberglass insulation is still in place. (photo 26) The front wall of the basement had 2" x 4" studs and fiberglass insulation in place from the left front corner to approximately the middle of the front wall. Between the insulation and the block foundation was a layer of black roofing paper. The wall studs at the center of the front wall had areas of rot. Some studs were rotted significantly on the vertical areas indicating a wetting and drying scenario over a period of time. (photo 48) The bottom wall plate was black and moisture saturated. This condition was on the back half of the base plate, the front half looked normal. The bottom was not rotted since the wood appears to stay wet or saturated. (photo 47,48) The rear basement wall and right end partition wall still had paneling on it, which was warped due to dampness and humidity. (photo 37,38,39) The worst warpage was at the right rear corner of the finished area. There was evidence of small pipe leaks at the copper water line joints in the ceiling. (photo 43,44,45,46,52) There was also evidence of condensation and sweating of the copper water lines which had been above the drywall and under the ceiling insulation. The indications were dark staining of the insulation above the pipes and rusting pipe supports. (photo 45,46) The areas affected appeared to increase in the amount of the rust and staining as you move

toward the center of the area at the right rear corner of the finished area. *(photo 37)* There has been references of a hot tub being located at one time in this area.  The storage area of the basement at the right end *(photo 40,41,42)* had current mold and mildew on the walls and paneling and efflorescence on the block indicating moisture migration through the block from the outside.

### Conclusions

The finishing of the basement was incorrectly done.  The vapor barrier (felt paper) was applied to the block wall.  The correct method would have been to have the vapor barrier between the interior finished wall (drywall or paneling) and the insulation so that warm, moist air is stopped before entering the wall cavity.  In this house, the warm, moist air was condensing on the felt paper and then running down the wall.  Also, any exterior surface water migrating through the wall was also stopped by the felt paper and would run down to the bottom of the wall which would account for the saturated condition of the bottom wall plate.  The presence of a hot tub in a basement without proper ventilation and dehumidifiers would contribute to humidity and temperature conditions needed for mold and mildew growth.  Finally, there is evidence of leakage at the water pipes above the basement ceiling which would also have contributed to mold and mildew growth.  Mold and mildew need moisture, warm temperatures, and a food source on which to grow.  In this basement, the moisture was readily available from any number of sources outside surface water leaking through the foundation walls; leaking water supply pipes, and the use of a hot tub indoors.  The food source was the framing, drywall, and paneling.  These conditions from the photographs I examined existed at the time the photographs were taken.  All my opinions are based upon a reasonable degree of home inspection certainty.

*Tom Moore*

# *Multi-Spec*

## **Home Inspection Services**

*421 Redgate Rd. Sewickley, Pa. 15143*      **Fax (412) 741-5465**      **Bus. (412) 749-0626**

*Jack Marrone, husband, Karen Marrone, wife both individually and in their capacity as parents and natural guardians for Vida Marrone, a minor, and Matthew Adam Marrone v. Allstate Insurance Company, Linda M. Edleman, Fred Shafer, Mt. Gretna Realty and House Masters.*

### **REFERENCES:**

1)      *A copy of the Amended Complaint in Civil Action;*

2)      *a copy of the Housemaster Express Report;*

3)      *a copy of the Advanced Applied Sciences Report;*

4)      *a copy of the photographs of the Marrone's House (Lower Level) after the mold infestation took place;*

5)      *a copy of the Seller's Disclosure Statement;*

6)      *a copy of the video tape deposition of Chuck Berthoud, the Housemaster home inspector;*

7)      *relevant portions of the materials that were attached to the home inspection report.*

**Tom Moore**
**Multi-Spec**
**421 Redgate Road**
**Sewickley, PA  15143**
**(412) 741-3256**

**HIGHLIGHTS OF**
**QUALIFICATIONS**
* Certified Pest Control Operator in PA
* Qualified through EPA for Radon Testing
* Certified by Building Officials and Code Administrators (BOCA) to perform one and two family dwelling and combination commercial inspections

**EMPLOYMENT**
**HISTORY**

May 1990 to
Present

Multi-Spec, Sewickley, PA
**Business Owner, Home Inspection & Pest Control**
Founded residential home inspection business, including radon, water quality, well-flow, and septic dye testing, as well as termite inspection and pest control
Responsible for determining general repair costs

Feb.1982 to
Mar.1990

Trapp Construction, Sewickley, PA
**Construction Crew Leader**
Oversaw construction crews in new home construction and remodeling

Dec.1972 to
Dec.1981

Bravo Corporation, Neville Island, PA
**Fitting and Welding Foreman**
Supervised fitting and welding crew of twenty men in the construction of barges and towboats

**EDUCATION**

Property Inspector's Training Institute
Fort Washington, MD
Certificate in Property Inspection, May 1990
Intensive training in all areas of home inspection

Community College of Allegheny County
Pittsburgh, PA
Certificate in Heating/Air Conditioning, May 1983
GPA: 3.2

Alliance College, Cambridge Springs, PA
21 credits in Liberal Arts, May 1970

**PROFESSIONAL**
**ORGANIZATIONS**
Member, American Society of Home Inspectors (ASHI)
Member, Building Officials and Code Adminstrators (BOCA)

**REFERENCES**
References available upon request

SEP 1 8 2002

LOUIS M. TARASI, JR.
CERTIFIED CIVIL TRIAL ADVOCATE BY THE NATIONAL
BOARD OF TRIAL ADVOCACY. A PENNSYLVANIA
SUPREME COURT APPROVED AGENCY.
ELIZABETH M. TARASI
CRAIG L. FISHMAN



# TARASI, TARASI & FISHMAN, P.C.
## ATTORNEYS AND COUNSELORS AT LAW

CHRISTINA K. HURNYAK
C. WILLIAM KENNY
GIANNI FLORO

510 THIRD AVENUE
PITTSBURGH, PENNSYLVANIA 15219-2191
(412)391-7135 FAX: (412)471-2673
WEBSITE: WWW.TARASILAW.COM
E-MAIL: LAWYERS@TARASILAW.COM

**Via Telefax (717) 237-7105**
**and U.S. Mail First Class**

September 13, 2002

John Flounlacker, Esquire
Thomas, Thomas & Hafer, LLP
305 North Front Street, 6th Floor
Harrisburg, PA  17108-0999

     Re: <u>Jack Marrone, husband, Karen Marrone, wife, both individually and in</u>
        <u>their capacity as parents and natural guardians for Vida Marrone, a minor,</u>
        <u>and Matthew Adam Marrone v. Allstate Insurance Company, Linda M.</u>
        <u>Edleman, Fred Schafer, Mt. Gretna Realty and House Masters</u>
        In the United States District Court for the Middle District of Pennsylvania
        Civil Action No. 1: CV-01-0073

Dear Mr. Flounlacker:

    Enclosed please find the Expert Report of Robert A. Pfromm, CIH.

    If you should have any questions or comments regarding this matter, please do not
hesitate to contact me directly.

        Very truly yours,

        TARASI, TARASI & FISHMAN, P.C.

        Gianni Floro

Enclosure

cc: James G. Nealon, Esquire (w/encl. *via telefax 717-236-9119 and U.S. Mail First Class*)
  Edward A. Monsky, Esquire  (w/encl. *via telefax 570-343-9538 and U.S. Mail First Class*)
  Paul E. Scanlan, Esquire  (w/encl. *via telefax 717-232-4015 and U.S. Mail First Class*)



September 12, 2002

**Mr. Jack P. & Karen A. Marrone**
11673 Highway PP
Dixon, Missouri  64559

RE: **Consultative Services - A2SI Project No. 2134**
Litigation Support of Civil Action No. 1: CV-01-0073
SUBJECT PROJECT:
Marrone Residence
354 Timber Road, (Mt. Gretna)
Lebanon, Pennsylvania
**Addendum to A2SI Project # 2008116**
**(Original Report Date 10/15/2000)**

Dear Mr. & Mrs. Marrone:

At the request of you and your attorney, Gianni Floro of Tarasi, Tarasi & Fishman, a review of A2SI's earlier project report **#2008116** was performed. As an additional support, we reviewed some additional pictures taken in the residence at 354 Timber Road by Mr. Floro, sometime after our original visit on 8/28/2000. In the pictures, more of the basement foundation wall finish (paneling, fiberglass insulation, and black roofing paper) and the ceiling drywall had been removed. These pictures helped to confirm our opinions stated in the original report that the exterior wall treatment was a significant contributor to the moisture and humidity levels in the basement which allowed the fungal growth we identified to grow and multiply.

At the time of our original visit, only a limited amount of wall and ceiling covering had been removed. The more recent pictures show additional discoloration from moisture, of the cement block foundation walls throughout the basement, and possibly from some fungal growth (as was found in sample 82800-002 in the earlier report), as well.

## COMMENTS

During the many IAQ/IEQ (indoor Air Quality/ Indoor Environmental Quality) surveys and assessments we have performed, we have observed a significant number of basements which had been finished in conventional ways, but should not have been finished due to a variety of limiting factors (circumstances and conditions). These limiting factors range from terrain and topography issues, to foundation type (cement block as opposed to a poured cement foundation), to the condition of the foundation, to

**Jack P. & Karen A. Marrone**
Consultative Services
Marrone Residence, 354 Timber Road, (Mt. Gretna)
Litigation Support of Civil Action No. 1: CV-01-0073
**A2SI Project No. 2134**
Sept. 12, 2002
Page 2 of 4

the presence of ongoing leaks or seepage (indicated by efflorescence and staining), to preexisting mold indications, to indications of elevated interior humidity from additional sources such as unvented hot tubs and combinations of these previously mentioned factors. If a home has one or more of these factors, there is a good possibility of moisture problems occurring in this basement, if inappropriate wall finishing methods are used significant mold growth can also become an issue. Based on our assessment, the residence at 354 Timber Road, had all of the limiting factors mentioned above.

