IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JACK MARRONE, Husband,                  :
KAREN MARRONE, Wife,                    :          CIVIL ACTION - LAW
Both Individually and in Their Capacity :
as Parents and Guardians for            :          JURY TRIAL DEMANDED
VIDA MARRONE, a Minor, and              :
MATTHEW ADAM MARRONE                    :
          Plaintiffs                    :          JUDGE KANE
                                        :
v.                                      :          1:CV-01-0773
ALLSTATE INSURANCE COMPANY,             :
LINDA M. EDLEMAN, FRED SCHAEFFER,       :
MT. GRETNA REALTY and                   :
HOUSE MASTERS,                          :
          Defendants                    :

---

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Moving Defendants, Fred Schaeffer and Mt. Gretna Realty, by and through their counsel, Fine,

Wyatt & Carey, P.C., pursuant to L.R. 56.1, hereby submit their Statement of Material Facts as to which

Moving Defendants contend there is no genuine issue to be tried:

    1.    Plaintiffs Jack Marrone and Karen Marrone entered into a standard agreement for the sale of

real estate with Linda M. Edleman on or about July 7, 1999. A true and correct copy of the standard

agreement is attached as Exhibit "A" to the Motion for Summary Judgment of Moving Defendants.

    2.    Plaintiffs executed a Receipt and Acknowledgement of the Seller's Property Disclosure

Statement on or about July 7, 1999. The Seller's Property Disclosure Statement is not executed by Fred

Schaeffer or any other representative of Mt. Gretna Realty. A true and correct copy of the Seller's Property

Disclosure Statement is attached as Exhibit "B" to the Motion for Summary Judgment of Moving

3.     At all times relevant to their purchase of the Edleman property, the Plaintiffs used the services of Chip Stanilla of Re-Max as their agent with regard to their purchase of the subject property. (K. Marrone dep., pp. 54-55; J. Marrone dep., p. 261).

4.     Karen Marrone never met Fred Schaeffer prior to closing and does not even recall meeting him at the closing on the subject property. (K. Marrone dep., pp. 55-56).

5.     Karen Marrone never spoke with Fred Schaeffer before the closing on the Edleman property and did not rely on anything he said about the Edleman property in connection with her decision to purchase the property. (K. Marrone dep., pp. 56-57).

6.     Karen Marrone obtained a house inspection from Housemasters based upon the recommendation of Plaintiff's agent, Chip Stanilla. (K. Marrone dep., p. 61, pp. 190-193).

7.     When Plaintiffs obtained the inspection from Housemasters, Fred Schaeffer was not present, nor was any representative of Mt. Gretna. The only real estate agent present at the inspection was the Plaintiff's agent, Chip Stanilla. (K. Marrone dep., pp. 71-72; Berthoud dep., p. 58).

8.     On the final house inspection prior to closing, Mr. Stanilla was present on behalf of the Plaintiffs. Moving Defendants were not present. Karen Marrone advised Stanilla that the home was dirty and filthy and he offered to obtain and pay for a cleaning service after closing. (K. Marrone dep., pp. 77-79).

9.     The real estate commission with regard to the sale of the house was split equally between moving Defendants and the Plaintiff's agent, Re-Max. (K. Marrone dep., pp. 82-83; J. Marrone dep., p. 261; Schaeffer dep. p. 19).

10.     Prior to closing on the home, Plaintiffs had the opportunity to review the report from Housemasters, and Plaintiffs never requested that Defendant Edleman correct any of the items noted on the inspection report. (K. Marrone dep., p. 171).

11.    The Marrone's saw quite a few homes with their agent, Chip Stanilla, prior to entering into the Agreement of Sale for the Edleman property. (J. Marrone dep., pp. 14-15).

12.    The Marrone's obtained an inspection of the property and understood that they would have the opportunity not to close on the home depending upon the results of the inspection. (J. Marrone dep., pp. 65-67).  Mr. Marrone stated that he would not buy a house unless he had a professional opinion from an inspector.  (J. Marrone dep., p. 73).

13.    The Inspection Report indicates that the Plaintiff's owner and Chip Stanilla were present for the inspection.  (J. Marrone dep., p. 77).

14.    Jack Marrone never met or talked with Defendant Schaeffer. (J. Marrone dep., p. 113).

15.    Jack Marrone does not even recall Fred Schaeffer attending closing.  (J. Marrone dep., pp. 113, 119).

16.    Jack Marrone is not aware of any other homes in Mt. Gretna that have a mold problem. (J. Marrone, p. 138, pp. 260-261).

17.    Plaintiffs put their trust in their real estate agent, Chip Stanilla of Re-Max.  (J. Marrone dep., pp. 261-262).

18.    Matthew Marrone recalled that his parents worked with a real estate agent, Chip Stanilla, who was present when they first visited the subject property.  (M. Marrone dep., pp.51-52).

19.    Matthew Marrone lived in the subject property from the time of closing until April of 2000 and did not observe a water problem in the basement of the property, nor did anyone tell him during that time that there was a water or similar problem in the basement.  (M. Marrone dep., pp. 60-61).

20.    Vida Marrone looked at the Edleman home prior to the purchase of the property by her parents, together with their real estate agent, Chip Stanilla of Re-Max.  (V. Marrone dep., pp.

30-31). They went through the entire house and the basement on that visit. (V. Marrone dep., p. 31).

21.    Fred Schaeffer has been a licensed real estate agent for 18 years. He is the sole owner and employee of Mt. Gretna Realty. (Schaeffer dep., pp. 12-13).

22.    The Marrone's had a Buyer's Agency Agreement with Chip Stanilla of Re-Max. (Schaeffer dep., p. 14, Exhibit 4).

23.    Fred Schaeffer did not accompany the Plaintiffs and the Plaintiff's real estate agent on the walk through inspection prior to closing. (Schaeffer dep., p. 17).

24.    Schaeffer visited the home and made a listing presentation to Ms. Edleman. At the time of this visit, he went through every room in the house and the basement, and did not notice any wetness or dampness in the basement. (Schaeffer dep., pp. 17-18).

25.    Fred Schaeffer was not aware of any water leakage or dampness within the basement. He relied upon information which he received from the Seller, Linda Edleman and his own visit, wherein he did not notice any water stains or water spots in the basement. (Schaeffer dep., pp. 25-26).

26.    Mr. Schaeffer was not present during any of the inspections for the subject property, including the Housemasters inspection. (Schaeffer dep. pp. 32-22; Berthoud dep., p. 58).

27.    Schaeffer was not aware that there was an inspection of the property because of a possible water problem. (Schaeffer dep., p. 42).

28.    Schaeffer did not obtain a copy of the Housemaster Inspection Report. (Schaeffer dep., pp. 43-46; Berthoud dep., p. 58).

29.    Schaeffer had no indication or conversation with anyone prior to the Plaintiff's purchase of the house that there was a mold problem in the house. (Schaeffer dep. p. 57).

30.     The Marrone's had the option to terminate the Agreement of Sale within five (5) days of receipt of the Inspection Report.  (Schaeffer dep., p. 62-63, Exhibit 29).

31.     Linda Edleman executed a Seller's Property Disclosure Statement which indicated that she was not aware of any water leakage, accumulation of dampness within the basement or crawlspace.  (Edleman dep., pp. 30-31).

32.     To her knowledge, her former husband Jeffrey Edleman was not aware of any water leakage, accumulation or dampness within the basement or crawlspace.  (Edleman dep., p. 32).

33.     Ms. Edleman did not know of any repairs or other attempts to control a water or dampness problem in the basement or crawlspace.   Her husband never advised her that he had worked in the basement to correct any wetness or dampness in the basement.  (Edleman dep., pp. 33-34).

34.     Mrs. Edleman's former husband, Jeffrey Edleman, placed paneling in the basement in 1985 or 1986 to finish off the basement.  (Edleman dep., pp. 35-36).

35.     Defendant Edleman also indicated in the Seller's Disclosure Statement that she was not aware of any problems with her plumbing fixtures.  (Edleman dep., p. 37).

36.     Defendant Edleman lived in the house from 1984 to 1999 and did not notice any mold or wetness in the house.  (Edleman dep., pp. 63-64).

37.     Plaintiffs received the Housemasters inspection report at the time of the inspection, and their  agent, Chip Stanilla, received a copy of the Housemasters inspection report.  (Berthoud dep., pp. 58-60).

38.     Mr. Berthoud of Housemasters did not know Mr. Schaeffer prior to his inspection and did not provide a copy of his report to Schaeffer.  (Berthoud dep., pp. 58-60).

39.    Attached hereto as Exhibits and incorporated by reference are the following portions of deposition transcripts referred to in the Statement of Undisputed Material Facts:

A.    Karen Marrone,  pp. 54-57, 61, 71-72, 77-79, 82, 83 and 171.

B.    Jack Marrone, pp. 14-15, 73, 77, 113, 119, 138, 260-262.

C.    Matthew  Marrone, pp. 51-52, 60-61

D.    Vida Marrone, pp. 30-31

E.    Fred Schaeffer, pp. 12-14, 17-18, 32, 42-46, 57, 62-63, Exhibit 29.

F.    Linda Edleman, pp. 30-37, 63-64

G.    Charles E. Berthoud, Jr., pp. 58-60

**WHEREFORE,**  Defendants Fred Schaeffer and Mt. Gretna Realty respectfully request that this Honorable Court grant summary judgment in their favor and against the Plaintiffs.

Respectfully submitted,

**FINE, WYATT & CAREY, P.C.**

By:    _Edward A. Monsky_
Edward A. Monsky, Esquire
Attorneys for Defendants
Fred Schaeffer and Mt. Gretna Realty

425 Spruce St., 4th Fl.
Scranton, PA  18501
(570) 343-1197

6

**EXHIBIT**

tabbies®  *A*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . .

JACK MARRONE, husband, . Civil Action No.:
KAREN MARRONE, wife, both . 1:CV-01-0773
individually and in their .
capacity as parents and .
Guardians for VIDA MARRONE .
a minor, and MATTHEW ADAM .
MARRONE, .
            Plaintiffs . (U.S. District Judge
                      .    Yvette Kane)
       vs. .

ALLSTATE INSURANCE COMPANY, .
LINDA M. EDLEMAN, FRED .
SCHAFFER, MT. GRETNA REALTY,.
and HOUSEMASTERS, .
           Defendants .

. . . . . . . . . . .


## VOLUME II


Deposition of:   KAREN MARRONE

Taken by     :  Defendants

Date         :  June 27, 2002, 10:50 a.m.

Place       :  Nealon & Gover
                    2411 North Front Street
                    Harrisburg, Pennsylvania

Before      :  Ann M. Wetmore
                    Reporter - Notary Public

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JACK MARRONE, HUSBAND, :
KAREN MARRONE, WIFE, BOTH :
INDIVIDUALLY AND IN THEIR :
CAPACITY AS PARENTS AND :
GUARDIANS FOR VIDA MARRONE, :
A MINOR, AND MATTHEW ADAM :
MARRONE, :
         PLAINTIFFS :
                  :
        V        :   NO. 1:CV-01-0773
                  :
ALLSTATE INSURANCE COMPANY, :
LINDA M. EDLEMAN, FRED :
SHAFER, MT. GRETNA REALTY, :
AND HOUSE MASTERS, :
         DEFENDANTS : JURY TRIAL DEMANDED

        DEPOSITION OF: KAREN MARRONE

        TAKEN BY:    DEFENDANT ALLSTATE INSURANCE
                  COMPANY

        BEFORE:     MARIA N. O'DONNELL, RPR
                  NOTARY PUBLIC

        DATE:       MAY 29, 2002, 1:14 P.M.

        PLACE:      NEALON & GOVER, PC
                  2411 NORTH FRONT STREET
                  HARRISBURG, PENNSYLVANIA

APPEARANCES:

    TARASI, TARASI & FISHMAN
    BY: LOUIS M. TARASI, JR., ESQUIRE
        GIANNI FLORO, ESQUIRE
        FOR - PLAINTIFFS



HAEN
Reporting Service, Inc.

Hughes
Albright
Foltz
Natale

2080 Linglestown Road • Suite 103 • Harrisburg, PA 17110
717.540.0220 • Fax 717.540.0221 • Lancaster 717.393.5101

51

APPEARANCES:

TARASI, TARASI & FISHMAN, P.C.
By:   LOUIS M. TARASI, JR., ESQ.
      GIANNI FLORO, ESQ.

      For - Plaintiffs

THOMAS, THOMAS & HAFER
By:   JOHN J. McNALLY, III, ESQ.

      For - Defendant Linda M. Edleman

NEALON & GOVER, P.C.
By:   JAMES G. NEALON, III, ESQ.

      For - Defendant Allstate Insurance Company

DUANE, MORRIS & HECKSCHER, LLP
By:   JENNIFER L. MURPHY, ESQ.

      For - Defendant HouseMaster

FINE, WYATT & CAREY, P.C.
By:   EDWARD A. MONSKY, ESQ.

      For - Defendant Fred Schaeffer

ALSO PRESENT:

      KAREN MARRONE
      MATTHEW MARRONE
      VIDA MARRONE

Exam./Monsky - K. Marrone                              54

1    BY MR. MONSKY:

2    Q.    Yes.

3    A.    That's a little difficult for me.

4    Q.    You had used Chip Stanilla and Re/max as your

5          agent with regard to the purchase of the Edleman

6          property?

7    A.    Yes, sir.

8    Q.    Did Mr. Stanilla, did he show you other properties

9          in the Lebanon/Mount Gretna area?

10   A.    I don't know if it was in the Lebanon area.  He

11         did show us other properties, yes.  The locations,

12         I'm not good at that.

13   Q.    Do you recall how many other properties he had

14         shown you?

15   A.    I remember one with stairs, I remember one with a

16         large Florida room, and that's really all I

17         remember.

18   Q.    So, you recall at least two other properties that

19         he had shown you?

20   A.    Correct.

21   Q.    And do you recall whether they were in the Mount

22         Gretna area?

23   A.    No, they were not.

24   Q.    How many times had you gone through the Edleman

25         property before you entered into the agreement of

1       sale?

2   A.  That I don't know.

3   Q.  When do you first recall going through the Edleman

4       property?

5   A.  The first time I don't know what the date was.

6   Q.  Looking at the agreement of sale, it bears the

7       date first of July 7th of 1999.  Do you recall how

8       long before that time you went through the Edleman

9       property?

10  A.  Could you give me that date again?  I thought I

11      heard 1st of July 7.

12  Q.  July 7th is the date on the first page.

13  A.  July 7th.  It would have been prior to that date I

14      believe.

15  Q.  When you were first shown the property, who was

16      with you?

17  A.  My husband, Chip Stanilla, and probably both of

18      the children.

19  Q.  Was Fred Schaeffer or Linda Edleman there?

20  A.  Fred Schaeffer I had never met.

21  Q.  Now, your husband indicated that the only time

22      that he may have met Fred Schaeffer was at the

23      closing on the property.  Is that your

24      recollection?

25  A.  I never met Fred Schaeffer.  Fred Schaeffer and

Exam./Monsky - K. Marrone                                    56

1          Linda Edleman were in a different room.

2    Q.    So, have you seen the videotape of his deposition,

3          also of Linda Edleman's deposition?

4    A.    Yes, sir.

5    Q.    You recall seeing them at the closing, but they

6          were in a different room?

7    A.    The only one I recall seeing was Linda Edleman

8          when she left.  She left early.

9    Q.    Do you recall even seeing Fred Schaeffer in the

10         building when at the closing?

11   A.    In all honesty, no.

12             MR. TARASI:  Just wait until he finishes his

13         question.

14   BY MR. MONSKY:

15   Q.    Right, right.  Yeah, wait until I ask my question

16         and then I'll give you a chance to answer your

17         question.

18             I take it then that you did not, if he was

19         there, you didn't talk with him at the closing?

20   A.    No, sir.

21   Q.    Had you ever talked with him before the closing

22         about the Edleman property?

23   A.    Not to my knowledge.  I don't remember ever

24         meeting him.

25   Q.    And I take it that you have never talked with him

Exam./Monsky - K. Marrone                    57

1        after the closing after your discovery of the

2        mold?

3   A.   No, Chip was supposed to.

4   Q.   Do you know whether Chip Stanilla ever spoke with

5        him about the home or any problems associated with

6        the home after closing?

7   A.   When we discovered the mold, unfortunately I'm

8        sorry to say that's when Mr. Schaeffer's son had

9        been killed in an accident.  So, I don't know if

10       Chip ever spoke with him.

11  Q.   Since you never met Mr. Schaeffer and never talked

12       with him before the closing, I take it you didn't

13       rely on anything that he ever said about the

14       Edleman property in connection with your decision

15       to purchase the property?

16  A.   No, sir.

17  Q.   Getting back to your initial inspection of the

18       home, you said your husband and the children were

19       there and Chip Stanilla.  You don't recall Mrs.

20       Edleman being there?

21  A.   I don't remember her being there, no.

22  Q.   There's been some discussion in other depositions

23       about there being a lock box on the property.

24       When you came there, did Mr. Stanilla have a key

25       or obtain a key somewhere on the premises when he

Exam./Monsky - K. Marrone                     61

1    Q.   Did you discuss that with Mr. Stanilla, this mark

2         that--

3    A.   Yes.

4    Q.   What did he tell you about that?

5    A.   He said to get a house inspector because we didn't

6         know what it was.

7    Q.   And that was the reason that you eventually got a

8         house inspection once you entered into the

9         agreement of sale?

10   A.   Because--

11            MR. TARASI:   Just answer his question.

12   A.   Yes, sir.

13   BY MR. MONSKY:

14   Q.   Other than Mr. Stanilla saying you should get a

15        house inspection, was there any other discussion

16        with him about that mark?

17   A.   No.  Basically I wanted to know what it was.

18   Q.   He didn't give you an explanation of what it was?

19   A.   No.  He wanted to know too.

20   Q.   Did he make a comment that it was usual, unusual

21        or no comment one way or the other?

22   A.   I honestly don't remember.

23   Q.   Did you ever discuss that mark with Linda Edleman?

24   A.   No.

25   Q.   How long would you say you were there the first

Exam./Monsky - K. Marrone                           71

1   A.    Yeah.  Because we -- I don't remember going in the

2         house and I don't remember coming out of the

3         house.  Why, I don't know.  But I remember we were

4         out at the front dirt and that's where he was

5         telling us again you got to slope the soil away,

6         extend the gutters.  And then we walked around to

7         the side and I believe it was on the corner where

8         it would have been Vida's bedroom where there was

9         some black stuff and he explained that was some

10        kind of a coating.

11  Q.    Do you have a specific recollection of being with

12        Mr. Berthoud inside the house in the basement?

13        I'm still not clear on that.

14  A.    Yes, because I pointed that out to him.

15  Q.    All right.  When you pointed that out to him, who

16        else was there, you and your husband and--

17  A.    And Chip Stanilla.

18  Q.    And Chip, okay.  Did Mr. Stanilla say anything

19        further about what you saw on the cinder block or

20        what you saw in the basement the date that you

21        were there for the inspection?

22  A.    Not that I recall.

23  Q.    Did Mr. Stanilla express any concerns or

24        reservations about you purchasing the house during

25        the inspection by Chuck Berthoud?

1  A.   No.  I think he was waiting for what Mr. Berthoud

2        had to say.

3  Q.   Mr. Berthoud indicated that he actually gave you I

4        think it's called an express report, which is his

5        report about the property, he would have given

6        that to you the date that he made the inspection.

7        Is that your recollection?

8  A.   He gave me two papers outside by our truck.

9  Q.   Did they pertain to his inspection of the house?

10  A.   Yes, sir.

11  Q.   And on one of those papers did it indicate the

12        things that you've already talked about, sloping

13        the soil away, some recommendations that he made?

14  A.   Yes, sir.

15  Q.   Do you recall what it said about whether there was

16        moisture in the basement?

17           (Mr. Nealon now present)

18  A.   I remember on the paper it said that the

19        inspection was for a structural, wet basement.  I

20        think there was something else.  I don't remember

21        right now.

22  Q.   But did he -- that's what he was inspecting for.

23        Do you recall what he told you or what was said on

24        the report with regard to whether there was any

25        wetness in the basement?

Exam./Monsky - K. Marrone                    77

1    were there so I wouldn't have kept stuff like

2    that.  That's not right.

3  Q.  Now, did you go through the house the day of the

4    closing, in other words, was there a preclosing, a

5    walkthru or inspection?

6  A.  Yes.

7  Q.  How long before closing was that?

8  A.  The same day.

9  Q.  The same day, a couple of house beforehand?

10  A.  I don't know.

11  Q.  On that final walkthru day, who was with you that

12    day?

13  A.  Chip and my husband.  I don't know if the kids

14    were there or not.

15  Q.  What did you observe on that final walkthru?

16  A.  The house was filthy.  It was a pigsty.

17  Q.  Can you describe it in further detail for us?

18  A.  Okay.  The room that we couldn't get into

19    originally because it was a kid's room, which when

20    I opened the closet there was a big hole in the

21    closet.  The doors, there were holes in the doors.

22    The floors were dirty.  The oven looked like it

23    hadn't been cleaned in the entire time that it had

24    been in the house.  The refrigerator was cruddy.

25    The place was dirty.  Filthy.

Exam./Monsky - K. Marrone                                    78

1    Q.    Were all of the contents out of the house?

2    A.    The contents, she -- Linda Edleman had called me

3          up saying that she wanted to keep the curtains in

4          the living room, did I mind.  I said, no, I can

5          understand, maybe they meant something to her.

6          The only curtains she left were the ones, the two

7          in the kitchen and the two in the hallway.  She

8          took everything else.

9    Q.    So, she had taken all of the curtains?

10   A.    Um-hum, except for the two in the kitchen and the

11         two in the hallway.

12   Q.    When you observed all of this--

13   A.    And she took the heating downstairs in the lower

14         level.

15   Q.    Took what?

16   A.    The heating that was downstairs in the lower

17         level.

