IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

---

JACK MARRONE, husband, KAREN
MARRONE, wife, both individually and
in their capacity as parents and guardians
for VIDA MARRONE, a minor, and
MATTHEW ADAM MARRONE,

    Plaintiffs

vs.

ALLSTATE INSURANCE COMPANY,
LINDA M. EDLEMAN, FRED SCHAFER,
MT. GRETNA REALTY, and HOUSE
MASTERS

: Civil Action No.: 1:CV-01-0773

: (U.S. District Judge Yvette Kane)

: **JURY TRIAL DEMANDED**

---

**PLAINTIFFS' AMENDED RESPONSE TO THE MOTION FOR SUMMARY
JUDGMENT OF DEFENDANT ALLSTATE INSURANCE COMPANY**

AND Now come the Plaintiffs, by and through their counsel of record, Tarasi, Tarasi &
Fishman, P.C., Louis M. Tarasi, Jr., Esquire, and Gianni Floro, Esquire, and hereby file this
Plaintiffs' Amended Response to the Motion for Summary Judgment of Defendant Allstate
Insurance Company, and in support thereof set forth the following:

1.     Admitted.

2.     Admitted in part and denied in part. It is admitted that discovery is closed
pursuant to this Honorable Court's Order of July 3, 2002, but is denied that discovery is closed
pursuant to the Plaintiffs' motion to be permitted to file their medical causation expert reports
*nunc pro tunc*.

3.     Denied. By way of further response, the underlying facts reveal that mold was
present in the subject home throughout August of 1999 to the present. (Depo. of Karen Marrone

at p. 69, lns. 16 - p. 70, ln. 17; Affidavit of Tom Moore at Ex. 2; Affidavit of Robert Pfromm at Ex. 2) The Plaintiffs were therefore exposed to said mold at various times, depending on the particular Plaintiff, throughout August of 1999 to October 14, 2000. (Depo. of Karen Marrone at p. 162, lns. 10-24)

    4.    Admitted.

    5.    Admitted. By way of further response and without waiver of the foregoing, the Allstate application noted by moving Defendant is silent on whether or not Ms. Zern inspected the home, although it clearly requires that an option be selected on the form by the Producer's or Agent's signature of the application. (Depo. of Miller at Ex. 6)

    6.    Admitted in part and denied in part. It is admitted that the Marrones went through an application process for their home insurance, but it is denied as suggested that the application was all that was required for the issuance of insurance by Allstate, it having had one of its representatives inspect the premises prior to issuing a home insurance policy to the Marrones. (Depo. of Karen Marrone p. 11, ln. 14 - p. 16, ln. 6) Of more importance is the fact that the Allstate application noted by moving Defendant above is silent on whether or not Ms. Zern inspected the home, although it clearly requires that an option be selected on the form by the Producer's or Agent's signature of the application. (Depo. of Miller at Ex. 6) Therefore, it is averred that a reasonable inference can be drawn that Allstate required that an inspection be conducted of the Plaintiffs' home prior to the issuance of a policy of insurance, which Allstate accomplished. Allstate therefore failed to inform the Marrones that the "black spot" in their basement was mold and that this mold was of concern. when the Plaintiffs met with their home

inspector Charles E. Bertoud, Jr. (hereinafter, "Bertoud"), they pointed out an area in the unfinished portion of the basement which they were unsure as to what the "black spot" upon the peg board was. (Depo. of Karen Marrone at p. 32, lns. 14-21; p. 58, ln. 23 - p. 60, ln. 25; p. 65, ln. 14 - p. 66, ln. 24; p. 69, ln. 16 - p. 71, ln. 14; p. 73, ln. 24 - p. 75, ln. 1; p. 82 lns. 2-9; Depo. of Jack Marrone at p. 76, ln. 24 - p. 77, ln. 7; p. 204, ln. 22 - p. 205, ln. 5; p. 207, lns. 2-7; Depo. of Vida Marrone at p. 33, ln. 3 - p. 34, ln. 5; p. 35, ln. 24 - p. 36, ln. 3; p. 61, ln. 19 - p. 62, ln. 13; Depo. of Matthew Marrone at p. 56, ln. 11 - p. 57, ln.1; p. 87, ln. 10 - p. 89, ln. 11) The Marrones later learned that the "black spot" was a fungus identified as Stachybotrys, which Robert Pfromm recommended that Marrones not occupy the basement until it was eliminated or reduced. (Affidavit of Robert Pfromm at Ex. 2, report of October 15, 2000, pp. 5-6) Mr. Bertoud testified that such a "black spot" would be indicative of mold. (Depo. of Bertoud at p. 46, ln. 23 - p. 47, ln. 21; Depo. of Bertoud at Ex. 10) Mr. Bertoud also testified, with what little recollection he had that he did observe the "black spot," but that he believed it to be a small amount, and said he would have mentioned it to the Marrones. (Depo. of Bertoud at p. 52, ln. 11 - p. 53, ln. 3)