## CONCLUSIONS

Moisture that passes through the wall must be allowed to evaporate and be exhausted from the area by normal air exchange, or be removed by dehumidification. Sealing the wall surface by placing a "vapor barrier" or vapor retardent such as black roofing paper against the foundation surface will prevent normal evaporation of water passing through the foundation, so this moisture will build up behind the "vapor barrier" until it begins leak out the bottom of the wall (usually dampening the carpet pad and carpet, if present, which will usually result in mold growth in the carpet, as was also found here) or through seams in the vapor retardent. Excessive amounts of moisture behind this type of vapor retardent (many seams = leak points) will result in elevated humidity levels in the wall cavity and mold growth in the wall cavity. Another moisture source in a wall cavity of this type, is moisture from the humid basement (**hot tub**, leaking plumbing, humid air coming in from outside) permeating through the paneling, through the insulation and reaching the cool surface of the vapor barrier covered foundation. This moisture is likely to condense and dampen the foundation wall surface and maintain the humidity of the wall cavity and to a lesser degree the wall covering (paneling) to allow mold growth to continue. So, if adequate rain has occurred for ground water to lie against the foundation and to penetrate foundation wall, the moisture will collect in the wall cavity. If rain has not occurred for while but humidity levels are high, the cooler surface of the foundation will still condense moisture which will collect in the wall cavity. Either situation results in moisture which will collect in the wall cavity and produce potential mold growth.

**With a reasonable degree of scientific certainty, based on our experience and training, the mold growth in the Marrone residence at 354 Timber Road was a result of the elevated moisture levels in the basement and in the basement wall cavities. These moisture levels were the result of the contributing factors detailed in the COMMENTS section, but primarily were the result of the inappropriately constructed finishing walls of the interior of the foundation trapping moisture that under other circumstances would have simply evaporated away.**

Jack P. & Karen A. ●rone
Consultative Services
Marrone Residence, 354 Timber Road, (Mt. Gretna)
Litigation Support of Civil Action No. 1: CV-01-0073
**A2SI Project No. 2134**
Sept. 12, 2002
Page 3 of 4

## RECOMMENDATIONS

For a basement such as this to be finished, an exterior drainage system and modifications to the landscaping would be suggested parts of the corrective actions required. The simplest but least attractive finishing approach would be to simply paint the foundation block walls with a waterproofing paint and operate a dehumidifier in the basement. A more cosmetic interior treatment would be to put wood studs and insulation up with a tight vapor barrier such as plastic sheeting, on the interior side (towards the room) of the insulation. However, with the amount of moisture potentially passing through the foundation, there is a high probability that moisture levels would still be elevated in the wall cavities, the carpets could still become damp and mold could still grow both in the wall cavities and in the carpet. Operation of one or more dehumidifiers in this basement would improve the situation by reducing the moisture levels present. A third option which we have seen have success in this type of situation is to build the finishing wall several inches from the foundation wall to provide an air space. This space is then ventilated by a small exhaust fan (more than one may be needed) which draws the damp air out of the space and vents it from the house. A further modification would have a dehumidifier in an adjacent area to the wall cavity (utility room or closet) and vent the dehumidified air into the wall cavity to further reduce the humidity level in the wall. A second dehumidifier drying the basement room air would further improve the conditions by reducing vapor loading, humidity levels and consequently, the potential for condensation.

## ADDITIONAL INFORMATION

Mr. Pfromm has been qualified as an expert on several occasions, as follows:

- 1985 – expert witness court testimony in a gasoline spill incident;
- 1990 – expert witness court testimony in a case against a laboratory regarding laboratory operations and analytical testing procedures;
- 2001 – expert testimony (deposition) involving indoor air quality, indoor environmental quality, health related issues, in a project with a major Pennsylvania State agency
- 2002 – expert testimony (deposition) in an Alabama case regarding indoor air quality and indoor environmental quality, health related effects, and source identification.

## References

**Bioaerosols – Assessment and Control**, published by the ACGIH (American Council of Governmental Industrial Hygienists) 1999

Jack P. & Karen A. Marrone
Consultative Services
Marrone Residence, 354 Timber Road, (Mt. Gretna)
Litigation Support of Civil Action No. 1: CV-01-0073
**A2SI Project No. 2134**
Sept. 12, 2002
Page 4 of 4

**Guidelines for the Determination, Remediation and Prevention of Biological Contamination in Indoor Environments**, Professional Development Course (#704) AIHA (American Industrial Hygiene Association) and the ACGIH, 1999 AIH Conference and Exposition

**Controlling Moisture and Microbial Problems in Buildings,** Professional Development Course, 1999 Mid Atlantic Environmental Hygiene Resource Center

**Remediation and Prevention of Biological Contamination in Indoor Environments**, Professional Development Course (#706) AIHA (American Industrial Hygiene Association) and the ACGIH, 2001 AIH Conference and Exposition

A2SI was pleased to assist you with this investigation and thank you for the opportunity to submit this Addendum to our previous project..

Sincerely,

*Robert A. Pfromm*

Robert A. Pfromm, CIH
Senior Technical Advisor

Enclosures



# ROBERT A. PFROMM, CIH
**SENIOR TECHNICAL ADVISOR**

### PROFESSIONAL EXPERIENCE

**ADVANCED APPLIED SCIENCES, INC.**                    **March 1999 to Present**

#### SENIOR TECHNICAL ADVISOR

Mr. Pfromm presently serves as the Senior Technical Advisor for Advanced Applied Sciences, Inc. from which he is primarily responsible for providing technical oversight and supervision in support of our indoor air quality, industrial hygiene, environmental, health and safety projects. Mr. Pfromm also provides training in the areas of indoor air quality and bioremediation.

For more than eighteen years, Mr. Pfromm has worked as an occupational safety and health professional. The American Board of Industrial Hygiene (ABIH) has certified him in the Chemical Aspects of industrial hygiene since 1988. In 1999 Mr. Pfromm tested for and received from the ABIH, the rare sub-specialty certification in Indoor Environmental Quality. In the field of occupational safety and health he has personally performed hundreds of surveys, investigations and assessments over the broad range of that discipline. His experiences have additionally been enhanced by many projects in the province of the environmental sciences; ranging from analyses of environmental air, water and soil samples and laboratory management, to phase 1 auditing, safety and health training, indoor air quality surveys and project management on biological remediation, lead abatement and asbestos remediation. He has had extensive experience interfacing with engineering, architectural, medical and legal professionals, as well as union and employee groups such as teachers unions as they were integral to and associated with these projects.

Mr. Pfromm has worked closely with company & corporate managers and professionals. At the same time he has had to communicate with and establish a working relationship with supervisors, staff, technical personnel, laborers, students and their parents. As a technical trainer, he has taught engineers, chemists, teachers, educational administrators and maintenance and custodial personnel in a variety of occupational and environmental subjects, including Bloodborne Pathogens, Right to Know, Asbestos Awareness and Indoor Environmental Quality Awareness. To function in these capacities, he has had to develop and maintain considerable communication and personnel skills.



# ROBERT A. PFROMM, CIH
SENIOR TECHNICAL ADVISOR

**AMERICAN WESTECH, INC.**                          **March 1999 to Present**

### DIRECTOR, INDUSTRIAL HYGIENE SERVICES

Advanced Applied Sciences, Inc. provides consulting services to American Westech, Inc. as a subcontractor. Mr. Pfromm manages the account and is responsible for achieving and maintaining certification of the laboratory by the American Industrial Hygiene Association (AIHA) and ensuring that the level of training, quality control and performance of the laboratory facility, its operation, and its personnel meet or exceed all applicable AIHA requirements.

Mr. Pfromm is directly responsible for the development and implementation of a sound Quality Assurance (QA) and Quality Control (QC) Program pertinent to the industrial hygiene department of American Westech, Inc.

**INX CORPORATION**                          **July 1998 to March 1999**

### DIRECTOR, INDOOR AIR QUALITY SERVICES/
### CERTIFIED INDUSTRIAL HYGIENIST

Mr. Pfromm marketed, planned, executed, and reported Indoor Air Quality services to a wide range of clients from industry to schools and homeowners. He was also responsible for planning and managing remediation projects based on survey results.

**KARL & ASSOCIATES**                          **October 1996 to July 1998**

### SENIOR INDUSTRIAL HYGIENIST

Mr. Pfromm was responsible for marketing, planning, implementation, and reporting of a variety of industrial hygiene and indoor air quality services for a broad range of clientele, from factories to school districts. In addition, Mr. Pfromm administered and performed an extensive range of training programs for employees of client school districts to meet state requirements. Mr. Pfromm also administered an environmental services program for a consortium of school districts in New Jersey.



# ROBERT A. PFROMM, CIH
## SENIOR TECHNICAL ADVISOR

**INDEPENDENT CONSULTING**                    **January 1996 to October 1996**

### CERTIFIED INDUSTRIAL HYGIENIST

Mr. Pfromm provided a variety of industrial hygiene and indoor air quality services to a broad range of clientele, from consulting engineers to school districts.  In addition, Mr. Pfromm performed an extensive range of training programs.

**ANALYTICAL HYDROLOGY**
**ASSOCIATES, LTD. (AHA)**                    **January 1990 to July 1992**

                                             **July 1992 to December 1995**

**ANALYTICAL LABORATORIES OF**
**SKELLY AND LOY, INC. (ALSL)**

### CERTIFIED INDUSTRIAL HYGIENIST, DIRECTOR- INDUSTRIAL HYGIENE LAB SERVICES, SENIOR ENVIRONMENTAL CHEMIST

Mr. Pfromm provided a variety of industrial hygiene and indoor air quality services to a broad range of clientele, from consulting engineers to school districts (ALSL).  In addition, Mr. Pfromm served as Organics Section Group Leader for the laboratory (ALSL). At Analytical Hydrology Associates (AHA),  Mr. Pfromm was Laboratory Manager and Senior Environmental Chemist  responsible for all laboratory operations, training of other chemists and report preparation and review.

**TRACOR INSTRUMENTS, INC**                    **October 1988 to January 1990**

### SENIOR MARKETING REPRESENTATIVE

Mr. Pfromm provided sales and technical training to clientele of this analytical instrument manufacturer in a variety of environmental and industrial hygiene services to a broad range of clientele, from consulting engineers and laboratories to municipal water treatment authorities.   In addition, Mr. Pfromm received the companies' "Presidents Award" for second highest national sales and third highest worldwide sales in 1989.