18   Q.    What type of heating?

19   A.    There was baseboard heaters down there.  She took

20         those too.

21   Q.    What did you do when you observed all of this?

22   A.    Nicely, how do I put this?  I was a little

23         perturbed and did not want to settle.

24   Q.    Did you tell Mr. Stanilla that?

25   A.    Yes.

1   Q.   Did he do anything about it before you got to the

2        closing?

3   A.   Well, he offered to have a cleaning team come in

4        and he said he could get me doors for $5 or $10 a

5        piece.

6   Q.   Who was going to pay for the cleaning service?

7   A.   He was.

8   Q.   Did he, in fact, pay for a cleaning service?

9   A.   Yes, he did.

10  Q.   Who did the cleaning after the closing?

11  A.   After the closing, I did.

12  Q.   But you said Chip was going to pay for a cleaning

13       service?

14  A.   That was afterwards.  They didn't come out

15       immediately.  The house was a pigsty.

16  Q.   And he also said he would buy you some doors?

17  A.   No, he said I could get doors for 5 or $10.  To me

18       that was minor.

19  Q.   Based on Chip's representations that he would get

20       a cleaning service and that you could get the

21       doors inexpensively, did you then proceed to go

22       through with the closing?

23  A.   After pressure from my son.  I still didn't want

24       to close in all honesty.

25  Q.   Matthew wanted the house because of the swimming

Exam./Monsky - K. Marrone                82

1          which--

2     Q.   Well, you made observations about the house being

3          filthy?

4     A.   Correct.

5     Q.   And I wanted to know if you made any additional

6          observations about water or moisture?

7     A.   Just the spot and, like I said, that glue stuff.

8     Q.   The same as previous?

9     A.   Correct.

10    Q.   You then went through with the closing.   Correct?

11    A.   Correct.

12    Q.   I had asked your husband did you have an attorney

13         for the closing?

14    A.   No, sir.

15    Q.   Was there any attorneys at closing that you

16         recall?

17    A.   I have no idea.

18    Q.   The closing took place at the Lebanon Land

19         Transfer Company in Lebanon, PA?

20    A.   I don't think so.   I thought it was at Re/max.

21    Q.   You recall it being at Mr. Stanilla's office at

22         Re/max?

23    A.   I believe so.

24    Q.   And was it your understanding that the real estate

25         commission was split equally between your agent,

Exam./Monsky - K. Marrone                          83

1      Re/max, and Mrs. Edleman's agent, Mount Gretna

2      Realty?

3   A. Yes, sir.

4   Q. When did you move into the property?

5   A. We took possession immediately.

6   Q. Now, from what you've indicated, you began to do

7      some cleaning at that point?

8   A. Yes, sir.

9   Q. When did you begin to move your things in, was it

10     that day?

11  A. Well, we had things in our camper.  I moved a lot

12     of stuff in the camper, so we started moving those

13     things in.

14  Q. What sort of things did you move in immediately

15     from the camper?

16  A. Oh, we had boxes of clothes and hanging clothes

17     and food and dishware, silverware.  Some of

18     Matthew's baseball cards we brought with us, my

19     files.

20  Q. What do you mean by your files?

21  A. I had a filing cabinet.  Actually I had two filing

22     cabinets, but I think I only had one that we

23     brought with us.  I don't remember everything.  I

24     packed that camper tight.

25  Q. What type of files are you referring to that you

Exam./McNally - K. Marrone                    171

1   A.   I did not notice that, no.

2   Q.   Did you detect any musty odors in the basement

3        between the time that you first saw the property

4        before you purchased it and when you returned from

5        Missouri in July of 2000?

6   A.   Did I notice in between that time?

7   Q.   Yes.  Any musty odors?

8   A.   Unfortunately, my nose was very stuffed.

9   Q.   Did any of your family members report to you or

10       complain of musty odors throughout the house?

11  A.   Not to my knowledge.

12  Q.   Now, you had HouseMasters out to inspect the

13       property before you purchased it.  Correct?

14  A.   Correct.

15  Q.   And they generated a report that you had the

16       chance to review before you went to settlement.

17       Correct?

18  A.   Correct.

19  Q.   At any point in time did you ask Linda Edleman to

20       correct any of the items noted in the

21       HouseMaster's report?

22  A.   No.

23  Q.   Why not?

24  A.   I don't know.

25  Q.   Did you review the report with your realtor?

EXHIBIT

tabbies®

B



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JACK MARRONE, HUSBAND, :
KAREN MARRONE, WIFE, BOTH :
INDIVIDUALLY AND IN THEIR :
CAPACITY AS PARENTS AND :
GUARDIANS FOR VIDA MARRONE,:
A MINOR, AND MATTHEW ADAM :
MARRONE, :
    PLAINTIFFS :
     :
  V    : NO. 1:CV-01-0773
     :
ALLSTATE INSURANCE COMPANY,:
LINDA M. EDLEMAN, FRED :
SHAFER, MT. GRETNA REALTY, :
AND HOUSE MASTERS, :
    DEFENDANTS : JURY TRIAL DEMANDED

    DEPOSITION OF: JACK MARRONE

    TAKEN BY:  DEFENDANT ALLSTATE INSURANCE
         COMPANY

    BEFORE:   MARIA N. O'DONNELL, RPR
         NOTARY PUBLIC

    DATE:    MAY 29, 2002, 9:21 A.M.

    PLACE:   NEALON & GOVER, PC
         2411 NORTH FRONT STREET
         HARRISBURG, PENNSYLVANIA

APPEARANCES:

  TARASI, TARASI & FISHMAN
  BY: LOUIS M. TARASI, JR., ESQUIRE
    GIANNI FLORO, ESQUIRE
    FOR - PLAINTIFFS



HAEN
Reporting Service, Inc.

Hughes
Albright
Foltz
Natale

2080 Linglestown Road • Suite 103 • Harrisburg, PA 17110
717.540.0220 • Fax 717.540.0221 • Lancaster 717.393.5101

NEALON & GOVER, PC
BY: JAMES G. NEALON, III, ESQUIRE
    FOR - DEFENDANT ALLSTATE INSURANCE COMPANY

THOMAS, THOMAS & HAFER, LLP
BY: JOHN FLOUNLACKER, ESQUIRE
    FOR - DEFENDANT EDLEMAN

FINE, WYATT & CAREY, P.C.
BY: EDWARD A. MONSKY, ESQUIRE
    FOR - DEFENDANTS SCHAEFFER AND MT. GRETNA REALTY

DUANE, MORRIS & HECKSHER, LLP
BY:  JENNIFER L. MURPHY, ESQUIRE
    FOR - DEFENDANT HOUSE MASTERS

ALSO PRESENT:
    VIDA MARRONE
    MATTHEW ADAM MARRONE
    KAREN MARRONE



2080 Linglestown Road • Suite 103 • Harrisburg, PA 17110
717.540.0220 • Fax 717.540.0221 • Lancaster 717.393.5101

**JACK MARRONE**
**MAY 29, 2002**

Multi-Page™

---

Page 14

1    Q  Why move near the Lebanon VA as opposed to closer
2  to the Columbia Missouri VA, for instance?
3    A  Why?
4    Q  Yes.
5    A  Convenience, everything was around -- everything
6  was around Lebanon, PA.
7    Q  Had you ever visited Lebanon before?
8    A  We lived in Lancaster.
9    Q  When did you live in Lancaster?
10   A  1984, '85.
11   Q  For how long?
12   A  Three, four years.
13   Q  That explains a little better.  So you were
14  familiar with the area?
15   A  Right.
16   Q  Decided to come back because you are closer to
17  Lebanon VA?
18   A  Right.
19   Q  Then, as I understand it, you started looking for
20  real estate?
21   A  Yes.
22   Q  In the Lebanon area?
23   A  Yes.
24   Q  How many realtors did you contact, or did you
25  work through a realtor?

---

Page 15

1    A  Well, we drove around on our own for awhile.
2    Q  Had you ever entered into any what are sometimes
3  called buyers agreements with the realtor for them to act as
4  your realtor?
5    A  No.
6    Q  So you didn't have a buyers agent?
7    A  No.
8    Q  All right.  How did you find this particular
9  house owned by Linda Edleman at the time?
10   A  Realty.
11   Q  Which realtor?
12   A  Remax.
13   Q  Okay.  How did you get to Remax?
14   A  Drove there.
15   Q  See, us lawyers often ask bad questions and that
16  was one of them.
17      How did you learn of Remax to go to them, in
18  other words --
19   A  Just paper I think.
20     MR. TARASI: You don't guess, Jack.  If don't
21  know, you don't know.
22     THE WITNESS: I don't remember at the time.
23  BY MR. NEALON:
24   Q  Do you know who you dealt with at Remax?
25   A  Chip Stinella.

---

Page 16

1    Q  Who had you already seen the Edleman house before
2  you met with Chip?
3    A  No.
4    Q  Okay.  So you went to Chip to try and get some
5  help in finding a house?
6    A  Yes.
7    Q  Do you know how many houses that you looked at
8  with Mr. Stinella?
9    A  No.
10   Q  Okay.
11   A  Quite a few.
12   Q  Do you know how many that you actually walked
13  through?
14   A  Quite a few.
15   Q  More than one, right?
16   A  Yes.
17   Q  Do you think more than ten?
18   A  Don't know.  Few quite a few.
19   Q  Do you know when you first met with Mr. Stinella?
20   A  Not offhand.  Do you want exact date and time?
21   Q  Well, let me -- I understand that you wouldn't
22  know the exact date and time, it looks like the agreement of
23  sale between you and Linda Edleman was July 7th, 1999.
24      Can you place it in relationship to that date?
25  Was it a week, a day, a month before then?

---

Page 17

1    A  Maybe two, three, two weeks, three weeks.  I
2  don't know, I can't recall.
3    Q  Do you know how you came to be looking at the
4  Edleman property then?
5    A  I believe he suggested it.
6    Q  Okay.
7    A  From his listings.
8    Q  Do you know how many times that you went through
9  the Edleman property prior to entering into the agreement of
10  sale?
11   A  I don't recall.  Quite a few.  Maybe twice, once
12  or twice.  I don't recall.
13     MR. NEALON: All right.  Let's get this marked as
14  Marrone 1.
15     (Document produced and marked Marrone Exhibit
16  Number 1.)
17     MR. NEALON:  I am going to show you what has been
18  marked as Marrone Exhibit No. 1, at this point I am not sure
19  who gave that to us, but it appears to be the agreement of
20  sale.
21     (Discussion held off the record.)
22     MR. NEALON: It looks like page four of eight
23  might be missing.  We can add that to it.
24      My question -- point of questioning is more for
25  historical timeframe than any questions about the document.

---

**HUGHES, ALBRIGHT, FOLTZ & NATALE**
717-540-0220\717-393-5101

**JACK MARRONE**                    Multi-Page™
**MAY 29, 2002**

---

### Page 70

1    MR. FLOUNLACKER: Seven.
2        (Document produced and marked Marrone Exhibit
3    Number 7.)
4        (Brief recess.)
5    MR. FLORO: Jennifer, this is not a complete copy
6    according to your --
7    MS. MURPHY: No, it has front and back. I
8    actually don't have the original. He has these two pages
9    which are front two pages, but on the back explanations.
10    MR. FLOUNLACKER: Sir --
11    MR. FLORO: Did you hear that?
12    MS. MURPHY: Off the record.
13        (Discussion held off the record.)
14    BY MR. FLOUNLACKER:
15    Q   Sir, do you have Exhibit Seven in front of you?
16    I am told it's an incomplete copy of a document that was
17    generated by House Masters. Is that a yes?
18    A   I believe so.
19    Q   This document first page is dated July 30, 1999.
20    Do you see that?
21    A   Where? Okay. Yes.
22    Q   Is it -- whose decision was it to hire
23    property -- House Masters in connection with your purchase
24    of this property?
25    A   I believe my wife's.

### Page 71

1    Q   Did you play any role in the decision-making
2    process to engage House Masters in connection with your
3    purchase of this property?
4    A   Yes, mutually.
5    Q   What was your personal interest or desire or why
6    did you personally want to engage House Masters in
7    connection with the purchase of this property?
8    A   I believe my wife said they were supposed to be
9    good at it, good.
10    Q   I understand that you said that the decision to
11    use House Masters was a mutual decision, correct?
12    A   Yes. Yes.
13    Q   Part of it was your wife's interest and desire to
14    use House Masters, and part of it was your interest in using
15    House Masters, am I correct with that?
16    A   Eighty percent hers, twenty percent me.
17    Q   Okay. Sounds like my house.
18        To the extent of your twenty percent, what was
19    your motivation for wanting to use House Masters?
20    A   My wife's judgment.
21    Q   Did you have any independent --
22    A   You said to be honest. I am being honest with
23    you.
24    Q   Please continue to do so.
25        Did you have any independent reason or basis to

### Page 72

1    use House Masters in connection with the purchase of this
2    home?
3    A   No. My wife said it was good, it was good.
4    Q   So other than using -- other than what your wife
5    said, you had no other reason for engaging House Masters for
6    the purposes of inspecting this home?
7    A   Let's get something straight here first. My
8    wife -- I am not good at paperwork. I am not good at -- my
9    wife did all of the organization work. She handled
10    everything for me. I don't -- all I do, just about listen
11    to her because she has better judgment than I do.
12    Q   You had no reason of your own concerning the use
13    of House Masters regarding the purchase of this property?
14    A   No.
15    Q   What's your understanding about why House Masters
16    was hired or retained here?
17    A   What was my understanding?
18    Q   Yes. Why were they hired?
19    A   They were professionals.
20    Q   What purpose -- what did you hire them to do?
21    A   Inspect the home.
22    Q   Why?
23    A   Because it had to be inspected.
24    Q   Why?
25        MR. TARASI: I will object to that question.

### Page 73

1        THE WITNESS: That's the law.
2        MR. TARASI: I am going to object. That's been
3    asked and answered. He said the VA required it, he said he
4    had to do it, and he said it's the law, but anyhow, he
5    has --
6        MR. FLOUNLACKER: If I may, just so we're clear
7    on what your counsel is saying, my understanding is your
8    reason, your personal reason for wanting this house
9    inspected was, one, it's your understanding of what the law
10    required, it was a requirement of VA financing, and it's
11    what your wife wanted to do?
12        THE WITNESS: Not completely.
13    BY MR. FLOUNLACKER:
14    Q   Where am I wrong?
15    A   I wouldn't buy a house unless I had a
16    professional opinion.
17    Q   That's your opinion?
18    A   Yes, that's my opinion.
19    Q   What was House Masters supposed to be inspecting
20    regarding the Mount Gretna property?
21    A   I believe constructional, I don't know the
22    requirements.
23    Q   What was your understanding about what they would
24    be looking at, sir?
25    A   The house.

---

**HUGHES, ALBRIGHT, FOLTZ & NATALE**
                                    **717-540-0220\717-393-5101**

Page 74

1    Q  What about the house, any particular systems
2  within the home?
3    A  I believe so.
4    Q  Was it your understanding they would be checking
5  the roof?
6    A  I would hope so.
7    Q  Is it your understanding that they would be
8  checking the wiring in the home?
9    A  I would hope so.
10    Q  Foundation of the home?
11    A  I would hope so.
12    Q  Was it your understanding that House Masters
13  would be inspecting the basement to the property?
14    A  I would hope so.
15    Q  Up to the point that the home was inspected by
16  House Masters, I got a date here of July 30, 1999?
17    A  Okay.
18    Q  Up to that point, do you have any independent
19  recollection about anything that Ms. Edleman may have said
20  to you regarding the condition of the Mount Gretna property?
21    A  No.
22    Q  Do you recall being present while House Masters
23  inspected the Mount Gretna property?
24    A  Yes.
25    Q  Tell me what you remember about that.

Page 7

1  says water penetration?
2    A  Yes.
3    Q  Then down under water penetration there is the
4  No. 1 and it says indications of water penetration
5  conditions?
6    A  Where?  I just see water penetration.
7    Q  Right there, sir.  Do you see that?
8    A  Indications -- yes, okay, yes.
9    Q  Do you see where it is X'd off here?  It says
10  water marks/stains.  Do you see that?
11    A  Yes.
12    Q  While you were there at the property, do you
13  remember seeing anything in the basement that suggested to
14  you that there were water marks or stains down there?
15    A  Just calcified, some calcification.
16    Q  What do you mean, sir?
17    A  Water stains.
18    Q  Where did you see them?
19    A  On the wall, one wall.
20    Q  Okay.  What did it look like, sir?
21    A  Water mark.
22    Q  What color was it?
23    A  White.
24    Q  Other than that, did you see anything else in the
25  basement that one would call a water mark or a stain or that

Page 75

1    A  I just remember them going down in the basement.
2  I was with them.  He looked around with the flashlight here
3  and there.  And his recommendation was to -- I believe to
4  divert the downspouts, gutters and leaders and to drain soil
5  away from the home.
6    Q  That's what the --
7    A  Yes, to terrace the soil.
8    Q  I got you.
9        And that was said to you by somebody from -- the
10  inspector from House Masters?
11    A  Yes, that was his recommendation.
12    Q  And -- but just so I am clear on what you are
13  telling me, that you recall a conversation with him at the
14  home on the date of the inspection?
15    A  I don't recall when I had the conversation with
16  him.  I know it was before -- I think it was just before he
17  left.  I am not sure.
18    Q  Sir, can you find this page on Exhibit 7?  I am
19  not sure of the number.  It's the one that looks like this.
20    MR. TARASI: Down here.
21    THE WITNESS:  Okay.
22    Exactly what I said.  Slope soil away.
23    MR. TARASI: Let him ask the questions.
24  Y MR. FLOUNLACKER:
25    Q  Sir, do you see -- do you see here midway down it

Page 7

1  you would call a water mark or a stain?
2    A  Yes, on the peg board.
3    Q  What did you see?
4    A  A black stain.
5    Q  How big was it?
6    A  Oh, by eye, maybe a foot by foot and a half, two
7  foot.
8    Q  Okay.  Did you see anything else that you saw
9  that resembled or what you would call a water mark or a
10  stain?
11    A  Not that I recall.
12    Q  Was Ms. Edleman down there in the basement with
13  you while this inspection was taking place?
14    A  I don't believe so.
15    Q  On the front of the page or the front of this
16  form it says people present for the inspection were the
17  clients, owner, and Chip Stinella.
18    A  Yes.
19    Q  Does that refresh your memory as to who was at
20  the property when the inspection was taking place?
21    A  I believe she was there, but not in the basement.
22    Q  Okay.  Other than what you have already told me,
23  sir, do you remember seeing anything else at the time of
24  this inspection that looked like a water mark or a stain in
25  the basement?

JACK MARRONE
MAY 29, 2002

Multi-Page™

---

Page 110

1  transaction?
2      A  Yes, I believe so.
3      Q  Was there any problems with the home that led to
4  any claims or lawsuits?
5      A  No.  I bought it on a VA -- back then the VA did
6  inspections, back in those days.
7      Q  With regard to the Edleman home, you did not get
8  a VA loan for that, is that correct?
9      A  Yes, we did.
10     Q  You did get a VA loan?
11     A  Yes, we did.
12     Q  Did the VA require an inspection for the Edleman
13  home?
14     A  Well, that's when I was surprised.  They said
15  they don't need to do that any more.
16     MR. TARASI: Wait a minute.
17  BY MR. MONSKY:
18     Q  No inspection prior to the VA?
19     MRS. MARRONE: You are not listening.
20     MR. TARASI: No, that's not so.  They required an
21  inspection.  They did -- they didn't do it.
22  BY MR. MONSKY:
23     Q  I thought from the closing statement there was a
24  mortgage company called Equity One.  Is that affiliated with
25  the VA?

---

Page 111

1      A  No.  I believe Equity One was bought by Homeside.
2      Q  How is that connected with the VA?
3      A  I don't know.
4      Q  Okay.  All right.
5      A  They picked up the mortgage.
6      MR. NEALON: Off the record.
7      (Discussion held off the record.)
8  BY MR. MONSKY:
9      Q  After you got out of Vietnam, did you work in the
10  private sector?
11     A  Yes.
12     Q  What kind of jobs did you have?
13     A  Drove tractor trailer for 24 years.
14     Q  And when did you stop driving tractor trailer for
15  a living?
16     A  When the family -- when the VA gave -- when they
17  finally -- when the VA finally gave me one hundred percent
18  disability.
19     Q  What year was that?
20     A  Dates back to '93.
21     Q  How many years did you live in Philadelphia?
22     A  I don't really like to know that.  Ten years.
23     Q  That was all with your first wife?
24     A  Yes.  Twelve --
25     Q  Twelve years?

---

Page 112

1      A  Twelve years.
2      Q  Then the next place that you lived was Lancaster?
3      A  No.
4      Q  Where did you move after Philadelphia?
5      A  Moved in with my wife.
6      Q  Where was that?
7      A  North Philly.
8      Q  All right.
9      A  I got to tell the truth here.  I will get in
10  trouble if I don't.
11     Q  At that point then you moved from Lancaster to
12  Dixon, Missouri?
13     A  Yes.
14     Q  Did you say that you have a trailer out there
15  or --
16     A  I have a fifth wheel.
17     MRS. MARRONE: Jack --
18     THE WITNESS:  What are you talking about?
19  BY MR. MONSKY:
20     Q  Dixon --
21     A  We have a home.
22     Q  Have you ever had mold problems in any of your
23  other residences?
24     A  No.
25     Q  Can you describe your house in Dixon, Missouri

---

Page 113

1  for me?  What type of home is it?
2      A  It's a split foyer with a basement being below
3  level.  It's a three bedroom bi-level I guess you would call
4  it here.
5      Q  Okay.  And you have been living -- you have been
6  living there continuously since you went back to Missouri
7  October of 2000?
8      A  Yes.
9      Q  When you worked with Chip Stinella, at what point
10  in time did you meet Fred Schaeffer?
11     A  Never met him.
12     Q  Never met him at all?
13     A  Never met the man.
14     Q  Did you ever talk with Mr. Schaeffer?
15     A  Never.
16     Q  Do you know whether your wife met or spoke with
17  him?
18     A  Not to my knowledge.
19     Q  I take it then since you never met or spoke with
20  him, that you didn't rely on anything that he said about the
21  property?
22     A  No.
23     Q  Were you ever at Mount Gretna Realty?
24     A  Yes.
25     Q  For what purpose?