    7.    Admitted.

    8.    Admitted.

    9.    Admitted in part and denied in part. It is admitted that after the Plaintiffs return from their trip that they discovered the mold infestation or "explosion" as it has been termed. It is denied that "Plaintiffs allegedly discovered mold had infiltrated their basement," when Allstate's own inspector observed the conditions and described it as a "major mold and mildew

3

problem." (Depo. of Miller p. 29, ln. 24 - p. 30, ln. 24; Ex. 2, p. 12)

    10.    Denied. By way of further response, a claim was filed with Allstate because when the Marrones returned from their trip they found that they had a basement full of mold and no idea how it got there. (Depo. of Jack Marrone at p. 23, ln. 23 - p. 26, ln. 25; Depo. of Karen Marrone at p. 17, ln. 8 - p. 26, ln. 23) Nevertheless, the Marrones were contacted by their insurer on August 8, 2000, the day after they reported their loss and the Allstate employee that took the call, Lauren Hittle, noted that:

> Water has caused damage to his basement floor and ceiling. He is not sure where problem is originating but it appears there is a pipe inside the basement where the water came from. Floor is damp and panels are buckled.

(Depo. of Miller at Ex. 2, p. 6; Depo. of Miller at p. 25, ln. 8 - p. 26, ln. 22) On August 7, 2000, when the Marrones reported the claim, a narrative was generated by that Allstate employee, Ms. Hittle, which listed the following:

```
080700      HI4    5    OTHER DAMAGE TO HOME:      YES
                   6    OTHER DAMAGE TO PROP:      NO
                   7    OTHER DAMAGES TO PROP:     YES
                   8    CEILING DAMAGE:            YES
                   8A   ROOMS W/CEIL DMG:          BASEMENT
                   9    WALLS DAMAGED:             YES
                   10   FLOOR DMG:                 YES
                   10A  ROOMS W/ FLOOR DMG:        BASEMENT
                   10B  DMGD FLOOR TYPES:          CARPET
                   11   CONTRACTOR SELECTED:       NO
                   12   DAMAGED CONTENTS?:         YES
                   13   DMGD CONTENTS OWNED
                        BY INSURED:               YES
                        -BUMPED UP CLAIM LEVEL PER INSD IS OLDER
                        AND THERE IS MOLD ALL OVER BASEMENT
```

(Depo. of Miller at Ex. 2, p. 3, "Loss Report - Diary" generated August 7, 2000)

4

11. Admitted.

12. Admitted. By way of further response, the policy speaks for itself.

13. Admitted in part and denied in part. It is admitted that the policy says what its says, by way of further response, the policy speaks for itself. It is denied as suggested that the referenced text can be construed as "specific exclusions," no such language ("specific") appears on the document itself. (Depo. of Larry Miller at Ex. 3, p. 7, ¶ 13)