# ROBERT A. PFROMM, CIH
## SENIOR TECHNICAL ADVISOR

**SPOTTS, STEVENS & MCCOY, INC. (SSM)**          **June 1981 to October 1988**

### INDUSTRIAL HYGIENIST, SENIOR ENVIRONMENTAL CHEMIST, CERTIFIED INDUSTRIAL HYGIENIST (1988)

Mr. Pfromm served as Organics Section Group Analyst for the Industrial Hygiene laboratory and later as Group Leader. Mr. Pfromm also provided a variety of industrial hygiene and indoor air quality services to a broad range of clientele, from consulting engineers to school districts. The broad range of projects SSM was involved in as a consulting engineering firm, exposed Mr. Pfromm to a rich level of industrial hygiene and environmental experience which has proven to be extremely valuable in his later endeavors.

### EXPERIENCE HIGHLIGHTS

Since 1988, Mr. Pfromm has had many experiences working on sick building syndrome/indoor air and water quality projects. He has been the project manager on HVAC remediation projects for clients and investigated numerous complaints of illness from indoor airborne/microbial contaminants.

A partial list of Indoor Air Quality and Industrial Hygiene projects that Mr. Pfromm has been directly involved with as either a Project Manager or Lead Investigator follows:

- Chester County Courthouse Annex – fungi contamination.
- Little Egg Harbor School District, N.J. – fungi contamination, roof leak.
- Upper Deerfield School District, N.J. – excessive humidity and fungi contamination .
- Upper Saddle River School District, N.J. – fungi contamination.
- Woodridge School District, N.J. – fungi contamination.
- Pennsylvania State Senate Chamber – post remediation fungi clearance sampling.
- Lafayette College, Easton, PA. – fungi sampling in Library following elevated humidity condition.
- Waynesboro Hospital, PA. – investigation of foul odor, fungi and bacteria contamination .
- York Hospital, York, PA. – pre and post remediation fungi sampling in hospital wing.
- a leading surgical instrument manufacturer, Reading, PA. – plant wide survey for trace levels of sulfuric acid vapors, which were causing an etching problem.





# ROBERT A. PFROMM, CIH
## SENIOR TECHNICAL ADVISOR

- Diversified Mechanical Incorporated, PA. – Carbon Monoxide survey in warehouse of DMI client.
- DMI, PA. – Carbon Monoxide survey in an eastern PA. High school.
- Excelsior Blower Corp. PA. – Welding Fume survey in plant to determine effectiveness of improvements to ventilation system.

## LITIGATION SUPPORT AND EXPERT TESTIMONY

Mr. Pfromm has performed many projects over the past twenty (20) years that involved epidemiological investigations, environmental health investigations, indoor air quality (IAQ) and indoor environmental quality (IEQ). Most recently, while at A2SI, Mr. Pfromm managed a comprehensive long-term IAQ/IEQ project for major Pennsylvania State agency that involved extensive health investigation studies, surveys, testing, public relations, and expert testimony. Due to our commitment to client confidentiality, we cannot discuss the details of such survey. However, the following reference is given to verify the work performed for that agency:

Pennsylvania Office of Administration
Mr. William Trusky
Manager, Accelerated Grievance Program
Bureau of Labor Relations
Room 404 – Finance Building
Harrisburg, Pennsylvania 17120
Telephone:  717-783-5160

In addition, Mr. Pfromm has been qualified to provide expert testimony on many occasions, most notably as follows:

- 1985 – expert witness court testimony in a gasoline spill incident;
- 1990 – expert witness court testimony in a case against a laboratory regarding laboratory operations and analytical testing procedures;
- 2001 – expert testimony involving indoor air quality, indoor environmental quality, health related issues, in a project with a major Pennsylvania State agency;
- 2002 – expert testimony in an Alabama case regarding indoor air quality and indoor environmental quality, health related effects, and source identification.



# ROBERT A. PFROMM, CIH
## SENIOR TECHNICAL ADVISOR

### EDUCATION AND CREDENTIALS

Kutztown University
B.S. Environmental Science, 1981
B.A. Marine Science, 1979

**Certified Industrial Hygienist (CIH)**
American Board of Industrial Hygiene (ABIH), 1988
Certificate #3948

**Indoor Environmental Quality (Sub-specialty)**
American Board of Industrial Hygiene (ABIH), 1999

### ADDITIONAL TRAINING

**Kutztown University** – "Noise and Man - Industrial Noise and Hearing Conservation" – 1981

**University of Michigan** - "Guidelines for the Assessment of Bioaerosols in the Indoor Environment" – 1989

**Harvard University – Harvard School of Public Health** – "Indoor Air Quality – Evaluation, Measurement and Control" - 1992

**American Industrial Hygiene Conference (AIHC) – Professional Development Course (PDC)** – "Indoor Air Quality and HVAC Systems" - 1995

**AIHC – PDC** – "Guidelines for the Determination, Remediation and Prevention of Biological Contamination in Indoor Environments" – 1998 & 2001

**MidAtlantic Environmental Hygiene Resource Center** –"Controlling Moisture and Microbial Problems in Buildings" - 1999

### PROFESSIONAL AFFILIATIONS

**Member, American Industrial Hygiene Association**
**Member, American Board of Industrial Hygiene**

# ROBERT A. PFROMM, CIH
## SENIOR TECHNICAL ADVISOR



### PUBLIC SERVICE

- President, Bernville Borough Council (Municipal Government), Bernville, PA

- Chairman, Water, Sewer and Public Safety Committee, Bernville Borough Council

- Member, Budget Committee, Bernville Borough Council

- Chairman, Emergency Services Committee, Bernville Borough Council



October 15, 2000
FINAL REPORT

Jack and Karen Marrone
354 Timber Road, Mt. Gretna
Lebanon, PA 17042

**Project: IAQ Survey of the Marrone residence – 354 Timber Road, Mt. Gretna**
**A2SI Project # 2008116**

Dear Mr. & Mrs. Marrone:

A2SI was requested by the Marrone's to perform a limited Indoor Air Quality/Indoor Environmental Quality (IAQ/IEQ) survey on 8/28/2000 to determine possible Bioaerosol (airborne Fungi, Mold and Yeast) involvement in Indoor Environmental Quality complaints related to the residence.

**Executive Summary**

The Marrone's have related that the home at 354 Timber Road, Mt. Gretna, was originally shown to them during a period of dryer weather. At that time, they did not observe any signs of water problems or visible mold. It was also stated, that as the weather changed and became damper, they began to notice more and more indicators of potential water problems (dampness in the basement, musty odors and eventually significant visible mold on the paneling and other surfaces). There were also some plumbing problems in the basement that became evident. These problems were indicated by numerous spots on the basement ceiling, where condensation from the pipes was wetting through the drywall ceiling and black spots leaching through at many of these points where mold was possibly growing (a common indicator of mold growth on the top surface of a ceiling). Visible mold became a significant noticeable problem in the basement and the Marrone's became concerned enough to request an IAQ/IEQ evaluation. Several members of the Marrone family were having indications of respiratory distress. Testing was performed as noted in the Scope of Work section, using appropriate methodologies and samples were sent to a qualified laboratory for incubation and identification. Several recommendations were made at the time of sampling based on the observed conditions. Evaluation of the results and observations led to the following conclusions:

Air, surface and carpet dust samples, all indicated the presence of fungi unrelated to the outside air, either by species or number, including the fungi Aspergillus, Penicillium and Stachybotrys, which are known and significant allergens. Heavy visible surface growth, all in the basement, was noted and sampled. The sampled surface locations were as follows: two separate walls in the basement (which appeared to have a coating of a faintly gray/green mold. Several other surfaces

1

had visible indications of mold, but were not sampled as representative surfaces of similar mold had already been sampled. Air samples were as follows: basement air, living room air, and outside the home for control and comparison purposes. Carpet dust was sampled in the basement and the living room. The basement was also found to have high Relative Humidity percentages (RH%) and a measurably higher airborne moisture loading (absolute humidity) than the outside air. The first floor RH% measured in the living room was within ASHRAE guidelines. The basement was found to have significant quantities of surface growth of known allergens and with the elevated interior humidity, additional growth would be possible, potentially resulting in a release of spores and fungal fragments (a "bloom" or amplification), which could challenge the respiratory conditions of the occupants. The cement block foundation interior walls are, in most of the basement covered with "tar paper" followed by fiberglass insulation and finished by wood fiber paneling. When a portion of the "tar paper" was peeled away by the homeowner, the foundation wall and the wall surface side of the "tar paper", were visibly wet.

**Observations**

The home has a mostly finished basement, with a cement floor and a cement block foundation. The house is built on rolling terrain, with landscaping in relatively close proximity. The ground around the home appeared quite damp. A2SI was contacted because of the presence of visible mold on a number of interior surfaces of the home, especially the basement, and the homeowners concern for potential health effects until these contaminants are identified. Bioaerosol samples were collected on each floor, with an emphasis on the basement, where most of the visible mold was noticed, and surface samples and carpet dust were also sampled at specific locations. An outside bioaerosol sample was collected for comparison and control purposes, as required by the methodology. In addition to the observations noted in the Executive Summary above, the basement of the house had a noticeably musty odor, with visible mold on many of the observed surfaces. There were also a number of visible wet spots in the basement, primarily on the walls. It was observed, that the most of the interior surface of the below grade (underground) foundation walls were covered first with a layer of tar paper, then with fiberglass insulation between studs, then with the wood paneling. This does not prevent moisture from entering the basement. What this type of wall treatment does do is slow evaporation preventing the walls from drying, allowing excessive mold growth behind the walls and by letting the moisture into the basement, increases the relative humidity throughout the basement making mold growth possible almost anywhere in the basement.

**Scope of Work**

A series of samples were collected in the residence located at 354 Timber Road, Mt. Gretna. The purpose of this sampling was to characterize the potential biological contamination in the home following the finding of visible mold inside the home. The samples were collected at several locations throughout the home. Sampling types consisted of airborne biological contaminants (Bioaerosols), collected with an Andersen N6 impaction sampler and Sabouraud's Dextrose Agar (fungal samples). Surface samples were collected with sterile biological transfer swabs. Two carpet dust samples was collected from a 1 square foot area, using 25 mm filter cassettes with 0.45 micron pore size membrane filter and a high volume air pump. Air sampling locations

2

included the basement, the first floor living room, and an outside sample for comparison and control. Surface samples were all collected in the basement, from suspected visible mold, and carpet dust was collected from the carpet in the basement and in the living room. Actual fungal ID's and counts were detailed in the lab report (Attached Appendix A).