---

HUGHES, ALBRIGHT, FOLTZ & NATALE
717-540-0220\717-393-5101

Page 118

1     A   The only question that I had was on this here was
2   why so much money for closing.
3     Q   You had gotten a statement of closing costs when
4   you originally signed the sales agreement, there was a
5   statement of the buyers closing costs?
6     A   Yes.
7     Q   Was Mrs. Edleman there at the closing?
8     A   Oh, yes.  I remember that.  She walked out.  Yes.
9     Q   Was there some dispute at that time?
10        You don't have to look at your wife, just answer
11  to the best of your recollection.
12    A   I don't remember.  She walked out.  I can't --
13  she walked out and I don't know  she was mad at her lawyer
14  or somebody.  I don't know.  She came back in again.
15    Q   In other words, at some point before the closing
16  was completed, she walked out then came back in?
17    A   I believe so.
18    Q   Do you know what she was angry about?
19    A   No.
20    Q   Did you have an attorney at that closing for you
21  and your wife?
22    A   I didn't -- can't recall.
23    Q   You believe that you did have an attorney?
24        MR. TARASI:  Can't recall he said.
25        THE WITNESS:  I can't recall.

Page 119

1   BY MR. MONSKY:
2     Q   Was Mr. Stinella there?
3     A   Yes, he was.
4     Q   You don't know --
5     A   Quite a few people there.  I couldn't remember
6   them all.
7     Q   You don't remember Mr. Schaeffer or anyone else
8   from Mount Gretna Realty there?
9     A   No, I don't.
10    Q   At the closing?
11    A   I wouldn't even know what he looked like.
12        MR. TARASI:  Look, just answer his questions.
13        THE WITNESS:  Okay.
14        MR. TARASI: Okay.
15  BY MR. MONSKY:
16    Q   Okay.  And at the time closing, was there any
17  discussion about water in the basement?
18    A   No, not that I know of.
19    Q   When you got to the inspection from the House
20  Masters, did Fred Schaeffer or Mount Gretna Realty have
21  anything to do with setting that up?
22    A   What was that question again?
23    Q   You got an inspection from House Masters that's
24  been previously identified as an exhibit, and I thought that
25  it was your wife testified that you folks went out and hired

Page 120

1   House Masters.  Is that your understanding?
2     A   My wife called House Masters.
3     Q   Okay.  It was not a recommendation of Fred
4   Schaeffer or anyone else from Mount Gretna Realty?
5     A   No.
6     Q   The closing was August 31 of 1999.  Did you move
7   in directly after that?
8     A   A day later.
9     Q   There were some recommendations from House
10  Masters in terms of the -- we have talked about them, the
11  down spout and --
12    A   Go back to that.  What do you mean move into it?
13  With the furniture and everything?
14    Q   Well, first of all, when did you and your wife
15  and family occupy the house?
16    A   I don't know if it was a couple days waiting for
17  furniture.  I can't recall how soon.
18    Q   What happened?  You said that you were living in
19  a trailer for three months.
20        What happened to that trailer?  Was that a
21  rental?
22    A   No.  I brought it out to my son in Missouri.
23  It's my trailer.  It's a camper.  Excuse me, not a trailer.
24    Q   Is that what happened after closing is you took
25  the camper back to Missouri, then you brought some furniture

Page 121

1   back to the house in Mount Gretna?
2     A   No.
3     Q   You tell me what happened then.
4     A   I brought the camper to my son who was going to
5   college out in Springfield, Missouri.  He needed a place to
6   stay.  We stayed with him a couple of days, came back to the
7   house in Missouri, and several days later went down in the
8   basement and I came upstairs and I said -- I think I -- I
9   said to my wife you should see what the hell is down there,
10  just like that.
11        MR. TARASI:  Wait a minute.
12        MRS. MARRONE:  That's not what he was asking you.
13        MR. MONSKY:  I am totally -- you totally confused
14  me.
15        MR. TARASI:  You are totally off.  You didn't go
16  to the basement in the house in Missouri.
17        THE WITNESS:  I am sorry, Missouri, I am sorry.
18  BY MR. MONSKY:
19    Q   I am trying to make this simple.  I am not trying
20  to confuse you.  I am just trying to get to the facts.
21        You brought the camper to your son in
22  Springfield, Missouri?
23    A   Yep.
24    Q   First of all --
25    A   I thought you said lead up to the events.

Multi-Page™

Page 138

1  let him finish question.
2  BY MR. MONSKY:
3      Q  Please.
4      A  Oh.
5      Q  Did Chip Stinella give you any recommendations
6  about what to do in your basement once if you discovered
7  this A Bomb of mold?
8      A  I don't recall.
9      Q  After you discovered the mold, did you ever
10 report this to Fred Schaeffer or anyone at Mount Gretna
11 Realty?
12     A  I don't recall.
13     Q  To this day, do you know if you have ever spoken
14 with Fred Schaeffer or ever met Fred Schaeffer?
15     A  No, I don't know what he even looks like.
16     Q  Are you aware of any other homes in Mount Gretna
17 that had a mold problem like your home?
18     A  Not that I know of.
19     Q  You had mentioned that after you -- correct me if
20 I am wrong, after you discovered this mold problem, that's
21 when you bought the dehumidifier from your neighbor,
22 Mr. Bentz, is it?
23     A  Bentz, Tom Bentz.
24     Q  Tom Bentz.
25        Is that with a B?

Page 139

1      A  Yes.
2      Q  And how far away did Tom live from you?
3      A  I could look in his window.
4      Q  So he's right next door?
5      A  Yes, catercorner.
6      Q  Did he ever tell you he had a water problem or
7  mold problem at his house?
8      A  Not that I recall.
9      Q  Did any of your neighbors ever tell you that they
10 had had a water problem or a mold problem?
11     A  We didn't know too many people.  We were new
12 there.
13     Q  Other than Tom, what other neighbors did you know
14 in the Mount Gretna area?
15     A  None.
16     Q  You didn't meet any folks?
17     A  Yes, I did meet a guy.  I met a Vietnam veteran
18 friend -- or acquaintance.
19     Q  Did he live in the same general area?
20     A  No, Manheim.
21     Q  Manheim.  Okay.
22        Other than Mr. Tom Bentz, anybody else that you
23 became friendly with in the Mount Gretna community?
24     A  No, very hard people to get acquainted with
25 people.

Page 140

1      Q  Pardon?
2      A  No, very hard people to get acquainted to.
3          MR. TARASI: Jack, just answer his question.
4          THE WITNESS:  No.
5  BY MR. MONSKY:
6      Q  Any knowledge that Mr. Schaeffer or anyone from
7  Mount Gretna Realty knew of any problems with water or
8  dampness or mold in the basement of the home that you
9  purchased?
10     A  Now, you are asking me a question, I believe that
11 they had to know.
12     Q  What is the basis for that belief?
13     A  What is the basis?  They had to know, they had
14 been in that business for years in that area.
15     Q  Well, you just told me that you are the only home
16 that you are aware of that had a mold problem.
17        What leads you to believe that Mr. Schaeffer had
18 knowledge of other homes that had mold problems?
19     A  Rephrase that question again.
20     Q  I thought that you had told me that you were not
21 aware of any other homes in the Mount Gretna area that had
22 water problems or mold problems.
23        How then do you come to the conclusion that
24 Mr. Schaeffer must have known that there was a problem wit
25 the home that you had purchased?

Page 14

1      A  Because he was a real estate agent to sell homes
2  in that area and I believe that he knows what is in that
3  area.
4      Q  Does Mr. Stinella also know about homes in the
5  area, he's a realtor in that area, isn't he?
6      A  No.
7      Q  Where is Mr. Stinella based?
8      A  Outside of Lebanon.
9      Q  How far is that from Mount Gretna?
10     A  I would say about fifteen miles.
11     Q  So it's your understanding that Mr. Stinella does
12 not know about homes in Mount Gretna, but Mr. Schaeffer
13 does?
14     A  Well, one office is in Lebanon, the other office
15 is in Mount Gretna.
16     Q  Is that the reason that you did not sue
17 Mr. Stinella, because you don't believe that he was familiar
18 with homes in the Mount Gretna area?
19     A  No, that's not the reason.
20     Q  What is the reason that you did not sue
21 Mr. Stinella who is listed as your agent on the sales
22 agreement?
23     A  What was that question again?
24     Q  What is the reason that you did not sue
25 Mr. Stinella who is listed as your agent on the real estate

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . .
JACK MARRONE, husband,  . Civil Action No.:
KAREN MARRONE, wife, both  . 1:CV-01-0773
individually and in their  .
capacity as parents and  .
Guardians for VIDA MARRONE  .
a minor, and MATTHEW ADAM  .
MARRONE,  .
                Plaintiffs  . (U.S. District Judge
                            . Yvette Kane)
        vs.  .
                                .
ALLSTATE INSURANCE COMPANY, .
LINDA M. EDLEMAN, FRED  .
SCHAFFER, MT. GRETNA REALTY,.
and HOUSEMASTERS,  .
                Defendants  .
. . . . . . . . . . . . . . .


<u>VOLUME II</u>


Deposition of:  JACK MARRONE

Taken by      :  Defendants

Date          :  June 27, 2002, 10:37 a.m.

Place         :  Nealon & Gover
                 2411 North Front Street
                 Harrisburg, Pennsylvania

Before        :  Ann M. Wetmore
                 Reporter - Notary Public

232

APPEARANCES:

      TARASI, TARASI & FISHMAN, P.C.
      By:  LOUIS M. TARASI, JR., ESQ.
            GIANNI FLORO, ESQ.

          For - Plaintiffs

      THOMAS, THOMAS & HAFER
      By:  JOHN J. McNALLY, III, ESQ.

          For - Defendant Linda M. Edleman

      NEALON & GOVER, P.C.
      By:  JAMES G. NEALON, III, ESQ.

          For - Defendant Allstate Insurance Company

      DUANE, MORRIS & HECKSCHER, LLP
      By:  JENNIFER L. MURPHY, ESQ.

          For - Defendant HouseMaster

      FINE, WYATT & CAREY, P.C.
      By:  EDWARD A. MONSKY, ESQ.

          For - Defendant Fred Schaeffer

ALSO PRESENT:

      KAREN MARRONE
      MATTHEW MARRONE
      VIDA MARRONE

233

INDEX
WITNESS

Examination

JACK MARRONE

By Ms. Murphy                           234

By Mr. Nealon                           248

By Mr. McNally              249, 263, 264

By Mr. Monsky                           257

By Mr. Tarasi                           262

)

Exam./Monsky - J. Marrone                 260

1          in the house while you were away in July?

2    A.    Buildup of heat?

3    Q.    Yeah.  In other words, you left your home closed

4          up?

5    A.    In July?

6    Q.    Yeah.

7    A.    No.

8    Q.    Was this the first time that you had closed up

9          your home and gone out to Missouri from the time

10         you purchased the home in Mount Gretna?

11   A.    Yes.

12   Q.    Other than that time, you had occupied it

13         continuously, other than the time you went out to

14         Missouri in July?

15   A.    Yes.

16   Q.    After you returned back when you discovered the

17         mold, did you have any contact or conversations

18         with Fred Schaeffer from Mount Gretna Realty?

19   A.    Not that I recall.

20   Q.    And as I understand it, the only time you ever met

21         him was at the closing when you signed the

22         paperwork for the property?

23   A.    I didn't even remember seeing him there either.

24         The first time I saw him was on videotape.

25   Q.    All right.  You've seen his videotaped deposition?

1   A.   Yeah.

2   Q.   When you saw the videotape, did you recognize him?

3   A.   No.

4   Q.   So, even as you sit here today you are still not

5        sure that he was even at the closing?

6   A.   I can't remember all of the faces that were there.

7        It was a lot of people there.

8   Q.   I had asked you at the first part of your

9        deposition at the end of May about whether or not

10       you had an attorney on your behalf at the closing.

11       Have you searched your records or searched your

12       memory with regard to that?

13  A.   I don't recall if we did.  I think we put our

14       trust in our agent.

15  Q.   And your agent, again, for the record was Chip

16       Stanilla from Re/max?

17  A.   Yes, sir.

18  Q.   And you actually had a buyer's agency agreement

19       with him that he was the agent for the buyer?

20  A.   Yes, sir.

21  Q.   And he got 3 percent commission as part of the

22       real estate closing?

23  A.   I didn't know exactly how much commission he got

24       at the time.

25  Q.   Well, if I were to show you the closing statement

Exam./Tarasi - J. Marrone                    262

1          which indicates that his agency got 3 percent, do

2          you have any reason to disagree with that?

3   A.     No.

4   Q.     So, you put your trust in your own real estate

5          agent, Mr. Stanilla.  Is that correct?

6   A.     Yes, sir.

7                MR. MONSKY:  Thank you.

8                MS. MURPHY:  I have nothing.

9                MR. NEALON:  No follow-up.

10               MR. TARASI:  Okay, I just have a couple.

11                            EXAMINATION

12  BY MR. TARASI:

13  Q.     Jack, my understanding is from your previous

14         testimony that you're totally disabled.  Right?

15  A.     Yes, sir.

16  Q.     Service connected?

17  A.     Yes, sir.

18  Q.     And also I understand, I don't know if you made

19         this clear, did you after Advanced talked to your

20         wife, did you seal off the basement?

21  A.     Yes, sir.

22  Q.     And is that because of the advice that Advanced

23         gave to your wife?

24  A.     Yes, sir.

25               MR. TARASI:  That's all of the questions I

**EXHIBIT**

tabbies®

$C$

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . .
JACK MARRONE, husband          .  Civil Action No.:
KAREN MARRONE, wife, both      .  1:CV-01-0773
individually and in their      .
capacity as parents and        .
guardians for VIDA MARRONE     .
a minor, and MATTHEW ADAM      .
MARRONE,                       .
              Plaintiffs       .
                               .
    vs.                        .  (U.S. District Judge
                               .     Yvette Kane)
ALLSTATE INSURANCE COMPANY,    .
LINDA M. EDLEMAN, FRED         .
SHAFFER, MT. GRETNA REALTY,    .
and HOUSEMASTERS,              .
              Defendants        .
. . . . . . . . .

Deposition of:  MATTHEW ADAM MARRONE

Taken by      :  Defendants

Date          :  June 28, 2002, 11:08 a.m.

Place         :  Nealon & Gover
                 2411 North Front Street
                 Harrisburg, Pennsylvania

Before        :  Ann M. Wetmore
                 Reporter - Notary Public

2

APPEARANCES:

       TARASI, TARASI & FISHMAN, P.C.
       By:  LOUIS M. TARASI, JR., ESQ.
            GIANNI FLORO, ESQ.

          For - Plaintiffs

       THOMAS, THOMAS & HAFER
       By:  JOHN FLOUNLACKER, ESQ.

          For - Defendant Linda M. Edleman

       NEALON & GOVER, P.C.
       By:  JAMES G. NEALON, III, ESQ.

          For - Defendant Allstate Insurance Company

       DUANE, MORRIS & HECKSCHER, LLP
       By:  JENNIFER L. MURPHY, ESQ.

          For - Defendant HouseMaster

       FINE, WYATT & CAREY, P.C.
       By:  THOMAS J. KILLINO, ESQ.

          For - Defendant Fred Schaeffer

ALSO PRESENT:

       JACK MARRONE
       KAREN MARRONE
       VIDA MARRONE

1       but in the sifting through process or the

2       elimination process, did you go with your folks to

3       look at houses and give your opinion on what you

4       thought about them?

5   A.  We did and there was a house that we spoke about

6       in Maryland that had an indoor pool and that was

7       definitely first on my list.  But I think the

8       problem with Maryland was taxes or something else.

9       But the other homes that we looked at were kind of

10      plain.

11  Q.  Now, do you recall working with a real estate

12      agent from Re/max or your parents working with

13      that guy?

14  A.  I don't know where he was from.

15  Q.  Do you remember the guy's name?

16  A.  Chip Stanilla, Danilla, something to that sort.

17  Q.  That's the guy I know too.  Do you ever remember

18      anybody other than Chip working with your parents

19      in trying to find some property?

20  A.  I don't remember.

21  Q.  Do you remember ever going to look at properties

22      other than those identified for you by Chip?

23  A.  I don't know which ones were identified by Chip.

24  Q.  Am I correct, though, it's your understanding that

25      Chip was the guy that identified the Mount Gretna

Exam./Flounlacker - M. Marrone                    52

1          property for you and your folks, the one that you

2          ultimately wound up moving into?

3     A.   I believe he did.

4     Q.   Do you recall the first time that you visited the

5          property?

6     A.   I don't recall, no.

7     Q.   Regardless of when it occurred, do you recall when

8          you visited the property for the first time who

9          was with you?

10    A.   I believe my parents, my sister and possibly the

11         agent.

12    Q.   So, your family and Chip?

13    A.   Sure.  Yes.

14    Q.   And do you recall when that was or how much time

15         went by from that until you guys bought the house

16         or moved in?

17    A.   I do not know.

18    Q.   Period of weeks?

19    A.   I can't say.  I don't know.

20    Q.   How many times were you inside the property prior

21         to moving in?

22    A.   That I can recall that I was there?

23    Q.   Right.

24    A.   I believe once, maybe twice, I don't know.

25    Q.   And on the occasions that you were there, did you

Exam./Flounlacker - M. Marrone                    60

1       anything at that time.

2   Q.  And from the time that you were aware that this

3       house was being considered until it was purchased,

4       do you remember your parents or anybody else

5       telling you anything that they thought was the

6       matter with the property in any way?

7   A.  I don't remember.

8   Q.  And prior to moving into the house, do you

9       remember anybody, that includes your parents,

10      telling you that they believe there was a problem

11      with water in the basement or any sort of problem

12      with the basement at all?

13  A.  Not that I can recall.

14  Q.  Now, do you recall when you moved in?

15  A.  I believe it was July or August of 1999.

16  Q.  And do you recall when you moved out of the

17      property?

18  A.  When I moved out was April of 2000 I think.

19  Q.  From the time that you moved in until the time

20      that you moved out, did you ever see anything at

21      the property that suggested there was a water

22      problem in the basement of the property?

23  A.  Not that I recall.

24  Q.  While you were there, again, after you moved in

25      and before you moved out, do you recall anyone

Exam./Flounlacker - M. Marrone                61

1        telling you that there was a problem with water in

2        the basement or a similar kind of problem?

3  A.   No.

4  Q.   Do you recall your parents or anyone telling you

5        any problems that they were aware of with the

6        property while you were living there?

7  A.   No, I don't recall.

8  Q.   Now, as I recall your earlier testimony, the first

9        physical problem that you noticed after you moved

10       in was shortness of breath?

11 A.   Yes.

12 Q.   And that you told me occurred a couple of months

13       after you moved in?

14 A.   Yes.

15 Q.   Where was your bedroom in the house?

16 A.   My bedroom was in the upper level.  Walking down

17       the hallway it was the first door after the

18       basement door.

19 Q.   Did you ever sleep in the basement while you lived

20       there?

21 A.   Yes.

22 Q.   How often would you sleep in the basement or did

23       you?

24 A.   It wasn't a daily basis.  A few times.

25 Q.   Weekly?



**EXHIBIT**

D

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . .
JACK MARRONE, husband,       .   Civil Action No.:
KAREN MARRONE, wife, both    .   1:CV-01-0773
individually and in their    .
capacity as parents and      .
guardians for VIDA MARRONE   .
a minor, and MATTHEW ADAM    .
MARRONE,                     .
              Plaintiffs     .
                             .
                             .   (U.S. District Judge
     vs.                     .      Yvette Kane)
                             .
ALLSTATE INSURANCE COMPANY,  .
LINDA M. EDLEMAN, FRED       .
SHAFFER, MT. GRETNA REALTY,  .
and HOUSEMASTERS,            .
              Defendants     .
. . . . . . . . . .


Deposition of:  VIDA ARIELLA MARRONE

Taken by     :  Defendants

Date         :  June 28, 2002, 2:18 p.m.

Place        :  Nealon & Gover
                2411 North Front Street
                Harrisburg, Pennsylvania

Before       :  Ann M. Wetmore
                Reporter - Notary Public

2

APPEARANCES:

TARASI, TARASI & FISHMAN, P.C.
By:  LOUIS M. TARASI, JR., ESQ.
     GIANNI FLORO, ESQ.

     For - Plaintiffs

THOMAS, THOMAS & HAFER
By:  JOHN FLOUNLACKER, ESQ.

     For - Defendant Linda M. Edleman

NEALON & GOVER, P.C.
By:  JAMES G. NEALON, III, ESQ.

     For - Defendant Allstate Insurance Company

DUANE, MORRIS & HECKSCHER, LLP
By:  JENNIFER L. MURPHY, ESQ.

     For - Defendant HouseMaster

FINE, WYATT & CAREY, P.C.
By:  THOMAS J. KILLINO, ESQ.

     For - Defendant Fred Schaeffer

ALSO PRESENT:

JACK MARRONE
KAREN MARRONE

1  Q.   Were they resolved certainly by January 2001?

2  A.   I do believe so.

3  Q.   And the two car accidents you told me about that

4       you were involved in were all out in Missouri?

5  A.   Yes.

6  Q.   Were you involved in the decision making process

7       to pick this Mount Gretna home?

8  A.   I was given the option to be involved, but I

9       slept.

10 Q.   Well, you heard what your brother said, you guys

11      were living at a campground.  Right?