14. Admitted in part and denied in part. It is admitted that the mold subsequently caused some of the Plaintiffs' alleged injuries, but it is denied that the mold infestation was the either the sole, proximate or primary cause of the Plaintiffs' economic damages and personal injuries, their expert Tom Moore, the Plaintiffs expert regarding home inspections found that there was evidence of leaking pipes in the ceiling of the basement. (Affidavit of Tom Moore at Ex. 2) Such evidence indicates that more than just the mold was to blame for this condition, a sudden and accidental release from a leaking pipe caused an additional water problem at this home. (Affidavit of Tom Moore at Ex. 2;) Larry Miller testified that Allstate received a statement from the Marrones on August 8, 2000, where an Allstate employee, Lauren Hittle, noted that "[w]ater has caused damage to his basement floor and ceiling. He is not sure where the problem is originating but it appears there is a pipe inside the basement where the water came from. Floor is damp and panels are buckled." (Depo. of Miller at p. 25, ln. 4 - p. 26, ln. 20; Ex. 2 at p. 6) Although Mr. Miller said he did not find a broken pipe, **he never examined above the ceiling for the leaking pipe.** (Depo. of Miller at p. 26, lns. 16-20; p. 61, ln. 3 - p. 63, ln. 4) He was able to make a coverage determination at that time, **without examining the above the**

5

**ceiling where the pipe was leaking**, blaming the situation on the obvious mold that had resulted from the increased relative humidity due to the pipe leaking, and not one of the primary causes the leaking pipe. (Depo. of Miller at p. 30, ln. 8 -p. 31, ln. 9) Moreover, such a determination demonstrated Allstate's bad faith in not properly investigating the claim, *i.e.*, how could the loss not be termed "sudden and accidental" if it occurred within approximately one (1) week. (Depo. of Miller at p. 36, lns. 2-18; Ex. 2, pp. 16-17) Allstate knew prior to Mr. Miller's investigation a possible source of the leaking water. (Depo. of Miller at p. 44, ln. 2 - p. 45, ln. 8; Ex. 2, p. 22) Even more egregious was the fact that the photograph of the ceiling, taken after the Marrones returned from their trip in July, revealed that black lines on the ceiling could be seen where the pipes ran through the ceiling. (Affidavit of Tom Moore at Ex. 2 at p.2-3; Ex. 3, p. 2 (top left photograph); Ex. 4, photographs 43-46 and 52; Affidavit of Robert Pfromm at Ex. 2, p. 2 of the September 12, 2002 report and p. 1 of the October 15, 2000 report; Deposition of Charles E. Bertoud, Jr. (hereinafter, "Bertoud") at Ex. 12A (top left photograph)) An action for bad faith may arise from an insurer's inadequate investigations. O'Donnell v. Allstate Insurance Co., 734 A.2d 901 (Pa. Super. 1999)

Proximate cause has been defined as that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces injury, and without which the result would not have occurred. Without water, in the form of a high relative humidity the mold would not have flourished as it did. (Affidavit of Robert Pfromm at Ex. 2, pp. 1-2 of the report of September 12, 2002 and pp. 1-2 and 6 of the report of October 15, 2000) In the case, *sub judice*, but for the leaking pipe in the basement of the Marrone's basement, the mold infestation would

6

not have occurred, and according to Tom Moore, the Plaintiffs expert regarding home inspections, he found that there was evidence of leaking pipes in the ceiling of the basement. (Affidavit of Tom Moore at Ex. 2) Such evidence indicates that more than just the mold was to blame for this condition, a sudden and accidental release from a leaking pipe caused an additional water problem at this home. (Affidavit of Tom Moore at Ex. 2; Affidavit of Robert Pfromm at Ex. 2)

The Plaintiff has pointed-out and indicated in the record, also from which it can be inferred, that the above referenced behavior comports with that conduct found to be "bad faith" pursuant to 42 Pa.C.S.A. § 8371. In Dercoli v. Pennsylvania National Mutual Insurance Company, the Supreme Court of Pennsylvania held that:

> The duty of an insurance company to deal with the insured fairly and in good faith includes the duty of full and complete disclosure as to all the benefits and every coverage that is provided by the applicable policy or policies along with all requirements, including any time limitations for making a claim.