This indoor air quality survey was performed within the scope of work and in accordance with chosen professional standards and guidelines, and in accordance with known applicable regulatory requirements and guidelines.  The sample collection, laboratory analyses, data reduction and calculations, interpretations, and evaluations were performed accurately to the best knowledge of A2SI.  A2SI assumes no liability for financial or health consequences from the actions or lack of actions taken by the Marrone family, or others, as a result of this report. All collected data, observations, conclusions, and recommendations presented in this report were influenced by the conditions which existed at the time of the survey and sample collection, and are representative of those conditions existing at the time of sampling and in the location sampled.

## Sample Locations

| Sample ID Number | Sample Type | Location |
| --- | --- | --- |
| 82800-001 | Surface swab – Mold and Fungi | Wall in basement |
| 82800-002 | Surface swab – Mold and Fungi | Wall in basement |
| 82800-003 | Air Sample - Mold and Fungi | Basement air |
| 82800-004 | Carpet dust – Mold and Fungi | Carpet dust in Basement |
| 82800-005 | Air Sample - Mold and Fungi | Living room air |
| 82800-006 | Carpet dust – Mold and Fungi | Carpet dust in Living room |
| 82800-007 | Air Sample - Mold and Fungi | Outside air |

## Sample Results Summary

| Sample ID Number & Type | | Total Fungi – CFU/unit |
| --- | --- | --- |
| 82800-001 | Surface swab – | >336 CFU/$in^2$ |
| 82800-002 | Surface swab – | 322 CFU/$in^2$ |
| 82800-003 | Air Sample – | 4308 CFU/$m^3$ |
| 82800-004 | Carpet dust – | >4390 CFU/ $in^2$ |
| 82800-005 | Air Sample – | 228 CFU/$m^3$ |
| 82800-006 | Carpet dust – | 1321 CFU/ $in^2$ |
| 82800-007 | Air Sample - | 588 CFU/$m^3$ |

**CFU/$in^2$** - Colony Forming Units/square inch; **CFU/$m^3$** - Colony Forming Units/cubic meter
Detailed Bacteria and Fungi results are found in Appendix 1

3



### Relative Humidity and Temperature Results

| Location | Relative Humidity (RH%) | Temperature ($^{\circ}F$) |
|---|---|---|
| Outside House | 50 % | 79 |
| Living room | 52% | 75 |
| Basement | 71% | 70 |

### Results

The outside bioaerosol counts should, in general, always be higher than the inside counts. This situation will occur, if there is a normally functioning ventilation system and if other circumstances effecting bioaerosol growth are in an acceptable range. An acceptable range of circumstances would minimize fungi and bacteria growth – such as clean and dry conditions; an unacceptable range of circumstances would help to maximize fungi and bacteria growth – such as dirty and damp or wet conditions.

If windows are open for ventilation, and air exchange is occurring, the counts should be approximately the same, but generally no higher inside than outside and the genera and proportions should be similar. If there is a situation leading to interior amplification of bioaerosol numbers, it should be readily apparent from the counts and proportion comparisons of the different genera of organisms. If the only source of fungal contamination was the outside air, then proportions of fungi in all of the samples inside or out would be comparatively similar. The proportions were determined to be significantly different during this sampling.

The presence of an organism in an interior sample and not in the exterior sample requires either active growing colonies of the organism or a reservoir of viable spores to be present in the building. For this apparent amplification to be possible, several requirements must be met or have been met at some time in the recent past. They are as follows: a substrate or growth media, appropriate temperature conditions, and adequate or excessive moisture. Normal dust and dirt are generally adequate to serve as a minimal growth media, but carpeting and the dirt it traps is even more favorable for growth. Virtually any surface in a home has an adequate source of nutrients for fungal growth to begin and occasionally the fungi can colonize the substrate (such as paneling). Over time the available nutrients on surfaces tend to increase through deposition such as cooking oils which became volatile when heated, or from application, such as cleaning agents. It is well documented that virtually any surface will have adequate nutrition for fungi to begin growing. Relative humidity percentages of greater than 60% are adequate for some fungal growth to begin, but higher humidity makes it more likely, and damp or wet surfaces will be ideal for growth. The RH% values make it clear, that at the time of sampling, the interior of the basement of the house was more humid than the outside air. This helps to create an ideal condition for mold and fungi growth.

The living room air sample (005) was lower in total counts then the outside sample, and the species present and the proportions of different fungi were similar to the outside sample for 2 out

4

of 3 organisms. The additional fungi is present in the basement in elevated numbers, and the quantities found in the living room for this fungi could easily be explained by normal air movement in the house, even with the basement door closed. The basement air sample (003) was much higher in total counts then the outside sample (007), and the species present and the proportions of different fungi were also significantly different from the outside sample indicating the presence of single or multiple repositories of growth and/or amplification points.   This conclusion was supported by the readily visible fungal growth found in the basement and the laboratory results, which confirmed this as well.

The carpet samples in both the living room (006) and the basement (004), indicate contamination by a variety of fungi. However, the basement carpet represents a potential respiratory hazard. The living room carpet results, while indicative of contamination, appear to be controllable by HEPA vacuuming and aggressive carpet cleaning, disinfection and rapid drying. Every effort should be made to control excess moisture in this home. As noted above, the basement carpet is significantly contaminated and is very possibly the primary source contributing to the high air counts found for both Aspergillus and Penicillium. As we recommended during our sampling visit, this carpet should be disposed of. The living room carpet is by itself unlikely to produce substantial airborne bioaerosols unless it is aggressively disturbed as with vacuuming using a non-HEPA filtered vacuum, or if the carpet was allowed to become damp or wet for an extended period.   This could occur if the carpet was cleaned and not quickly and thoroughly dried. As we recommended during our sampling visit, only a HEPA filtered vacuum should be used in a carpeted home or area with allergens present and allergy sufferers in residence.

No bioremedial efforts will be successful if the moisture levels remain elevated. Even though the living room air samples have lower total fungal counts than the outside sample, there are a number of species of concern from an IAQ and allergen perspective. The living room air sample (005) contained mostly Cladosporium, which is considered a fairly mild allergen and is the predominant fungi in the outside sample. This sample also contained a low number of Aspergillus sp., a genus with generally stronger allergen effects and a similar count of Penicillium sp., generally considered somewhat less allergenic than the Aspergillus sp. and also in low numbers. The basement air sample (003) had a much higher count than the outside sample and more significantly, the predominant fungi was Penicillium sp., not Cladosporium sp. as in the outside sample, indicating a significant reservoir of Penicillium in the basement. In fact, the basement sample did not have any detectable Cladosporium sp., but the presence of any Cladosporium may have been masked by the other growth. The remainder of fungi in the basement air sample was Aspergillus sp., also in significantly high but somewhat lower numbers than the Penicillium.

A swab sample (001) was collected from the basement wall paneling on the outside of the bathroom (not an exterior wall, adjacent to the foundation, but an interior wall). This sample was collected due to the possible appearance of fungi growth on that surface. This surface coating was a dusting, of light gray to green in color. The lab results indicate a significant presence of Stachybotrys sp. fungi spores on that surface. The fungi growth observed on the wall surface did not have the characteristic appearance of Stachybotrys (black and moist) and the paneling did not appear to be at the time of the sampling or to ever have been wet to the extent normally

5



associated with Stachybotrys. The paneling in this area was dry and unstained. The second swab sample collected in the basement (002) was sampled from the wet foundation wall, after lifting up a section of the tar paper that presently covers most of the below grade interior wall surface. This sample had a very similar proportion of Stachybotrys and Aspergillus to the other wall sample. This sample also had one additional fungi (Mucor sp.), which prefers wet conditions.

**Conclusions**

There were noteworthy indications of fungal contamination in this house. The fungi found are of significant concern from an allergen aspect, dependant on the sensitivity of the exposed person. These levels could possibly be at symptomatic concentrations, if the exposed person is, in fact, sensitive to these species. As noted above, conditions are adequate for additional growth to occur, with the elevated RH% and the existing surface growth, which could substantially increase the exposure risk for a susceptible individual, such as an asthmatic. Appropriate medical testing on the occupants by qualified medical personnel could assist in determining the susceptibility of these individuals. Based on the observed and confirmed surface growth of Aspergillus and Penicillium (carpet) in this home, and the non-typical presence of Stachybotrys, it would be prudent to limit occupancy by individuals known to have a physical condition aggravated by fungal contamination. At least until corrective actions have been completed and the effectiveness of these actions confirmed by follow-up testing.

Some fungi of the genus Aspergillus are opportunistic pathogens in susceptible immuno-suppressed individuals (HIV or AIDS patients, organ transplant patients, chemotherapy patients and diabetics are some examples of these). The levels of contamination found in this residence should be controlled with aggressive means to prevent any increases, reduce the existing populations and return the interior populations to the ideal of a reduced version of the exterior populations. The amount of surface fungi present could under existing conditions of growth produce a substantial airborne allergen count in this home, especially as the season requires that the windows be closed, thus reducing the air exchange of this house. So far, based on the sampling, there does not appear to be an excessive transfer of allergens to the first floor from the basement. As noted in the air samples, despite the presence of Stachybotrys in the basement, there was none detected in the basement air sample. Stachybotrys is usually not detected in air samples due to the normal state of the spores (wet and sticky).

It is obvious from the inspection observations and the lab results that this home and specifically the basement were at the time of sampling significantly damp and contaminated with a variety of allergenic fungi. The susceptibility of the occupants to these allergens and the quantities present are the deciding factors in how the occupants will react to this exposure.

It is essential that the moisture problems with the basement foundation be corrected and that steps be taken to reduce relative humidity levels in the basement and in the main portion of the house. Based on observations, the carpet in the living room is also a very likely source reservoir of some of the airborne concentrations. Controlling moisture is the primary method of controlling mold, fungi and bacteria in a residence. Additional aggressive cleaning (with HEPA vacuums) and disinfection may be needed.