12 A.   Yes.

13 Q.   And you lived at that campground as a family while

14      your family was going through a house hunting

15      process.  Correct?

16 A.   Correct.

17 Q.   And I think you heard your brother talk about the

18      different houses that you and your family went to

19      look at.  Correct?

20 A.   Yes.

21 Q.   And do you recall being a part of that process?

22 A.   Yes.

23 Q.   Do you recall working with a real estate agent

24      from Re/max in assisting you and your family

25      finding a home?

Exam./Flounlacker - V. Marrone                    31

1    A.    Yes.

2    Q.    And do you remember that guy being Chip Stanilla?

3    A.    Yes.

4    Q.    Do you remember visiting the Mount Gretna property

5          before you moved into it?

6    A.    Yes.

7    Q.    How many times did you visit that property before

8          you moved into it?

9    A.    I believe once with Chip and once during the

10         inspection.

11   Q.    Twice?

12   A.    Yes.

13   Q.    When you say once with Chip, do you mean Chip and

14         your family?

15   A.    Yes.

16   Q.    You didn't go out there with Chip by yourself, did

17         you?

18   A.    No.

19   Q.    Now, when you went out there on that -- that was

20         the first occasion?

21   A.    Yes.

22   Q.    Did you look through the whole house?

23   A.    Yes.

24   Q.    Did you go into the basement?

25   A.    Yes.

**EXHIBIT**

tabbies®

_E_

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
. . . . . . . . . . . .
JACK MARRONE, husband,        .  Civil Action No.:
KAREN MARRONE, wife, both     .  1:CV-01-0773
individually and in their     .
capacity as parents and       .
guardians for VIDA MARRONE    .
a minor, and MATTHEW ADAM     .
MARRONE,                      .
              Plaintiffs  .  (U.S. District Judge
                              .     Yvette Kane)
       vs.                    .
                              .
ALLSTATE INSURANCE COMPANY,   .
LINDA M. EDLEMAN, FRED        .
SCHAFFER, MT. GRETNA REALTY,  .
and HOUSEMASTERS,             .
              Defendants  .  Jury Trial Demanded
. . . . . . . . . . . .
```

Deposition of:   FREDERICK SCHAEFFER

Taken by      :  Plaintiffs

Date          :  June 5, 2002, 11:19 a.m.

Place         :  Nealon & Gover
                 2411 North Front Street
                 Harrisburg, Pennsylvania

Before        :  Ann M. Wetmore
                 Reporter - Notary Public
                 Joe Vengoechea
                 Video Operator

APPEARANCES:

       TARASI, TARASI & FISHMAN, P.C.
       By:  LOUIS M. TARASI, JR., ESQ.
            JOHN GIANNIFLORO, ESQ.

            For - Plaintiffs

       THOMAS, THOMAS & HAFER
       By:  JOHN FLOUNLACKER, ESQ.

            For - Defendant Linda M. Edleman

       NEALON & GOVER, P.C.
       By:  ANDREW C. LEHMAN, ESQ.

            For - Defendant Allstate Insurance Company

       DUANE, MORRIS & HECKSCHER, LLP
       By:  PAUL E. SCANLAN, ESQ.

            For - Defendant HouseMaster

       FINE, WYATT & CAREY, P.C.
       By:  EDWARD A. MONSKY, ESQ.

            For - Defendant Fred Schaeffer

3

INDEX
WITNESS

Examination

FREDERICK SCHAEFFER

        By Mr. Tarasi                               7, 66

        By Mr. Flounlacker                          61

        By Mr. Lehman                               63

        By Mr. Scanlan                              64

        By Mr. Monsky                               -

EXHIBITS

Schaeffer Deposition
Exhibit Number                                      Page

1       Notice of Deposition                        6

2       Landy Insurance Agency, Inc.                6
        Notice of Incident/Claim

3       Buyer's Closing Costs, Estimated            6

4       Buyer Agency/Dual Agency                    6
        Consent/Disclosure

5       Deposit Money:  Notice to Buyer             6
        photocopy of check

6       VI.   Conclusions of Law                    6
        VII.  Recommendations

7       Letter to confirm settlement date           6
        from Lebanon Land Transfer Co., Inc.
        dated August 24, 1999

8       Settlement Statement                         6

9       Recepit of check for sales commission        6

10      Wood Destroying Insect Infestation           6
        Inspection Report

4

Schaeffer Deposition
| Exhibit Number | | Page |
|---|---|---|
| 11 | Water Analysis Report | 6 |
| 12 | Lebanon County Multi-List Services Exclusive Right to Sell Agreement for Sale of Real Estate | 6 |
| 13 | Lebanon County Multiple Listing Services, Inc. Minilist Input Form | 6 |
| 14 | Seller's Property Disclosure Statement | 6 |
| 15 | Multi-list printout of 354 Timber Road | 6 |
| 16 | Corrective Deed | 6 |
| 17 | Realty Transfer Tax Affidavit of Value | 6 |
| 18 | Courthouse Assessment records | 6 |
| 19 | Earnest Money Verification from Equity One | 6 |
| 20 | Fax to Fred Schaeffer from Nancy dated 8/2/99 | 6 |
| 21 | Lender's Notice of Reasonable Value | 6 |
| 22 | Residential Appraisal Report | 6 |
| 23 | Fax to Fred Schaeffer from Nancy dated 8/19/99 | 6 |
| 24 | Equity One, Inc. Loan Commitment | 6 |
| 25 | Lender's Notice of Reasonable Value | 6 |
| 26 | Photocopy of Front of File Folder of Mr. Schaeffer | 6 |
| 27 | Qualifications of Appraiser | 40 |
| 28 | Listing Presentation | 40 |
| 29 | Standard Agreement for the Sale of Real Estate | 51 |

5

Schaeffer Deposition
<u>Exhibit Number</u>                                                  <u>Page</u>

30      Statement of Estimated Seller's Costs          51

31      Complete copy of all documents furnished       68
        by Mr. Schaeffer today except for
        Schaeffer Exhibits 29, 30 and 32

32      Seller's Property Disclosure Statement          68

Exam./Tarasi - Schaeffer                    12

1    Q.    And where at?

2    A.    University of Pittsburgh.

3    Q.    Now, after you left JC Penney and went in business

4          for yourself, what kind of business was that?

5    A.    I ran the Mount Gretna Country Store which is a

6          grocery gas type of convenience store.

7    Q.    And how long did you do that?

8    A.    Approximately four years.

9    Q.    What was the name of it again?

10   A.    Mount Gretna Country Store.

11   Q.    All right.  After you finished that business, what

12         did you do?

13   A.    When I was in that business, I got licensed and

14         started Mount Gretna Real Estate.

15   Q.    And what year did you start that business?

16   A.    I've been in it 18 years.

17   Q.    15?

18   A.    18.

19   Q.    18.  And you are licensed?

20   A.    Correct.

21   Q.    When did you become licensed?

22   A.    18 years ago.

23   Q.    Okay.  Now, in this Mount Gretna Realty, are you

24         the sole owner?

25   A.    Yes, I am.  It's a corporation.

Exam./Tarasi - Schaeffer                          13

1    Q.   How many employees do you have?

2    A.   None.  Self-employed.

3    Q.   So, you are the Mount Gretna Realty?

4    A.   Correct.

5    Q.   Now, pursuant to your business as a Mount Gretna

6         Realty, did you have as a client Ms. Linda

7         Edleman?

8    A.   Yes.

9    Q.   And she's in -- you and her are both involved in

10        this lawsuit involving the Marrones.  Is that

11        correct?

12   A.   Yes.

13   Q.   And I've showed you Exhibit 1 and 2 and I want to

14        show you Exhibit Number 3 and ask if you recognize

15        that document?

16   A.   Yes.

17   Q.   And what is it?

18   A.   It's estimated seller's closing costs and also

19        estimated buyer's closing costs, one prepared by

20        me and one prepared by another agent.

21   Q.   Which one did you prepare?

22   A.   The seller's.

23   Q.   All right.  Now, this was as a result of a sale o

24        the property owned by Ms. Edleman at 354 Timber

25        Road?

Exam./Tarasi - Schaeffer                                14

1   A.   Yes.

2   Q.   To the Marrones.  Is that correct?

3   A.   Yes.

4   Q.   And you handled the situation for the seller?

5   A.   Yes.

6   Q.   For the Marrones, okay?

7   A.   Yes.  No, I'm sorry, not the Marrones.  I handled

8        it for the seller.

9   Q.   That's what I mean by seller's, it was sold to the

10       Marrones?

11  A.   Correct.

12  Q.   Now I'm going to show you Exhibit Number 4 and ask

13       if you recognize that document?

14  A.   Yes.

15  Q.   And what is that?

16  A.   It's a buyers agency relationship that the buyers,

17       the Marrones, had with their agent.

18  Q.   And why -- what does this document mean, why did

19       they do this?

20  A.   They put their trust in their agent and their

21       agent represented them.

22  Q.   And that's what this is, buyer agency/dual agency

23       consent disclosure?

24  A.   Yes.

25  Q.   And it's signed by the Marrones and Linda Edleman

Exam./Tarasi - Schaeffer                    17

1           date for that.

2   Q.    Now, the walkthru inspection, all right, who would

3           do that?

4   A.    The agent of the buyers and the buyers.

5   Q.    All right.  Would you accompany them?

6   A.    No, I would not.  It's for the purpose of them to

7           see if the condition of the house is acceptable to

8           them before settlement.

9   Q.    Now, tell me, when you got this house listed by

10          Ms. Edleman yourself, did you go visit the home?

11  A.    Yes, I made a listing presentation.

12  Q.    What's that mean?

13  A.    That before I went there I would go to the

14          courthouse, pull the courthouse records, deed,

15          have an idea of what the property was as far as

16          style and square footage, go to the listing

17          presentation at the house, walk through the house

18          and sit down and discuss the house itself and what

19          the market value was.

20  Q.    So, Ms. Edleman testified that the market value

21          was determined by I guess your advice to her?

22  A.    Yes, and with her final -- it was her house so she

23          had the final input.

24  Q.    But you would advise her?

25  A.    Correct.

1    Q.    Now, in the process of going to the house and

2          looking it over, did you go through every single

3          room in the house?

4    A.    Yes, I did.

5    Q.    Including the basement?

6    A.    Yes.

7    Q.    At that time, did you notice any problems in the

8          basement?

9    A.    No.

10   Q.    Any wetness?

11   A.    No.

12   Q.    Any dampness?

13   A.    No.

14   Q.    Now I want to show you Exhibit Number 8 and ask if

15         you recognize that document?

16   A.    Yes.

17   Q.    And what is it?

18   A.    It's a settlement statement from the settlement of

19         the property.

20   Q.    I notice at the top it says U.S. Department of

21         Housing and Urban Development.  What's that mean,

22         why is that on that document?

23   A.    I don't really know.  I didn't prepare the

24         document.

25   Q.    But you know who prepared it?

1  Q.  Is that the common practice to do it that way?

2  A.  Yes, it is.

3  Q.  I show you Exhibit Number 20.  Do you recognize

4      that document?

5  A.  Yes.

6  Q.  And what's that, sir?

7  A.  It was a -- it's from their, from the buyer's

8      mortgage company and it was either faxed to me

9      from their mortgage company or the buyer's agent

10     and it's requesting--

11 Q.  Does it say VA appraisal?

12 A.  Yes, it does.

13 Q.  And did you understand then that this was a VA

14     type of loan?

15 A.  Yes, I knew that when the sales agreement was

16     signed.

17 Q.  And did you realize then, of course, that the VA

18     would require an inspection?

19 A.  Did I realize that?  No, I'm not that familiar

20     with VA.  I'm aware that inspections were

21     requested by the buyers and put on the sales

22     agreement as contingencies.

23 Q.  All right.  Were you present on any of the

24     inspections?

25 A.  No, I was not.