520 Pa. 471, 478, 554 A.2d 906, 909 (1989), citing, Gatlin v. Tennessee Farmers Mutual Insurance Co., 741 S.W.2d 324 (Tenn. 1987); Sarchett v. Blue Shield of California, 43 Cal.3d 1, 233 Cal.Rptr. 76, 729 P.2d 267 (1987). Did Mr. Miller neglect to investigate the leaking pipe at the time the claim was made for fear Allstate would have to pay the loss, and that he knew he would have a duty to explain the possibility of coverage to the Marrones, which he failed and neglected to do. Moreover, in that case the Supreme Court of Pennsylvania earlier had recognized its own long standing rule that:

> [T]he utmost fair dealing should characterize the transactions between an insurance company and the insured.

7

520 Pa. 471, 477, 554 A.2d 906, 909 (1989), *quoting*, Fedas v. Insurance Company of the State of Pennsylvania, 300 Pa. 555, 151 A. 285 (1930).

The Supreme Court of Pennsylvania's pronouncement in Dercoli regarding an insurer's duty toward its insured was followed by this statement:

> This is especially true where the insurer undertakes to advise and counsel the insured in the insured's claim for benefits.

520 Pa. 471, 478, 554 A.2d 906, 909 (1989). Thus, even if an insured is represented by counsel, the insurer still is duty bound "to deal with the insured fairly and in good faith includes the duty of full and complete disclosure as to all the benefits and every coverage that is provided by the applicable policy or policies along with all requirements, including any time limitations for making a claim." 520 Pa. 471, 478, 554 A.2d 906, 909 (1989), *citing*, Gatlin v. Tennessee Farmers Mutual Insurance Co., 741 S.W.2d 324 (Tenn. 1987); Sarchett v. Blue Shield of California, 43 Cal.3d 1, 233 Cal.Rptr. 76, 729 P.2d 267 (1987).

In Tonkovic v. State Farm Mutual Automobile Insurance Company, the Supreme Court of Pennsylvania set forth clearly when dealing with its insured, if there is any question of fairness the insurance company must explain the policy to the insured clearly and fairly. 513 Pa. 445, 452-453, 521 A.2d 920, 924 (1987) (*See also*, Worldwide Underwriters Insurance Company v. Brady, 973 F.2d 192, 194-195 (3d. Cir. 1992) Here as in Worldwide there is ambiguity in the policy.

To determine whether a claim potentially comes within coverage of the policy, the scope of the coverage must first be ascertained. Sclabassi v. Nationwide Mutual Fire. Ins. Co., 789 A.2d 699, 702 (Pa. Super. 2001). Any ambiguity in an insurance policy should be construed in

8

favor of the insured and against the insurer. Redevelopment Authority of Cambria County v. International Ins. Co., 454 Pa. Super. 374, 388, 685 A.2d 581, 588 (1996); Tonkovic, 513 Pa. at 452-453, 521 A.2d at 924 (As there is a manifest inequality of bargaining power between an insured and insurer, a court may deviate from the plain language of an insurance contract).

15. Denied as a conclusion of law for which no response is required. By way of further response, and insofar as one is required, it is denied that the mold damage is excluded from coverage under the home policy, especially in light of the opinion of the Plaintiffs expert regarding home inspections who found that there was evidence of leaking pipes in the ceiling of the basement. Such evidence indicates that more than just the mold was to blame for this condition, water problems existed at this home as well in the form of water penetration from the outside and leaking pipes from the inside. Tom Moore, the Plaintiffs expert regarding home inspections found that there was evidence of leaking pipes in the ceiling of the basement. (Affidavit of Tom Moore at Ex. 2) Such evidence indicates that more than just the mold was to blame for this condition, a sudden and accidental release from a leaking pipe caused an additional water problem at this home. (Affidavit of Tom Moore at Ex. 2;) Larry Miller testified that Allstate received a statement from the Marrones on August 8, 2000, where an Allstate employee, Lauren Hittle, noted that "[w]ater has caused damage to his basement floor and ceiling. He is not sure where the problem is originating but it appears there is a pipe inside the basement where the water came from. Floor is damp and panels are buckled." (Depo. of Miller at p. 25, ln. 4 - p. 26, ln. 20; Ex. 2 at p. 6) Although Mr. Miller said he did not find a broken pipe, **he never examined above the ceiling for the leaking pipe.** (Depo. of Miller at p. 26, lns.