**Recommendations**

1.) Until the presence of the elevated fungal growth, specifically Stachybotrys and Aspergillus sp., is reduced or removed, occupation of the basement of this home would generally not be recommended.

2.) Until other steps can be taken, we strongly recommend that all vacuuming of carpets and furnishings done in this home, only be done with a true HEPA filtered vacuum cleaner.

3.) Install a dehumidifier (more than one if necessary) in the basement permanently and operate a unit in the main occupied area of the house when humidity is high.

4.) Portable HEPA filtration units can be used in occupied rooms to further reduce airborne allergens of all types, if needed.

5.) Redirect all downspouts so that flow of rain water from the gutters does not directly contact the side of the foundation or saturate the ground directly adjacent to the house. This recommendation also applies to the sump pump discharge.

6.) Sample additional locations in the basement to localize contamination sources there and to determine extent of remediation or precautions required for use and occupancy.

7.) Evaluate additional waterproofing methods for the foundation (exterior or interior methods), many options are available.

8.) It may be of value to have the entire house "fogged" with a biocidal disinfectant (several types are available) to eliminate viable free floating fungal spores, and to eliminate surface contamination on walls and hard surfaces. This process would not eliminate contamination from carpets or furnishings, as spores may be deep into the pile or fabric. Fogging will also not control the growth of fungi behind the "tar paper" water proofing in the basement. Further bioremediation suggestions are possible. The use of Ozone treatment systems is generally not recommended to control fungi and bacteria due to inconsistency of treatment, inability of the Ozone to penetrate porous materials, questionable effectiveness under different circumstances and the known toxicity of Ozone (OSHA limit of 0.1 ppm). The EPA has a great deal of information on this application and does not recommend it.

9.) The basement "waterproofing" should all be removed and the walls disinfected. More effective true waterproofing methods should be implemented to dry the basement. These methods may include any of the following: foundation exterior application of waterproofing agents with drainage tile; interior drainage of the block wall with interior application of a waterproofing material; in either case, dehumidification will be necessary.

7

These recommendations may not be in order of urgency, as we feel all may be necessary to complete the control of the contamination in this residence. We would be pleased to discuss these recommendations further. If you have any questions in reference to this report, please contact us at your earliest convenience.

Sincerely,

Robert A. Pfromm, CIH
Project Manager
Advanced Applied Sciences, Inc.

8

# APPENDIX 1



# LABORATORY REPORT

## CLIENT PROJECT INFORMATION

| | | | |
|---|---|---|---|
| Client Name: | Marrone | Project Manager: | Robert Pfromm, CIH |
| Address: | | Project ID: | 2008116 |
| | | Project Number: | |
| | | Telephone: | |
| | | Fax: | |

## LABORATORY PROJECT INFORMATION

| | | | |
|---|---|---|---|
| Project Number: | 2008106 | Date Received: | 8/28/00 |
| Project Manager: | Robert J. Lesher, Ph.D. | Due Date: | NA |
| Quote Number: | NA | Date Completed: | 9/10/00 |
| Invoice Number: | NA | | |

# LABORATORY RESULTS

| FIELD SAMPLE ID | Sample Type | LOCATION DESCRIPTION | RESULT | ISOLATE | UNITS |
|---|---|---|---|---|---|
| 82800-001 | Wipe, 1sq. in. | Basement Wall 1 | >300<br>36 | **Fungal Isolates**<br>Stachybotrys sp.<br>Aspergillus sp. | CFU/in$^2$ |
| 82800-002 | Wipe | Basement Wall 2 | 276<br>40<br>6 | **Fungal Isolates**<br>Stachybotrys sp.<br>Aspergillus sp.<br>Mucor sp. | CFU/in$^2$ |
| 82800-003 | Air, 85 liters | Basement | 3192<br>1116 | **Fungal Isolates**<br>Penicillium sp.<br>Aspergillus sp. | CFU/m$^3$ |
| 82800-004 | Vac, 144 sq. in. | Carpet Basement | >3000<br>1300<br>90 | **Fungal Isolates**<br>Penicillium sp.<br>Aspergillus sp.<br>Alternaria sp. | CFU/in$^2$ |
| 82800-005 | Air | Living Room | 180<br>24<br>24 | **Fungal Isolates**<br>Cladosporium sp.<br>Aspergillus sp.<br>Penicillium sp. | CFU/m$^3$ |

Advanced Applied Sciences, Inc.          Project Number 2008106          Page 1



# LABORATORY RESULTS

| FIELD SAMPLE ID | Sample Type | LOCATION DESCRIPTION | RESULT | ISOLATE | UNITS |
|---|---|---|---|---|---|
| 82800-006 | Vac, 144 sq. in. | Carpet, Living Room | 920<br>310<br>60<br>31 | **Fungal Isolates**<br>Penicillium sp.<br>Aspergillus sp.<br>Chrysosporium sp.<br>Epicoccum sp. | CFU/in$^2$ |
| 82800-007 | Air | Outside | 468<br>60<br>60 | **Fungal Isolates**<br>Cladosporium sp.<br>Epicoccum sp.<br>Penicillium sp. | CFU/m$^3$ |

## Laboratory Report Approval

Approved By: _____    Date Approved: 9/15/00

Robert J. Lesher, Ph.D.
Laboratory Director

CORPORATE HEADQUARTERS          TELEPHONE: (717) 651-9377
4400 LINGLESTOWN ROAD ◆ HARRISBURG, PA, 17112          FAX: (717) 657-0752

# Chain-of-Custody
# Sample Submittal Form

**ADVANCED APPLIED SCIENCES, INC.**

CLIENT: 2008106

PROJECT: DUE:

Page ___ of ___

**LAB QUOTATION #:**

## CLIENT REPORT TO AND PROJECT INFORMATION

| | | LAB NO: | Analysis Requested |
|---|---|---|---|
| Company: | AASI | Project Name: MARRONE | |
| Contact: | BOB PFROMM | Project No: 2008116 | |
| Address: | | P.O. #: | |
| | | Telephone: | |
| | | Fax: | |

Turnaround Time: [✓] 5-10 Days   [ ] Rush (Specify) _____

| Lab ID P2800 | Client Sample ID | Sample Matrix | | | | Sample Date | Volume (L) | Area (in²) | FUNGI |
|---|---|---|---|---|---|---|---|---|---|
| -001 | BASEMENT WALL 1 | | ✓ | | | 8/28/00 | | 1 | ✓ |
| -002 | BASEMENT WALL 2 | | ✓ | | | | | 1 | ✓ |
| -003 | BASEMENT AIR | ✓ | | | | | 85 | | ✓ |
| -004 | CARPET DUST BASEMENT | | | ✓ | | | | 144 | ✓ |
| -005 | LIVING ROOM | ✓ | | | | | 85 | | ✓ |
| -006 | CARPET DUST LVRM | | | ✓ | | | | 144 | ✓ |
| -007 | OUTSIDE | ✓ | | | | | 85 | | ✓ |

## INVOICE TO (may enter "SAME" if same as report):

| | | CLIENT COMMENTS or SPECIAL INSTRUCTIONS: |
|---|---|---|
| Client: | | |
| Address: | | |
| Phone: | | |
| Fax: | | |

| Sampled By: Robert Pfromm | Date: 8/28/00 | Time: | | | |
|---|---|---|---|---|---|
| Relinquished By: | Date: | Time: | Accepted By: | Date: | Time: |
| | | | | | |
| Relinquished to Lab By: Robert Pfromm | Date: 8/28/00 | Time: | Accepted at Lab By: J. Tech | Date: 8/28/00 | Time: |

NOTE: Rush TAT must be pre-arranged.  Surcharges will be applied accordingly.

**ADVANCED APPLIED SCIENCES, INC.**
4400 LINGLESTOWN ROAD ◆ HARRISBURG, PA, 17112

TELEPHONE: (717) 651-9377
FAX: (717) 657-0752

Source: Legal > Combined Federal & State Case Law - U.S. > All Courts - By State > **PA Federal and State Cases** ⓘ
Terms: **summary judgment and mold and causation and expert testimony required** (Edit Search)

☞ Select for FOCUS™ or Delivery
☐

*2000 U.S. Dist. LEXIS 12993, \**

IN RE: PAOLI RAILROAD YARD PCB LITIGATION. THIS DOCUMENT RELATES TO: Narcise v. SEPTA, et al., Williams v. SEPTA, et al., Stanbach v. SEPTA, et al.

MASTER DOCKET NO. 86-2229, No. 87-1190, No. 87-1258, No. 87-3227

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2000 U.S. Dist. LEXIS 12993

September 6, 2000, Decided

**DISPOSITION:** **[\*1]** Defendants' motion for **Summary Judgment** Granted.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant railroads moved for **summary judgment** in a case where plaintiffs sought monetary damages and medical monitoring based on claims arising under state tort law and the Federal Employers Liability Act resulting from alleged illnesses from exposure to polychlorinated biphenyls.

**OVERVIEW:** Plaintiffs were workers at a railroad yard. They filed an action alleging that they suffered a variety of severe and unusual illnesses as a result of exposure to polychlorinated biphenyls. The complaints sought monetary damages and medical monitoring based on claims arising under state tort law and the Federal Employers Liability Act (FELA). No FELA claims remained. Plaintiffs' tort claims against remaining defendants were governed by Pennsylvania common law. Plaintiffs were pursuing five types of claims against the remaining defendants: (1) negligence; (2) strict liability, including failure to warn and defective design; (3) fraud, including fraudulent concealment; (4) infliction of severe emotional distress (negligent and intentional); and (5) punitive damages. The court found that the emotional distress claims were barred as a matter of law. Next, the court found that plaintiffs failed to provide sufficient evidence of **causation,** a necessary element in a products liability action as well as in negligence and misrepresentation actions. Finally, a medical monitoring claim failed because of plaintiff's inability to provide reliable **expert testimony.**

**OUTCOME:** Defendants' motion was granted because plaintiffs failed to provide sufficient evidence of **causation** regarding negligence, strict liability, and fraud claims, without which **summary judgment** must be granted. With regard to the medical monitoring claim, **summary judgment** was proper because a plaintiff failed to provide reliable, individualized **expert testimony.**

**CORE TERMS:** causation, exposure, expert testimony, medical monitoring, summary judgment, disease, illness, causal relationship, proffered, landfill, medical testimony, settlement, exposed, cancer, genuine issue of material fact, toxic chemicals, expert opinion, toxicologist, diagnostic, expertise, chemicals, diagnose, reliable, railroad, residential, elevated, training, poisons, doctor, opportunity to meet

## CORE CONCEPTS - ◆ <u>Hide Concepts</u>

📄 <u>Civil Procedure : Summary Judgment : Summary Judgment Standard</u>
⬩**Summary judgment** is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, reveal no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law. In deciding a motion for **summary judgment,** all facts, and reasonable inferences drawn therefrom, must be viewed in the light most favorable to the non-moving party.