```
 1          because the sales agreement was written up with
 2          the contingency that there's a VA mortgage,
 3          contingency on it.
 4   Q.     Now, were you aware at any time that the Marrones
 5          went and had the property inspected for water
 6          problems?
 7              MR. SCANLAN:  I'm going to object to the
 8          form.  You can answer.
 9   A.     I knew the Marrones had the option to do a
10          property inspection because it's written up at
11          their request at buyer's expense in the sales
12          agreement as a contingency by them.
13   BY MR. TARASI:
14   Q.     Now the question I asked you, Mr. Schaeffer,
15          specifically, were you aware that they did an
16          inspection because of a possible water problem
17          with the property?
18   A.     No.
19   Q.     No.  No one informed you, either Ms. Edleman or
20          anybody else, that there was a problem with water
21          in the basement of the property at Timber Road?
22   A.     No.
23   Q.     Were you aware that HouseMasters had inspected the
24          property?
25   A.     Yes.
```

Exam./Tarasi - Schaeffer                                          43

1   Q.   Did you request from them a copy of their report?

2   A.   No, I did not.  A listing agent is responsible for

3        having contingencies met.  That home inspection

4        was part of a contingency of the sales agreement

5        at the buyer's option provided by the buyer at

6        buyer's expense.  If there was -- they had X

7        number of days to get it completed.  If there was

8        a problem, then the next step from a buyer's agent

9        would have been notification to the seller and the

10       seller's agent.  I received no notice.

11  Q.   Did you ever request a copy of the Homemaker's or

12       HomeMaster's -- HouseMaster's inspection report?

13  A.   No, I believe I just answered that though.

14  Q.   No, I just asked you if you asked for a copy of

15       the inspection report.

16  A.   Is that the question you are asking right now?

17  Q.   I'm asking you right now.

18  A.   No, I did not.

19  Q.   Okay.

20  A.   And I just explained why.

21  Q.   I understand now.  I want to show you what's been

22       marked Exhibit 26 and do you recognize that

23       document?

24  A.   Yes, I do.

25  Q.   And what is that, sir?

1   A.   These are just sort of my notes from the front of

2        my vanilla folder.

3   Q.   And--

4   A.   It's a list of the property when I listed it.

5        Sorry.

6   Q.   I don't want to talk when you are talking.  Go

7        ahead.  Anything else you wanted to add?

8   A.   No.

9   Q.   In the lower part of that document does it state

10       certain inspections took place?

11  A.   Yes, it does.

12  Q.   And what were they?

13  A.   The radon which was due per buyer's request on

14       7/23 was inspected on 7/28.  Foundation due, which

15       would be the home inspection, on 7/23, inspected

16       on 7/28.  Mortgage due on 8/15.  There was no

17       commitment as of 8/18.  Termite due 8/26.  I have

18       no note for that.  Yes, I do, I'm sorry.  Seller

19       request 8/17 inspect at once, and well the same

20       thing due 8/26, seller request 8/17 inspect at

21       once.

22  Q.   Did you get any reports, any of these reports

23       back, did you note it on your notes for

24       inspections?

25  A.   As we previously discussed, the only two that I

Exam./Tarasi - Schaeffer                                45

1    got back are the ones that I ordered which

2    actually were the buyer's responsibility or the

3    buyer's agent to order, and they were the termite

4    and the well and I ordered those because the

5    settlement was coming up quickly and they still

6    weren't done and the mortgage company wanted those

7    two inspections.

8    Q.   You got copies of those inspection reports?

9    A.   Yes.  They were part of your exhibits.

10   Q.   Right.  And did you get -- but you didn't get a

11        copy of the HouseMaster's inspection report?

12   A.   No, I did not.

13   Q.   Did you get any copy in regard to that foundation

14        inspection, what was that inspection about?

15   A.   That's the home inspection.

16   Q.   The Housemake -- HouseMaster's inspection?

17   A.   That's who they used, yes.

18   Q.   Okay.

19   A.   The sales agreement is written up by the buyers or

20        a home inspection.

21   Q.   All right.

22   A.   On here I listed it as a foundation inspection.

23        Same thing.

24   Q.   Same thing.  Is that correct?

25   A.   In my, yes.

Exam./Tarasi - Schaeffer                46

1   Q.   In your notes?

2   A.   Yes, in my notes.

3   Q.   And you didn't get a copy of that inspection

4        report?

5   A.   No, there was no need to.

6   Q.   No, the question is did you get a copy of it?

7   A.   The first part of my answer was no.

8   Q.   Okay.  Now, did you ever go back and determine or

9        did anybody tell you that Mr. Marrone had put on

10       spouts and sloped the landscaping away from the

11       house to cure a possible water problem?

12            MR. SCANLAN:  I'm going to object to the form

13       of the question.  You may answer.

14  A.   Are you asking if I was aware of that?

15  BY MR. TARASI:

16  Q.   Yes, sir.

17  A.   I was aware of that through the deposition that my

18       attorney provided me a week ago maybe.

19  Q.   You never knew that before?

20  A.   No.

21  Q.   Any time right before the sale of the house -- or

22       I'll put it this way.  Any time when you became

23       involved with this house at 354 Timber Road, were

24       you aware of any water problems?

25  A.   No.

Exam./Tarasi - Schaeffer                          57

1   A.   And agent for buyer Re/max also accepted that.

2   Q.   Wait a minute.  Where is that marked for them?

3        Agent for buyer is not marked.

4   A.   He -- well, that signature on the page there, he

5        had signed that.

6   Q.   Okay.  Does that mean he accepts mediation then?

7   A.   That's correct.

8   Q.   Anything else?

9   A.   Those are all of the contingencies.  I mean the

10       other parts of the agreement describe the location

11       of the property, the price of the property, the

12       personal property that it goes with the offer with

13       the sales agreement.

14  Q.   All right.  And did you -- and also I notice in

15       the first page for this the chair lift that I

16       think Ms. Edleman had mentioned when she

17       testified.  Do you remember seeing that in the

18       house?

19  A.   Yes, I did.

20  Q.   Did you have any indication or anybody tell you

21       before the sale of the house that there was a mold

22       problem in the house?

23  A.   No.

24  Q.   How about after the sale?

25  A.   No.

Exam./Flounlacker - Schaeffer                    62

1        MR. TARASI:  Exhibit 29.

2        MR. FLOUNLACKER:  Okay.

3  A.    Yeah, it's Exhibit 29, Number 8, property

4        inspection.

5  BY MR. FLOUNLACKER:

6  Q.    My understanding is the Marrones opted through

7        their buyer agent to elect this contingency for

8        the sale of this property.  Is that correct?

9  A.    Yes, it is.

10  Q.   I note under there once that election is made

11       there is some options, at least 1 and 2, and

12       several sentences indicating how the sale can go

13       forward from that point if that contingency is

14       selected.  Do you see that language in the

15       document?

16  A.   Yes, I do.

17  Q.   Sir, would you explain for me what your

18       understanding was as to how this sale proceeded

19       after the Marrones selected this contingency

20       option?

21  A.   They had the property inspected at that time.

22       They had five days after receiving the report to

23       contact somebody if they thought there was a

24       problem with the property.  If they did not do

25       anything as a result of the inspection report,

Exam./Flounlacker - Schaeffer                63

1    this sale would proceed, that contingency would

2    have been met.

3         There was no contact with me so that

4    contingency was met.  They were given the option

5    of inspecting the property, which they did.  They

6    never noted any problems with the inspection.  So,

7    that contingency was fulfilled.

8  Q.  And in fulfilling that contingency it's my

9    understanding then that the Marrones would have

10   accepted the property with the information stated

11   in the report generated as a consequence of an

12   inspection?

13 A.  That's correct.

14 Q.  And that's your understanding about what happened

15   in this case?

16 A.  Yes, it is.

17 Q.  And my understanding is that the report that we're

18   talking about which is the subject of this

19   contingency is the HouseMaster's report or

20   inspection.  Is that your understanding?

21 A.  Yes, it is.

22        MR. FLOUNLACKER:  Thank you, sir.

23                    EXAMINATION

24 BY MR. LEHMAN:

25 Q.  Mr. Schaeffer, I just have one question for you.

29

*SALES AGR*  *MENU*

## STANDARD AGREEMENT FOR THE ~~LE~~ OF REAL ESTATE   A/S Residential
This form recommended and approved for, but not restricted to use by, the members of the Pennsylvania Association of REALTORS® (PAR)

**PA LICENSED BROKER**

AGENT FOR SELLER ~~Sure~~ffM.Gretna Realty _____ PH 964-2100
ADDRESS P.O. Box 338 Mt. Gretna, P, 17064 _____ FAX
SUBAGENT FOR SELLER _____ PH
ADDRESS _____ FAX
AGENT FOR BUYER Re/Max of Lebanon County _____ PH 270-8308
ADDRESS 209 W. Penn Ave Cleona, Pa 17042 _____ FAX

1  1. **This Agreement**, dated July 7, 1999 _____ is between
2  SELLER(S): Linda M. Folleman
3
4  Address  354  Timber Road
5  Mt. Gretna, Pa.  Zip Code 17064  hereafter "Seller," and
6  BUYER(S): Jack Peter Marcone
7  Karen Anne Marcone
8  Address  11673  Highway P.P
9  Dixon, MO  Zip Code 65459  hereafter "Buyer."
10  2. **PROPERTY (1-98)** Seller hereby agrees to sell and convey to Buyer, who hereby agrees to purchase:
11  ALL THAT CERTAIN lot or piece of ground with buildings and improvements thereon erected, if any, known as:
12  354  Timber Road
13  in the  Township  of  S. Londonderry,
14  County of  Lebanon  in the Commonwealth of Pennsylvania, Zip Code  17064
15  Identification (e.g., Tax ID#; Parcel #; Lot, Block; Deed Book, Page, Recording Date). 31-9A-0250   207-337
16
17  3. **TERMS (1-98) (A)** Purchase Price $160,000 $165,000   23  Jen  KAM
18  One Hundred Sixty Thousand _____ Dollars
19  which shall be paid to Seller by Buyer as follows: One Hundred Sixty Five Thousand
20  (B) Cash or check at signing this Agreement  ONE HUNDRED SIXTY FIVE THOUSAND  $ 5,000.⁰⁰
           4/3/99
21  (C) Cash or check on or before:  7/3  $
22  (D)  KAM  JPM  $
23  (E) Cash, cashier's or certified check at time of settlement:  Jen  165,000 $ 155,000.⁰⁰
                                                              7/3/99
24                                                        TOTAL $ 160,000. 165.⁰⁰ KAM
25  (F) Deposits to be held by Agent for Seller, unless otherwise stated here:  $16,000.⁰⁰   $10,000.⁰⁰
26  (G) Written approval of Seller to be on or before:  July 7, 1999  7/3/99
27  (H) Settlement to be made on or before:  Aug 31, 1999
28  (I) Conveyance from Seller will be by fee simple deed of special warranty unless otherwise stated here:
29
30  (J) Payment of transfer taxes will be divided equally between Buyer and Seller unless otherwise stated here:
31
32  (K) At time of settlement, the following shall be adjusted pro-rata on a daily basis between Buyer and Seller, reimbursing where applicable:
33  taxes; rents; interest on mortgage assumptions; condominium fees and homeowner association fees, if any; water and/or sewer rents, if
34  any, together with any other lienable municipal service. The charges are to be pro-rated for the period(s) covered: Seller will pay up to
35  and including the date of settlement; Buyer will pay for all days following settlement, unless otherwise stated here:
36
37  4. **FIXTURES AND PERSONAL PROPERTY (1-98)**
38  (A) INCLUDED in this sale and purchase price are all existing items permanently installed in the Property, free of liens, including plumb-
39  ing; heating; lighting fixtures (including chandeliers and ceiling fans); water treatment systems; pool and spa equipment; garage door
40  openers and transmitters; television antennas; shrubbery, plantings and unpotted trees; any remaining heating and cooking fuels stored
41  on the Property at the time of settlement; wall to wall carpeting; shades, blinds, window covering hardware; built-in air conditioners;
42  built-in appliances; and the range/oven unless otherwise stated. Also included: Dishwasher range refrigerator
43  Hot tub, chair lift, washer & dryer, window covering
44  (B) EXCLUDED fixtures and items:
45
46  5. **SPECIAL CLAUSES (1-98)**
47  (A) ☒ Buyer and Seller acknowledge having received a statement of their respective estimated closing costs before signing this Agreement
48  of Sale.
49  (B) ☒ Buyer acknowledges receipt of Seller's Property Disclosure Statement before signing this Agreement, if required by law. (See
50  Notice, Information Regarding the Seller's Property Disclosure Act.)
51  (C) ☒ Buyer acknowledges receipt of the Deposit Money Notice (for cooperative sales when Agent for Seller is holding deposit money)
52  before signing this Agreement.
53  (D) The following are a part of this Agreement if checked:
54  ☐ Limited Dual Agency Addendum (PAR Form 140)        ☐ Settlement of Other Property Contingency
55  ☐ Sale & Settlement of Other Property                   (PAR Form 133)
56  Contingency Addendum (PAR Form 130)              ☐ Tenant-Occupied Property Addendum (PAR Form TOP)
57  ☐ Sale & Settlement of Other Property Contingency      ☐
58  with Right to Continue Marketing Addendum          ☐
59  (PAR Form 131)                                  ☐
60  E) Seller to include 1 year home warranty. deleted  Jen  KAM
61                                                7/3/99
62                                               JPM
63                                               7/3/99
64
65
66
67  Buyer Initials: X KAM  JPM        A/S Residential Page 1 of 8        Seller Initials: LF

**Pennsylvania Association of** REALTORS®
COPYRIGHT PENNSYLVANIA ASSOCIATION OF REALTORS® 1998

Sheeffer
**DEPOSITION EXHIBIT**
6-5-02
PENGAD 1-800-631-6989

# NOTICES AND INFORMATION

## INFORMATION REGARDING THE SELLER'S PROPERTY DISCLOSURE

Generally speaking, the Seller's Property Disclosure Act applies to any sale, exchange, installment sales contract, lease with an option to buy, or transfer of an interest in real estate where not less than one and not more than four residential dwelling units are involved. The Act stipulates that certain disclosures have to be made and delivered in a form defined by the Act, before an agreement of sale is signed.

The Act defines nine exceptions, where the form does not have to be used.
1. Transfers that are the result of a court order.
2. Transfers to a mortgage lender that result from a buyer's default and subsequent foreclosure sales that result from the default.
3. Transfers by a fiduciary during the administration of a decedent's estate, guardianship, conservatorship or trust.
4. Transfers from a co-owner to one or more other co-owners.
5. Transfers made to a spouse or a direct descendent.
6. Transfers between spouses that result from divorce, legal separation, or property settlement.
7. Transfers by a corporation to its shareholders as part of a plan of liquidation.
8. Transfers by a partnership to its partners as part of a plan of liquidation.
9. Transfers of new construction that has never been occupied when:
    a. The buyer has received a one-year written warranty covering the construction;
    b. The building has been inspected for compliance with the applicable building code or, if none, a nationally recognized model building code; and
    c. A certificate of occupancy or a certificate of code compliance has been issued for the dwelling.

In addition to these exceptions, the Act limits the disclosure in the cases of condominiums and cooperatives to the seller's particular unit. It does not impose disclosure regarding common areas or facilities; those elements are already addressed in the laws that govern the resales of condominiums and cooperative interests.

6.  MORT   L CONTINGENCY (1-98)

☐  WAIVED.  This sale is NOT contingent on mortgage financing.

☒  ELECTED

(A)  This sale is contingent upon Buyer obtaining mortgage financing as follows:

1.  Amount of mortgage loan $ _____
2.  Minimum Term ___30___ years                    $165,000
3.  Type of mortgage ___VA___
4.  Interest rate ___7.5___ %; however, Buyer agrees to accept the interest rate as may be committed by the mortgage lender, not to exceed a maximum interest rate of ___8.5___ %.
5.  Discount points, loan origination, loan placement and other fees charged by the lender as a percentage of the mortgage loan (excluding any mortgage insurance premiums or VA funding fee) not to exceed ___0___ % of the mortgage loan.

The interest rate and fees provisions required by Buyer are satisfied if a mortgage lender makes available to Buyer the right to guarantee an interest rate at or below the Maximum Interest Rate specified herein with the percentage fees at or below the amount specified herein. Buyer gives Seller the right, at Seller's sole option and as permitted by the lending institution and applicable laws, to contribute financially, without promise of reimbursement, to the Buyer and/or lender to make the above terms available to Buyer.

(B)  Within 10 days of the execution of this Agreement, Buyer shall make a completed, written mortgage application to a responsible mortgage lending institution through the office of Agent for Buyer, if any, otherwise through the office of Subagent for Seller, if any, or Agent for Seller, if any. This Agent is authorized to communicate with the lender for the purposes of assisting in the mortgage loan process.

(C)  1.  Upon receipt of a mortgage commitment, Buyer and/or Agent will promptly deliver a copy of the commitment to Agent for Seller, if any, otherwise to Seller.

2.  Mortgage commitment date ___Aug 15, 1999___ . If a written commitment is not received by Agent for Seller, if any, otherwise by Seller, by the above date, Buyer and Seller agree to extend the commitment date until Seller terminates this Agreement in writing.

3.  Seller has the option to terminate this Agreement in writing, on or after the mortgage commitment date, if the mortgage commitment:
   a.  Is not valid until the date of settlement, OR
   b.  Is conditioned upon the sale and settlement of any other property, OR
   c.  Contains any other condition not specified in this Agreement.

4.  In the event Seller does not terminate this Agreement as provided above, Buyer has the option to terminate this Agreement in writing if the mortgage commitment:
   a.  Is not obtained by or valid until the date of settlement, OR
   b.  Is conditioned upon the sale and settlement of any other property which do not occur by the date of settlement, OR
   c.  Contains any other condition not specified in this Agreement which Buyer is unable to satisfy by the date of settlement.

5.  If this Agreement is terminated as specified in paragraphs 6 (C) (2), (3) or (4), all deposit monies paid on account of purchase price shall be returned to Buyer. Buyer will be responsible for any premiums for mechanics lien insurance and/or title search, or fee for cancellation of same, if any; AND/OR any premiums for flood insurance and/or fire insurance with extended coverage, insurance binder charges or cancellation fee, if any; AND/OR any appraisal fees and charges paid in advance to mortgage lender.

(D)  If the mortgage lender requires repairs to the Property, Buyer will, upon receipt, deliver a copy of the mortgage lender's requirements to Agent for Seller, if any, otherwise to Seller. Seller shall, within 5 days of receipt of the lender's requirements, notify Buyer whether Seller shall make the required repairs at Seller's expense.

1.  If Seller chooses to make repairs, Buyer shall accept the Property and agree to the RELEASE set forth in paragraph 26 of this Agreement.
2.  If Seller chooses not to make the required repairs, Buyer will, within 5 days, notify Seller in writing of Buyer's choice to  terminate the Agreement of Sale OR make the required repairs at Buyer's expense and with Seller's permission, which shall not be unreasonably withheld. If Seller denies Buyer permission to make the required repairs, Buyer may, within 5 days of Seller's denial, terminate this Agreement. If Buyer terminates this Agreement, all deposit monies paid on account of purchase price shall be returned promptly to Buyer and this Agreement of Sale will be NULL and VOID.

(E)  Seller Assist

☒  NOT APPLICABLE
☐  APPLICABLE. Seller shall pay:
   ☐  $ _____
   ☐  _____ % _____ maximum, toward Buyer's costs as permitted by the mortgage lender.

FHA/VA, IF APPLICABLE                    $165,000

(F)  It is expressly agreed that notwithstanding any other provisions of this contract, Buyer shall not be obligated to complete the purchase of the Property described herein or to incur any penalty by forfeiture of earnest money deposits or otherwise unless Buyer has been given, in accordance with HUD/FHA or VA requirements, a written statement by the Federal Housing Commissioner, Veterans Administration, or a Direct Endorsement Lender setting forth the appraised value of the Property of not less than $ _____ (the dollar amount to be inserted in the sales price as stated in the Agreement). Buyer shall have the privilege and option of proceeding with consummation of the contract without regard to the amount of the appraised valuation. The appraised valuation is arrived at to determine the maximum mortgage the Department of Housing and Urban Development will insure. HUD does not warrant the value nor the condition of the Property. Buyer should satisfy himself/herself that the price and condition of the Property are acceptable.

Warning:  Section 1010 of Title 18, I.S.C., Department of Urban Development provides, "Whoever for the purpose of ... influencing in any way the action of such department ... makes, passes, utters or publishes any statement knowing the same to be false ... shall be fined not more than $5,000 or imprisoned not more than two years, or both."

(G)  U.S. Department of Housing and Urban Development (HUD) NOTICE TO PURCHASERS:

THE IMPORTANCE OF A HOME INSPECTION

HUD does not warrant the condition of a property. (See Notices and Information on Property Condition Inspections.)

(H)  Certification .We the undersigned, Seller(s) and Buyer(s) party to this transaction each certify that the terms of this contract for purchase are true to the best of our knowledge and belief, and that any other agreement entered into by any of these parties in connection with this transaction is attached to this Agreement of Sale.

7.  INSPECTIONS (1-98)

(A)  Seller hereby agrees to permit inspections by authorized appraisers, reputable certifiers, insurer's inspectors, surveyors, municipal officials and/or Buyer as may be required by the lending institutions, if any, or insuring agencies. Seller further agrees to permit any other inspections required by or provided for in the terms of this Agreement.

(B)  Buyer reserves the right to make a pre-settlement walk-through inspection of the Property. Buyer's right to make this  inspection is not waived by any other provision of this Agreement.

(C)  Seller will have heating and all utilities (including fuel(s)) on for the inspections.

8.  PROPERTY INSPECTION CONTINGENCY (1-98)

☐  WAIVED.  Buyer understands that Buyer has the option to request inspections of the Property (see Property Inspection and Environmental Notices). BUYER WAIVES THIS OPTION and agrees to the RELEASE set forth in paragraph 26 of this Agreement.

## NOTICE TO BUYERS SEEKING MORTGAGE FINANCING

The appraised value of the Property is used in determining the maximum amount of the mortgage loan and may be different from the purchase price and market value.

## NOTICES AND INFORMATION ON PROPERTY CONDITION INSPECTIONS

**U.S. Department of Housing and Urban Development**
**FHA Loans:   PROPERTY INSPECTION NOTICE   Importance of Home Inspections:**
The U.S. Department of Housing and Urban Development (HUD) does not warrant the value or condition of a home. While HUD's FHA (the Federal Housing Administration) program requires the lender to have an appraiser determine the value of the property, it is an estimate only and is used to determine the amount of mortgage FHA will insure and if the condition of the property makes it eligible for FHA mortgage insurance. It is not, however, a guarantee that the property is free of defects.

As the purchaser (buyer), you should carefully examine the property or have it inspected by a qualified home inspection company to make sure that the condition is acceptable to you. You should do this before you sign the sales agreement (this document) or make the contract contingent on the inspection. If repairs are needed, you may negotiate with the owner about having the faults corrected.

There is no requirement that you hire an inspector. If you choose to, the cost of the inspection up to $200 may be included in your mortgage loan, Names of home inspection companies can be found in the yellow pages of your telephone directory under the heading, "Home Inspection Services."

If you believe you have been subject to discrimination because of your race, color, religion, sex, handicap, familial status, or national origin, you should call the HUD Fair Housing and Equal Opportunity Complaint Hotline: (800) 669-9777.

This statement must be delivered to you at the time of initial loan application. Return one copy to your lender as proof of notification and keep one copy for your records.