16-20; p. 61, ln. 3 - p. 63, ln. 4) He was able to make a coverage determination at that time, **without examining the above the ceiling where the pipe was leaking**, blaming the situation on the obvious mold that had resulted from the increased relative humidity due to the pipe leaking, and not one of the primary causes the leaking pipe. (Depo. of Miller at p. 30, ln. 8 -p. 31, ln. 9) Moreover, such a determination demonstrated Allstate's bad faith in not properly investigating the claim, *i.e.*, how could the loss not be termed "sudden and accidental" if it occurred within approximately one (1) week. (Depo. of Miller at p. 36, lns. 2-18; Ex. 2, pp. 16-17) Allstate knew prior to Mr. Miller's investigation a possible source of the leaking water. (Depo. of Miller at p. 44, ln. 2 - p. 45, ln. 8; Ex. 2, p. 22) Even more egregious was the fact that the photograph of the ceiling, taken after the Marrones returned from their trip in July, revealed that black lines on the ceiling could be seen where the pipes ran through the ceiling. (Affidavit of Tom Moore at Ex. 2 at p.2-3; Ex. 3, p. 2 (top left photograph); Ex. 4, photographs 43-46 and 52; Affidavit of Robert Pfromm at Ex. 2, p. 2 of the September 12, 2002 report and p. 1 of the October 15, 2000 report; Deposition of Charles E. Bertoud, Jr. (hereinafter, "Bertoud") at Ex. 12A (top left photograph))

In addition, the term "consisting of" is not a defined term within the policy, and therefore it should be determined to be ambiguous. As detailed above, the mold was not the first problem to have occurred at the Marrone's home, it was the pipe that leaked in their ceiling that caused their problems, *i.e.*, the sudden and accidental release of water from their pipes above the ceiling. It is well settled that this District Court must consider all the evidence, and the inferences from it, in the light most favorable to the non-moving party. U.S. v. Diebold, Inc., 369 U.S. 654, 655, 82

S.Ct. 993, 994 (1962); Tigg v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987); Baker v. Lukens Steel Co., 793 F.2d 509, 511 (3d Cir. 1986). If a conflict arises between the evidence presented by both sides, the District Court must accept as true the allegations of the non-moving party. Lind, 135 F.Supp.2d at 619, *citing*, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 (1986). These determinations are questions of fact, and therefore, are questions for a jury. Fidelity Bank and Tiernan, 249 Pa. Super. 216, 234, 375 A.2d 1320, 1330 (1977).

Lastly, on the aforementioned element of reliability, whether or not said reliance was justifiable is a question for the jury to be based on all of the facts and permissible inferences which may be drawn from the evidence presented at trial. Myers v. McHenry, 398 Pa. Super. 100, 109, 580 A.2d 860, 865 (1990). Because the Marrones have raised genuine issues of material fact, which need to be determined by a jury, dismissal of this action against the Plaintiffs would be inappropriate.

16. Denied. The inspector who was sent out to the Plaintiffs home should have advised the Plaintiffs of the potential for adverse health effects of mold exposure, Allstate having known of such claims previously; Mr. Miller himself testified that he knew of the potential health hazards of exposure to mold, but the Plaintiffs claim that he failed to warn the Plaintiffs of this fact, Mr. Miller stated otherwise. (Depo. of Larry Miller at p. 31, ln. 21 - p. 32, ln. 7; p. 56, lns. 17-25; Pls.' Ans. and Objs. to Ints. Filed on Behalf of Def. Housemaster at Int. 9 ("At no time did he state that there was a mold problem."))

17. Denied. Genuine issues of material fact exist that preclude the entry of default

11

judgment on behalf of this Defendant.

Wherefore, the Plaintiffs respectfully request that this District Court enter an Order Denying the Motion for Summary Judgment of the Defendant Allstate Insurance Company.

        Respectfully submitted,

        TARASI, TARASI & FISHMAN, P.C.

By:_____
    Gianni Floro, Esquire
    PA ID No. 85837
    Attorney for the Plaintiffs
    510 Third Avenue
    Pittsburgh, PA  15219
    P: (412) 391-7135
    F: (412) 471-2673