📄 <u>Civil Procedure : Summary Judgment : Burdens of Production & Proof</u>
⬩To obtain **summary judgment** relief, the moving party has the initial burden of identifying evidence that shows an absence of a genuine issue of material fact. The non-moving party then must go beyond the mere allegations of the pleadings, and, from the evidence of record, designate specific facts showing that there is a genuine disputed issue for trial. In deciding whether an issue is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.

📄 <u>Civil Procedure : Summary Judgment : Summary Judgment Standard</u>
⬩**Summary judgment** must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

📄 <u>Civil Procedure : Summary Judgment : Summary Judgment Standard</u>
⬩A dispute over those facts that might affect the outcome of the suit under the governing substantive law, i.e., the material facts, will preclude the entry of **summary judgment.**

📁 <u>Torts : Business & Employment Torts</u>
⬩Under Pennsylvania law, plaintiffs in toxic tort cases have no cause of action for risk or fear of future injuries.

📁 <u>Torts : Causation</u>
⬩Proof of **causation** is a necessary element in a products liability action as well as in a negligence action. Accordingly, a defendant cannot be held liable on a theory of negligence, strict product liability, or misrepresentation unless a causal relationship is established between the defendant's product and the plaintiff's injury.

📄 <u>Evidence : Witnesses : Expert Testimony</u>
📁 <u>Torts : Causation</u>
⬩Under Pennsylvania law, unequivocal medical testimony is necessary to establish the causal connection in cases where there is no obvious causal relationship between the accident and the injury. Such testimony is needed to establish that the injury in question did, with a reasonably degree of medical certainty, stem from the complained of act. Under some rare circumstances, Pennsylvania law may allow a personal injury case in which there is no obvious causal relationship to be submitted to a jury on the basis of **causation** testimony presented by a qualified expert other than a medical doctor. Expert medical testimony on **causation** requires the witness to offer expert medical testimony on the injury itself and the relationship between the injury and the alleged cause. Consequently, an expert offered by plaintiffs on the issue of **causation** in this case must be an expert in diagnosing, and in determining the cause of, the injuries at issue.

📄 Evidence : Witnesses : Expert Testimony
⬇       See Fed. R. Evid. 702.

📄 Evidence : Witnesses : Expert Testimony
⬇ Under Fed. R. Evid. 702, the trial judge acts as a gatekeeper to ensure that any and all **expert testimony** or evidence is not only relevant, but also reliable. Fed. R. Evid. 702 has three major requirements: (1) the proffered witness must be an expert; (2) the expert must testify about matters requiring scientific, technical, or specialized knowledge; and (3) the **expert's testimony** must assist the trier of fact. Under the first requirement, the witness must be qualified as an expert. An expert can be qualified by a broad range of knowledge, skills, training, education, or experience. A witness who does not possess sufficient knowledge of the subject matter is not qualified to offer an expert opinion.

📄 Evidence : Witnesses : Expert Testimony
⬇ Courts have insisted time and time again that an expert may not give opinion testimony to a jury regarding specific **causation** if the expert has not engaged in the process of differential diagnosis -- that is, the process of eliminating other possible diagnoses.

📄 Torts : Negligence : Negligence Generally
⬇ In order to establish his medical monitoring claim, a plaintiff is **required** to show the following: (1) plaintiff was significantly exposed to a proven hazardous substance through the negligent actions of the defendant, (2) as a proximate result of the exposure, plaintiff suffers a significantly increased risk of contracting a serious latent disease, (3) that increased risk makes periodic diagnostic medical examinations reasonably necessary, and (4) monitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial.

📄 Evidence : Witnesses : Expert Testimony
⬇ A district court need not provide a plaintiff with an open-ended and never-ending opportunity to meet a Daubert challenge until plaintiff "gets it right" nor should a plaintiff be given the opportunity to meet a Daubert challenge with an expert's submission that is based on new methodology.

📄 Torts : Negligence : Negligence Generally
⬇ The need for diagnostic examinations must be supported by the testimony of competent medical experts.

**COUNSEL:** For MABEL BROWN, Individually and on behalf of all others similarly situated, PLAINTIFFS: Joseph C. Kohn, Esq., Kohn, Swift & Graf, P.C., Phila., PA.

For UNITED STATES OF AMERICA, Defendant: by: Steven J. Engelmyer, Esq., AUSA, Joanna M. Jacobs, Esq., AUSA. U.S. OF A (Co-Counsel), by: Anthony R. Sherry, Esq., Torts Branch, Civil Division, U.S. Dept. of Justice, Washington, D.C. U.S. OF A., J. Steven Rogers, Esq., Environmental Defense Section, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, DC. Chrisopher S. Vaden, Esq.

For SEPTA, Defendant: BY: Roger F. Cox, Esq., BLANK ROME COMISKY & McCAULEY, Philadelphia, PA.

For AMTRAK, Defendant: BY: Mary L. Grad, Esq., Association General Counsel - AMTRAK,

Washington, D.C.

For CONRAIL, Defendant: BY: David Richman, Esq., PEPPER HAMILTON & SCHEETZ, Phila., PA.

**JUDGES:** ROBERT F. KELLY, J.

**OPINIONBY:** ROBERT F. KELLY

**OPINION: MEMORANDUM**

ROBERT F. KELLY, J.

SEPTEMBER 6, 2000

The only pending motion remaining in the above-captioned cases, Defendants' Motion for **Summary Judgment,** is now ripe for decision. n1 Plaintiffs were workers at the Paoli Railroad **[*2]** Yard. Plaintiffs filed this action alleging that they have suffered from a variety of severe and unusual illnesses as a result of their exposure to polychlorinated biphenyls ("PCBs"), used in the transformers of train cars which these Plaintiffs serviced and maintained in the Paoli Railroad Yard. The Complaints in these cases seek monetary damages and medical monitoring from the railroad defendants that employed Plaintiffs based on claims arising under state tort law and the Federal Employers Liability Act ("FELA"). n2 Since the filing of Defendants' **summary judgment** motion, the last of the railroad defendants, SEPTA, has settled with Plaintiffs. n3 As a result, no FELA claims remain in these cases. Plaintiffs' tort claims against the remaining defendants - Solutia, Inc. (f/k/a Monsanto, defendant in all three cases) and General Electric (defendant in Narcise and Williams) - are governed by Pennsylvania common law, just like the claims of the residential plaintiffs, which have already been adjudicated. n4 For the following reasons, Defendants' Motion for **Summary Judgment** will be granted.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n1 On March 7, 2000, this Court denied reconsideration of the decision to exclude the **expert testimony** of Plaintiffs' sole medical **causation** expert, Janette Sherman, M.D. See In Re Paoli R.R. Yard PCB Litig., 2000 U.S. Dist. LEXIS 2529, Nos. 86-2229, 87-1190, 87-1258, 87-3227, 2000 WL 274262 (E.D. Pa. March 7, 2000). However, Plaintiffs' Motion for Reconsideration regarding the expert opinion of Dr. Ian C. T. Nisbet, Ph.D., was granted in accordance with the Third Circuit's reversal of the exclusion of the vast majority of his testimony in the related residential cases. Because Dr. Nisbet's opinions in these worker cases do not materially differ from his opinions in the residential cases, the parties, with some limited exceptions, did not dispute that he should be permitted to testify regarding exposure. Id. at *9. More recently, Plaintiffs' Motion to Submit Updated Expert Reports was denied by Order, dated May 10, 2000. **[*3]**

n2 Andre Williams is the only living worker plaintiff; therefore, he is the only plaintiff pursuing a claim for medical monitoring.

n3 That settlement was effected as part of a class settlement approved by the Court of Common Pleas for Chester County, Pennsylvania.

n4 Westinghouse Electric Corp. (now known as CBS, Inc.) was a party to this litigation solely as a defendant on SEPTA's third-party claims, which have been mooted and/or abandoned as a result of SEPTA's settlement with Plaintiffs. The City of Philadelphia nominally remains as a defendant in the Narcise and Williams actions, but Plaintiffs have settled with the City as part of a classwide settlement that is awaiting approval by the Chester County Court of Common

Pleas.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

## I. STANDARD OF REVIEW

"⚓**Summary judgment** is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, reveal no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law." Wragg v. Comcast Metrophone, 18 F. Supp. 2d 524, 526 (E.D. Pa. 1998) **[*4]** (citing Fed R. Civ. P. 56(c)). In deciding a motion for **summary judgment,** all facts, and reasonable inferences drawn therefrom, must be viewed in the light most favorable to the non-moving party. Id. at 527; Clark v. Commonwealth of Pennsylvania, 885 F. Supp. 694, 707 (E.D. Pa. 1995).