**You, the borrower(s), must be certain that you understand the transaction. Seek professional advice if you are certain.**

## PROPERTY INSPECTION NOTICES

**Property Inspection:**  A general inspection of the Property can be performed by a professional contractor or home inspection service and may include inspections of: structural components; roof; exterior windows and exterior doors; exterior siding, walls, gutters and downspouts; appliances; electrical; plumbing, heating, and cooling systems; water penetration; and any other items Buyer may select. Inspections or certifications might include: Environmental Hazards (e.g., Asbestos, Ureaformaldehyde Foam Insulation, Underground Storage Tanks; etc.); Electromagnetic Fields, Wetlands Inspection, Flood Verification, Property Boundary/Square Footage Verification, and any other items Buyer may select. Buyer is advised to investigate easements, deed and restrictions that apply to the Property and to review local zoning ordinances.

**Flood Plains:**  If the Property is located in a flood plain, Buyer may be required to carry additional insurance.

**Property Boundary / Square Footage:**  Buyer is advised that Seller may not had the Property surveyed and that any fences, hedges, walls and other natural or constructed barriers may or may not represent the true boundary lines of the Property. Buyer is also advised that any numerical representations of the footage of the structure(s) and/or the lot area approximations only and may be inaccurate. Buyer is advised to engage a professional surveyor or obtain independent measurement of the structure(s) and/or lot size if the buyer wishes to make this sale contingent on Buyer's approval of the Property's boundaries or square footage.

**Water Service:**  Buyer may elect to have the water service inspected by a professional water testing company. In addition, on-site water service systems may have to meet certain quality and/or quantity requirements set by the municipality or the mortgage lender.

**Wood-Destroying Insect Infestation:**  Insects whose primary source of food is wood, such as termites, wood-boring beetles, carpenter ants, carpenter bees and certain other insects, can cause damage to the wood structure of a residence. Termite and Pest Control companies are available to make inspections to determine whether wood-destroying insects are present. Because of the way these insects function, damage to wood may be hidden. Careful selection should be made of skilled experts in the termite/pest control field to insure a proper determination of whether wood-boring insects or resultant damage is present.

## ENVIRONMENTAL NOTICES

**Asbestos:**  The heat-resistant and durable nature of asbestos makes it useful in construction and industry. The physical properties that give asbestos its resistance to heat and decay are linked with several adverse human health effects. Asbestos can easily break into microscopic fibers that can remain suspended in the air for long periods of time. When inhaled, these fibers easily penetrate body tissue. Asbestos is known to cause Asbestosis and various forms of cancer. Inquiries or requests for more information about asbestos can be directed to the United States Environmental Protection Agency, 111 18th Street, Washington, D.C. 20207, and/or the Department of Health, Commonwealth of Pennsylvania, Division of Environmental Health, Harrisburg, PA 17108.

**Electromagnetic Fields:**  Electromagnetic Fields (EMFs) occur around all electrical appliances and power lines. Conclusive evidence that EMF health risks does not exist at present, and Pennsylvania has no laws regarding this issue.

**Environmental Hazards:**  The U.S. Environmental Protection Agency has a list of hazardous substances, the use and disposal of which are restricted by law. Generally, if hazardous substances are found on a property, it is the property owner's responsibility to dispose of them properly. For more information and a list of hazardous substances, contact U.S. Environmental Protection Agency, 111 18th Street N.W., Washington, D.C. 20207; (202) 634-7740.

**Ureaformaldehyde Foam Insulation (UFFI):**  Ureaformaldehyde Foam Insulation (UFFI) is a thermal insulation material that is manufactured at the time of installation and pumped into the space in the walls of the building being insulated. UFFI can release formaldehyde gas into the interiors of the buildings in which it is installed. Adverse health effects linked to exposure to UFFI are cancer; acute illness such as eye, nose, and throat irritation, and sensitization. Although a 1982 ban of future sales of UFFI by the U.S. Consumer Product Safety Commission was overturned in 1983 because the health risk was not established as "unreasonable," it is recommended that prospective buyers be informed if UFFI is present or has been present on the property. Tests can be conducted to determine the concentration of formaldehyde gas present in a structure, as well as to measure the presence and toxicity of UFFI. The cost of testing UFFI will vary with the stage of the construction and the accessibility of the insulation. Information regarding tests and testing procedures can be obtained by writing the U.S. Consumer Product Safety Commission, Office of the Secretary, Third Floor, 5401 Westbard Avenue, Bethesda, MD 20816.

**Wetlands:**  Wetlands are protected by both the federal and state governments. Buyer may wish to have the Property inspected for wetlands by an environmental engineer to determine if permits for plans to build, improve, or develop the property would be affected or denied because of wetlands.

149   ...TED
150   (A)   Within **10** days of the execution of this Agreement, Buyer, at Buyer's expense, may choose to have inspections and/or certifications com-
      pleted by licensed or otherwise qualified professionals (see Property Inspection and Environmental Notices). Other provisions of this
153   Agreement may provide for inspections and/or certifications that are not waived or altered by Buyer's election here. If Buyer is not satisfied
      with the condition of the Property as stated in any written report, Buyer will, **within the time given for completing inspections:**
154   ☐   **Option 1**
155   1.   Accept the Property with the information stated in the report(s) and agree to the RELEASE set forth in paragraph 26 of this
156        Agreement, OR
157   2.   Terminate the Agreement of Sale in writing by notice to Agent for Seller, if any, otherwise to Seller, within the time given for inspection,
158        in which case all deposit monies paid on account of purchase price shall be returned promptly to Buyer and this Agreement will
159        be NULL and VOID.
160   ☐   **Option 2**
161   1.   Accept the Property with the information stated in the report(s) and agree to the RELEASE set forth in paragraph 26 of this
162        Agreement, UNLESS the total cost to correct the conditions contained in the report(s) is more than $ **1,000.**
163   2.   If the total cost to correct the conditions contained in the report(s) EXCEEDS the amount specified in paragraph 8(A) (Option 2) 1,
164        Buyer will deliver the report(s) to Agent for Seller, if any, otherwise to Seller, **within the time given for inspection.**
165        a.   Seller will, within **5** days of receiving the report(s), inform Buyer in writing of Seller's choice to:
166             1)   Make repairs before settlement so that the remaining cost to repair conditions contained in the report(s) is less than or equal to
167                  the amount specified in paragraph 8 (A) (Option 2) 1.
168             2)   Credit Buyer at settlement for the difference between the estimated cost of repairing the conditions contained in the report(s)
169                  and the amount specified in paragraph 8 (A) (Option 2) 1. This option must be acceptable to the mortgage lender, if any.
170             3)   Not make repairs and not credit Buyer at settlement for any defects in conditions contained in the report(s).
171        b.   If Seller chooses to make repairs or credit Buyer at settlement as specified in paragraph 8 (A) (Option 2) 2, Buyer shall accept the
172             Property and agree to the RELEASE set forth in paragraph 26 of this Agreement.
173        c.   If Seller chooses to not make repairs and not to credit Buyer at settlement, or if Seller fails to choose any option within the time
174             given, Buyer will within **5** days:
175             1)   Accept the Property with the information stated in the report(s) and agree to the RELEASE set forth in paragraph 26 of this
176                  Agreement, OR
177             2)   Terminate the Agreement of Sale in writing by notice to Agent for Seller, if any, otherwise to Seller, in which case all deposit
178                  monies paid on account of purchase price shall be returned promptly to Buyer and this Agreement of Sale will be NULL and
179                  VOID.
180   (B)   Buyer's failure to exercise any of Buyer's options within the time limits specified in this paragraph shall constitute a WAIVER of this
181        contingency and Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 26 of this Agreement.
182   **9.   WOOD INFESTATION CONTINGENCY (1-98)**
183   ☐   WAIVED. Buyer understands that Buyer has the option to request that the Property be inspected for wood infestation by a certified Pest Control
184        Operator. BUYER WAIVES THIS OPTION and agrees to the RELEASE set forth in paragraph 26 of this Agreement.
185   ☒   ELECTED
186   (A)   Within **45** days of the execution of this Agreement,
187        ☐   Buyer, at Buyer's expense,
188        ☐   Buyer, at Buyer's expense, not to exceed $ _____
189        shall obtain a written "Wood-Destroying Insect Infestation Inspection Report" from a certified Pest Control Operator and will deliver it and all
190        supporting documents and drawings provided by the Pest Control Operator to Agent for Seller, if any, otherwise to Seller. The report is to be
191        made satisfactory to and in compliance with applicable laws, mortgage and lending institutions, and/or Federal Insuring and Guaranteeing
192        Agency requirements, if any. The inspection will include all readily visible and accessible areas of all structures on the Property except the fol-
193        lowing structures, which will not be inspected: _____
194        _____
195   (B)   If the inspection reveals evidence of active infestation(s), Seller agrees, at Seller's expense and before settlement, to treat for active infestation(s),
196        in accordance with applicable laws.
197   (C)   If the inspection reveals damage from active infestation(s) or previous infestation(s), Buyer, at Buyer's expense, has the option to obtain a writ-
198        ten report by a professional contractor, home inspection service, or structural engineer that is limited to structural damage to the Property caused
199        by wood-destroying organisms and a proposal to repair the damage. Buyer will deliver the structural damage report and corrective proposal to
200        Agent for Seller, if any, otherwise to Seller, within _____ days of delivering the original inspection report.
201   (D)   Within 5 days of receiving the structural damage report and corrective proposal, Seller shall advise Buyer whether Seller will repair, at Seller's
202        expense and before settlement, any structural damage from active or previous infestation(s).
203   (E)   If Seller chooses to repair structural damage revealed by the report, Buyer agrees to accept the Property as repaired and agrees to the RELEASE
204        set forth in paragraph 26 of this Agreement.
205   (F)   If Seller chooses not to repair structural damage revealed by the report, Buyer, within 5 days of receiving Seller's notice, will notify Seller in
206        writing of Buyer's choice to:
207        1.   Accept the Property with the defects revealed by the inspection, without abatement of price and agree to the RELEASE set forth in para-
208             graph 26 of this Agreement, OR
209        2.   Make the repairs before settlement, if required by the mortgage lender, if any, at Buyer's expense and with Seller's permission, which shall
210             not be unreasonably withheld, in which case Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 26 of this
211             Agreement. If Seller denies Buyer permission to make the repairs, Buyer may, within 5 days of Seller's denial, terminate this Agreement.
212             If Buyer terminates this Agreement, all deposit monies paid on account of purchase price shall be returned promptly to Buyer and this
213             Agreement of Sale will be NULL and VOID, OR
214        3.   Terminate this Agreement, in which case all deposit monies paid on account of purchase price shall be returned promptly to Buyer and
215             this Agreement of Sale will be NULL and VOID.
216   (G)   Buyer's failure to exercise any of Buyer's options within the time limits specified in this paragraph shall constitute a WAIVER of this
217        contingency and Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 26 of this Agreement.
218   **10.   CERTIFICATE OF OCCUPANCY (1-98)**
219   ☒   NOT APPLICABLE
220   ☐   APPLICABLE
221   (A)   Buyer and Seller acknowledge that a certificate permitting occupancy of the Property may be required by the municipality and/or govern-
222        mental authority.
223   (B)   If a certificate is required, Seller shall, at Seller's expense and within _____ days of the execution of this Agreement, order the certificate for
224        delivery to Buyer on or before settlement.
225   (C)   In the event repairs/improvements are required for the issuance of the certificate, Seller shall, within 5 days of Seller's receipt of the require-
226        ments, notify Buyer of the requirements and whether Seller shall make the required repairs/improvements at Seller's expense.
227   (D)   If Seller chooses not to make the required repairs/improvements, Buyer will, within 5 days, notify Seller in writing of Buyer's choice to
228        terminate the Agreement of Sale OR make the repairs/improvements at Buyer's expense and with Seller's permission, which shall not be unrea-
229        sonably withheld. If Seller denies Buyer permission to make the required repairs, Buyer may, within 5 days of Seller's denial, terminate this
230        Agreement. If Buyer terminates this Agreement, all deposit monies paid on account of purchase price shall be returned promptly to Buyer and
231        this Agreement of Sale will be NULL and VOID.
232   **11.   RESIDENTIAL LEAD-BASED PAINT HAZARD REDUCTION ACT NOTICE REQUIRED FOR PROPERTIES**
      **BUILT BEFORE 1978 (1-98)**
234   ☒   NOT APPLICABLE
235   ☐   APPLICABLE
236   (A)   **Seller represents that:** (check 1 OR 2)*
237        ☐ 1. Seller has no knowledge concerning the presence of lead-based paint and/or lead-based paint hazards in or about the Property.
238        ☐ 2. Seller has knowledge of the presence of lead-based paint and/or lead-based paint hazards in or about the Property. (Provide the basis for
239             determining that lead-based paint and/or hazards exist, the location(s), the condition of the painted surfaces, and other available informa-
240             tion concerning Seller's knowledge of the presence of lead-based paint and/or lead based paint hazards.) _____
241        _____

245    (B)  Records/Reports (check 1 OR 2)

☐ 1. Seller has no records or records pertaining to lead-based paint and/or lead-based paint hazards in or about the Property.

☐ 2. Seller has provided Buyer with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in or about the Property. (List documents)

250

251    (C)  Buyer's Acknowledgment

☐ 1. Buyer has received the pamphlet *Protect Your Family from Lead in Your Home* and has read the Lead Warning Statement contained in this Agreement (See Environmental Notices).

Buyer's Initials _____    Date _____

☐ 2. Buyer has reviewed Seller's disclosure of known lead-based paint and/or lead-based paint hazards, as identified in paragraph 11(A) and has received the records and reports pertaining to lead-based paint and/or lead-based paint hazards identified in paragraph 11(B).

Buyer's Initials _____    Date _____

258    (D)  RISK ASSESSMENT/INSPECTION. Buyer acknowledges that before Buyer is obligated to buy a residential dwelling built before 1978, Buyer has a 10 day period (unless Buyer and Seller agree in writing to a different period of time) to conduct a risk assessment or inspection of the Property for the presence of lead-based paint and/or lead-based paint hazards.

261    ☐  WAIVED. Buyer understands that Buyer has the right to conduct a risk assessment or inspection of the Property to determine the presence of lead-based paint and/or lead-based paint hazards.  BUYER WAIVES THIS RIGHT and agrees to the RELEASE set forth in paragraph 26 of this Agreement.

264    ☐  ELECTED

265    1.  Buyer, at Buyer's expense, chooses to obtain a risk assessment and/or inspection of the Property for lead-based paint and/or lead-based paint hazards. The risk assessment and/or inspection shall be completed within _____ days of the execution of this Agreement of Sale (insert "10" unless Buyer and Seller agree to a different period of time).

268    2.  Within the time set forth above for obtaining the risk assessment and/or inspection of the Property for lead-based paint and/or lead-based paint hazards, Buyer may deliver to Agent for Seller, if any, otherwise to Seller, a written list of the specific hazardous conditions cited in the report and those corrections requested by Buyer, along with a copy of the risk assessment and/or inspection report.

271    3.  Seller may, within _____ days of receiving the list and report(s), submit a written corrective proposal to Buyer. The corrective proposal will include, but not be limited to, the name of the remediation company and a completion date for corrective measures. Seller will provide certification from a risk assessor or inspector that corrective measures have been made satisfactorily on or before the completion date.

274    4.  Upon receiving the corrective proposal, Buyer, within 5 days, will:

275    a.  Accept the corrective proposal and the Property in writing, and agree to the RELEASE set forth in paragraph 26 of this Agreement, OR

277    b.  Terminate this Agreement in writing, in which case all deposit monies paid on account of purchase price shall be returned promptly to Buyer and this Agreement of Sale will be NULL and VOID.

279    5.  Should Seller fail to submit a written corrective proposal within the time set forth in paragraph 11(D)3 of this Agreement, then Buyer, within 5 days, will:

280    a.  Accept the Property in writing, and agree to the RELEASE set forth in paragraph 26 of this Agreement, OR

282    b.  Terminate this Agreement of Sale in writing, in which case all deposit monies paid on account of purchase price shall be returned promptly to Buyer and this Agreement of Sale will be NULL and VOID.

284    6.  Buyer's failure to exercise any of Buyer's options within the time limits specified in this paragraph shall constitute a WAIVER of this contingency and Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 26 of this Agreement.

286    (E)  Certification By signing this Agreement, Buyer and Seller certify the accuracy of their respective statements, to the best of their knowledge.

287  12.  RADON CONTINGENCY (1-98)

288    (A)  Seller represents that: (check appropriate response(s))

☐ 1. Seller has no knowledge concerning the presence or absence of radon.

☐ 2. Seller has knowledge that the Property was tested on the dates, by the methods (e.g., charcoal canister, alpha track, etc.), and with the results of all tests indicated below:

292    DATE        METHOD        RESULTS (picoCuries/liter or working levels)

293    _____    _____    _____

294    _____    _____    _____

295

296    COPIES OF ALL AVAILABLE TEST REPORTS will be delivered to Buyer with this Agreement. SELLER DOES NOT WARRANT EITHER THE METHODS OR RESULTS OF THE TESTS.

298    ☐ 3. Seller has knowledge that the Property underwent radon reduction measures on the date(s) and by the method(s) indicated below:

299    DATE        RADON REDUCTION METHOD

300    _____    _____

301    _____    _____

302

303    ☐  WAIVED. Buyer understands that Buyer has the option to request that the Property be inspected for radon by a certified inspector (see Radon Notice). BUYER WAIVES THIS OPTION and agrees to the RELEASE set forth in paragraph 26 of this Agreement.

305    ☐  ELECTED

306    (B)  Buyer, at Buyer's expense, has the option to obtain, from a certified inspector, a radon test of the Property and will deliver a copy of the test report to Agent for Seller, if any, otherwise to Seller, within _____10_____ days of the execution of this Agreement. (See Radon Notice.)

308    1.  If the test report reveals the presence of radon below 0.02 working levels (4 picoCuries/liter), Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 26 of this Agreement.

310    2.  If the test report reveals the presence of radon at or exceeding 0.02 working levels (4 picoCuries/liter), Buyer will, within _____ days of receipt of the test results:

312    ☐  Option 1

313    a.  Accept the Property in writing and agree to the RELEASE set forth in paragraph 26 of this Agreement, OR

314    b.  Terminate this Agreement in writing, in which case all deposit monies paid on account of purchase price shall be returned promptly to Buyer and this Agreement of Sale will be NULL and VOID, OR

316    c.  Submit a written, corrective proposal to Agent for Seller, if any, otherwise to Seller. The corrective proposal will include, but not be limited to, the name of the certified mitigation company; provisions for payment, including retests; and completion date for corrective measures.

319    1)  Within 5 days of receiving the corrective proposal, Seller will:

320    a)  Agree to the terms of the corrective proposal in writing, in which case Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 26 of this Agreement, OR

322    b)  Not agree to the terms of the corrective proposal.

**Lead:** (For Properties built before 1978)

**Lead Warning Statement:** Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

**Lead Hazard Disclosure Requirements:** In accordance with the Residential Lead-Based Paint Hazard Reduction Act, any seller of property built before 1978 must provide the buyer with an EPA-approved lead hazard information pamphlet titled *Protect Your Family From Lead in Your Home* and must disclose to the buyer and the seller's agent the known presence of lead-based paint and/or lead-based paint hazards in or on the property being sold, including the basis used for determining that lead-based paint and/or lead-based paint hazards exist, the location of lead-based paint and/or lead-based paint hazards, and the condition of painted surfaces. A seller of a pre-1978 structure must also provide the buyer with any records or reports available to the seller pertaining to lead-based paint and/or lead-based paint hazards in or about the property being sold, the common areas, or other residential dwellings in multi-family housing. The Act further requires that before a buyer is obligated to purchase any housing constructed prior to 1978, the seller shall give the buyer 10 days (unless buyer and seller agree in writing to another time period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards. The opportunity to conduct a risk assessment or inspection may be waived by the buyer, in writing. Neither testing nor abatement is required of the seller. Housing built in 1978 or later is not subject to the Act.

**Radon:** Radon is a natural, radioactive gas that is produced in the ground by the normal decay of uranium and radium. Studies indicate that extended exposure to high levels of radon gas can increase the risk of lung cancer. Radon can find its way into any air space, including basements and crawl spaces of permeable building materials. The Environmental Protection Agency (EPA) advises corrective action if the annual average exposure to radon exceeds 0.02 working levels (four picocuries). If a house has a radon problem, it usually can be cured by increased ventilation and/or by preventing radon entry. A person who tests and/or safeguards a building for radon in Pennsylvania must be certified by the Department of Environmental Protection. Information about radon and about certified testing or mitigation firms is available through DEP, Bureau of Radiation Protection, P.O. Box 2063, Harrisburg, PA (800) 23RADON or (717) 783-3594.

2) Should Seller not agree to the terms of the corrective prop... ...r fail to respond within the given time, Buyer will, within 5 days, elect to:

    a) Accept the Property in writing and agree to the RELEASE set forth in paragraph 26 of this Agreement, OR

    b) Terminate this Agreement in writing, in which case all deposit monies paid on account of purchase price shall be returned promptly to Buyer and this Agreement of Sale will be NULL and VOID.

**Option 2**

a. Accept the Property in writing and agree to the RELEASE set forth in paragraph 26 of this Agreement, OR

b. Submit a written, corrective proposal to Agent for Seller, if any, otherwise to Seller. The corrective proposal will include, but not be limited to, the name of the certified mitigation company; provisions for payment, including retests; and completion date for corrective measures. Seller shall pay a maximum of $_____ toward the total cost of remediation and retests, which shall be completed by settlement.

    1) If the total cost of remediation and retests EXCEEDS the amount specified in paragraph 12(B) (Option 2) b, Seller will, within 5 days of receipt of the cost of remediation, notify Buyer of Seller's choice to pay for the total cost of remediation and retests OR not pay for the total cost of remediation and retests.

    2) If the Seller chooses not to pay for the total cost of remediation and retests, Buyer will, within 5 days of receipt of Seller's notification, notify Seller, in writing, of Buyer's choice to:

        a) Pay the difference between Seller's contribution to remediation and retests and the actual cost thereof, in which case Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 26 of this Agreement, OR

        b) Terminate this Agreement, in which case all deposit monies paid on account of purchase price shall be returned promptly to Buyer and this Agreement of Sale will be NULL and VOID.

(C) Buyer's failure to exercise any of Buyer's options within the time limits specified in this paragraph shall constitute a WAIVER of this contingency and Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 26 of this Agreement.

**13. STATUS OF WATER (1-98)**

(A) Seller represents that this property is served by:

    ☐ Public Water
    ☒ Onsite Water
    ☐ Community Water
    ☐ None
    ☐ _____

(B) **WATER SERVICE INSPECTION CONTINGENCY**

☐ WAIVED. Buyer acknowledges that Buyer has the option to request an inspection of the water service for the Property. BUYER WAIVES THIS OPTION and agrees to the RELEASE set forth in paragraph 26 of this Agreement.

☒ ELECTED

    1. Buyer has the option, within ____ days of the execution of this Agreement and at Buyer's expense, to deliver to Agent for Seller, if any, otherwise to Seller, a written inspection report by a qualified, professional water testing company of the quality and/or quantity of the water service.

    2. Seller agrees to locate and provide access to the on-site (or individual) water system, if applicable, at Seller's expense, if required by the inspection company. Seller also agrees to restore the Property prior to settlement.

    3. If the report reveals that the water service does not meet the minimum standards of any applicable governmental authorities and/or fails to satisfy the requirements for quality and/or quantity set by the mortgage lender, if any, then Seller shall, within ___5___ days of receipt of the report, notify Buyer in writing of Seller's choice to:

        a. Upgrade the water service to the minimum acceptable levels, before settlement, in which case Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 26 of this Agreement, OR

        b. Not upgrade the water service.

    4. If Seller chooses not to upgrade the water service to minimum acceptable levels, Buyer will, within ___5___ days of Seller's notice not to correct, either:

        a. Accept the Property and the water service and, if required by the mortgage lender, if any, and/or any governmental authority, upgrade the water service before settlement or within the time required by the mortgage lender, if any, and/or any governmental authority, at Buyer's expense and with Seller's permission, which shall not be unreasonably withheld, and agree to the RELEASE set forth in paragraph 26 of this Agreement. If Seller denies Buyer permission to upgrade the water service, Buyer may, within 5 days of Seller's denial, terminate this Agreement. If Buyer terminates this Agreement, all deposit monies paid on account of purchase price shall be returned promptly to Buyer and this Agreement of Sale will be NULL and VOID, OR

        b. Terminate this Agreement, in which case all deposit monies paid on account of purchase price shall be returned promptly to Buyer and this Agreement of Sale will be NULL and VOID.

    5. Buyer's failure to exercise any of Buyer's options within the time limits specified in this paragraph shall constitute a WAIVER of this contingency and Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 26 of this Agreement.

**14. STATUS OF SEWER (1-98)**

(A) Seller represents that Property is served by:

    ☒ Public Sewer
    ☐ Individual On-lot Sewage Disposal System (See Sewage Notice 1)
    ☐ Individual On-lot Sewage Disposal System in Proximity to Well (See Sewage Notice 1; see Sewage Notice 4, if applicable)
    ☐ Community Sewage Disposal System
    ☐ Ten-acre Permit Exemption (See Sewage Notice 2)
    ☐ Holding Tank (See Sewage Notice 3)
    ☐ None (See Sewage Notice 1)
    ☐ None Available/Permit Limitations in Effect (See Sewage Notice 5)
    ☐ _____

(B) **INDIVIDUAL ON-LOT SEWAGE DISPOSAL INSPECTION CONTINGENCY**

☐ WAIVED. Buyer acknowledges that Buyer has the option to request an individual on-lot sewage disposal inspection of the Property. BUYER WAIVES THIS OPTION and agrees to the RELEASE set forth in paragraph 26 of this Agreement.

☐ ELECTED

    1. Buyer has the option, within _____ days of the execution of this Agreement and at Buyer's expense, to deliver to Agent for Seller, if any, otherwise to Seller, a written inspection report by a qualified, professional inspector of the individual on-lot sewage disposal system.

    2. Seller agrees to locate and provide access to the individual on-lot sewage disposal system, and, if required by the inspection company, empty the septic tank, at Seller's expense. Seller also agrees to restore the Property prior to settlement.

    3. If the report reveals defects that do not require expansion or replacement of the existing sewage disposal system, Seller shall, within _____ days of receipt of the report, notify Buyer in writing of Seller's choice to:

        a. Correct the defects before settlement, including retests, at Seller's expense, in which case Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 26 of this Agreement, OR

        b. Not correct the defects, in which case Buyer will, within _____ days of Seller's notice not to correct the defects, either:

            1) Accept the Property and the system and, if required by the mortgage lender, if any, and/or any governmental authority, correct the defects before settlement or within the time required by the mortgage lender, if any, and/or any governmental authority, at Buyer's sole expense and with Seller's permission, which shall not be unreasonably withheld, and agree to the RELEASE set forth in paragraph 26 of this Agreement. If Seller denies Buyer permission to correct the defects, Buyer may, within 5 days of Seller's denial, terminate this Agreement. If Buyer terminates this Agreement, all deposit monies paid on account of purchase price shall be returned promptly to Buyer and this Agreement of Sale will be NULL and VOID, OR

            2) Terminate this Agreement in writing, in which case all deposit monies paid on account of purchase price shall be returned promptly to Buyer and this Agreement of Sale will be NULL and VOID, OR

    4. If the report reveals the need to expand or replace the existing individual on-lot sewage disposal system, Seller may, within _____ days of receipt of the report, submit a corrective proposal to Agent for Buyer, if any, otherwise to Buyer. The corrective proposal will include, but not be limited to, the name of the remediation company; provisions for payment, including retests; and completion date for corrective measures. Within 5 days of receiving Seller's corrective proposal, or if no corrective proposal is received within the given time, Buyer will:

        a. Agree to the terms of the corrective proposal, if any, in writing, in which case Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 26 of this Agreement, OR

# SEWAGE NOTICES

### NOTICES PURSUANT TO THE PENNSYLVANIA SEWAGE FACILITIES ACT

**NOTICE 1:** THERE IS NO CURRENTLY EXISTING COMMUNITY SEWAGE SYSTEM AVAILABLE FOR THE SUBJECT PROPERTY. Section 7 of the Pennsylvania Sewage Facilities Act provides that no person shall install, construct, request bid proposals for construct, alter, repair or occupy any building or structure for which an individual sewage system is to be installed, without first obtaining a permit. Buyer is advised by this notice that, before signing this Agreement of Sale, Buyer should contact the local agency charged with administering the Act to determine the procedure and requirements for obtaining a permit for an individual sewage system. The local agency charged with administering the Act will be the municipality where the Property is located or that municipality working cooperatively with others.

**NOTICE 2:** THIS PROPERTY IS SERVICED BY AN INDIVIDUAL SEWAGE SYSTEM INSTALLED UNDER THE TEN-ACRE PERMIT EXEMPTION PROVISIONS OF SECTION 7 OF THE PENNSYLVANIA SEWAGE FACILITIES ACT. (Section 7 provides that a permit may not be required before installing, constructing, awaiting a contract for construction, altering, repairing or connecting to an individual sewage system where a ten-acre parcel or lot is subdivided from a parent tract after January 10, 1987). Buyer is advised that soils on site testing were not conducted and that, should the system malfunction, the owner of the Property or properties serviced by the system at the time of a malfunction may be held liable for any contamination, pollution, public health hazard or nuisance which occurs as a result.

**NOTICE 3:** THIS PROPERTY IS SERVICED BY A HOLDING TANK (PERMANENT OR TEMPORARY) TO WHICH SEWAGE IS CONVEYED BY A WATER CARRYING SYSTEM AND WHICH IS DESIGNED AND CONSTRUCTED TO FACILITATE ULTIMATE DISPOSAL OF THE SEWAGE AT ANOTHER SITE. Pursuant to the Pennsylvania Sewage Facilities Act, Seller must provide a history of the annual cost of maintaining the tank from the date of its installation or December 14, 1995, whichever is later.

**NOTICE 4:** AN INDIVIDUAL SEWAGE SYSTEM HAS BEEN INSTALLED AT AN ISOLATION DISTANCE FROM A WELL THAT IS LESS THAN THE DISTANCE SPECIFIED BY REGULATION. The regulations at 25 Pa. Code §73.13 pertaining to minimum horizontal isolation distances provide guidance. Subsection (b) of §73.13 states that the minimum horizontal isolation distance between an individual water supply or water supply system suction line and treatment tanks shall be 50 feet. Subsection (c) of §73.13 states that the horizontal isolation distance between the individual water supply or water supply system suction line and the perimeter of the absorption shall be 100 feet.

**NOTICE 5:** THIS LOT IS WITHIN AN AREA IN WHICH PERMIT LIMITATIONS ARE IN EFFECT AND IS SUBJECT TO THOSE LIMITATIONS. SEWAGE FACILITIES ARE NOT AVAILABLE FOR THIS LOT AND CONSTRUCTION OF A STRUCTURE TO BE SERVED BY SEWAGE FACILITIES MAY NOT BEGIN UNTIL THE MUNICIPALITY COMPLETES A MAJOR PLANNING REQUIREMENT PURSUANT TO THE PENNSYLVANIA SEWAGE FACILITIES ACT AND REGULATIONS PROMULGATED THEREUNDER.

b. Accept the Property and the system and, if required by the mortgage lender, if any, and/or any governmental authority, correct the defects before settlement or within the time required by the mortgage lender, if any, and/or any governmental authority, at Buyer's sole expense and with Seller's permission, which shall not be unreasonably withheld, and agree to the RELEASE set forth in paragraph 26 of this Agreement. If Seller denies Buyer permission to correct the defects, all deposit monies paid on account of purchase price shall be returned promptly to Buyer and this Agreement of Sale will be NULL and VOID, OR

c. Terminate this Agreement in writing, in which case all deposit monies paid on account of purchase price shall be returned promptly to Buyer and this Agreement of Sale will be NULL and VOID.

5. Buyer's failure to exercise any of Buyer's options within the time limits specified in this paragraph shall constitute a WAIVER of this contingency and Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 26 of this Agreement.

## 15. NOTICES & ASSESSMENTS (1-98)

(A). Seller represents as of Seller's execution of this Agreement, that no public improvement, condominium or homeowner association assessments have been made against the Property which remain unpaid and that no notice by any government or public authority has been served upon Seller or anyone on Seller's behalf, including notices relating to violations of zoning, housing, building, safety or fire ordinances which remain uncorrected, and that Seller knows of no condition that would constitute violation of any such ordinances which remains uncorrected, unless otherwise specified here: _____

(B) Seller knows of no other potential notices and assessments except as follows: _____

(C) In the event notices and assessments are received after execution of this Agreement and before settlement, Seller will notify Buyer in writing within 5 days of receiving the notice or assessment, that Seller shall:

   1. Comply with notices and assessments at Seller's expense, in which case Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 26 of this Agreement, OR

   2. NOT comply with notices and assessments, at Seller's expense, in which case Buyer will notify Seller within 5 days in writing that Buyer shall:

     a. Comply with the notices and assessments at Buyer's expense and agree to the RELEASE set forth in paragraph 26 of this Agreement, OR

     b. Terminate this Agreement, in which case all deposit monies paid on account of purchase price shall be returned promptly to Buyer and this Agreement of Sale will be NULL and VOID.

   If Buyer fails to notify Seller within the given time, Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 26 of this Agreement.

(D) Buyer is advised that access to a public road may require issuance of a highway occupancy permit from the Department of Transportation.

(E) If required by law, Seller shall deliver to Agent for Buyer, if any, otherwise to Buyer, on or before settlement, a certification from the appropriate municipal department or departments disclosing notice of any uncorrected violation of zoning, housing, building, safety or fire ordinances.

## 16. TITLE, SURVEYS, AND COSTS (1-98)

(A) The Property is to be conveyed free and clear of all liens, encumbrances, and easements, EXCEPTING HOWEVER the following: existing deed restrictions, building restrictions, ordinances, easements of roads, easements visible upon the ground, easements of record, privileges or rights of public service companies, if any; otherwise the title to the above described real estate shall be good and marketable and such as will be insured by a reputable Title Insurance Company at the regular rates.

(B) In the event Seller is unable to give a good and marketable title and such as will be insured by a reputable Title Company at the regular rates, as specified in paragraph 16(A), Buyer shall have the option of taking such title as Seller can give without changing the price or of being repaid all monies paid by Buyer to Seller on account of the purchase price and Seller shall reimburse Buyer for any costs incurred by Buyer for those items specified in paragraph 16(C) and in paragraph 16(D) items (1), (2), (3); and in the latter event there shall be no further liability or obligation on either of the parties hereto and this Agreement shall become NULL and VOID.

(C) Any survey or surveys which may be required by the Title Insurance Company or the abstracting attorney, for the preparation of an adequate legal description of the Property (or the correction thereof), shall be secured and paid for by Seller. However, any survey or surveys desired by Buyer or required by the mortgage lender shall be secured and paid for by Buyer.

(D) Buyer shall pay for the following: (1) The premium for mechanics lien insurance and/or title search, or fee for cancellation of same, if any; (2) The premiums for flood insurance and/or fire insurance with extended coverage, insurance binder charges or cancellation fee, if any; (3) Appraisal fees and charges paid in advance to mortgage lender, if any; (4) Buyer's customary settlement costs and accruals.

## 17. ZONING CLASSIFICATION (1-98)

Failure of this Agreement to contain the zoning classification (except in cases where the property [and each parcel thereof, if subdividable] is zoned solely or primarily to permit single-family dwellings) shall render this Agreement voidable at the option of the Buyer, and, if voided, any deposits tendered by the Buyer shall be returned to the Buyer without any requirement for court action.

Zoning Classification: _____
☐ ELECTED. Within _____ days of the execution of this Agreement, Buyer will verify that the existing use of the Property as _____ is permitted. In the event the use is not permitted, Buyer will, within the time given for verification, notify Agent for Seller, if any, otherwise Seller, in writing that the existing use of the Property is not permitted and this Agreement will be NULL and VOID, in which case all deposit monies paid on account of purchase price shall be returned promptly to Buyer. Buyer's failure to respond within the given time shall constitute a WAIVER of this contingency and all other terms of this Agreement of Sale remain in full force and effect.

## 18. COAL NOTICE

☑ NOT APPLICABLE
☐ APPLICABLE

THIS DOCUMENT MAY NOT SELL, CONVEY, TRANSFER, INCLUDE OR INSURE THE TITLE TO THE COAL AND RIGHTS OF SUPPORT UNDERNEATH THE SURFACE LAND DESCRIBED OR REFERRED TO HEREIN, AND THE OWNER OR OWNERS OF SUCH COAL MAY HAVE THE COMPLETE LEGAL RIGHT TO REMOVE ALL SUCH COAL AND IN THAT CONNECTION, DAMAGE MAY RESULT TO THE SURFACE OF THE LAND AND ANY HOUSE, BUILDING OR OTHER STRUCTURE ON OR IN SUCH LAND. (This notice is set forth in the manner provided in Section 1 of the Act of July 17, 1957, P.L. 984.) "Buyer acknowledges that he may not be obtaining the right of protection against subsidence resulting from coal mining operations, and that the property described herein may be protected from damage due to mine subsidence by a private contract with the owners of the economic interests in the coal. This acknowledgment is made for the purpose of complying with the provisions of Section 14 of the Bituminous Mine Subsidence and the Land Conservation Act of April 27, 1966." Buyer agrees to sign the deed from Seller which deed will contain the aforesaid provision.

## 19. POSSESSION (1-98)

(A) Possession is to be delivered by deed, keys and:

   1. Physical possession to a vacant building (if any) broom clean, free of debris at day and time of settlement, AND/OR

   2. Assignment of existing lease(s), together with any security deposits and interest, at time of settlement, if Property is tenant occupied at the execution of this Agreement or unless otherwise specified herein. Buyer will acknowledge existing lease(s) by initialing said lease(s) at time of signing of this Agreement of Sale, if Property is tenant occupied.

(B) Seller shall not enter into any new leases, written extension of existing leases, if any, or additional leases for the Property without expressed written consent of Buyer.

## 20. RECORDING (3-85)

This Agreement shall not be recorded in the Office for the Recording of Deeds or in any other office or place of public record and if Buyer causes or permits this Agreement to be recorded, Seller may elect to treat such act as a breach of this Agreement.

## 21. ASSIGNMENT (3-85)

This Agreement shall be binding upon the parties, their respective heirs, personal representatives, guardians and successors, and to the extent assignable, on the assigns of the parties hereto, it being expressly understood, however, that Buyer shall not transfer or assign this Agreement without the written consent of Seller.

## 22. DEPOSIT AND RECOVERY FUND (1-98)

(A) Deposits paid by Buyer within 30 days of settlement shall be by cashier's or certified check. Deposits, regardless of the form of payment and the person designated as payee, shall be paid to Agent identified in paragraph 3(F), who shall retain them in an escrow account until consummation or termination of this Agreement in conformity with all applicable laws and regulations. Agent may hold any uncashed check tendered as deposit pending the acceptance of this offer.

(B) In the event of a dispute over entitlement to deposit monies, the Agent holding the deposit is required by the Rules and Regulations of the State Real Estate Commission (49 Pa. Code §35.327) to retain the monies in escrow until the dispute is resolved. In the event of litigation for the return of deposit monies, Agent shall distribute the monies as directed by a final order of court or the written Agreement of the parties. Buyer and Seller agree that, in the event Agent herein is joined in litigation for the return of deposit monies, the attorneys' fees and costs of the Agent(s) will be paid by the party joining the Agent.

(C)  A    Estate Recovery Fund exists to reimburse any persons who have . . . .ed a final civil judgment against a Pennsylvania real estate licensee owing to fraud, misrepresentation, or deceit in a real estate transaction and who have been unable to collect the judgment after exhaust- ing all legal and equitable remedies. For complete details about the Fund, call (717) 783-3658, or (800) 882-2113 (within Pennsylvania) and (717) 783-4854 (outside Pennsylvania)..

23.  CONDOMINIUM RESALE ACT NOTICE (8-95)
☒    NOT APPLICABLE
☐    APPLICABLE
(A)  Buyer acknowledges that the Property is a unit of a condominium that is primarily run by a unit owners' association.
(B)  §3407 of the Uniform Condominium Act of Pennsylvania requires Seller to furnish Buyer with a Certificate of Resale and copies of the condo- minium declaration (other than plats and plans), the bylaws, and the rules and regulations of the association.
(C)  Within _____ days of the execution of this Agreement, Seller shall submit a request to the association for a Certificate of Resale and the doc- uments necessary to enable Seller to comply with the Act. The Act provides that the association is required to provide these documents within 10 days of Seller's request.
(D)  Under the Act, Seller is not liable to Buyer for the failure or delay of the association to provide the Certificate in a timely manner, nor is Seller liable to Buyer for any erroneous information provided by the association and included in the Certificate.
(E)  Buyer may declare the Agreement of Sale VOID at any time before Buyer's receipt of the Certificate of Resale and for 5 days thereafter, OR until settlement, whichever occurs first. Buyer's notice declaring the Agreement void must be in writing; thereafter all deposit monies shall be returned to Buyer.

24.  PLANNED COMMUNITY (HOMEOWNER ASSOCIATION) NOTICE FOR PURPOSES OF RESALE ONLY (1-97)
☒    NOT APPLICABLE
☐    APPLICABLE
(A)  Buyer acknowledges that the Property is part of a planned community as defined by the Uniform Planned Community Act. (See Definition of Planned Community Notice for the definition contained in the Act).
(B)  §5407(a) of the Act requires Seller to furnish Buyer with a copy of the Declaration (other than plats and plans), the bylaws, the rules and regu- lations of the association, and a Certificate containing the provisions set forth in §5407(a) of the Act.
(C).  Within _____ days of the execution of this agreement, Seller shall submit a request for a Certificate and the documents nec- essary to enable Seller to comply with the Act. The Act provides that the association is required to provide these documents within 10 days of Seller's request.
(D)  Under the Act, Seller is not liable to Buyer for the failure or delay of the association to provide the Certificate in a timely manner, nor is Seller liable to Buyer for any erroneous information provided by the Association and included in the Certificate.
(E)  Buyer may declare the Agreement of Sale VOID at any time before Buyer's receipt of the association documents and for 5 days thereafter, OR until settlement, whichever occurs first. Buyer's notice declaring the Agreement void must be in writing; thereafter all deposit monies shall be returned to Buyer.

25.  MAINTENANCE AND RISK OF LOSS (1-98)
(A)  Seller shall maintain the Property, grounds, fixtures, and any personal property specifically scheduled herein in its present condition, normal wear and tear excepted.
(B)  In the event any system or appliance included in the sale of the Property fails and Seller does not repair or replace the item, Seller will promptly notify Buyer in writing of Seller's choice:
    1.  Repair or replace the failed system or appliance before settlement or credit Buyer at settlement for the fair market value of the failed sys- tem or appliance (this option must be acceptable to the mortgage lender, if any). In each case, Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 26 of this Agreement.
    2.  Make no repairs or replacements, and not credit Buyer at settlement for the fair market value of the failed system or appliance, in which case Buyer will notify Seller in writing within 5 days or before settlement, whichever is sooner, that Buyer shall:
        a.  Accept the Property and agree to the RELEASE set forth in paragraph 26 of this Agreement, OR
        b.  Terminate this Agreement, in which case all deposit monies paid on account of purchase price shall be returned promptly to Buyer and this Agreement of Sale shall be NULL and VOID.
(C)  Seller shall bear risk of loss from fire or other casualties until time of settlement. In the event of damage by fire or other casualties to any prop- erty included in this sale that is not repaired or replaced prior to settlement, Buyer shall have the option of rescinding this Agreement and promptly receiving all monies paid on account of purchase price or of accepting the Property in its then condition together with the proceeds of any insurance recovery obtainable by Seller. Buyer is hereby notified that Buyer may insure Buyer's equitable interest in this Property as of the time of execution of this Agreement.
Buyer's failure to exercise any of Buyer's options within the time limit specified in this paragraph shall constitute a WAIVER of this con- tingency and Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 26 of this Agreement.

26.  RELEASE (7-95) —  Buyer hereby releases, quit claims and forever discharges SELLER, ALL AGENTS, their SUBAGENTS, EMPLOY- EES, and any OFFICER or PARTNER of any one of them and any other PERSON, FIRM, or CORPORATION who may be liable by or through them, from any and all claims, losses or demands, including, but not limited to, personal injuries and property damage and all of the consequences thereof, whether now known or not, which may arise from the presence of termites or other wood-boring insects, radon, lead-based paint hazards, environmental hazards, any defects in the individual on-lot sewage disposal system or deficiencies in the on-site water service system, or any defects or conditions on the Property. This release shall survive settlement.

27.  REPRESENTATIONS (1-98)
(A)  Buyer understands that any representations, claims, advertising, promotional activities, brochures or plans of any kind made by Seller, Agents or their employees are not a part of this Agreement, unless expressly incorporated or stated in this Agreement.
(B)  It is understood that Buyer has inspected the Property before signing this Agreement of Sale (including fixtures and any personal prop- erty specifically scheduled herein), or has waived the right to do so, and has agreed to purchase it in its present condition unless otherwise stated in this Agreement. Buyer acknowledges that the Agents have not made an independent examination or determination of the structural soundness of the Property, the age or condition of the components, environmental conditions, the permitted uses, or of conditions existing in the locale where the Property is situated; nor have they made a mechanical inspection of any of the systems contained therein.
(C)  It is further understood that this Agreement contains the whole agreement between Seller and Buyer and there are no other terms, obligations, covenants, representations, statements or conditions, oral or otherwise of any kind whatsoever concerning this sale. Furthermore, this Agreement shall not be altered, amended, changed, or modified except in writing executed by the parties.
(D)  The headings, captions, and line numbers in this Agreement are meant only to make it easier to find the paragraphs.

28.  DEFAULT-TIME OF THE ESSENCE (1-98)
The said time for settlement and all other times referred to for the performance of any of the obligations of this Agreement are hereby agreed to be of the essence of this Agreement. For the purposes of this Agreement, number of days shall be counted from the date of execution, by excluding the day this Agreement was executed and including the last day of the time period. Should Buyer:
(A)  Fail to make any additional payments as specified in paragraph 3; OR
(B)  Furnish false or incomplete information to Seller, Agent for Seller, Agent for Buyer, or the mortgage lender, if any, concerning Buyer's legal or financial status, or fail to cooperate in the processing of the mortgage loan application, which acts would result in the failure to obtain the approval of a mortgage loan commitment; OR
(C)  Violate or fail to fulfill and perform any other terms or conditions of this Agreement;
then in such case, Seller shall have the option of retaining all deposit monies and other sums paid by Buyer on account of purchase price whether required by this Agreement or not, only as elected below: (Check only one)
    ☒  As liquidated damages. In this event Buyer and Seller shall be released from further liability or obligation and this Agreement shall be NULL and VOID.
    ☐  On account of purchase price, or as monies to be applied to Seller's damages, or as liquidated damages for such breach, as Seller may elect. In the event of liquidated damages, Buyer and Seller shall be released from further liability or obligation and this Agreement shall be NULL and VOID.

29.  AGENT(S) (1-98)  It is expressly understood and agreed between the parties that the named Agent for Seller, any Subagents, their salespeople, employees, officers and/or partners, are Agent(s) for Seller, and that the named Agent for the Buyer, their salespeople, employees, officers and/or partners, are Agent(s) for Buyer. If there is no Agent for Buyer, Agent for Seller or Subagent for Seller may perform services for Buyer in connec- tion with financing, insurance and document preparation, with written disclosure to Buyer and Seller.