⚓To obtain **summary judgment** relief, the moving party has the initial burden of identifying evidence that shows an absence of a genuine issue of material fact. Coregis Ins. Co. v. Wheeler, 24 F. Supp. 2d 475, 477 (E.D. Pa. 1998). The non-moving party then must go beyond the mere allegations of the pleadings, and, from the evidence of record, designate specific facts showing that there is a genuine disputed issue for trial. n5 Stickney v. Muhlenberg College TIAA-CREF Retirement Plan, 896 F. Supp. 412, 417 (E.D. Pa. 1995); see also Coregis, 24 F. Supp. 2d at 477. In deciding whether an issue is genuine, "the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." **[*5]** Orsatti v. New Jersey State Police, 71 F.3d 480 at 482. ⚓**Summary judgment** must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n5 "[⚓A] dispute over those facts that might affect the outcome of the suit under the governing substantive law, i.e., the material facts, will preclude the entry of **summary judgment.**" Orsatti v. New Jersey State Police, 71 F.3d 480, 482 (3d Cir. 1995); see also Mertig v. Milliken & Michaels of Delaware, Inc., 923 F. Supp. 636, 642 (D. Del. 1996).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

## II. DISCUSSION

Plaintiffs are pursuing five types of claims against the three remaining defendants: (1) negligence; (2) strict liability, including failure to warn and defective design; (3) fraud, including fraudulent concealment; (4) infliction of severe **[*6]** emotional distress (negligent and intentional); n6 and (5) punitive damages. n7 In addition, Helen Narcise has a loss of consortium claim.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n6 Plaintiffs' emotional distress claims are barred as a matter of law. Defendants correctly argue that the Third Circuit, in In Re Paoli R.R. Yard PCB Litig., 35 F.3d 717 (3d Cir. 1994) ("Paoli II"), cert. denied, 513 U.S. 1190 (1995), found that, ⚓under Pennsylvania law, plaintiffs in toxic tort cases have no cause of action for risk or fear of future injuries. Id. at 785 n.51.

n7 Plaintiffs contend that only the first two types of claims require expert proof of disease **causation.**

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

As this Court has previously observed, "⊼proof of **causation** is a necessary element in a products liability action as well as in a negligence action." Burton v. Danek Medical, 1999 U.S. Dist. LEXIS 2619, No. Civ. A. 95-5565, 1999 WL 118020, *2 (E.D. Pa. Mar. 1, 1999). Accordingly, a defendant cannot be held liable on a theory of negligence, strict product  **[\*7]**  liability, or misrepresentation unless a causal relationship is established between the defendant's product and the plaintiff's injury. Id.

⊼Under Pennsylvania law, unequivocal medical testimony is necessary to establish the causal connection in cases where there is no obvious causal relationship between the accident and the injury. n8 Niklaus v. Vivadent, Inc., 767 F. Supp. 94, 96 (M.D. Pa. 1991), aff'd,

> 986 F.2d 1409 (3d Cir. 1993).
> "Such testimony is needed to establish that the injury in question did, with a reasonably degree of medical certainty, stem from the [complained of] act." . . . Under some rare circumstances, Pennsylvania law may allow a personal injury case in which there is no obvious causal relationship to be submitted to a jury on the basis of **causation** testimony presented by a qualified expert other than a medical doctor.
>
> Expert medical testimony on **causation** requires the witness to offer expert medical testimony on the injury itself and the relationship between the injury and the alleged cause. Consequently, an expert offered by plaintiffs on the issue of **causation** in this case must be an expert in diagnosing, and  **[\*8]**  in determining the cause of, [the] injuries [at issue].

Id. (citations omitted). The instant matter clearly falls in the category of cases requiring expert medical testimony. Accordingly, the issue raised by Defendants is whether the **expert testimony** offered by Plaintiffs is sufficient to establish a genuine issue of material fact with regard to the issue of **causation.**

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n8 "An obvious causal relationship exists when the injury is either an 'immediate and direct' or the 'natural and probable' result of the complained of act. The injury and the act must be so closely connected that a lay person could diagnose the causal connection." Niklaus, 767 F. Supp. at 96.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

## A. Causation

Defendants argue that this Court's exclusion of Dr. Sherman's testimony leaves these Plaintiffs without any individualized proof of medical **causation.** In response, Plaintiffs that the record evidence that the Paoli workers were exposed to PCBs, combined with Dr. Nisbet's and Dr. Melvyn Kopstein's  **[\*9]**  **expert testimony** is sufficient to establish a likelihood that the cancers of Mr. Narcise and Stanbach, and the illnesses of Mr. Williams, were caused by PCBs. (Pls.' Supplemental Mem. at 22.) However, Defendants point out that neither Dr. Kopstein nor Dr. Nisbet can fill this **causation** gap. Defendants explain that Dr. Kopstein testified only that there was an opportunity for exposure and was never offered by Plaintiffs as an expert on medical **causation.** As for Dr. Nisbet, Defendants submit that he never offered any opinion as to the PCB exposure of John Narcise and Charles Stanbach or

the causes of their alleged injuries. And although Dr. Nisbet did provide a specific opinion on the exposure of Andre Williams, he did not express an opinion on **causation.**

⊤Federal Rule of Evidence 702, which governs the admissibility of **expert testimony,**

> If scientific, technical, or other specialized knowledge will assist the trier of fact understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

⊤Under this Rule, the trial judge  **[*10]**  acts as a "gatekeeper" to ensure that any and all **expert testimony** or evidence is not only relevant, but also reliable. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993); Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997). Rule 702 has three major requirements: (1) the proffered witness must be an expert; (2) the expert must testify about matters requiring scientific, technical, or specialized knowledge; and (3) the **expert's testimony** must assist the trier of fact. Kannankeril, 128 F.3d at 806.

Under the first requirement, the witness must be qualified as an expert. See Paoli II, 35 F.3d at 741. An expert can be qualified by a broad range of knowledge, skills, training, education, or experience. In re Paoli R.R. Yard PCB Litigation, 916 F.2d 829, 855 (3d Cir. 1990) ("Paoli I"), cert. denied, 499 U.S. 961 (1991). A witness who does not possess sufficient knowledge of the subject matter is not qualified to offer an expert opinion. Surace v. Caterpillar, Inc., 111 F.3d 1039, 1056 (3d Cir. 1997). **[*11]**

In the instant action, Plaintiffs have now taken the unique position of offering Drs. Nisbet and Kopstein, experts who have been previously identified by Plaintiffs for purposes of providing evidence of Plaintiffs' exposure to Defendants' PCBs, as medical **causation** experts. n9 Federal courts that have applied the Third Circuit Paoli standards in the face of deciding whether similarly proffered experts are qualified to opine on the medical cause of a plaintiff's injury have ruled in favor of precluding such testimony.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n9 It is worth noting that neither Dr. Nisbet nor Dr. Kopstein are medical doctors, yet both are now being proffered by Plaintiffs to establish the likelihood that the cancers of Mr. Narcise and Stanbach, and the illnesses of Mr. Williams were caused by PCBs. While this Court recognizes that this does not per se preclude Drs. Nisbet or Kopstein from testifying about **causation** of these diseases in humans, see Paoli I, 916 F.2d at 856, Drs. Nisbet and Kopstein do not have any general expertise regarding disease **causation** in humans. Such lack of expertise in human disease has been taken into consideration by other federal judges in this circuit when examining the reliability of expert opinions and in determining "fit" under the Daubert standard. See, e.g., In re: Diet Drugs Prods. Liab. Litig., 2000 U.S. Dist. LEXIS 9661, No. MDL 1203, 2000 WL 962545, *5 (E.D. Pa. June 28, 2000).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -  **[*12]**

For example, in Poust v. Huntleigh Healthcare, 998 F. Supp. 478 (D.N.J. 1998), the court held that Robert Benowitz, an engineer proffered by the plaintiff as an expert, was qualified to provide an opinion as to alleged defects in the design of a pneumatic compression device that was used during the plaintiff's back surgery, but found that he was not qualified to opine on medical **causation.** In that case, the court reviewed Mr. Benowitz's background and that his areas of expertise included (1) hospital and health safety, and (2) medical devices -

use, safety and design. In addition, Mr. Benowitz served as a safety consultant, a position in which he investigated electro-mechanical equipment incidents, conducted medical safety testing and provided consulting services to healthcare institutions. Based on the above, the New Jersey federal court found that Benowitz was qualified to provide an opinion on the subject of the alleged defects in the design of the medical device; however, the court also determined that the expert had no experience, education, or training which would qualify him to render an opinion as to the medical cause of the plaintiff's injuries. Id. at 492-93. **[*13]**

Genty v. Resolution Trust Corp., 937 F.2d 899 (3d Cir. 1991), is also instructive. In Gentry, homeowners brought suit alleging that a developer and mortgage lender conspired with Gloucester Township, which owned land leased as a landfill, to promote the fraudulent sale of the property, despite the defendants' knowledge of the landfill's toxic nature. Plaintiffs' had proffered the **expert testimony** of toxicologist Dr. Brubaker, who opined that the plaintiffs' injuries could have been caused by exposure to the toxic chemicals present in the landfill. Brubaker, however, was not a medical doctor and he did not examine the plaintiffs. As a result, the district court concluded that the plaintiffs had not produced a medically qualified expert to testify about **causation** and excluded Brubaker's testimony. Genty v. Township of Gloucester, 736 F. Supp. 1322 (D.N.J. 1990).

On appeal, the Third Circuit found that the district court's exclusion of Brubaker because he did not possess a medical degree was improper, but affirmed the district court's holding on other grounds. In doing so, our federal appellate court reasoned as follows:

> According to the **[*14]** record, the plaintiffs offered no evidence as to how Brubaker would connect the toxic chemicals at the GEMS landfill to these plaintiffs' alleged injuries. He did not physically examine the plaintiffs and their symptoms. Brubaker may have been qualified as a toxicologist to identify poisons generally and offer treatment for exposure to poisons, but there is no evidence in this record that would connect the presence of poisons to the plaintiffs' particular grievances.
>
> The plaintiffs state in their brief that Brubaker's opinion "would have been based on individual plaintiff observations reporting the presence of odors in and around plaintiffs' residences." He thus would have relied, not on firsthand observations, but merely on the reports of the plaintiffs. He obviously had not conducted the personal physical investigation necessary to form an expert opinion that toxins in the landfill caused the plaintiffs' symptoms. Indeed, the plaintiffs concede that Brubaker could not have testified to a reasonable certainty as to such **causation** with the following statement in their brief: "Dr. Brubaker would have proffered testimony that exposure via inhalation to these emanating odors consisting **[*15]** of the alleged volatile organic chemicals and other toxic substances may account for the frequent and severe health problems suffered by the plaintiffs." (emphasis added).