## DEFINITION OF A PLANNED COMMUNITY

The Uniform Planned Community Act defines "planned community" as real estate with respect to which a person, by virtue of ownership of an interest in any portion of the real estate, is or may become obligated by covenant, easement or agreement imposed on the owner's interest to pay any amount for real property taxes, insurance, maintenance, repair, improvement, management, administration or regulation of any part of the real estate other than the portion or interest owned solely by the person. The term excludes a cooperative and a condominium, but a cooperative or condominium may be part of a planned community. For the purposes of this definition, "ownership" includes holding a leasehold interest of more than 20 years, including renewal options, in real estate. The term includes nonresidential campground communities.



818 **30. MEDIATION (7-96)**
819   ☐ NOT AVAILABLE
820   ☐ WAIVED. Buyer and Seller understand that they may choose to mediate at a later date, should a dispute arise, but that there will be no oblig-
821    ation on the part of any party to do so.
822   ☒ ELECTED
823   (A) Buyer and Seller will try to resolve any dispute or claim that may arise from this Agreement of Sale through mediation, in accordance with the
824    Rules and Procedures of the Home Sellers/Home Buyers Dispute Resolution System. Any agreement reached through a mediation conference
825    and signed by the parties will be binding.
826   (B) Buyer and Seller acknowledge that they have received, read, and understand the Rules and Procedures of the Home Sellers/Home Buyers
827    Dispute Resolution System. (See Mediation Notice.)
828   (C) This agreement to mediate disputes arising from this Agreement shall survive settlement.

830 Buyer and Seller acknowledge that they have read and understand the notices and explanatory information regarding property condition inspec-
831 tions set forth on the back of this form.

**NOTICE TO PARTIES: WHEN SIGNED, THIS AGREEMENT IS A BINDING CONTRACT.** Return by facsimile transmission (FAX) of this
634 Agreement of Sale, and all addenda, bearing the signatures of all parties, constitutes acceptance of this Agreement. Parties to this transaction
635 are advised to consult an attorney before signing if they desire legal advice.

637 WITNESS _____ BUYER X _Jack J Marrow_ DATE _7 July 99_
638 WITNESS _____ BUYER X _Karen A. Marrow_ DATE _7 July 99_
639 WITNESS _____ BUYER X _____ DATE _____

642 Seller hereby approves the above contract this _9th JE_ day of _July_ A.D. 19_99_

648 WITNESS _____ SELLER X _Linda M Fellman_ DATE X _7/9/99_
649 WITNESS _____ SELLER X _____ DATE _____
650 WITNESS _____ SELLER _____ DATE _____
651 _Seller agreed to add initial Buyer's counters 7-13-99, Escrow deposit_
652 Services to Buyer _check due within 24 hours of Seller's acceptance, 7-13-99 JE 7/13/99_
653 In conjunction with this Agreement of Sale, by initialing below, Buyer authorizes Subagent for Seller, if any, or Agent for Seller to perform the following
654 services on Buyer's behalf:

655
656 _____ Order Title Insurance from any reputable Title Insurance Company.
657 Buyer's Initials
658
659 _____ Order Homeowner's Insurance with coverage in the amount of $ _____
660 Buyer's Initials
661
662 _____ Order Fire & Extended Coverage Insurance with coverage in the amount of $ _____
663 Buyer's Initials
664
665 _____ Order Flood Insurance with coverage in the amount of $ _____
667 Buyer's Initials
668 _____ Buyer's Services _____ Fee: $ _____
669
670
671 _____
672 Buyer's Initials

674 **Seller's Acknowledgment**
675 _____ Seller acknowledges receipt of a separate Buyer's services agreement with Agent for Seller or Subagent for Seller.
676 Seller's Initials

678 **Broker's/Agent's Certifications (check all that are applicable):**
680   ☐ Regarding Lead-Based Paint Hazards Disclosure: Required if Property was built before 1978. The undersigned Agents involved in this
681    transaction, on behalf of themselves and their brokers, certify that their statements are true to the best of their knowledge and belief.
682    Agents' Acknowledgment: The Agents involved in this transaction have informed Seller of Seller's obligations under The Residential Lead
683    Paint Hazard Reduction Act, 42 U.S.C. 4852(d), and are aware of their responsibility to ensure compliance.

685   ☐ Regarding FHA Mortgages: The undersigned Agents involved in this transaction, on behalf of themselves and their brokers, certify that the
686    terms of this contract for purchase are true to the best of their knowledge and belief, and that any other agreement entered into by any of these
687    parties in connection with this transaction is attached to this Agreement of Sale.

689   ☒ Regarding Mediation: The undersigned
690    ☒ Agent for Seller ☐ Agent for Buyer ☐ Subagent for Seller
691    on behalf of themselves and their brokers, agree to submit to mediation in accordance with paragraph 30 of this Agreement.

694 AGENT FOR SELLER (Company Name) _Mt Gretna Realty_
695 ACCEPTED BY _Lu Cherry_ DATE _7-9-99_
696    (Signature of Broker or Salesperson)

699 SUBAGENT FOR SELLER (Company Name) _____
700 ACCEPTED BY _____ DATE _____
701    (Signature of Broker or Salesperson)

704 AGENT FOR BUYER (Company Name) _Re/Max of Lebanon Co._
705 ACCEPTED BY _Wm R Siski_ DATE _7/9/99_
706    (Signature of Broker or Salesperson)

710 Buyer Initials _JJM KAM_    A/S Residential Page 8 of 8    _JE_

# MEDIATION

## DISPUTE RESOLUTION SYSTEM RULES AND PROCEDURES

1. **Agreement of Parties**   The Rules and Procedures of the Dispute Resolution System (DRS) apply when the parties have agreed in writing to mediate under DRS. The written agreement can be achieved by a standard clause in an agreement of sale, an addendum to an agreement of sale, or through a separate written agreement.

2. **Initiation of Mediation**   If a dispute exists, any party may start the mediation process by submitting a completed Request to Initiate Mediation and Transmittal Form (Transmittal Form) to the local Association of REALTORS® (hereafter "Administrator"). The Transmittal Form should be available through the Administrator's office. The initiating party should try to include the following information when sending the completed Transmittal Form to the Administrator:

   a. A copy of the written agreement to mediate if there is one, OR a request by the initiating party to have the Administrator contact the other parties to the dispute to invite them to join the mediation process.

   b. The names, addresses and telephone numbers of the parties involved in the dispute, including the name of every insurance company known to have received notice of the dispute or claim and the corresponding file or claim number.

   c. A brief statement of the facts of the dispute and the damages or relief sought.

3. **Selection of Mediator**   Within five days of receiving the completed Transmittal Form, the Administrator will send each party to the dispute a copy of the Transmittal Form and a list of qualified mediators and their fee schedules. Each party then has ten days to review the list of mediators, cross off the name of any mediator to whom the party objects, and return the list to the Administrator. The Administrator will appoint the first available mediator who is acceptable to all parties involved.

   A mediator who has any financial or personal interest in the dispute or the results of the mediation cannot serve as mediator to that dispute, unless the parties are informed and give their written consent.

4. **Mediation Fees**   Mediation fees will be divided equally among the parties and will be paid before the mediation conference. The parties will follow the payment terms contained in the mediator's fee schedule.

5. **Time and Place of Mediation Conference**   Within ten days of being appointed to the dispute, the mediator will contact the parties and set the date, time and place of the mediation conference. The mediator must give at least twenty days advance notice to all parties. The mediation conference should not be more than sixty days from the mediator's appointment to the dispute.

6. **Conduct of Mediation Conference**   The parties attending the mediation conference will be expected to:

   1. Have the authority to enter into and sign a binding settlement of the dispute.

   2. Produce all information required for the mediator to understand the issues of the dispute. The information may include relevant written materials, as well as descriptions of witnesses and the content of their testimony, whether or not they will be appearing at the mediation conference. The mediator can require the parties to deliver written materials and information before the date of the mediation conference.

   The mediator presiding over the conference:

   1. Will impartially conduct an orderly settlement negotiation.

   2. Will help the parties define the matters in dispute and reach a mutually agreeable solution.

   3. Will have no authority to render an opinion, to bind the parties to his or her decision, or to force the parties to reach a settlement.

   Formal rules of evidence will not apply to the mediation conference.

7. **Representation by Counsel**   Any party who intends to be accompanied to the mediation conference by legal counsel will notify the mediator and the other parties of that intent at least ten days before the conference.

8. **Confidentiality**   No aspect of the mediation can be relied upon or introduced as evidence in any arbitration, judicial or other proceeding. This includes but is not limited to, any opinions or suggestions made by any party regarding a possible settlement; any admissions made during the course of the mediation; any proposals or opinions expressed by the mediator; and any responses given by any party to opinions, suggestions, or proposals.

   No privilege will be affected by disclosures made in the course of the mediation.

   Transcripts or recordings of the mediation will not be allowed without the prior, written consent of all parties and the mediator.

   Records, reports, and other documents received or prepared by the mediator or Administrator cannot be compelled by an arbitration, judicial, or other proceeding, with the exception of an agreement that was reached in the course of mediation and signed by all the parties.

   Neither the mediator nor the Administrator can be compelled to testify in any proceeding regarding information given or representations made either in the course of the mediation or in any confidential communication.

9. **Mediated Settlement**   When a dispute is resolved through mediation, the mediator will put the complete agreement in writing and all parties will sign the written agreement within ten days of the conclusion of the mediation conference. Every reasonable effort will be made to sign the written agreement at the end of the conference.

10. **Judicial Proceedings and Immunity**   NEITHER THE ADMINISTRATOR, THE MEDIATOR, THE NATIONAL ASSOCIATION OF REALTORS®, PENNSYLVANIA ASSOCIATION OF REALTORS®, NOR ANY OF ITS MEMBER BOARDS, SHALL BE DEEMED NECESSARY OR INDISPENSABLE PARTIES IN JUDICIAL PROCEEDINGS RELATING TO THESE RULES AND PROCEDURES, NOR SHALL ANY OF THEM SERVING UNDER THESE PROCEDURES BE LIABLE TO ANY PARTY FOR ANY ACT, ERROR OR OMISSION IN CONNECTION WITH ANY SERVICE OR THE OPERATION OF THE HOME SELLERS/HOME BUYERS DISPUTE RESOLUTION SYSTEM.



EXHIBIT

tabbies®

F

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JACK MARRONE, husband,
KAREN MARRONE, wife, both
individually and in their
capacity as parents and
guardians for VIDA MARRONE
a minor, and MATTHEW ADAM
MARRONE,

               Plaintiffs

        vs.

ALLSTATE INSURANCE COMPANY,
LINDA M. EDLEMAN, FRED
SCHAFFER, MT. GRETNA REALTY,
and HOUSEMASTERS,

               Defendants

Civil Action No.:
1:CV-01-0773

(U.S. District Judge
Yvette Kane)

Jury Trial Demanded

Deposition of:  LINDA M. EDLEMAN

Taken by     :  Plaintiffs

Date         :  June 5, 2002, 9:24 a.m.

Place       :  Nealon & Gover
               2411 North Front Street
               Harrisburg, Pennsylvania

Before      :  Ann M. Wetmore
               Reporter - Notary Public
               Joe Vengoechea
               Video Operator

APPEARANCES:

    TARASI, TARASI & FISHMAN, P.C.
    By:  LOUIS M. TARASI, JR., ESQ.
        JOHN GIANNIFLORO, ESQ.

        For - Plaintiffs

    THOMAS, THOMAS & HAFER
    By:  JOHN FLOUNLACKER, ESQ.

        For - Defendant Linda M. Edleman

    NEALON & GOVER, P.C.
    By:  ANDREW C. LEHMAN, ESQ.

        For - Defendant Allstate Insurance Company

    DUANE, MORRIS & HECKSCHER, LLP
    By:  PAUL E. SCANLAN, ESQ.

        For - Defendant HouseMaster

    FINE, WYATT & CAREY, P.C.
    By:  EDWARD A. MONSKY, ESQ.

        For - Defendant Fred Shcaeffer

ALSO PRESENT:

    FREDERICK SCHAEFFER

1       and I do recall filling things out as far as what

2       the house had and didn't have in order to list it.

3   Q.  But in any case, on Exhibit Number 4 that's your

4       signature at the bottom of the page?

5   A.  Yes.

6   Q.  I'm going to show to you Exhibit Number 5 and ask

7       if you recognize that document?

8   A.  I recognize it like I recognize the other papers.

9   Q.  Well, let's go through this.  This document is

10      signed by you, isn't it?

11  A.  Yes.

12  Q.  The last page it's signed Linda M. Edleman and

13      that's your signature?

14  A.  Yes.

15  Q.  And it's dated 4/27/99.  Correct?

16  A.  Yes.

17  Q.  And the Seller's Property Disclosure Statement is

18      written at the top of the first page?

19  A.  Yes.

20  Q.  Exhibit Number 5, and the property address is 354

21      Timber Road, Mount Gretna.  That's the address of

22      the house involved?

23  A.  Yes.

24  Q.  And the seller is Linda M. Edleman and that's you

25  A.  Yes.

Exam./Tarasi - Edleman                    31

1  Q.  And then it goes through this list.  It says

2      occupancy, do you, the seller, currently occupy

3      this property, and you put yes?

4  A.  Yes.

5  Q.  The date the roof was installed November 1984.  Is

6      that a correct date?

7  A.  Yes.

8  Q.  Okay.  Has the roof been replaced or repaired

9      during your ownership?  No.  Is that correct?

10 A.  Correct.

11 Q.  Has the roof ever leaked during your ownership?

12     You put no?

13 A.  Correct.

14 Q.  Do you know of any problems with the roof, gutters

15     or downspouts, and you put no?

16 A.  Correct.

17 Q.  Basement and crawl spaces.  Does the property have

18     a sump pump, you put no.  Is that correct?

19 A.  Yes.

20 Q.  Are you aware of any water leakage, accumulation

21     of dampness within the basement or crawl space,

22     you put down no?

23 A.  Correct.

24 Q.  Did you inspect your house to determine whether

25     there was any wetness or dampness in it before you

Exam./Tarasi - Edleman                    32

1       signed this document or marked this document?

2   A.  Correct.

3   Q.  You did?

4   A.  What is your question again?

5   Q.  Did you inspect your house and look it over before

6       you filled out this document specifically the one

7       where it says are you aware of any water leakage,

8       accumulation or dampness within the basement or

9       crawl space?

10  A.  Are you asking me two questions about did I

11      inspect the house?

12  Q.  Yes.

13  A.  When I went to sell it did I inspect it?

14  Q.  Yes.

15  A.  No.

16  Q.  Did you inspect it at any time to determine

17      whether what is stated in this particular question

18      was true, are you aware of any water leakage,

19      accumulation or dampness within the basement or

20      crawl space?

21  A.  I was not aware of any, no.

22  Q.  Was your husband aware of any such situation to

23      your knowledge?

24  A.  No.

25  Q.  Was there any work ever done in your basement

Exam./Tarasi - Edleman                                    33

1    because of any dampness that was involved in your

2    basement?

3  A.    Not that I'm aware of.

4  Q.    If somebody did that work, who would do it?

5  A.    It would have, I don't know, I guess been done by

6         my husband at the time.

7  Q.    And your husband's name was Jeff?

8  A.    Yes.

9  Q.    Do you know where he lives?

10 A.    Yes.

11 Q.    Where is that?

12 A.    In Palmyra.

13 Q.    Where?

14 A.    Palmyra.

15 Q.    And do you know the address?

16 A.    No, I don't.

17 Q.    So, the question I asked you is when you filled

18        this thing out, did you inspect your house and

19        look it over in order to fill these particular

20        questions out correctly?

21 A.    No.  I mean I lived in the home.  I knew --

22 Q.    You knew the home?

23 A.    Right.

24 Q.    All right.  And the next question, do you know of

25        any repairs or other attempts to control any wate

Exam./Tarasi - Edleman                          34

1    or dampness problem in the basement or crawl space

2    and you put down no.  Is that right?

3  A.   Correct.

4  Q.   Did your husband ever tell you that he had worked

5       in the basement to correct any wetness or dampness

6       in the basement?

7  A.   No.

8  Q.   He never told you that?

9  A.   No.

10 Q.   Are you aware of any termites, wood destroying

11      insects, dry rot or pests affecting the property,

12      you put no?

13 A.   Correct.

14 Q.   Are you aware of any damage to the property caused

15      by termites/wood destroying insects, dry rot or

16      pests, and you put no?

17 A.   Correct.

18 Q.   Is your property currently under contract by a

19      licensed pest control company, you put no?

20 A.   Correct.

21 Q.   Are you aware of any termite/pest control reports

22      or treatments for the property in the last five

23      years, you put no.  Correct?

24 A.   Correct.

25 Q.   And then structural items, are you aware of any

1    past or present water leakage in the house or

2    other structures, and you put no?

3  A.  Correct.

4  Q.  By the way, how long did you live in this house?

5  A.  From '84 to when it was sold.

6  Q.  All right.  And that apparently was in '99.

7     Right?

8  A.  Yes.

9  Q.  Then are you aware of any past or present

10    movement, shifting, deterioration or other

11    problems with walls, foundations or other

12    structural components, and you put no?

13  A.  Correct.

14  Q.  Are you aware of any past or present problems with

15    driveways, walkways, patios or retaining walls on

16    the property, and you put no?

17  A.  Correct.

18  Q.  Additions remodeling, have you made any additions,

19    structural changes or other alterations to the

20    property, and you put no?

21  A.  Correct.

22  Q.  Was there at one time that your husband had placed

23    paneling down in the basement?

24  A.  About that would have been in '85 or '86.

25  Q.  And did he tell you why he did that?

Exam./Tarasi - Edleman                                    36

1   A.   We were going to finish off the basement.

2   Q.   Was there any reason of dampness or wetness in the

3        basement that he wanted to take care of with that

4        paneling?

5   A.   No.

6   Q.   Did he ever tell you that?

7   A.   No.

8   Q.   By the way, when you had the paneling done, to

9        your knowledge, did you have anybody come in

10       independent of your husband to look this over and

11       advise him as to what kind of paneling he should

12       use?

13  A.   No.

14  Q.   He just did it on his own?

15  A.   Yes.

16  Q.   All right.  What is the source of your drinking

17       water, you have a well on that property?

18  A.   Yes.

19  Q.   If your drinking water is not public, when was

20       your water last tested, what was the result of the

21       test, is the pumping system in working order, and

22       you put yes?

23  A.   Correct.

24  Q.   Do you have a softener, filter or other

25       purification system, you put no?

Exam./Tarasi - Edleman                    37

1   A.   Correct.

2   Q.   The sewer is the public sewer?

3   A.   Correct.

4   Q.   And then they asked you whether the sewer system

5        is shared and you put no.  Is that correct?  We

6        are on Line H.

7   A.   Correct.  I would assume.

8   Q.   Well, it's a public sewer, but that's okay.  A lot

9        of people share I'm sure.  But in any case, next

10       one, are you aware of any leaks, backups or other

11       problems relating to any of the plumbing, water

12       and sewage-related items, and you put no?

13  A.   Correct.

14  Q.   The plumbing system is copper.  Is that correct?

15       It says your plumbing is copper to your knowledge?

16  A.   I don't know that for a fact, but it's probably

17       one of the questions I asked someone to find out,

18       so, correct, yes.

19  Q.   But in any case, you put down copper?

20  A.   Yes.

21  Q.   Are you aware of any problems with any of your

22       plumbing fixtures, including but not limited to

23       the kitchen, laundry or bathroom fixtures, wet

24       bars, hot water heater, et cetera, and you put no?

25  A.   Correct.

Exam./Tarasi - Edleman                                    63

1   A.   That's my assumption or my understanding.

2   Q.   And where do you get that understanding from?

3   A.   I think in the settlement papers or somewhere at

4        settlement time I know I heard something about it.

5   Q.   But in any case, if anybody came to inspect the

6        property they would have to -- you'd have to be

7        there to let them in?

8   A.   Well, or I have three children that could have.

9   Q.   Okay, you or somebody in your family had to be

10       there to let them in?

11  A.   I think there was either at the realtors or at the

12       house a box with a key in it.

13  Q.   Um-hum.

14  A.   But I don't specifically recall the inspection.

15  Q.   But in any case, if there was an inspection -- and

16       I'll represent to you there was one -- somebody

17       from your family, yourself or your children, or

18       somebody from the realtor would have to let the

19       people in the property?

20  A.   I believe so, yes.

21  Q.   Now, how long was your property on the market

22       before it sold?

23  A.   I'm not -- nine months maybe.  I'm not sure.  A

24       year.

25  Q.   Now, did you when you lived in this house since

Exam./Tarasi - Edleman                                    64

1          '84 until '99 notice any mold in the house?

2     A.   No.

3     Q.   Any wetness in the house?

4     A.   No.

5     Q.   And you were familiar with every part of the

6          house?

7     A.   I could get to every part of it.  I -- when you

8          say familiar, what do you mean?

9     Q.   Well, you lived there.  Did you go to every part

10         of the house?

11    A.   Yes.

12    Q.   Including the basement?

13    A.   Yes.

14    Q.   And you did that I'm sure any number of times over

15         '84 to '99?

16    A.   Yes.

17    Q.   '84 to 1999.  Is that correct?

18    A.   Yes.

19              MR. TARASI:  I don't have any other

20         questions.

21                        EXAMINATION

22    BY MR. LEHMAN:

23    Q.   Ms. Edleman, my name is Andy Lehman.  I represent

24         Allstate Insurance Company in this action.  I just

25         have what might be just one question for you.  Did

**EXHIBIT**

tabbies®

_G_

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . .

JACK MARRONE, husband,       .   Civil Action No.:
KAREN MARRONE, wife, both    .   1:CV-01-0773
individually and in their    .
capacity as parents and      .
guardians for VIDA MARRONE   .
a minor, and MATTHEW ADAM    .
MARRONE,                     .
           Plaintiffs   .   (U.S. District Judge
                 .     Yvette Kane)

     vs.                  .

ALLSTATE INSURANCE COMPANY,  .
LINDA M. EDLEMAN, FRED       .
SCHAFFER, MT. GRETNA REALTY, .
and HOUSEMASTERS,            .
           Defendants    .   Jury Trial Demanded

. . . . . . . . . . . . . .


Deposition of:   CHARLES E. BERTHOUD, JR.

Taken by      :  Plaintiffs

Date          :  June 6, 2002, 9:24 a.m.

Place         :  Nealon & Gover
                 2411 North Front Street
                 Harrisburg, Pennsylvania

Before        :  Ann M. Wetmore
                 Reporter - Notary Public
                 Joe Vengoechea
                 Video Operator

2

APPEARANCES:

TARASI, TARASI & FISHMAN, P.C.
By:  LOUIS M. TARASI, JR., ESQ.
     JOHN GIANNIFLORO, ESQ.

     For - Plaintiffs

THOMAS, THOMAS & HAFER
By:  JOHN FLOUNLACKER, ESQ.

     For - Defendant Linda M. Edleman

NEALON & GOVER, P.C.
By:  JAMES G. NEALON, III, ESQ.

     For - Defendant Allstate Insurance Company

DUANE, MORRIS & HECKSCHER, LLP
By:  PAUL E. SCANLAN, ESQ.

     For - Defendant HouseMaster

FINE, WYATT & CAREY, P.C.
By:  EDWARD A. MONSKY, ESQ.

     For - Defendant Fred Schaeffer

<u>INDEX</u>
<u>WITNESS</u>

<u>Examination</u>

CHARLES E. BERTHOUD, JR.

By Mr. Tarasi                    6, 62

By Mr. Nealon                     53

By Mr. Flounlacker                54

By Mr. Monsky                     57

By Mr. Scanlan                    60

<u>EXHIBITS</u>

Berthoud Deposition
<u>Exhibit Number</u>                     <u>Page</u>

| | | |
|---|---|---|
| 1 | Notice of Deposition | 5 |
| 2 | HouseMaster Background Information | 5 |
| 2A | Business Card of Chuck Berthoud | 14 |
| 3 | HouseMaster Home Inspection Limited Guarantee | 5 |
| 4 | Inspection Order Agreement | 5 |
| 5 | HouseMaster Prices for Real Estate Services | 5 |
| 6 | Cover Letter to Clients from HouseMaster | 5 |
| 7 | HouseMaster Express Report | 5 |
| 8 | Closed House Conditions | 5 |
| 9 | Seller's Property Disclosure Statement | 5 |
| 10 | Photocopy of colored photograph | 5 |

4

Berthoud Deposition
Exhibit Number                                           Page

11        HouseMaster Web Contents                    48

12A       Photocopy of four colored                   68
          photographs

12B       Photocopy of four colored                   68
          photographs

12C       Photocopy of four colored                   68
          photographs

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACK MARRONE, Husband, | : | |
| KAREN MARRONE, Wife, | : | CIVIL ACTION - LAW |
| Both Individually and in Their Capacity | : | |
| as Parents and Guardians for | : | JURY TRIAL DEMANDED |
| VIDA MARRONE, a Minor and | : | |
| MATTHEW ADAM MARRONE | ; | |
|     Plaintiffs | : | JUDGE KANE |
| | : | |
| v. | : | 1:CV-01-0773 |
| ALLSTATE INSURANCE COMPANY, | : | |
| LINDA M. EDLEMAN, FRED SCHAEFFER, | : | |
| MT. GRETNA REALTY and | : | |
| HOUSE MASTERS, | : | |
|     Defendants | : | |

---

## CERTIFICATE OF CONCURRENCE/NON-CONCURRENCE

I, Edward A. Monsky, Esquire, hereby certify that I have conferred with all counsel of record, who have indicated the following with regard to the Motion for Summary Judgment of Fred Schaeffer and Mt. Gretna Realty:

| | | |
|---|---|---|
| Paul E, Scanlan, Esquire | - | takes no position with regard to Motion |
| Louis M. Tarasi, Esquire | - | does not concur in motion |
| John Flounlacker, Esquire | - | takes no position with regard to Motion |
| James Nealon, Esquire | - | takes no position with regard to Motion |

**FINE, WYATT & CAREY, P.C.**

By: _Edward A. Monsky_
Edward A. Monsky, Esquire
Attorneys for Defendants Fred Schaeffer and
Mt. Gretna Realty