Genty, 937 F.2d at 917-18. The Third Circuit went on to distinguish its earlier Paoli I opinion in which it reversed this Court's exclusion of testimony by another toxicologist, Dr. Deborah Barsotti, Ph.D., who, unlike Drs. Kopstein and Nisbet, offered expert opinions on both exposure and **causation**. Id. As in Genty, the instant matter is significantly different from Paoli I in that Dr. Barsotti proposed to establish a causal relationship between exposure to PCBs and the plaintiffs illnesses by using the results of tests of the plaintiffs' blood as well as comparison with the medical and clinical records of the plaintiffs. 916 F.2d at 839. No such personal examination or study of the worker plaintiffs was performed by Dr. Kopstein or Dr. Nisbet in the cases at hand.

Despite the above, Plaintiffs note that Dr. Nisbet is competent to testify on **causation** by stating that certain adverse effects seen in the Plaintiffs are consistent with those shown to have been caused **[*16]** by PCBs in epidemiological and animal studies. (Pls.' Mem. at 22 n.14.) Defendants reply that Dr. Nisbet's testimony does not adequately support **causation** for the following reasons: Dr. Nisbet has never opined that any of the specific medical conditions of Plaintiffs were caused by exposure to PCBs; none of the medical conditions Dr. Nisbet "associates" with exposure to PCBs exists in any of these worker plaintiffs; at most, Dr. Nisbet stated that Plaintiff Andre Williams was at "elevated risk" of unspecified "adverse health effects"; and Dr. Nisbet conceded that he cannot link any specific dosage of PCBs to any type of cancer. (Defs.' Reply Mem. in Supp. of Worker Pls.' Cases at 8) (citing Pls.' Ex. J, Report of Ian C. T. Nisbet, Ph.D.).

Recently, however, Plaintiffs filed a supplemental memorandum advising this Court that Dr. Nisbet's testimony would include the following: (1) that exposure to PCBs increases the frequency of cancer in humans, (2) that small levels of PCBs have lead to elevated levels of enzymes associated with liver damage, (3) that there are a number of reports of complaints involving skin irritation resulting from direct contact with **[*17]** PCB fluids with no measures of the extent or duration of that exposure, and (4) that PCB exposure creates an expectation of elevated lipids at almost any level. In addition to Dr. Nisbet's proposed testimony, Plaintiffs are prepared to present Dr. Kopstein's description of the opportunities Plaintiffs had for being exposed to PCBs while working at the Paoli Railroad Yard, and lay testimony that would purportedly prove that these "opportunities" or potential exposures were, in fact, real exposure. Plaintiffs submit that such evidence coupled with cross-examination of defense experts establish a sufficient foundation from which this Court should deny Defendants' **summary judgment** motion.

Plaintiffs' position goes against the very teachings of Third Circuit case law, much of which came about as a result of this litigation. Indeed, following Paoli I and Paoli II, "courts have insisted time and time again that an expert may not give opinion testimony to a jury regarding specific **causation** if the expert has not engaged in the process of differential diagnosis -- that is, the process of eliminating other possible diagnoses." Rutigliano v. Valley Bus. Forms, 929 F. Supp. 779, 786 (D.N.J. 1996), **[*18]** aff'd, 118 F.3d 1577 (3d Cir. 1997); see also Diaz v. Johnson Matthey, Inc., 893 F. Supp. 358, 376 (D.N.J. 1995) (rejecting **expert testimony** that work place exposure to platinum salts caused plaintiff to contract asthma based on doctor's inability to negate other possible causes).

This Court has already declined to reconsider the admissibility of Plaintiffs' original **causation** expert, Dr. Sherman, based on her inability to explain why alternative possible causes pointed to by Defendants were not the sole cause of Plaintiffs' illnesses. 2000 U.S. Dist. LEXIS 2529, 2000 WL 274262 at *4-7. Now, Plaintiffs urge this Court to accept the non-specific medical **causation** testimony of Drs. Nisbet and Kopstein, neither of which has performed the necessary differential diagnoses in these cases. That being the case, this Court finds that Plaintiffs have failed to provide sufficient evidence of **causation** in these cases, without which **summary judgment** must be granted. n10 See Mazur v. Merck & Co., 742 F. Supp. 239, 265 (E.D. Pa. 1990) (doctors' opinions that possible link existed between measles vaccine and child's illness was not enough to support **expert testimony**). **[*19]**

- - - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n10 **Summary judgment is also required** on Helen Narcise's loss of consortium claim. Like Plaintiffs' claims for punitive damages, it is derivative and viable only as long as the underlying cause of action is viable. See Hepps v. General American Life Ins., 1998 U.S. Dist. LEXIS 13795, No. CIV. A. 95-5508, 1998 WL 564497, *7 (E.D. Pa. Sept. 2, 1998); Harrell v. Fibreboard Corp., 1989 U.S. Dist. LEXIS 14196, Civ. A. Nos. 85-4604, 85-5655, 85-6873, 2118, 86-2304, 86-3112, 1989 WL 145810, at *4 & 12 (E.D. Pa. Nov. 27, 1989).

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - -

## B. Medical Monitoring

⚓In order to establish his medical monitoring claim, Plaintiff Andre Williams is **required** to show the following:

> (1) Plaintiff was significantly exposed to a proven hazardous substance through the negligent actions of the defendant, (2) As a proximate result of the exposure, plaintiff suffers a significantly increased risk of contracting a serious latent disease, (3) That increased risk makes periodic diagnostic medical examinations reasonably necessary, and (4) Monitoring and **[*20]** testing procedures exist which make the early detection and treatment of the disease possible and beneficial.

Paoli II, 35 F.3d at 787; see also O'Brien v. Sofamar, 1999 U.S. Dist. LEXIS 4070, No. CIV. A. 96-8015, 1999 WL 239414, *6 (E.D. Pa. March 30, 1999); Heller v. Shaw Indus., 1997 U.S. Dist. LEXIS 12399, No. Civ. A. 95-7657, 1997 WL 535163, *21 (E.D. Pa. Aug. 18, 1997), aff'd, 167 F.3d 146 (3d Cir. 1999).

As noted above, this Court recently denied Plaintiffs' Motion for Reconsideration of this Court's Order excluding the testimony of Dr. Jannette Sherman. 2000 U.S. Dist. LEXIS 2529, 2000 WL 274262. Now, in light of this Court's rejection of Dr. Sherman's testimony and protocol, Mr. Williams states that he would accept the medical monitoring program described as appropriate for railroad workers exposed to PCBs by one of defendants' experts, Dr. Kenneth Chase. Even assuming Plaintiff Williams could propose a different medical monitoring program at this point in time, Plaintiff's inability to provide reliable, individualized **expert testimony** predicated on the significance and extent of his exposure to chemicals, the toxicity of chemicals, the seriousness of the diseases for **[*21]** which Plaintiff is at risk, the relative increase in the chance of onset of disease, and the value of early diagnosis, is fatal to his medical monitoring claim. Defendants have made the arguments and supplied the evidentiary materials that the Third Circuit found lacking in Paoli II. n11 35 F.3d at 790, 794 n.59. Thus, the record before this Court now demonstrates that **summary judgment** is proper on Mr. Williams medical monitoring claim under Pennsylvania law. n12 See In re TMI Litig., 199 F.3d 158, 159 (3d Cir. 2000) (⚓district court need not provide a plaintiff with an open-ended and never-ending opportunity to meet a Daubert challenge until plaintiff "gets it right" nor should a plaintiff be given the opportunity to meet a Daubert challenge with an expert's submission that is based on new methodology), cert. denied, ___ U.S. ___, 120 S. Ct. 2238, 147 L. Ed. 2d 266 (2000).

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n11 Following the Third Circuit's holding in Paoli II with respect to Dr. Sherman's medical monitoring opinion, Defendants not only submitted evidence showing the necessity of analyzing the concepts of "specificity" and "sensitivity" in deciding whether particular screening tests are needed, but how Dr. Sherman failed to determine whether the components of her protocol were likely to be accurate in detecting the conditions that she believed may be caused by Plaintiffs' exposure. Thus, Defendants established that Dr. Sherman was not able to properly compare the risks and benefits of medical monitoring. 2000 U.S. Dist. LEXIS 2529, 2000 WL 274262 at *7-9. **[*22]**

n12 ⚓The need for diagnostic examinations must be supported by the testimony of

competent medical experts. See Friends For All Children v. Lockheed Aircraft Corp., 241 U.S. App. D.C. 83, 746 F.2d 816, 826 n.15 (D.C. Cir. 1984) (noting that need for diagnostic examinations must be supported by competent medical **expert testimony**); Theer v. Philip Carey Co., 133 N.J. 610, 628 A.2d 724, 732-33 (N.J. 1993) (exposure to toxic chemicals may sustain a claim for medical surveillance damages when supported by reliable **expert testimony**).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Based on the above, Defendants' Motion for **Summary Judgment** shall be granted. An Order will follow.

**ORDER**

AND NOW, this 6th day of September, 2000, upon consideration of Defendants' Motion for **Summary Judgment,** and all responses thereto, it is hereby ORDERED that Defendants' Motion is GRANTED.

BY THE COURT:

ROBERT F. KELLY, J.

Source:  Legal > Combined Federal & State Case Law - U.S. > All Courts - By State > **PA Federal and State Cases** (i)
Terms:  **summary judgment and mold and causation and expert testimony required**  (Edit Search)
View:  Full
Date/Time:  Wednesday, September 18, 2002 - 4:05 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2002 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

<u>CERTIFICATE OF SERVICE</u>

I. Jeannie L. Kawalec, an employee for the law firm Thomas, Thomas & Hafer, LLP, hereby state that a true and correct copy of the foregoing document(s) was served upon all counsel of record by first class United States mail, postage prepaid, addressed as follows, on the date set forth below:

<u>By First Class U.S. Mail:</u>

Gianni Floro, Esquire
Louis M. Tarasi, Esquire
Tarasi, Tarasi & Fishman, P.C.
510 Third Avenue
Pittsburgh, PA  15219

James G. Nealon, III, Esquire
Nealon & Gover
2411 North Front Street
Harrisburg, PA  17110

Edward A. Monsky, Esquire
Fine, Wyatt & Carey, P.C.
425 Spruce Street
P.O. Box 590
Scranton, PA  18501-0590

Paul E. Scanlan, Esquire
Duane Morris & Heckscher
305 N. Front Street
P.O. Box 1003
Harrisburg, PA 17108

THOMAS, THOMAS & HAFER, LLP

Dated: 10/18/02

Jeannie L. Kawalec