# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JACK MARRONE, KAREN MARRONE, : 
both individually and in their capacity as :
parents and guardians for :   CIVIL ACTION - LAW
VIDA MARRONE, a minor, and :
MATTHEW MARRONE :
        Plaintiffs :
 :
         v. :   CASE NO.: 1:CV-01-0773
 :
 :   JURY TRIAL DEMANDED
ALLSTATE INSURANCE COMPANY, :
LINDA M. EDLEMAN, FRED SCHAFER, :
MT. GRETNA REALTY, and :   (JUDGE KANE)
HOUSEMASTER :
        Defendants :

FILED
HARRISBURG, PA

MAY 1 6 2003

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

## APPENDIX IN SUPPORT OF DEFENDANT HOUSEMASTER'S MOTION TO PRECLUDE EXPERT REPORTS AND TESTIMONY OF ECKARDT JOHANNING, M.D.

James J. Kutz, Esquire
Attorney ID No. 21589
Jennifer L. Murphy, Esquire
Attorney ID No. 76432
DUANE MORRIS LLP
305 North Front Street, 5th Floor
P.O. Box 1003
Harrisburg, PA 17108-1003
717-237-5500

Attorneys for Defendant HouseMaster

Date: May 16, 2003

# TABLE OF CONTENTS

| Description of Documents | Tab |
| --- | --- |
| Plaintiff's Amended Complaint | A |
| Excerpts from Deposition of Jack Marrone | B |
| Excerpts from Deposition of Karen Marrone | C |
| Excerpts from Deposition of Mathew Marrone | D |
| Excerpts from Deposition of Vida Marrone | E |
| Expert Report of Eckardt Johanning, M.D. for Jack Marrone | F |
| Expert Report of Eckardt Johanning, M.D. for Karen Marrone | G |
| Expert Report of Eckardt Johanning, M.D. for Matthew Marrone | H |
| Expert Report of Eckardt Johanning, M.D. for Vida Marrone | I |
| Laboratory Reports | J |
| Expert Report of Michael G. Holland, M.D.'s  on Jack Marrone | K |
| Expert Report of Michael G. Holland, M.D.'s Report on Karen Marrone | L |
| Expert Report of  Michael G. Holland, M.D.'s Report on Matthew Marrone | M |
| Expert Report of Michael G. Holland, M.D.'s Report on Vida Marrone | N |
| Report of Robert A. Pfromm, CIH, Dated 10/15/00 | O |

# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACK MARRONE, husband, KAREN MARRONE, wife, both individually and in their capacity as parents and guardians for VIDA MARRONE, a minor, and MATTHEW ADAM MARRONE,<br><br>              Plaintiffs<br><br>   vs.<br><br>ALLSTATE INSURANCE COMPANY, LINDA M. EDLEMAN, FRED SCHAFER, MT. GRETNA REALTY, and HOUSE MASTERS<br>              Defendants | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action No.   1: CV-01-0773<br><br>RECEIVED<br>SCRANTON<br><br>NOV - 2 2001<br><br>PER _____<br>       DEPUTY CLERK<br><br>JURY TRIAL DEMANDED |

## AMENDED COMPLAINT

AND NOW COMES, the Plaintiffs, by and through their counsel, Stevens & Johnson, and for their Complaint states and alleges the following:

## JURISDICTION

1.     Plaintiffs seek jurisdiction of this Court under Diversity of Citizenship pursuant to 28 U.S.C. § 1332. Plaintiffs are citizens of the State of Missouri. Defendant Allstate Insurance Company, is duly incorporated in the State of Delaware, with its corporate headquarters located in

Illinois. Defendant Linda M. Edleman is a citizen of Pennsylvania, Defendant, Mt. Gretna Realty

is located in Pennsylvania, Defendant Housemasters is an independently owned franchise located

in Pennsylvania. The matter in controversy exceeds, exclusive of interests and costs, the sum

specified by 28 U.S.C. § 1332.

## PARTIES

2.      Plaintiffs, Jack Marrone and Karen Marrone, are both adults, who are husband and

wife, and reside at 11673 Highway PP, Dixon, Missouri. They are the natural guardians of Vida

Marrone, their daughter.

3.      . Plaintiff, Vida Marrone, is a sixteen (16) year old minor, and daughter of Jack and

Karen Marrone and resides with her parents at 11673 Highway PP, Dixon, Missouri.

4.      Plaintiff, Matthew Adam Marrone, is an adult residing at 308 Sherman Avenue,

Lebanon, Missouri.

5.      Defendant, Allstate Insurance Company is a corporation, duly incorporated in the

State of Delaware, with its corporate headquarters located at Allstate Plaza, 2775 Sanders Road,

Northbrook, Illinois.

6.      Defendant, Linda M. Edleman, is an adult woman residing at 82 Norway Lane,

Lebanon, Lebanon County, Pennsylvania.

7.      Defendant, Fred Schafer, was Defendant Edleman's real estate agent and is located

at 83 Columbia Avenue, Mt. Gretna, Lebanon County, Pennsylvania.

8.      Defendant, Mt. Gretna Realty, is located at 83 Columbia Avenue, Mt. Gretna,

Lebanon County, Pennsylvania.

2

9.      Defendant, HouseMasters, is an independently owned franchise, located at 203, West Caracas Avenue, Hershey, Dauphin County, Pennsylvania.

10.     At all relative times hereto, Defendants Allstate, Mt.   Gretna Realty, and HouseMasters, were acting through their respective agents, servants, employees, and ostensible agents who were acting within the course and scope of their employment with the above listed Defendants and under the exclusive control of said Defendants.

## BACKGROUND

11.     On or about June of 1999, the Plaintiffs came to Pennsylvania to look for a home.

12.     On or about July of 1999, the Plaintiffs found the home at issue, located at 354 Kimber Road, Mt.  Gretna, Lebanon County, Pennsylvania, owned at that time by Defendant Linda M.  Edleman.

13.     Mt.  Gretna Realty, at all relevant times, acted as the agent of the seller, Linda M. Edleman, in the sale of the property at issue, and as such knew, or should have known, due to previous experience in the sale of homes in the neighborhood, of the potential for water/dampness and mold problems with the house at issue.

14.     On or about July 30, 1999, the Plaintiffs hired Defendant HouseMasters, to inspect said home, who did so through their agent, servant, employee, or ostensible agent.

15.     Said inspection was for any problems associated with the purchase of a dwelling.

16.     Said inspection noted water stains in the basement and without further inspection HouseMasters recommended to "slope soil away from house; keep down spouts clean and flowing, or consider extending spouts onto surface."

3

17.     Plaintiffs, relying on said report, complied fully with said recommendation.

18.     Defendant Allstate issued an insurance policy covering the property at issue which became effective August 25, 1999.

19.     Prior to completing the purchase, Defendant Edleman, pursuant to 68 P.S. §1024, provided a Seller's Property Disclosure Statement specifically denying any basement dampness/water problems or leakage problems.

20.     On or about August 31, 1999, Plaintiffs completed the purchase of said home and the Plaintiffs immediately took possession and occupied said property relying on the representations of all of the Defendants except Defendant Allstate.

21.     All of the contracts referred to in this suit have in addition to the other terms, the implied covenant of "good faith."

22.     On or about July of 2000, the Plaintiffs went away on vacation, and returned one (1) week later to find the basement covered in mold.  Said mold covered the walls, ceiling, floor, and furniture.  This was the first time that the Plaintiffs had any notice of this problem.

23.     Plaintiffs immediately contacted Defendant Allstate and filed an insurance claim.

24.     Defendant Allstate's agent, servant, employee, or ostensible agent, at all times acting in the course and scope of his employment, performed only a cursory and superficial inspection, and in a letter dated August 10, 2000, denied coverage claiming said damage was the result of a "preexisting condition" and therefore not covered by Plaintiffs' policy.

25.     The cause of the "so called" preexisting condition was not stated.

26.     There was also no statement that Plaintiffs should have somehow been aware of the

4

condition.

27.     Despite Defendant Allstate's involvement in similar litigation concerning the health hazards posed by mold, at no time did Defendant Allstate, or its agents, servants, employees, or ostensible agents, who now had actual knowledge of the mold problem, inform or otherwise make known to the Plaintiffs the possibility of potential health problems related to the growth of mold, or other organic toxins.

28.     Plaintiffs, being unaware of the potential catastrophic dangers created by mold remained in the home.

29.     As between Plaintiffs and Defendant Allstate, an unknown condition, does not meet the test of a preexisting condition; or in the alternative, the test for preexisting condition in this policy is either ambiguous or unenforceable.

30.     On or about August 28, 2000, the Plaintiffs had their home inspected by Advanced Applied Sciences, Inc., whose corporate headquarters is located at 4400 Linglestown Road, Harrisburg, Pennsylvania.

31.     Said inspection consisted of a bioaerosol survey.

32.     On or about September 29, 2000, as a result of a telephone conversation with Advanced Applied Sciences, Inc., the Plaintiffs learned the results of the aforementioned testing.

33.     Plaintiffs learned that there was a finding of "fungal contaminations in the house" consisting of, but not limited to, Aspergillus, Stachybotrys, Penicillium, Alternaria, Chrysosporium, Epicoccum, and Cladosporium, said inspection also revealed a relative humidity level in   the basement 21% higher than that found outside the house.

5

34.    Having learned that the toxic levels in the house were unsafe, the Plaintiffs, as a result, were forced to vacate the premises.

35.    As a direct and proximate result of exposure to said fungal toxins, Plaintiff, Jack Marrone has suffered and will continue to suffer from among other things:

(a)    memory loss

(b)    mood swings

(c)    depression

(d)    severe fatigue

(e)    sexual dysfunction

36.    As a direct and proximate result of exposure to said fungal toxins, Plaintiff, Karen Marrone has suffered and will continue to suffer from among other things:

(a)    hair loss

(b)    abdominal cramping

(c)    diarrhea

(d)    sinusitis

(e)    phlegm and coughing

(f)    fever

(g)    dry and itching skin

(h)    loss of concentration

(i)    loss of cognitive functions

(j)    severe fatigue

(k)     severe loss of voice

37.     As a direct and proximate result of exposure to said fungal toxins, Plaintiff, Vida Marrone has suffered and will continue to suffer from among other things:

(a)     hair loss

(b)     sinusitis

(c)     continuous headaches

(d)     diarrhea

(e)     cramping

(f)     severe fatigue

38.     As a direct and proximate result of exposure to said fungal toxins, Plaintiff, Matthew Adam Marrone has suffered and may continue to suffer from among other things:

(a)     severe fatigue

(b)     loss of concentration

(c)     memory loss

39.     As a direct and proximate result of exposure to said fungal toxins, the Plaintiffs have suffered and will continue to suffer embarrassment, humiliation, and psychological trauma.

40.     As a direct and proximate result of said fungal toxins, the Plaintiffs have suffered financial damages, including but not limited to, the economic loss of their home.

41.     To this date, the house at 354 Kimber Road is still standing, vacant and unsalable.

42.     At all times material hereto, the Plaintiffs have met all of their obligations acquired under all contracts mentioned below.

7

43.     Plaintiffs now bring this action for damages caused by the Defendants bad faith, breach of contract, misrepresentations, negligence, and violations of statutes.

**COUNT I**

**PLAINTIFFS v.  ALLSTATE INSURANCE COMPANY**
**BAD FAITH**

44.     The Plaintiffs hereby incorporate paragraphs 1 through 43 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

45.     Defendant Allstate Insurance Company failed to handle the Plaintiffs' claims in a reasonable manner by failing to perform a complete and detailed investigation as to the cause of said fungal toxins.

46.     Defendant Allstate Insurance Company violated the provisions of 42 Pa. C.S.A. §8371; the Unfair Insurance Practices Act, 40 P.S. § 1171.1 et al., and the Unfair Claims Settlement Practices, Title 31, Subsection 146.1 et al.

47.     An action for bad faith may arise from an insurer's inadequate investigations. *O'Donnell v.  Allstate Insurance Co.,* 734 A.2d 901 (Pa.  Super.  1999).

48.     Defendant Allstate Insurance Company also acted in bad faith by failing to inform the Plaintiffs of possible health risks associated with exposure to fungal toxins, which the Defendant was or should have been aware of from such claims which were known to Defendant Allstate previously.

49.     In addition to all other monetary demands heretofore made, in order to punish Defendant Allstate Insurance Company for their bad faith and to deter other insurers from engaging

in similar activities, and to compensate Plaintiffs for the complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, the Plaintiffs, individually, demand damages in an amount in excess of One Hundred  Thousand ($100,000.00) Dollars together with attorneys' fees, interests, costs, and punitive damages in excess of One Hundred  Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against Defendant Allstate Insurance Company for payment in excess of One Hundred  Thousand ($100,000.00) Dollars, plus attorneys' fees, costs, and punitive damages in excess of One Hundred Thousand ($100,000.00) Dollars.

### COUNT II

**THE PLAINTIFFS v.  ALLSTATE INSURANCE COMPANY
BREACH OF CONTRACT**

50.     The Plaintiffs hereby incorporate paragraphs 1 through 49 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

51.     The Plaintiffs, Jack and Karen Marrone, contracted with Defendant Allstate Insurance Company to provide homeowners insurance coverage for the Plaintiffs' property which included an express or implied requirement for Defendant Allstate to fairly, in good faith, and with the exercise of reasonable care, without bad faith, to adjust covered claims by Plaintiffs.

52.     Defendant Allstate, through its agents, representatives, and employees breached the contract by performing the most simple of inspections, then coming to the immediate determination

9

that the mold infestation of the house at issue was a pre-existing condition, despite the fact that there was nothing which would indicate that Plaintiffs were aware of any alleged preexisting problem.

53.    Defendant Allstate failed to properly evaluate and pay Plaintiffs' claim within a reasonable period of time, which constituted a breach of its contract with the Plaintiffs, to properly adjust claims by the Plaintiffs.

54.    Defendant Allstate also failed to warn the Plaintiffs of the potential danger associated with mold.

55.    Defendant Allstate failed to properly apply the terms and conditions of the policy.

56.    As a direct and proximate result of Defendant Allstate's breach of contract, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against Defendant Allstate Insurance Company for payment in excess of One Hundred Thousand ($100,000.00) Dollars.

### COUNT III

### PLAINTIFFS v. LINDA M. EDLEMAN
### MISREPRESENTATION

57.    The Plaintiffs hereby incorporate paragraphs 1 through 43 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

10

58.     Defendant Edleman had a duty to disclose all material defects relating to the property at issue, pursuant to the Real Estate Seller Disclosure Act (68 P.S. § 1021 et seq.).

59.     In the Seller's Property Disclosure Statement, required pursuant to 68 P.S. § 1024, Defendant Edleman intentionally misrepresented the conditions associated with the property at issue when she indicated that there was no basement dampness/water problems or leakage problems.

60.     Defendant Edleman knew, or should have known, that said basement was prone to dampness and water problems and disclosed same as required by law.

61.     At all times material hereto, the Plaintiffs relied upon the misrepresentations of Defendant Edleman.

62.     These undisclosed problems lead to the formation of the mold in July of 2000.

63.     As a direct and proximate result of Defendant Edleman's failure to disclose said information, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their  home and personal possessions, as set forth supra., and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against Defendant Edleman  for payment in excess of One Hundred  Thousand ($100,000.00) Dollars, Plaintiffs also request Rescission of the subject transaction for the sale of the property at issue and complete restitution together with a judgment ordering other incidental and consequential costs, prejudgment interest, attorneys' fees, and cost of suit.

11

## COUNT IV

### PLAINTIFFS v LINDA M.  EDLEMAN
### NEGLIGENCE

64.    The Plaintiffs incorporate paragraphs 1 through 41 and 57 through 63 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

65.    Defendant Edleman had a legally imposed duty to disclose all known defects to the property at issue prior to settlement.

66.    Defendant Edleman knew or should have known of said defects to the property, in the form of dampness/water leakage in the basement.

67.    Defendant Edleman negligently breached this duty when she failed to disclose said information as was required by law.

68.    These undisclosed problems lead to the formation of the mold in July of 2000.

69.    As a direct and proximate result of Defendant Edleman's failure to disclose said information, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their  home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred  Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against Defendant Edleman  for payment in excess of One Hundred  Thousand ($100,000.00) Dollars, Plaintiffs also request Recision of the subject transaction for the sale of the property at issue and

12

complete restitution together with a judgment ordering other incidental and consequential costs,

prejudgment interest, attorneys' fees, and cost of suit.

### COUNT V

### PLAINTIFFS v.  LINDA M.  EDLEMAN
### BREACH OF CONTRACT

70.     The Plaintiffs hereby incorporate paragraphs 1 through 43 and 57 through 69 of their

Amended Complaint, inclusive, as though the same were set forth herein at length.

71.     The Plaintiffs, Jack and Karen Marrone, contracted with Defendant Edleman for the

purchase of her house.

72.     When Defendant Edleman agreed to said contract, she made express or implied

warranties concerning the condition of said house.

73.     Defendant Edleman breached her contract with the Plaintiffs by failing to disclose

relevant information concerning the condition of the basement prior to the sales transaction.

74.     These undisclosed problems lead to the formation of the mold in July of 2000.

75.     As a direct and proximate result of Defendant Edleman's breach of contract, the

Plaintiffs, Jack and Karen Marrone,  have suffered a complete disruption of their lives, physical and

emotional damage and distress, and loss of their  home and personal possessions, and therefore the

Plaintiffs, individually, demand damages in an amount in excess of One Hundred  Thousand

($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone and Karen Marrone, respectfully requests that

this Honorable Court enter judgment in their favor and against Defendant Edleman  for payment in

13

excess of One Hundred  Thousand ($100,000.00) Dollars, Plaintiffs also request Recision of the

subject transaction for the sale of the property at issue and complete restitution together with a

judgment ordering other incidental and consequential costs, prejudgment interest, attorneys' fees,

and cost of suit.

## COUNT VI

### PLAINTIFFS v.  FRED SCHAFER AND MT.  GRETNA REALTY
### MISREPRESENTATION

76.     The Plaintiffs incorporate paragraphs 1 through 43 of their Amended Complaint,

inclusive. as though the same were set forth herein at length.

77.     Defendants Fred Schafer and Mt.  Gretna Realty were at all relevant times the agent,

servant, employee, or ostensible agent of Defendant Linda M.  Edleman, and acted through its

agents, servants, employees, and ostensible agents.

78.     Defendants Fred Schafer and Mt.  Gretna Realty were, and have been an agent for,

other homes in the area and as such, due to their experience and expertise, knew or should have

know that the property in question, and the area was prone to said dampness/water problems.

79.     Defendants Fred Schafer and Mt.  Gretna Realty had a duty to disclose, as well as a

duty to make sure that the seller, their principle, disclosed all known defects in the property at issue

prior to sale.

80.     Defendants Fred Schafer and Mt.  Gretna Realty breached that duty by failing to

disclose, and acted in concert with Defendant Edleman to not reveal said known defects relating to

dampness/water.

14

81.     These undisclosed problems lead to the formation of the mold in July of 2000.

82.     As a direct and proximate result of Defendants Fred Schafer and Mt. Gretna Realtys'
failure to disclose said information, the Plaintiffs have suffered a complete disruption of their lives,
physical and emotional damage and distress, and loss of their home and personal possessions, and
therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred
Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida
Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against
Defendants Fred Schafer and Mt. Gretna Realty for payment in excess of One Hundred Thousand
($100,000.00) Dollars, Plaintiffs, Jack and Karen Marrone, also request Recision of the subject
transaction for the sale of the property at issue and complete restitution together with a judgment
ordering other incidental and consequential costs, prejudgment interest, attorneys' fees, and cost of
suit.

## COUNT VII

### PLAINTIFFS v. FRED SCHAFER AND MT. GRETNA REALTY
### UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW (UTPCPL)

83.     Plaintiffs incorporate paragraphs 1 through 43 and 76 through 82 of their Amended
Complaint, inclusive, as though the same were set forth herein at length.

84.     In view of the foregoing, the Plaintiffs believe and therefore aver that the Defendants,
Fred Schafer and Mt. Gretna Realty, have engaged in unfair and/or deceptive acts or practices as
contemplated by the Pennsylvania Unfair Trade Practice and Consumer Protection Law (hereinafter

15

sometimes referred to as "UTPCPL") which include but are not limited to the following:

(a)  Using deceptive representations in connection of the condition of the aforesaid sale of subject property;

(b)  In representing that said property was not defective when they knew, or should have known, it was not;

(c)  Engaging in fraudulent conduct which created a likelihood of confusion and/or misunderstanding in the Plaintiffs' purchase, ownership, and maintenance of the subject property;

(d)  Defendants engaged in the foregoing conduct for the sole purpose of concealing the seriousness and gravity of the defective conditions of said property and thus preventing any further action to rectify the serious and defective condition of the subject property which was reckless, malicious, and in gross disregard of the Plaintiffs' rights.

85.  As a direct and proximate cause of the Defendants' violation of the UTPCPL, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars, and are entitled to treble damages and attorneys' fees.

WHEREFORE, Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against the Defendants Fred Schafer and  Mt.  Gretna Realty, in excess of One Hundred Thousand ($100,000.00) Dollars, costs, treble damages, and punitive damages.

## COUNT VIII

16

## PLAINTIFFS v. HOUSEMASTERS
## NEGLIGENCE

86.     The Plaintiffs hereby incorporate paragraphs 1 through 43 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

87.     At all relative times hereto, Defendant HouseMasters acted through its agents, employees, servants, and ostensible agents, including but not limited to, Chuck Berthound, the HouseMasters inspector who inspected the Plaintiffs home.

88.     Due to concerns of the Plaintiffs regarding water spots in the basement, they contracted with and hired HouseMasters to perform an inspection of what became the fungal toxin infested house prior to their purchasing the same.

89.     On or about July 30, 1999, Defendant HouseMasters performed an inspection of the home.

90.     The HouseMasters report noted water stains in the basement, and recommended sloping the soil away from the house, keeping the down spouts clean, or to consider extending the spouts onto the surface.

91.     Defendant, HouseMasters, through its agent Mr. Berthound, was and is a professional house inspection company and therefore holds itself out as expert in said field.

92.     Defendant, HouseMasters, while noting the water stains, did not identify the source of said stains, nor did they recommend further investigation, nor did they refer the Plaintiffs to other professionals who may have been of assistance.

93.     In reliance of the HouseMasters report, which was void of any warnings of potential

17

problems, the Plaintiffs purchased the house at issue.

94.     Defendant HouseMasters had a duty to inspect said home for defects and to then notify the potential purchasers of said defects.

95.     As a direct and proximate result of Defendant HouseMasters's failure to disclose said information, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against Defendant HouseMasters for payment in excess of One Hundred Thousand ($100,000.00) Dollars, interest, and costs of this suit.

## COUNT IX

### PLAINTIFFS v. HOUSEMASTERS
### MISREPRESENTATION

96.     The Plaintiffs hereby incorporate Paragraphs 1 through 43 and 86 through 95 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

97.     Defendant HouseMasters misrepresented the conditions of the house at issue to the Plaintiffs when it failed to inform them of the source of the water damage and/or of any current or potential problems related to water damage.

98.     The Plaintiffs' justifiably relying on said information purchased the house at issue.

18

99.     As a direct and proximate result of Defendant HouseMasters's failure to disclose said information, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against Defendant HouseMasters for payment in excess of One Hundred Thousand ($100,000.00) Dollars.

## COUNT X

### PLAINTIFFS v. HOUSEMASTERS
### BREACH OF CONTRACT

100.     The Plaintiffs hereby incorporate paragraphs 1 through 43 and 86 through 99 of their Complaint, inclusive, as though the same were set forth herein at length.

101.     Plaintiffs, Jack and Karen Marrone, contracted with HouseMasters to perform an inspection of the property at issue, in order to determine any defects or potentially hazardous conditions on the property prior to the Plaintiffs purchasing the same.

102.     The Plaintiffs specifically contracted with HouseMasters regarding potential water/dampness problems with the house.

103.     Defendant, HouseMasters, while noting water damage, failed to identify the source of said damage, the severity of said source, nor did they identify or notify the Plaintiffs regarding any potential health problems pertaining to said water/dampness prior to the purchase of what became

19

the fungal toxin infested home.

104. As experts in the field of home inspection, Defendant HouseMasters knew, or should have known, that fungal growth was a potential result of said water/dampness.

105. As experts in the field of home inspection, Defendant HouseMasters knew, or should have known, that said fungal growth was potentially toxic and harmful to human health.

106. Despite their contractual arrangement with the Plaintiffs to inform them of potential hazards associated with their prospective home, Defendant HouseMasters at no time informed them of any potential fungus or potential harm which could result therefrom.

107. As a direct and proximate result of Defendant HouseMasters breach of contract with the Plaintiffs, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone and Karen Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against the Defendant HouseMasters in excess of One Hundred Thousand ($100,000.00) Dollars.

## COUNT XI

### PLAINTIFFS v. HOUSEMASTERS
### UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW (UTPCPL)

108. The Plaintiffs incorporate paragraphs 1 through 43 and 86 through 107 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

109. In view of the foregoing, the Plaintiffs believe and therefore aver that the Defendant, HouseMasters, has engaged in unfair and/or deceptive acts or practices as contemplated by the Pennsylvania Unfair Trade Practice and Consumer Protection Law (hereinafter sometimes referred to as "UTPCPL") which include but are not limited to the following:

(a)   Using deceptive representations in connection of the condition of the aforesaid sale of subject property;

(b)   In representing that said property was not defective when they knew, or should have known, it was not;

(c)   Engaging in fraudulent conduct which created a likelihood of confusion and/or misunderstanding in the Plaintiffs' purchase, ownership, and maintenance of the subject property;

(d)   Fraudulently representing to Plaintiffs that suggested repairs regarding property at issue would mitigate and/or prevent said leakage and/or other defects or damage which occurred.

(e)   Defendant engaged in the foregoing conduct for the sole purpose of concealing the seriousness and gravity of the defective conditions of said property and thus preventing any further action to rectify the serious and defective condition of the subject property which was reckless, malicious, and in gross disregard of the Plaintiffs' rights.

110. As a direct and proximate cause of the Defendant's violation of the UTPCPL, the Plaintiffs have  suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars, and are entitled to treble damages and attorneys' fees.

WHEREFORE, Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida

WHEREFORE, Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against the Defendant HouseMasters, in excess of One Hundred Thousand ($100,000.00) Dollars, costs, treble damages, punitive damages, and attorneys' fees.

STEVENS & JOHNSON

By: _Richard F. Stevens_

Richard F. Stevens, Esquire
I.D. No: 08073
Attorneys for the Plaintiffs,
Jack Marrone,
Karen Marrone,
Matthew Marrone, and
Vida Marrone

740 Hamilton Mall
Allentown, Pennsylvania 18101
(610) 439-1451

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that a true and correct copy of the attached Amended

Complaint, will be  served upon all parties, by placing the same in the United States Postal Service,

first class, postage prepaid, and mailed to the following upon return receipt from the U.S. District

Court for the  Middle District of Pennsylvania:


James G. Nealon, III, Esquire
Nealon & Grover
2411 North Front Street
Harrisburg, PA 17110

Edward A. Monsky, Esquire
Fine, Wyatt & Carey, PC
425 Spruce St.
P.O. Box 590
Scranton, PA 18501-0590

John Flounlacker, Esquire
Thomas, Thomas & Hafer, LLP
305 North Front Street
P.O. Box 999
Harrisburg, PA 17108

Robert E. Kelly, Jr., Esquire
Duane, Morris & Heckscher, LLP
305 North Front Street, 5th Floor, .
P.O. Box 1003
Harrisburg, PA 17108-1003


Date: 11/01/01

By: _Richard F. Stevens_
Richard F. Stevens, Esquire
I.D. No: 08073 .
Attorneys for the Plaintiffs
Jack Marrone, Karen Marrone,
Matthew Marrone and Vida Marrone

740 Hamilton Mall
Allentown, Pennsylvania 18101
(610) 439-1451

# EXHIBIT "B"

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JACK MARRONE, HUSBAND,           :
KAREN MARRONE, WIFE, BOTH        :
INDIVIDUALLY AND IN THEIR        :
CAPACITY AS PARENTS AND          :
GUARDIANS FOR VIDA MARRONE,      :
A MINOR, AND MATTHEW ADAM        :
MARRONE,                         :
      PLAINTIFFS           :
               :
    V                        :   NO. 1:CV-01-0773
               :
ALLSTATE INSURANCE COMPANY,      :
LINDA M. EDLEMAN, FRED           :
SHAFER, MT. GRETNA REALTY,       :
AND HOUSE MASTERS,               :
      DEFENDANTS          :   JURY TRIAL DEMANDED

DEPOSITION OF:   JACK MARRONE

TAKEN BY:        DEFENDANT ALLSTATE INSURANCE
                 COMPANY

BEFORE:          MARIA N. O'DONNELL, RPR
                 NOTARY PUBLIC

DATE:            MAY 29, 2002, 9:21 A.M.

PLACE:           NEALON & GOVER, PC
                 2411 NORTH FRONT STREET
                 HARRISBURG, PENNSYLVANIA

APPEARANCES:

    TARASI, TARASI & FISHMAN
    BY: LOUIS M. TARASI, JR., ESQUIRE
       GIANNI FLORO, ESQUIRE
       FOR - PLAINTIFFS



HAEN
Reporting Service, Inc.

Hughes
Albright
Foltz
Natale

2080 Linglestown Road • Suite 103 • Harrisburg, PA 17110
717.540.0220 • Fax 717.540.0221 • Lancaster 717.393.5101

1    tired all of time.

2         MR. TARASI: Wait a minute, that's enough.  You

3    said it.

4         THE WITNESS:  That's the only thing I can

5    attribute it to.

6         MR. TARASI: You have answered the question.

7    BY MR. FLOUNLACKER:

8         Q    Sir, prior to buying this home, have you ever

9    experienced any problems with memory loss?

10        A    No.

11        Q    Prior to buying the Mount Gretna home, have you

12   ever experienced any problems with fatigue?

13        A    No.

14        Q    Prior to buying this home in Mount Gretna, did

15   you ever experience any problems with your eyes or so called

16   irritated eyes?

17        A    No.

18        Q    Ever suffered prior to buying the home from

19   depression?

20        A    Yes.

21        Q    Ever suffered with any respiratory problems or

22   breathing or sneezing problems prior to buying the home in

23   Mount Gretna?

24        A    Not to the extent of now.

25        Q    So if I understand what you are telling me, out

Case 1:01-cv-00773-YK   Document 157   Filed 05/16/2003   Page 30 of 100

1    of the list of problems that you believe were caused by

2    living in this home, the only problems that you might have

3    had before this were depression problems and breathing

4    problems, but they are worse now than they were before?

5         A    You got it.

6         Q    Is that right?

7         A    Yes.

8         Q    Okay.  When did you first experience a problem

9    with depression prior to buying this home?

10        A    I guess a few months after we moved in.  I don't

11   -- say that again now.

12        Q    Yes.  Please listen to me, sir.  I'd like to know

13   when you first began or first were aware of a depression

14   problems prior to or before buying this property?

15        A    Before buying?

16             MR. TARASI: Yes, he said before.

17             THE WITNESS:  When I came back from Vietnam.

18   BY MR. FLOUNLACKER:

19        Q    When was that, sir?

20        A    Thirty years ago.

21        Q    When did you last seek treatment for a problem

22   with depression before you bought this home?

23        A    1987 about I believe.

24        Q    Where?

25        A    Perryville, PA.

furniture.  You could almost grow mushrooms.

Q    And this was the first time that you ever had this condition during the time that you owned and occupied the home?

A    Yes.

Q    What did you do?  Did you take steps to clean it up when you first discovered all of this?

A    I didn't know what the hell to do.  I told my wife.

Q    All right.  Did your wife come down and take a look at it?

A    No.

Q    Did your wife ever go down into the basement?

A    Sure.

Q    After you discovered all of this mold?

A    No.

Q    She never went down?

A    No.

Q    Did you consult with anyone other than your wife?

A    She did just to take a peek.

Q    Not your wife.  Did you consult with anyone as to what to do about the mold?

A    Did i consult with anybody what to do with the mold?

Q    Yes.

1     showed him and he came down, he says you need a

2     dehumidifier down here and I bought one from him.

3  Q.  You said that it was after you found the mold?

4  A.  Yes.

5  Q.  So, that would be after July of 2000, not

6     necessarily between September 29th and October

7     14th?

8  A.  It was after we came back from Missouri.

9  Q.  And did you find that the dehumidifier helped

10    things in the basement, did it make a difference?

11 A.  Not really.  It was already exploded all over the

12    place.  It was already all over the place.

13 Q.  Did you have to empty the dehumidifier daily that

14    would contain the water?

15 A.  I don't know how often I emptied it, but I emptied

16    it.  It did suck up water.

17 Q.  Mr. Marrone, I would like to turn to your injuries

18    now.  Are you currently under any doctor's orders

19    to limit your activities in any manner?

20 A.  No.

21 Q.  Were you at any time since July 2000 under any

22    doctor's orders to limit your activities?

23 A.  No.

24 Q.  Were there any activities that you did before the

25    alleged exposure to mold that you cannot now do?

1    A.    In a way, yes.  I have trouble breathing.  My eyes

2          get -- what's the word -- irritable.  I sneeze a

3          lot.

4    Q.    And did you ever have these symptoms before moving

5          to your house?

6    A.    I have memory loss too.

7    Q.    Did you ever have trouble breathing prior to

8          moving into the home in Mount Gretna?

9    A.    Yes, some, but not to this extent.

10   Q.    And what were your problems breathing prior to the

11         Mount Gretna home?

12   A.    I don't know.  I can't explain it.  I couldn't

13         explain it medically wise.

14   Q.    When did you have problems breathing prior to

15         moving into the Mount Gretna home?

16   A.    If I, you know, walked a lot.

17   Q.    Have your eyes ever been irritated prior to moving

18         into the Mount Gretna home?

19   A.    Never, no.

20   Q.    How about memory loss, have you ever experienced

21         memory loss prior to moving into the Mount Gretna

22         home?

23   A.    Yes.

24   Q.    And when was that?

25   A.    Pardon me?

# EXHIBIT "C"

# ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JACK MARRONE, HUSBAND,          :
KAREN MARRONE, WIFE, BOTH       :
INDIVIDUALLY AND IN THEIR       :
CAPACITY AS PARENTS AND         :
GUARDIANS FOR VIDA MARRONE,     :
A MINOR, AND MATTHEW ADAM       :
MARRONE,                        :
      PLAINTIFFS         :
                   :
    V                          :    NO. 1:CV-01-0773
                   :
ALLSTATE INSURANCE COMPANY,     :
LINDA M. EDLEMAN, FRED          :
SHAFER, MT. GRETNA REALTY,      :
AND HOUSE MASTERS,              :
        DEFENDANTS       :    JURY TRIAL DEMANDED

     DEPOSITION OF:  KAREN MARRONE

     TAKEN BY:       DEFENDANT ALLSTATE INSURANCE
                   COMPANY

     BEFORE:         MARIA N. O'DONNELL, RPR
                   NOTARY PUBLIC

     DATE:           MAY 29, 2002, 1:14 P.M.

     PLACE:          NEALON & GOVER, PC
                   2411 NORTH FRONT STREET
                   HARRISBURG, PENNSYLVANIA

APPEARANCES:

    TARASI, TARASI & FISHMAN
    BY: LOUIS M. TARASI, JR., ESQUIRE
        GIANNI FLORO, ESQUIRE
        FOR - PLAINTIFFS



HAFN Reporting Service, Inc. — Hughes / Albright / Foltz / Natale

2080 Linglestown Road • Suite 103 • Harrisburg, PA 17110
717.540.0220 • Fax 717.540.0221 • Lancaster 717.393.5101

Case 1:01-cv-00773-YK  Document 157  Filed 05/16/2003  Page 36 of 100

1      testimony?

2  A.   Yes.  I did the planting most of the stuff and I

3       put the mulch around.  That's my job.

4  Q.   So, you did the planting and the mulching?

5  A.   Yes, sir.

6  Q.   Did you or your husband consult with anybody about

7       how to properly do the work?

8  A.   Plant?

9  Q.   Yeah.  In other words, you just did it based on

10      your own knowledge of what you should do?

11 A.   Yes, sir.

12 Q.   Now, did your children live with you continuously

13      from '99 to 2000 when you eventually moved out of

14      the home?

15 A.   No, my son moved out in April of 2000.

16 Q.   So, he lived in the home until April of 2000?

17 A.   Correct.

18 Q.   And your daughter lived there until you and your

19      husband moved out.  Is that correct?

20 A.   Correct.

21 Q.   How often would you be down in the basement?

22 A.   To vacuum.

23 Q.   You had vacuumed the rugs?

24 A.   Yeah, it was this here, I would vacuum that up,

25      and this I would all sweep up.  (Indicating)  And

1   A.    Right.

2   Q.    That would bring one or both of the children down

3         there?

4   A.    Yes.

5   Q.    There was a television down there?

6   A.    Yes.

7   Q.    Would the children sometimes watch TV down there?

8   A.    Sometimes, but they had TVs in their rooms.

9   Q.    Of course, you had the spa in the basement.  Was

10        there anything else that would bring people down

11        to the basement on a regular basis?

12  A.    Not on a regular basis, no.

13  Q.    Until the time that you came back from Missouri in

14        July or August of 2000, did you make any

15        additional observations about marks in the

16        basement or water or moisture or mold in the

17        basement?

18  A.    Not that I remember, no.

19  Q.    How about upstairs, did you make any further

20        observations of marks or water or moisture or mold

21        in the main upstairs level?

22  A.    Well, when I moved the refrigerator, but I didn't

23        know that was mold.  I didn't know what it was.

24              MR. TARASI:  He meant other than that.

25              MR. MONSKY:  Other than that.  We've already

Case 1:01-cv-00773-YK    Document 157    Filed 05/16/2003    Page 38 of 100

1    discussed that.

2            MR. TARASI:  We already went through that.

3            MR. MONSKY:  Yeah.

4    A.    Dirty windows.

5            MR. TARASI:  Just answer his question.  He is

6    only talking about something which was wet or mold

7    or something?

8    A.    Oh, no.

9    BY MR. MONSKY:

10   Q.    First of all, behind the refrigerator, do you know

11   for a fact whether that was mold?

12   A.    I don't know.

13           MR. TARASI:  I'll object.  She's been asked

14   and answered that a couple of times.  She didn't

15   know what it was.

16   BY MR. MONSKY:

17   Q.    Is that correct that you didn't know what it was?

18   A.    No, it was nasty.

19   Q.    Just black gooky stuff.  As I understand it, until

20   the time you came back from Missouri in the summer

21   of 2000, you didn't make any other observations of

22   water or moisture or mold in the house?

23   A.    No.

24   Q.    After you did the extensive cleaning of the house,

25   were you satisfied with the house from that point

1  BY MR. MONSKY:

2  Q.   Did you ever have any breathing problems, any

3       respiratory problems before you purchased the

4       Edleman home?

5  A.   Oh, respiratory problems prior to that?

6  Q.   Yes.

7  A.   I had sinusitis.  I was zero percent for that.

8  Q.   What does zero percent mean?

9  A.   That means that when I was in the Army I had a

10      nostril would close up, but then it would go away.

11      That was basically about it.

12 Q.   Does zero percent mean you had no disability for

13      that?

14 A.   No, that is a disability.  Zero percent.

15 Q.   You mean zero percent that you could smell or

16      breathe?  I just don't follow you, I'm sorry.

17 A.   You're not a veteran?

18 Q.   No, ma'am.

19 A.   It just means that when I was in the military, I

20      had a problem with my sinus.  I couldn't breathe

21      in through one of my nostrils.  But after I got

22      out, it wasn't a major problem.  And with the VA,

23      you have to be -- if the sinuses were blocked or

24      something like that, then they would give you a

25      percentage.  But because it was on the record in

1   Q.   Right.   Some of that included post traumatic

2        stress disorder?

3   A.   Correct.

4   Q.   And what were the medical problems?

5   A.   MS, which that was diagnosed in '97.

6   Q.   '97?

7   A.   Correct.

8   Q.   Okay.

9   A.   The gastric ulcer, the sinusitis.

10            MR. TARASI:   Wait a minute.   The sinusitis

11       was zero.

12  A.   Right.

13  BY MR. MONSKY:

14  Q.   Gastric ulcer was in terms of the hundred percent

15       disability, was there an--

16  A.   It doesn't work that way.

17  Q.   Any other conditions other than sinusitis, gastric

18       ulcer, MS and the post traumatic stress disorder?

19  A.   Not that I can think of.

20  Q.   When you had these respiratory problems while you

21       were living in the house, did you get any medical

22       treatment for those?

23  A.   Only when I got really bad in I believe it was

24       April.

25  Q.   April of 2000?

1    A.    I believe so.   I think it was April.

2    Q.    And where were you treated for that?

3    A.    Lebanon Medical Center, the VA.

4    Q.    Lebanon VA?

5    A.    Yes.

6    Q.    Did the doctors give you a diagnosis as to the

7          cause of those respiratory problems?

8    A.    Not personally.

9    Q.    How many times did you go out to the Lebanon VA

10         for that problem?

11   A.    I don't remember.   My husband made me go because I

12         was so sick.

13   Q.    Well, do you recall going out one time, more than

14         one time?

15   A.    I remember going out once.   If I went anymore than

16         that, I honestly don't remember.

17   Q.    What was their course of treatment, what did they

18         recommend for you?

19   A.    I think he put me on antibiotics.   I can't

20         remember.

21   Q.    Do you recall the type of doctor you saw, was it

22         an ENT, respiratory specialist?

23   A.    No, he was my primary care physician.

24   Q.    And who was that while you were out there?

25   A.    Dr. DeCosta.

1    embarrassing.  Gosh.

2    Q.  So, you didn't go to the Lebanon VA about that?

3    A.  No.

4    Q.  Did you buy anything over the counter to try to

5        take care of that?

6    A.  Yes.  I tried to get different hair stuff.  We

7        tried different hair brushes.  We'd go to that

8        Sally's Beauty Supply and ask them what we could

9        use.

10   Q.  But in any event, because you were embarrassed

11       about it, you didn't get any medical diagnosis of

12       that?

13   A.  No.

14   Q.  When you moved out of the house in October of

15       2000, did that condition stop?

16   A.  Very slowly.  Very slowly.

17   Q.  Did you take any photographs of yourself that

18       showed your hair coming out?

19   A.  No, but the other lawyer had me save a day's

20       worth.

21   Q.  Attorney Stevens?

22   A.  Yes.

23           MR. TARASI:  Did he take photographs, is that

24       what you are saying?

25   A.  No, his secretary or paralegal or somebody said

Case 1:01-cv-00773-YK   Document 157   Filed 05/16/2005   Page 43 of 100

1    you should save it.

2         MR. TARASI:  Save what, your hair?

3  A.   The hair that was falling out, yeah.

4  BY MR. MONSKY:

5  Q.   So, you had sent it to Attorney Stevens' office?

6  A.   No, they just told me to save it.

7  Q.   Do you still have it?

8  A.   I don't know what I did with it.  I would have to

9       look in all honesty.

10 Q.   As far as you know, did you take any photographs

11      or any family members or any representatives of

12      previous lawyers, did they take any photographs of

13      this hair condition?

14 A.   No.

15 Q.   When would you say your hair had come back

16      completely?

17 A.   That's really hard to say.  It took a long time.

18      It just kept falling out.

19 Q.   When you were living in Mount Gretna, did you wear

20      your hair about the same length you have it now?

21 A.   No, it was shorter.

22 Q.   Shorter.  Did you actually have bald spots with

23      this loss of hair?

24 A.   Not those that showed.

25 Q.   How about your daughter, did she actually have

1   A.   They didn't know anything at the time.

2   Q.   So, they didn't do anything for your respiratory

3        problems?

4   A.   At the time, no.

5   Q.   Did anybody ever do anything for those respiratory

6        problems or did they just clear up after you were

7        away from the house for a period of time?

8   A.   Well, actually it was after my surgery.

9   Q.   You had some surgery for nasal surgery.  Right?

10  A.   Yes.

11  Q.   And that was out in Missouri.  Correct?

12  A.   Yes.

13  Q.   And what was the nature of that surgery, what did

14       they do for you?

15  A.   They cleaned out the sinuses, removed a mucocele,

16       muco something or other, and the turbinates inside

17       of my -- the inferior turbinates inside my nose

18       were like permanently swollen.

19  Q.   When was the surgery performed?

20  A.   January 30th of this year.

21  Q.   And has that cleared up the problem?

22  A.   Yes.

23  Q.   You didn't have any respiratory problems then?

24  A.   Not that I know of.

25  Q.   No nasal problems?

Case 1:01-cv-00773-YK Document 157 Filed 05/16/2003 Page 45 of 100

1  A.   No.

2  Q.   Did that problem go away when you returned to

3       Missouri?

4  A.   Eventually.

5  Q.   Did you treat in Missouri for those problems?

6  A.   No.

7  Q.   When would you say that that concentration problem

8       improved to the point that it went away?

9  A.   Well, I don't believe it actually went away.

10 Q.   Have you been tested or evaluated by any doctor

11      for this problem?

12          MR. TARASI:  Wait.  I'll instruct the witness

13      not to answer that question except as to treating

14      physicians.

15 BY MR. MONSKY:

16 Q.   Has any treating doctor evaluated you for problems

17      with concentration or organizing things?

18 A.   Not that I remember.

19 Q.   What would you say your current difficulties are

20      with regard to that?

21 A.   I'm still very disorganized.

22 Q.   Do you have difficulty concentrating still?

23          MR. TARASI:  What was that question?

24 BY MR. MONSKY:

25 Q.   Do you still have difficulty with concentration?

1      You said that problem -- had you ever had that

2      problem before you lived in Mount Gretna?

3   A. Not that I know of.

4   Q. And you've continued to have a problem with that

5      since you moved out of Mount Gretna?

6   A. With organization, yes.

7   Q. Your concentration levels, are they back to normal

8      as opposed to organizational?

9   A. I don't know.

10  Q. Are you claiming any memory loss problems?  Your

11     husband mentioned that he had a memory problem

12     when he lived in Mount Gretna.  Have you had any

13     problems like that?

14  A. I don't know.

15  Q. Did you ever have any GI problems before living in

16     Mount Gretna?

17  A. Yes.

18  Q. And were they similar problems, cramping and

19     diarrhea?

20  A. No.

21  Q. What type of prior GI problems did you have?

22  A. I had a gastrointestinal ulcer.

23  Q. Was that ulcer removed?  Did you have your ulcer

24     removed?

25  A. Oh, no.

Case 1:01-cv-00773-YK   Document 157   Filed 05/16/2003   Page 47 of 100

1          Matthew while he was living in Mount Gretna?

2    A.    He was having some breathing problems.

3    Q.    Did he get any medical treatment for that?

4    A.    I don't remember.

5    Q.    Did you say Matthew was a smoker?

6    A.    No, he's not.

7    Q.    Has he had any problems with breathing since he

8          moved to Missouri?

9    A.    Yes.

10   Q.    Has he been treated in Missouri for the problems?

11   A.    Yes.

12   Q.    What types of problems does he have breathing?

13   A.    He said he has asthma.

14   Q.    To your knowledge, has any doctor, any treating

15         doctor indicated to you or Matthew that the asthma

16         is because of his living in the home at Mount

17         Gretna?

18   A.    I don't know.

19   Q.    Is he under current treatment for the asthma?

20   A.    From my understanding, yes.

21   Q.    Do you know what that treatment is?

22   A.    A puffer and inhaler.

23   Q.    You've seen him use it?

24   A.    Yes.

25   Q.    Any other physical problems that he developed

1    Q.    Spring of 2000?

2    A.    Yes.

3    Q.    Do you recall the type of tree?

4    A.    No.

5    Q.    Was it a large tree, tall tree?

6    A.    Not like -- no, it was not a real big tree, no.

7    Q.    After that tree was removed, did you have any

8          moisture or drainage problems in front of your

9          house?

10   A.    No.

11   Q.    In your front yard you had grass and plants?

12   A.    Correct, and trees.

13   Q.    Then in July 2000 you went out to Missouri for I

14         think you said about a week?

15   A.    We left on Monday and I believe we returned on

16         Sunday.

17   Q.    Do you recall what week specifically that was?

18   A.    Not without a calendar.

19   Q.    With reference to the 4th of July holiday, was it

20         during or after 4th of July?

21   A.    After.

22   Q.    And what was the reason you went out to Missouri,

23         just to visit and check on your other house?

24   A.    No, to give my son the camper.

25   Q.    So, you were away from the house for a week, away

1      from the house in Mount Gretna for a week?

2   A.   Approximately, yes.

3   Q.   Was it possible that you were away for two weeks?

4   A.   No.

5   Q.   Was the house all closed up during the time you

6      were away?

7   A.   Yes, sir.

8   Q.   Matthew did not return back with you, it was just

9      you, your husband and Vida that returned back to

10     Mount Gretna?

11  A.   I don't remember if Vida came back with us or not.

12  Q.   You just recall yourself and your husband coming

13     back?

14  A.   That's all I remember right now, yes.

15  Q.   Do you recall -- I guess you don't recall what

16     specific date you came back?

17  A.   Not without a calendar, no, sir.

18  Q.   What did you observe when you first came back, was

19     there some unusual developments at the house?

20  A.   Not when I first got back, no, sir, not that I

21     know of.

22  Q.   After you first got back, when did you first

23     notice any problems or changes inside the house?

24  A.   It was a couple of days later my husband had gone

25     into the lower level.

Case 1:01-cv-00773-YK   Document 157   Filed 05/16/2003   Page 50 of 100

1   Q.   So, you were actually home with your husband for a

2        couple of days and then for the first time he went

3        down to the basement was that when--

4   A.   He went down I believe to retrieve something.

5   Q.   Do you drive?

6   A.   Yes, sir.

7   Q.   When people would park a vehicle in the garage,

8        would they then come up through the basement into

9        the main floor or what would the normal sequence

10       of events be?

11         MR. TARASI:  For the record, I think she

12       testified they couldn't park the truck in the

13       garage, but you can ask your question, sir.

14  BY MR. MONSKY:

15   Q.   When you and your husband would go to and from,

16        would you take the vehicle in and out of the

17        garage?

18   A.   No, we parked in the front.

19   Q.   Oh.  So, during those couple of days when you got

20       back, you did not go in the basement at all?

21   A.   No, sir.

22   Q.   What did your husband first tell you when he

23       noticed something in the basement?

24   A.   You are not going to believe what's down there.

25   Q.   And you then went down there?

1   A.   No.

2   Q.   Did you ever go down there?

3   A.   Yes.

4   Q.   How long after these couple of days did you go

5        down there?

6   A.   It may have been a day or so.

7   Q.   Why did you wait a day or so to go down there?

8   A.   I didn't want to see whatever it was.

9   Q.   What did he tell you was down there?

10  A.   He didn't.

11  Q.   When you finally mustered the courage to go down

12       there, what did you observe?

13  A.   Twilight zone.

14  Q.   Can you be more descriptive than that?

15  A.   Fur hair like stuff growing on everything.

16  Q.   When you say growing on everything, where was this

17       fur or hair growing?

18  A.   The walls, ceiling, the furniture, everything.

19  Q.   Was there any length to the fur or hair?  I mean,

20       I don't know, I'm trying to visualize it.

21  A.   I did not get that close to it.

22  Q.   Was it on the carpet?

23  A.   I don't remember.

24  Q.   But it was on the walls and the ceiling?

25  A.   Yes, sir.

1   Q.    I neglected to ask this.  Had your husband made

2         any changes to the basement ceiling during the

3         time you owned the property?

4   A.    No, sir.

5   Q.    How long were you down there when you first

6         noticed this condition?

7   A.    Almost immediately.  You have to go down.

8   Q.    Okay, I understand.  But I mean did you stay down

9         there for a period of time or did you just go back

10        upstairs?

11  A.    No, I did not stay down there for a period of

12        time.

13  Q.    You took a look and went back upstairs?

14  A.    Yes.

15  Q.    Did you go back down there on other occasions or

16        did you stay away from that area?

17            MR. TARASI:  That's two questions.  Want to

18        break it down?

19  BY MR. MONSKY:

20  Q.    Did you go back down there on other occasions

21        besides the day that you first noticed all of

22        this?

23  A.    I believe we had a barbecue.  I didn't walk down.

24        I went in from the pool area with the doors open

25        and the day we left.

Case 1:01-cv-00773-YK   Document 157   Filed 05/16/2003   Page 53 of 100

1   A.   Well, the estimate they sent out was to rip

2        everything out and then to replace everything

3        afterwards.  So, my husband started ripping

4        everything out.

5   Q.   And was that ripping out phase, he didn't get to

6        any of the replacing phase as I understand it?

7   A.   Correct.

8   Q.   There was also an environmental company that came

9        out?

10  A.   Yes, sir.

11  Q.   And what was the circumstances that they came out,

12       who had requested that they come out?

13  A.   I did.

14  Q.   How did you get a hold of that organization?

15  A.   Through the health department.

16  Q.   Pennsylvania Department of Health.

17  A.   Yes.

18  Q.   When did they come out?

19  A.   The lab?

20  Q.   Yes.  What's the name of the organization again?

21  A.   A2S1.

22  Q.   When did they come out?

23  A.   August 28th.

24  Q.   Were you there when they did their investigation?

25  A.   I was upstairs.

1   A.   I believe so.

2   Q.   Did your husband stop his demolition work in the

3        basement?

4   A.   Yes.

5   Q.   Did they tell you to vacate the home?

6   A.   No.

7   Q.   Did you eventually get a written report from them

8        with some recommendations?

9   A.   Yes.

10  Q.   After you got this call, is that when you made the

11       decision to vacate the home?

12  A.   Yes.

13  Q.   And how did you go about deciding that?

14  A.   My husband hung up the phone and said we're out of

15       here.

16  Q.   And did you agree with his decision?

17  A.   Yes.

18  Q.   Was your daughter, Vida, living there at the time?

19  A.   Yes.

20  Q.   Did you then make plans to move out of the home?

21  A.   Yes.

22  Q.   And I think it was a couple of weeks until you

23       actually made your move?

24  A.   October 14.

25  Q.   October 14th, about two weeks later?

1    A.   Yes, sir.

2    Q.   Did you get the report from the environmental

3          company while you were still living in Mount

4          Gretna?

5    A.   No.

6    Q.   Did you continue to live in the home for the next

7          two weeks?

8    A.   Yes.

9    Q.   Were you busy packing up for those two weeks?

10   A.   Yes.

11   Q.   As I understand it, you were only down in the

12         basement once or twice once you returned back from

13         Missouri in July or August of 2000.  Is that

14         right?

15   A.   I went down after we returned one time, yes.

16   Q.   And then the barbecue?

17   A.   Correct.

18   Q.   And did you have to pack up things in the basement

19         to move?  Was anything taken from the basement and

20         moved back to Missouri?

21   A.   Yes.

22   Q.   What specifically did you take back to Missouri?

23   A.   The scooter was in the garage, the Crazy Ed my

24         daughter's bike thing was out in the garage, the

25         kids' baby box.

1   Q.    When was the first period of separation?

2   A.    August 1987.

3   Q.    And how long were you separated?

4   A.    I think two months.

5   Q.    And you reconciled after two months?

6   A.    Correct.

7   Q.    And when was your second period of separation?

8   A.    January 14th, 2000.

9   Q.    Why did you separate?

10  A.    Stupidity.

11  Q.    On whose fault?

12  A.    His, on my husband's part.

13  Q.    Could you explain that, please?

14  A.    It's self-explanatory.

15  Q.    How long were you separated?

16  A.    That's hard to say because we were working things

17        out so he came back.

18  Q.    Do you know when about he came back?

19  A.    I believe the first time was in March.

20  Q.    So, did you have several attempts at

21        reconciliation before?

22  A.    No, we were trying to work it out.

23  Q.    So, you say when he came back.  What do you mean

24        by that?

25  A.    He came to visit, we went out, we ate.

1   Q.   But he didn't stay?

2   A.   Maybe for a night, two nights.

3   Q.   When did you finally reconcile?

4   A.   It may have been in May.  I'm not really sure.

5   Q.   And where did your husband live during this time

6        that you were separated?

7   A.   In the camper.

8   Q.   But where did he go?

9   A.   Oh, Martinsburg, West Virginia.

10  Q.   And do you know why he went there?

11  A.   No idea.

12  Q.   So, essentially from January of 2000 through

13       approximately May of 2000, your husband was not

14       living at the Timber Road address?

15  A.   Not full time, no.

16  Q.   And you said the first that time he came back

17       during the period of separation was approximately

18       March of 2000?

19  A.   I believe so.

20  Q.   Do you know how many other times that he came back

21       before he finally came back in May?

22  A.   No, I don't.

23  Q.   Can you estimate, was it more than ten?

24  A.   I honestly, honestly can't tell you because I

25       really--

# EXHIBIT "D"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JACK MARRONE, husband
KAREN MARRONE, wife, both
individually and in their
capacity as parents and
guardians for VIDA MARRONE
a minor, and MATTHEW ADAM
MARRONE,

        Plaintiffs

   vs.

ALLSTATE INSURANCE COMPANY,
LINDA M. EDLEMAN, FRED
SHAFFER, MT. GRETNA REALTY,
and HOUSEMASTERS,

        Defendants

Civil Action No.:
1:CV-01-0773

(U.S. District Judge
Yvette Kane)

Deposition of:  MATTHEW ADAM MARRONE

Taken by     :  Defendants

Date         :  June 28, 2002, 11:08 a.m.

Place       :  Nealon & Gover
                2411 North Front Street
                Harrisburg, Pennsylvania

Before      :  Ann M. Wetmore
                Reporter - Notary Public

1  A.  Physically today, shortness of breath.  I have a

2      small lawn and can barely do the lawn without

3      getting winded.  My eyesight is blurry at times,

4      waters and burns.

5  Q.  Your eyes?

6  A.  Yes.  Today my -- for the past few days I get some

7      pains in my knees.  I don't know what it's related

8      to, but I do have some pains in my knees.  Memory

9      loss, sometimes both short term and long term.

10     And that's about it to this day.

11 Q.  And do you believe those problems that you just

12     told me about are associated with living at the

13     Mount Gretna property?

14 A.  I believe some of them are.

15 Q.  Tell me what you believe is the matter with you

16     today as a consequence of living at the Mount

17     Gretna property.

18 A.  I believe my shortness of breath.

19 Q.  All right.

20 A.  Memory loss.

21 Q.  All right.

22 A.  And I'm not sure about the eyes, but at the moment

23     I can't attribute it to that.

24 Q.  What about your knee pain?

25 A.  I've had since I was a young kid--

1    Q.   When was the first time that you began to

2          experience the shortness of breath that you told

3          me about a while ago?

4    A.   I do believe it was about two months after we

5          moved into the home.

6    Q.   What happened?

7    A.   I believe the first time I was downstairs on my

8          putting green practicing golf, you know how that

9          works, and I believe I was walking up the stairs

10        and just got winded.

11   Q.   That's the first time you recall having a problem

12        with shortness of breath after you moved into the

13        Mount Gretna home?

14   A.   That's the first time I can recall, yes.

15   Q.   What did you do about it?

16   A.   Walked upstairs and let it work its way off.

17   Q.   How long did it last?

18   A.   I can't remember.

19   Q.   Any other symptoms other than that?

20   A.   At that time, no.

21   Q.   How long did it take to wear off?

22   A.   I've got the shortness of breath to this day.

23   Q.   Constantly?

24   A.   It was bothering me up until about a month ago and

25        the coughing went away as far as being consistent.

1    A.    Just that common burning and watering.

2    Q.    The one that started that you told me about

3          November of '99?

4    A.    Yes.

5    Q.    How often does that occur?

6    A.    Not on a daily basis.  I'm wanting to say maybe

7          once every three, four days.

8    Q.    What triggers it?

9    A.    I don't know.

10   Q.    Reading with your school work?

11   A.    It can happen any time.  I've had it happen while

12         I'm driving.  I've had it happen while I'm in

13         class.

14   Q.    And have you ever sought any medical care for that

15         problem?

16   A.    No, I can't afford it at the moment.

17   Q.    Have you ever talked to anybody at the Lebanon --

18         or at any veterans' hospital regarding your eyes

19         or brought that to any doctor's attention?

20   A.    Not to my knowledge.

21   Q.    When you were talking with that doctor about the

22         shortness of breath, did you tell him about the

23         eyesight problems that you had just told me about?

24   A.    I don't believe I did.

25   Q.    Why not?

1  A.   Treating physician, no.

2  Q.   Other than what you've already told me, is there

3       any other problem that you are or have experienced

4       with your eyesight?

5  A.   No, not to my knowledge.

6  Q.   You've told me about the entire universe of the

7       problems that you've experienced with your eyes?

8  A.   Yes.

9  Q.   I think you told me that, and just to recap, you

10      don't believe the problems with your knees are

11      related to your time living at Mount Gretna?

12 A.   Not at all.

13 Q.   What about memory loss, when did you first

14      experience what you believe was something relating

15      to a memory loss?

16 A.   It was shortly before I left Mount Gretna, which

17      would have been December or January of either 2000

18      or 2001.

19 Q.   All right.  What happened?

20 A.   I believe I was at a fraternal meeting and

21      previously had the part memorized no problem and

22      there was a few words I couldn't get out, I just

23      couldn't remember the words.

24 Q.   What are you talking about?

25 A.   Ritual work.

Case 1:01-cv-00773-YK    Document 157    Filed 05/16/2003    Page 64 of 100

1   Q.    Your parents?

2   A.    I don't know.

3   Q.    Why did you move out of the house in I think you

4         told me April of 2000?

5   A.    From Mount Gretna?

6   Q.    Right.

7   A.    To be with my girlfriend.

8   Q.    Is she here?

9   A.    She's outside.

10  Q.    Any other reason why you decided to move out in

11        April of 2000?

12  A.    Cheaper schooling out that way, so I tie it all

13        together.

14  Q.    Did you leave Mount Gretna or the Mount Gretna

15        property because of any medical problem that you

16        thought you were experiencing because you lived at

17        the house?

18  A.    No.

19  Q.    When was the first time in your life that you

20        believe you were experiencing a physical problem

21        with your body as a consequence of living at that

22        Mount Gretna property?

23  A.    I don't know because I don't know medically what

24        was tied in with that so I wouldn't know.

25  Q.    All right, I understand that.  And just to be

# EXHIBIT "E"

Case 1:01-cv-00773-YK   Document 157   Filed 05/16/2003   Page 66 of 100

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . .

JACK MARRONE, husband,          .   Civil Action No.:
KAREN MARRONE, wife, both       .   1:CV-01-0773
individually and in their       .
capacity as parents and         .
guardians for VIDA MARRONE      .
a minor, and MATTHEW ADAM       .
MARRONE,                        .
                 Plaintiffs     .

        vs.                     .   (U.S. District Judge
                                .      Yvette Kane)
ALLSTATE INSURANCE COMPANY,     .
LINDA M. EDLEMAN, FRED          .
SHAFFER, MT. GRETNA REALTY,     .
and HOUSEMASTERS,               .
                 Defendants     .

. . . . . . . . . . . . . . . .


Deposition of:  VIDA ARIELLA MARRONE

Taken by    :   Defendants

Date        :   June 28, 2002, 2:18 p.m.

Place       :   Nealon & Gover
                2411 North Front Street
                Harrisburg, Pennsylvania

Before      :   Ann M. Wetmore
                Reporter - Notary Public

1   A.   Yes.

2   Q.   And how long after -- and when was that, can you

3        give me an approximation as to when that was?

4   A.   We moved back October 16th, 2000, and I started

5        noticing my headaches and itchy eyes and my sinus

6        problems almost immediately.

7   Q.   So, you leave school in June of 2000 with the

8        problems that you are telling me about, and then a

9        few months later in October, was that four months

10       later, you moved back to Missouri and the problems

11       start clearing up as you are describing for me.

12       Correct?

13   A.   Correct.

14   Q.   And assuming you move back and all of this started

15       to unwind in October of 2000, how long was it

16       until it was that you believe all of the problems

17       that you were experiencing had resolved themselves

18       or subsided?

19   A.   Say that one more time.

20   Q.   How long did it take for your problems to resolve

21       or subside after you moved back to Missouri in

22       October of 2000?

23   A.   Maybe a month tops.

24   Q.   November 2000?

25   A.   Roughly.

1   A.   Yes, I was.

2   Q.   Do you recall experiencing those problems say

3        before Halloween or the end of October?

4   A.   I don't believe so.

5   Q.   You weren't experiencing them by then?

6   A.   I don't believe so.

7   Q.   Do you recall what marking period you were in at

8        school before you started having these problems?

9        Does Palmyra have four marking periods?

10  A.   I think so.

11  Q.   All right.  Do you recall which marking period you

12       were in before your grades started to go downhill?

13  A.   I believe it was still the first marking period.

14  Q.   Do you recall experiencing any of the problems

15       that you told me about before the holidays, say

16       Thanksgiving or Christmas 1999?

17  A.   I do remember I had started getting very sick

18       before Christmas.

19  Q.   So, is it safe to say sometime after August 31st,

20       1999, up until the Christmas of '99, around then

21       is when your physical problems started to show

22       themselves?

23  A.   Correct.

24  Q.   And then those problems continued for you until

25       June of 2000 and then they started to wean away as

1    separated?

2  A.    Yes.

3  Q.    When was that?

4  A.    I believe in January.

5  Q.    Of 2000?

6  A.    Yes.

7  Q.    And how long were they separated?

8  A.    My dad had come back a couple of times here and

9        there because my parents were trying to work

10       through things and he finally came back to stay I

11       believe it was right after my 16th birthday which

12       would have been shortly after May 5th.

13  Q.    So, he was gone most of four months or the best

14       part of four months?

15  A.    Correct.

16  Q.    Did you think the problems with your parents and

17       the problems that your parents were having in

18       their separation played any role in any of the

19       problems that you told me about earlier that you

20       were experiencing?

21  A.    My health problems?

22  Q.    Yeah.

23  A.    No.

24  Q.    And that separation of your parents and your

25       father leaving the house did not have an adverse

1   A.    He might have.

2   Q.    And what about your mom, where does she fall in

3         the lineup?

4   A.    She can't handle the heat because of her multiple

5         sclerosis.

6   Q.    So, she never used it?

7   A.    She used it a couple of times, but it wouldn't be

8         high, it would be lukewarm.

9   Q.    Lukewarm tub?

10  A.    Um-hum.

11  Q.    Yes?

12  A.    Yes.  Sorry.

13  Q.    That's all right.  Between the whole group of you,

14        how often was that hot tub used on say a weekly or

15        monthly basis?

16  A.    I don't ever remember it being used on a weekly

17        basis.  Sporadically, I honestly can't say.

18  Q.    Are you currently taking any medications?

19  A.    No.

20  Q.    Do you have any present plans to pursue any

21        medical care for problems that you believe stem

22        from you living at this Mount Gretna house?

23  A.    I would like to see somebody about my learning

24        difficulty, you know, with my concentration and my

25        memory and such, but as of right this second, I

1    honestly don't know.

2  Q.   Aside from that memory issue that you've just

3       described for me, are you presently suffering from

4       any other problem that you believe is associated

5       with the time that you spent at that Mount Gretna

6       property?

7  A.   Currently, no.

8  Q.   Although you'd like to do it, do you have any

9       appointments or have you made any appointments

10      with anybody regarding those memory issues that

11      you discussed for me?

12 A.   Not yet.

13 Q.   If you told me I apologize, what was the name of

14      your guideance counselor at Palmyra?

15 A.   There's three guidance counselors.  Mine was the

16      only male.  And they assign them alphabetically,

17      the students to the counselors alphabetically, and

18      I believe his last name began with a W.  Other

19      than that, I really don't remember his name.

20 Q.   And the other two guidance counselors are ladies?

21 A.   Yes.

22 Q.   So, you had the only guy there during that year.

23      Right?

24 A.   Yes.

25           MR. FLOUNLACKER:  Thanks.

# EXHIBIT "F"

# Eckardt Johanning, M.D., M.Sc.

## Occupational and Environmental Life Science - Fungal Research Group, Inc. (FRG)

650 Warren Street - Medical Arts Building
Albany, N.Y. 12208 U.S.A.
518-459-3336 • fax - 4646
www.fungalresearchgroup.com

<u>Offices:</u>
Albany,
New York City
Frankfurt/Main, FRG

October 21, 2002

RE:                                  Jack P. Marrone
                                        11673 Highway PT
                                        Dixon, MO 65459
Date of Birth              2/22/46

I reviewed again the visit of Jack Marrone from January 17, 2002. This is a summary of the findings. I reviewed all provided outside medical reports and environmental findings, including the Advanced Applied Science report from October, 15, 2000.

Mr. Marrone, age 55, is a VA vet, with 100% disability since 1993 secondary to a gunshot wound, posttraumatic stress syndrome, and chloracne problems. He reported that after moving into and after doing some clean-up work inside the house on 354 Timber Rd, Mount Gretna, Pa, he developed a variety of problems including shortness of breath, eye irritation, chest tightness, wheezing, coughing, excessive fatigue, and nasal problems. He has been sneezing as well. He also developed an increased sensitivity and intolerance to gases, fumes, and a variety of air contaminants. He reports that his chloracne problem had been getting worse, and that he generally would look different. He reported that the special acne soap has not been helpful for him as in the past. He reported that he had not been seen at the time by his VA doctor and he had no special breathing test or chest x-ray test done. He left his home secondary to health concerns and findings of mold and moisture problems in his previous house. Since leaving this house, he felt much better. He stated that his breathing and fatigue had improved. He has less headaches.

## Medications:

Trazodone.

## Past Medical History:

Benign prostrate hypertrophy, exposure to Agent Orange resulting in chloracne development, posttraumatic stress syndrome, and gunshot wound. He had episodes of stomach cramps in the past. He denied any other significant abnormalities.

## Past Surgical History:

 

"is a member of"     AMERICAN COLLEGE OF
OCCUPATIONAL AND
ENVIRONMENTAL MEDICINE

Case 1:01-cv-00773-YK   Document 157   Filed 05/16/2003   Page 74 of 100

Scrotal cyst surgery in 1976.

**Social History:**

He is a smoker starting at age 16, 1-1½ pack per day. He denied any alcohol or significant drug history.

He reported that he now has been living in Missouri, and that he feels much better there. In his current home there are no known environmental problems.

**Physical Examination:**

Blood pressure: 120/90 mmHg. Respiratory rate 12/min. Temperature 97 T. Height: 5'9". Weight: 201 pounds. His peak flow was found at 440.

Examination of head, ears, nose, throat, chest, abdomen, lungs, and extremities was overall unremarkable. The nasal passage showed increased erythema and were narrow.

**Laboratory Tests:**

On laboratory examination, he showed no reaction to specific IgE allergens; however, he had a marked reaction indicating significant organic dust exposure including to a variety of tested fungi, i.e., *Micropolyspora faeni, Aspergillus fumigatus, Aureobasidium pullulans, Penicillium notatum, and Trichoderma viride*. He also had elevated IgG and IgA response to *Stachybotrys chartarum*. These tests are used as exposure markers and do not necessarily correspond with disease activity.

Pulmonary function test from September 12, 2002 showed that he had overall normal lung function. Chest x-ray was negative.

Immunological test which included IgG subclasses and lymphocyte enumeration test and function test showed a slightly lower than normal absolute CD3 or matured T-lymphocyte cell count with 1462, normal 1507-1953. The remainder of the testing was normal. These findings are non-specific, but typical after intense fungal exposure.

I reviewed medical records provided to me by various providers. These records did not produce any additional information. He has been diagnosed in the past with prostatitis, hemorrhoids, stable COPD, and prostatitis problems.

The environmental investigation and report by Mr. R. Pfromm indicated the presence of moisture related fungi and defects inside the house, in particular in the basement. Fungi included species of *Aspergillus, Penicillium and Stachybotrys*, that were higher inside the house than outside (control). Photos were also provided confirming visible contamination.

**Conclusion:**

Based on recent findings, I conclude that Mr. Marrone had a respiratory reaction after intense exposure to mold and mildew in his home, which was probably also aggravated by doing some repair and clean-up work in the moldy house. He has been diagnosed in addition to his previous medical conditions with upper and lower airway inflammation and irritation effects (Rhinosinusitis, bronchitis) and mold allergy. With a reasonable degree of medical certainty I believe this was the result of the exposure in the described contaminated house. He has been advised that in the future he should avoid any of these problems since he has clearly been sensitized. Provided that he has no further exposure to the fungi, he should be reasonably well.

Sincerely,

Eckardt Johanning, M.D., MSc.
Diplomate of American Board of Preventive Medicine
(Occupational and Environmental Medicine)
Diplomate of American Board of Family Medicine

# EXHIBIT "G"

# Eckardt Johanning, M.D., M.Sc.

Occupational and Environmental Life Science -
Fungal Research Group, Inc. (FRG)

650 Warren Street - Medical Arts Building
Albany, N.Y. 12208 U.S.A.
518-459-3336 • fax - 4646
www.fungalresearchgroup.com

<u>Offices:</u>
Albany,
New York City
Frankfurt/Main, FRG

October 21, 2002

RE:        Karen A. Marrone
           11673 Highway PT
           Dixon, MO 65459
**Date of Birth**        12/22/56

I reviewed again the visit of Karen Marrone from January 17, 2002. She came accompanied by her husband and daughter Vida, who also were examined that day. This is a summary of the findings. I reviewed all provided outside medical reports and environmental findings, including the Advanced Applied Science report from October, 15, 2000.

Mrs. Marrone, age 45 years, has a known service related disability since 1976. She has been previously diagnosed with multiple sclerosis in 1977. She reported that after moving into the house on 354 Timber Rd, Mount Gretna, Pa, she developed a variety of problems including shortness of breath, chest tightness, coughing, excessive fatigue, and nasal problems, stomach cramps. She had been diagnosed by her VA physician Dr. DaCosta with sinusitis and bronchitis. She also consulted an ENT specialist who reportedly recommended surgery.

She and the rest of the family left this home October 14, 2001 secondary to health concerns and findings of mold and moisture problems in this house. Since leaving this house, she also felt much better.

<u>Medications:</u>

Albuterol, Ibuprofen, Baclofen, Clonazepam

<u>Past Medical History</u>:

Rubella 1972, MS 1977, PUD, reflux, esophagitis, rhinosinusitis since early 70s, PTSD in 80s. Allergy to penicillin.

 

*"is a member of"*    AMERICAN COLLEGE OF
OCCUPATIONAL AND
ENVIRONMENTAL MEDICINE

Case 1:01-cv-00773-YK   Document 157   Filed 05/16/2003   Page 78 of 100

## Past Surgical History:

Gallbladder surgery 5/2000, hernia repair, cyst removal, laparoscopy.

## Social History:

She is a smoker starting at age 15, 1-2 packs per day. She denied any alcohol or significant drug history.

She reported that she now living with her family in Missouri, and that she feels much better there. In this current home there are no known environmental problems.

## Physical Examination:

Blood pressure: 120/90 mmHg. Respiratory rate 12/min. Temperature 99.8 T. Height: 5'5". Weight: 131 pounds. Her peak flow was 400 ml. She was coughing during the exam.

Examination of head, ears, nose, throat, chest, abdomen, lungs, and extremities was overall unremarkable. She had problems with line walking and imbalance.

## Laboratory Tests:

No reaction to specific IgE and IgG fungal allergens.

Pulmonary function test was not done. Chest x-ray was negative.

Immunological test which included IgG subclasses and lymphocyte enumeration test and function test showed a higher than normal CD4/CD8 ratio and B-lymphocyte cell counts/percentage. The remainder of the testing was normal. These findings are non-specific, but typical after intense fungal exposure.

I reviewed medical records provided to me by various providers. These records did not produce any additional information.

The environmental investigation and report by Mr. R. Pfromm indicated the presence of moisture related fungi and defects inside the house, in particular in the basement. Fungi included species of *Aspergillus, Penicillium and Stachybotrys*, that were higher inside the house than outside (control). Photos were also provided confirming visible contamination.

## Conclusion:

Based on recent findings, I conclude that Mrs. Marrone had an respiratory reaction after intense exposure to mold and mildew in her previous home. She has been diagnosed in addition to her previous medical conditions with upper and lower airway inflammation and irritation effects (Rhinosinusitis, bronchitis). With a reasonable degree of medical

certainty I believe these were the results of the exposure in the described contaminated house. She has been advised that in the future she should avoid any of these moldy indoor exposures and stop smoking. Provided that she has no further exposure to the fungi, she should be reasonably well related to this condition.

Sincerely,

Eckardt Johanning, M.D., MSc.
Diplomate of American Board of Preventive Medicine
(Occupational and Environmental Medicine)
Diplomate of American Board of Family Medicine

# EXHIBIT "H"

# Eckardt Johanning, M.D., M.Sc.

## Occupational and Environmental Life Science -
## Fungal Research Group, Inc. (FRG)

650 Warren Street - Medical Arts Building
Albany, N.Y. 12208 U.S.A.
518-459-3336 • fax - 4646
www.fungalresearchgroup.com

<u>Offices:</u>
Albany,
New York City
Frankfurt/Main, FRG

October 21, 2002

RE:                     Matthew Marrone
                        11673 Highway PT
                        Dixon, MO 65459
**Date of Birth**        7/29/82

I reviewed again the visit of Matthew Marrone from January 17, 2002. This is a summary of the findings. I reviewed also the environmental findings, including the Advanced Applied Science report from October, 15, 2000.

Matthew Marrone, age 19,  is a biology undergraduate student with no prior significant medical history. He reported that after moving into the house on 354 Timber Rd, Mount Gretna, Pa, in August of 1999 he developed shortness of breath, chest tightness, eye irritation, skin lesions under his axillae, excessive fatigue, nasal problems and significant memory loss. After leaving the house he had some improvement. At the time of the visit he was particularly bothered by joint pain in knees, memory problems and fatigue.

<u>Medications:</u>

None.

<u>Past Medical History</u>:

Benign. He denied any other significant abnormalities.

<u>Past Surgical History:</u>

*"is a member of"*    AMERICAN COLLEGE OF OCCUPATIONAL AND ENVIRONMENTAL MEDICINE

## Social History:

He denied any smoking, alcohol or drug abuse history.

## Physical Examination:

Blood pressure: 110/70 mmHg. Respiratory rate 12/min. Temperature normal Height: 5'10". Weight: 163 pounds. His peak flow was found at 450ml.

Examination of head, ears, nose, throat, chest, abdomen, lungs, and extremities was overall unremarkable.

## Environmental Exposure:

The environmental investigation and report by Mr. R. Pfromm indicated the presence of moisture related fungi and defects inside the house, in particular in the basement. Fungi included species of *Aspergillus, Penicillium and Stachybotrys,* that were higher inside the house than outside (control). Photos were also provided confirming visible contamination.

## Conclusion:

Mr. Matthew Marrone had a variety of health complaints including respiratory reactions that are in time and place associated with exposure to mold and mildew in his previous home. He has been advised that in the future he should avoid any of these fungal indoor exposures and related problems. He has been discharged for care and follow up by his local physicians. Provided that he has no further exposure to the fungi, he should be reasonably well.

Sincerely,

Eckardt Johanning, M.D., MSc.
Diplomate of American Board of Preventive Medicine
(Occupational and Environmental Medicine)
Diplomate of American Board of Family Medicine

# EXHIBIT "I"

# Eckardt Johanning, M.D., M.Sc.

## Occupational and Environmental Life Science - Fungal Research Group, Inc. (FRG)

650 Warren Street - Medical Arts Building
Albany, N.Y. 12208 U.S.A.
518-459-3336 • fax - 4646
www.fungalresearchgroup.com

Offices:
Albany,
New York City
Frankfurt/Main, FRG

October 21, 2002

RE:         Vida A. Marrone
            11673 Highway PT
            Dixon, MO 65459
Date of Birth    5/5/84

I reviewed again the visit of Ms. Vida A. Marrone from January 17, 2002. She came accompanied by her parents, who also were examined that day. This is a summary of the findings. I reviewed all provided outside medical reports and environmental findings, including the Advanced Applied Science report from October, 15, 2000.

Ms. Vida Marrone, age 17 years, is a student who works part time as a waitress. She reported that after moving into the house on 354 Timber Rd, Mount Gretna, Pa, she developed a variety of problems including coughing, sore throat, fatigue, skin irritation, headaches and nasal problems. Away from the house (such as her friends' houses) she generally would feel much better. She had been diagnosed by an emergency room doctor with sinusitis and bronchitis.

She left with her family the house on October 14, 2001 secondary to health concerns and findings of mold and moisture problems. Since leaving this house, she also felt much better.

## Medications:

None.

## Past Medical History:

MVA 2/01 related low back pain.

## Past Surgical History:

None

 

*"is a member of"*   AMERICAN COLLEGE OF
OCCUPATIONAL AND
ENVIRONMENTAL MEDICINE

Case 1:01-cv-00773-YK   Document 157   Filed 05/16/2003   Page 85 of 100

## Social History:

She is a "very light" smoker (1-5 cigg./day). She denied any alcohol or significant drug history.

She reported that she is now living with her parents in Missouri, and that she feels much better there. In this current home there are no known environmental problems.

## Physical Examination:

Blood pressure: 100/60 mmHg. Respiratory rate 12/min. Temperature 98 T. Height: 5'5". Weight: 138 pounds. Her peak flow was 550 ml.

Examination of head, ears, nose, throat, chest, abdomen, lungs, and extremities was overall unremarkable.

## Laboratory Tests:

No reaction to specific IgE and IgG fungal allergens. There was a very minimal IgA elevation to *Stachybotrys* specific IgA.

Pulmonary function test and Chest x-ray were not done.

Immunological test which included IgG subclasses and lymphocyte enumeration test and function test showed a higher than normal T and B-lymphocyte cell counts/percentage. The remainder of the testing was normal. These findings are non-specific, but typical after intense fungal exposure and some immune reactivity. Follow up repeat evaluation have been recommended.

I reviewed medical records provided to me by various providers. These records did not produce any additional information.

The environmental investigation and report by Mr. R. Pfromm indicated the presence of moisture related fungi and defects inside the house, in particular in the basement. Fungi included species of *Aspergillus, Penicillium and Stachybotrys*, that were higher inside the house than outside (control). Photos were also provided confirming visible contamination.

## Conclusion:

Based on recent findings, I conclude that Ms. Vida Marrone had also a typical acute respiratory reaction after intense exposure to mold and mildew in her previous home. She has been diagnosed with upper and lower acute airway inflammation and irritation effects (Rhinosinusitis, bronchitis). With a reasonable degree of medical certainty I believe these were the results of the exposure in the described contaminated house. She has been advised that in the future she should avoid any of these moldy indoor exposures and stop

smoking. Provided that she has no further exposure to the fungi, she should be reasonably well related to this condition.


Sincerely,



Eckardt Johanning, M.D., MSc.
Diplomate of American Board of Preventive Medicine
(Occupational and Environmental Medicine)
Diplomate of American Board of Family Medicine

# EXHIBIT "J"

OCCUPATIONAL & ENVIRONMENTAL
HEALTH SCIENCE
ECKARDT JOHANNING, M.D., M.SC.
MEDICAL ARTS BUILDING
650 WARREN STREET
ALBANY, NY 12208

DEA # BJ 1914363
LIC. # 175278-1

NAME _Barbara Marrone_ AGE ____

ADDRESS _____ DATE 7/22/02

R̸

☑ SPECIALTY LAB PANEL

☐ HBT - LAB PANEL

THIS PRESCRIPTION WILL BE FILLED GENERICALLY
UNLESS PRESCRIBER WRITES 'd & w' IN THE BOX BELOW

Refill _____ times

NR ____ Label ____

Dispense As Written

1AGP1426198

OCCUPATIONAL & ENVIRONMENTAL
HEALTH SCIENCE
**ECKARDT JOHANNING, M.D., M.SC.**
MEDICAL ARTS BUILDING
650 WARREN STREET
ALBANY, NY 12208

DEA # BJ 1814383
LIC. # 175278-1

NAME _____ AGE _____

ADDRESS _____ DATE 2/22/07

℞

☑ PULMONARY FUNCTION TEST
WITH PRE / POST BRONCHODILATOR
AND DIFFUSION

☑ CHEST X-RAY PA / LAT

THIS PRESCRIPTION WILL BE FILLED GENERICALLY
UNLESS PRESCRIBER WRITES 'd a w' IN THE BOX BELOW

Refill _____ times

NR ____ Label ____

Dispense As Written

: 1AGP1426198

Case 1:01-cv-00773-YK   Document 157   Filed 05/16/2003   Page 90 of 100

OCCUPATIONAL & ENVIRONMENTAL
HEALTH SCIENCE
ECKARDT JOHANNING, M.D., M.SC.
MEDICAL ARTS BUILDING
650 WARREN STREET
ALBANY, NY 12208

DEA # BJ 1914363
LIC. # 175278-1

NAME _____ AGE _____

ADDRESS _____ DATE 2/22/02

℞

☑ SPECIALTY LAB PANEL

☑ IBT - LAB PANEL

THIS PRESCRIPTION WILL BE FILLED GENERICALLY
UNLESS PRESCRIBER WRITES 'd a w' IN THE BOX BELOW

Refill _____ times

NR _____ Label _____

Dispense As Written

1AGP1426198

OCCUPATIONAL & ENVIRONMENTAL
HEALTH SCIENCE
ECKARDT JOHANNING, M.D., M.SC.
MEDICAL ARTS BUILDING
850 WARREN STREET
ALBANY, NY 12208

DEA # BJ 1914363
LIC. # 175278-1

NAME _____  AGE _____

ADDRESS _____  DATE 7/22/02

R⯑

☑ PULMONARY FUNCTION TEST
WITH PRE / POST BRONCHODILATOR
AND DIFFUSION

☑ CHEST X-RAY PA / LAT

THIS PRESCRIPTION WILL BE FILLED GENERICALLY
UNLESS PRESCRIBER WRITES 'd a w' IN THE BOX BELOW

Refill _____ times

NR _____ Label _____

Dispense As Written

1AGP1426198

# LABORATORY REPORT

**IBT REFERENCE LABORATORY**

Specializing in Allergy and Clinical Immunology

10453 West 84th Terrace
Lenexa, Kansas 66214
(913) 492-2224    (800) 637-0370
CLIA #17D0448989    Medicare #17L0008078

1978
Eckardt Johanning, M.D.,M.Sc.

Fungal Research Group, Inc.
650 Warren St.
Albany, NY  12208

PATIENT: **MARRONE, JACK**

I.D.#: **099346381**          ACC#: **258171**

D/O/B: **02/22/1946** AGE: **56y** SEX: **Male**

SPECIMEN DATE:  **01/25/2002**

DATE RECEIVED:  **08/28/2002**

DATE OF REPORT: **08/30/2002**
                **15:59**

| ALLERGEN SPECIFIC IgE | kU/L | CLASS NORMAL | ELEVATED |
|---|---|---|---|
| ASPERGILLUS FUMIGATUS | < 0.10 | 0 | |
| CLADOSPORIUM/HORMODENDRUM | < 0.10 | 0 | |
| PENICILLIUM NOTATUM/CHRYSOGENM | < 0.10 | 0 | |
| CHAETOMIUM GLOBOSUM^ | < 0.10 | 0 | |
| MOUSE SERUM PROTEINS | < 0.10 | 0 | |
| RAT SERUM PROTEINS | < 0.10 | 0 | |
| PIGEON DROPPINGS | < 0.10 | 0 | |
| GERMAN COCKROACH (B germanica) | < 0.10 | 0 | |

| The test method is the Pharmacia & Upjohn | IgE CONC (kU/L) | CLASS | INTERPRETATION |
|---|---|---|---|
| ImmunoCAP allergen-specific IgE system. | <0.10 | 0 | Negative |
| When the symbol(^) is next to an allergen | 0.10 - 0.34 | 0/1 | Equivocal/Borderline |
| it indicates that the test was developed | 0.35 - 0.69 | 1 | Low Positive |
| and its performance characteristics deter- | 0.70 - 3.4 | 2 | Moderate Positive |
| mined by IBT Reference Laboratory. It has | 3.5 - 17.4 | 3 | High Positive |
| not been cleared or approved by the FDA. | 17.5 - 49.9 | 4 | Very High Positive |
| | 50.0 - 99.9 | 5 | " " " |
| | >100 | 6 | " " " |

| HYPERSENSITIVITY PNEUMONITIS IgG | MCG/ML | REFERENCE RANGE |
|---|---|---|
| Micropolyspora faeni | 8* | <  7 |
| Thermoactinomyces spp. | 6 | <  9 |
| Alternaria alternata | 24 | <  43 |
| Aspergillus fumigatus | 87* | <  29 |
| Aureobasidium pullulans | 197* | <  108 |
| Penicillium notatum | 178* | <  88 |
| Phoma herbarum | 23 | <  32 |
| Trichoderma viride | 175* | <  33 |

-- See Graph on Next Page --

SEP 0 4 2002

\* **Abnormal Result**

ALL SPECIMENS ARE SAVED THREE
MONTHS FOR FOLLOW-UP TESTING          \* **CONTINUED** \*

JOHN F. HALSEY, Ph.D.
**LABORATORY DIRECTOR**

# LABORATORY REPORT

**IBT REFERENCE LABORATORY**
Specializing in Allergy and Clinical Immunology

10453 West 84th Terrace
Lenexa, Kansas 66214
(913) 492-2224    (800) 637-0370
CLIA #17D0448969    Medicare #17L0008078

1978
Eckardt Johanning, M.D.,M.Sc.

Fungal Research Group, Inc.
650 Warren St.
Albany, NY 12208

**PATIENT:** MARRONE, JACK

**I.D.#:** 099346381          **ACC#:** 258171

**D/O/B:** 02/22/1946 **AGE:** 56y **SEX:** Male

**SPECIMEN DATE:** 01/25/2002

**DATE RECEIVED:** 08/28/2002

**DATE OF REPORT:** 08/30/2002
15:59

| HYPERSENSITIVITY PNEUMONITIS IgG   MCG/ML | REFERENCE RANGE |
|---|---|



Hypersensitivity Pneumonitis

The characteristic serological finding in hypersensitivity pneumonitis (HP) is a
marked elevation of specific IgG, usually to more than one antigen. However, moderate
elevations in antibody level are sometimes observed in asymptomatic individuals
who have significant environmental exposure to one of these "organic dust" antigens.
This test was developed and its performance characteristics determined by IBT
Reference Lab. It has not been cleared or approved by the FDA. Lot#4472:020100.

| STACHYBOTRYS CHARTARUM SEROLOGY | RESULT | UNITS | REFERENCE RANGE |
|---|---|---|---|
| STACHYBOTRYS IgE | < 0.10 | KU/L | < 0.35 |
| STACHYBOTRYS IgG | 30.1* | MG/L | < 20.4 |

**\* Abnormal Result**

Case 1:01-cv-00773-YK   Document 157   Filed 05/16/2003   Page 94 of 100

# LABORATORY REPORT

**IBT REFERENCE LABORATORY**

Specializing in Allergy and Clinical Immunology

10453 West 84th Terrace
Lenexa, Kansas 66214
(913) 492-2224   (800) 637-0370
CLIA #17D0448989   Medicare #17L0008078

1978
Eckardt Johanning, M.D.,M.Sc.

Fungal Research Group, Inc.
650 Warren St.
Albany, NY  12208

PATIENT: **MARRONE, JACK**

I.D.#: 099346381          ACC#: **258171**

D/O/B: **02/22/1946** AGE: **56y** SEX: **Male**

SPECIMEN DATE:   01/25/2002

DATE RECEIVED:   08/28/2002

DATE OF REPORT: 08/30/2002
15:59

| STACHYBOTRYS CHARTARUM SEROLOGY | RESULT | UNITS | REFERENCE RANGE |
|---|---|---|---|
| STACHYBOTRYS IgA | 3.83* | MG/L | < 1.00 |

Stachybotrys chartarum is a mold that has been implicated in a variety of illnesses associated with water damaged buildings.

These tests were developed and their performance characteristics determined by IBT Reference Lab. They have not been cleared or approved by the FDA.

IgE:  The specific IgE is generally used to confirm a diagnosis of Type I allergy to this mold.

IgG and IgA:  In those patients who have the symptoms and physical findings of hypersensitivity pneumonitis, the presence of elevated IgG and IgA responses to a mold can be used to support the diagnosis of HP. In the absence of these clinical findings, the IgG and IgA antibody responses only indicate prior exposure and immunological sensitization to antigens from S. chartarum or to cross-reacting antigens from immunochemically-related fungi. An elevated IgA response is expected to correlate with a recent exposure to antigens from this mold since the persistence of the IgA isotype is generally of shorter duration than IgG.

Case 1:01-cv-00773-YK   Document 157   Filed 09/16/2003   Page 95 of 100

# LABORATORY REPORT

**IBT REFERENCE LABORATORY**

Specializing in Allergy and Clinical Immunology

10453 West 84th Terrace
Lenexa, Kansas 66214
(913) 492-2224    (800) 637-0370
CLIA #17D0448989    Medicare #17L0008078

PATIENT: **MARRONE, KAREN**

I.D.#: **171440593**        ACC#: **258173**

D/O/B: **12/22/1956** AGE: **45y** SEX: **Female**

SPECIMEN DATE:  **01/25/2002**

1978
Eckardt Johanning, M.D.,M.Sc.

DATE RECEIVED:  **08/28/2002**

Fungal Research Group, Inc.
650 Warren St.
Albany, NY  12208

DATE OF REPORT: **09/03/2002**
**15:43**

|  |  | CLASS | |
| --- | --- | --- | --- |
| **ALLERGEN SPECIFIC IgE** | **kU/L** | **NORMAL** | **ELEVATED** |
| ASPERGILLUS FUMIGATUS | < 0.10 | 0 | |
| CLADOSPORIUM/HORMODENDRUM | < 0.10 | 0 | |
| PENICILLIUM NOTATUM/CHRYSOGENM | < 0.10 | 0 | |
| CHAETOMIUM GLOBOSUM^ | < 0.10 | 0 | |
| MOUSE SERUM PROTEINS | < 0.10 | 0 | |
| RAT SERUM PROTEINS | < 0.10 | 0 | |
| PIGEON DROPPINGS | < 0.10 | 0 | |
| GERMAN COCKROACH (B germanica) | < 0.10 | 0 | |

| | IgE CONC (kU/L) | CLASS | INTERPRETATION |
| --- | --- | --- | --- |
| The test method is the Pharmacia & Upjohn | <0.10 | 0 | Negative |
| ImmunoCAP allergen-specific IgE system. | 0.10 - 0.34 | 0/1 | Equivocal/Borderline |
| When the symbol(^) is next to an allergen | 0.35 - 0.69 | 1 | Low Positive |
| it indicates that the test was developed | 0.70 - 3.4 | 2 | Moderate Positive |
| and its performance characteristics deter- | 3.5 - 17.4 | 3 | High Positive |
| mined by IBT Reference Laboratory. It has | 17.5 - 49.9 | 4 | Very High Positive |
| not been cleared or approved by the FDA. | 50.0 - 99.9 | 5 | "    "    " |
| | >100 | 6 | "    "    " |

| **HYPERSENSITIVITY PNEUMONITIS IgG** | **MCG/ML** | **REFERENCE RANGE** |
| --- | --- | --- |
| Micropolyspora faeni | 5 | < 7 |
| Thermoactinomyces spp. | < 5 | < 9 |
| Alternaria alternata | 20 | < 43 |
| Aspergillus fumigatus | 11 | < 29 |
| Aureobasidium pullulans | 16 | < 108 |
| Penicillium notatum | 22 | < 88 |
| Phoma herbarum | 16 | < 32 |
| Trichoderma viride | 13 | < 33 |

-- See Graph on Next Page --

SEP 0 6 2002

ALL SPECIMENS ARE SAVED THREE
MONTHS FOR FOLLOW-UP TESTING

* CONTINUED *

JOHN F. HALSEY, Ph.D.
LABORATORY DIRECTOR

# LABORATORY REPORT

**IBT REFERENCE LABORATORY**

Specializing in Allergy and Clinical Immunology

10453 West 84th Terrace
Lenexa, Kansas 66214
(913) 492-2224    (800) 637-0370
CLIA #17D0448989    Medicare #17L0008078

1978
Eckardt Johanning, M.D.,M.Sc.

Fungal Research Group, Inc.
650 Warren St.
Albany, NY  12208

PATIENT: **MARRONE, KAREN**

I.D.#: **171440593**        ACC#: **258173**

D/O/B: **12/22/1956** AGE: **45y** SEX: **Female**

SPECIMEN DATE:  **01/25/2002**

DATE RECEIVED:  **08/28/2002**

DATE OF REPORT:  **09/03/2002**
**15:43**

| HYPERSENSITIVITY PNEUMONITIS IgG   MCG/ML | REFERENCE RANGE |
|---|---|



Hypersensitivity Pneumonitis

The characteristic serological finding in hypersensitivity pneumonitis (HP) is a
marked elevation of specific IgG, usually to more than one antigen. However, moderate
elevations in antibody level are sometimes observed in asymptomatic individuals
who have significant environmental exposure to one of these "organic dust" antigens.
This test was developed and its performance characteristics determined by IBT
Reference Lab. It has not been cleared or approved by the FDA. Lot#4472:020100.

| STACHYBOTRYS CHARTARUM SEROLOGY | RESULT | UNITS | REFERENCE RANGE |
|---|---|---|---|
| STACHYBOTRYS IgE | < 0.10 | KU/L | < 0.35 |
| STACHYBOTRYS IgG | 3.91 | MG/L | < 20.4 |

**\* Abnormal Result**

ALL SPECIMENS ARE SAVED THREE
MONTHS FOR FOLLOW-UP TESTING

**\* CONTINUED \***

JOHN F. HALSEY, Ph.D.
LABORATORY DIRECTOR

# LABORATORY REPORT

**IBT REFERENCE LABORATORY**

Specializing in Allergy and Clinical Immunology

10453 West 84th Terrace
Lenexa, Kansas 66214
(913) 492-2224     (800) 637-0370
CLIA #17D0448989     Medicare #17L0008078

1978
Eckardt Johanning, M.D.,M.Sc.

Fungal Research Group, Inc.
650 Warren St.
Albany, NY  12208

PATIENT: MARRONE, KAREN

I.D.#: 171440593          ACC#: 258173

D/O/B: 12/22/1956 AGE: 45y SEX: Female

SPECIMEN DATE:   01/25/2002

DATE RECEIVED:   08/28/2002

DATE OF REPORT: 09/03/2002
                        15:43

| STACHYBOTRYS CHARTARUM SEROLOGY | RESULT | UNITS | REFERENCE RANGE |
|---|---|---|---|
| STACHYBOTRYS IgA | 1.19* | MG/L | < 1.00 |

Stachybotrys chartarum is a mold that has been implicated in a variety of illnesses associated with water damaged buildings.

These tests were developed and their performance characteristics determined by IBT Reference Lab. They have not been cleared or approved by the FDA.

IgE:  The specific IgE is generally used to confirm a diagnosis of Type I allergy to this mold.

IgG and IgA:  In those patients who have the symptoms and physical findings of hypersensitivity pneumonitis, the presence of elevated IgG and IgA responses to a mold can be used to support the diagnosis of HP. In the absence of these clinical findings, the IgG and IgA antibody responses only indicate prior exposure and immunological sensitization to antigens from S. chartarum or to cross-reacting antigens from immunochemically-related fungi. An elevated IgA response is expected to correlate with a recent exposure to antigens from this mold since the persistence of the IgA isotype is generally of shorter duration than IgG.

ALL SPECIMENS ARE SAVED THREE
MONTHS FOR FOLLOW-UP TESTING

\* FINAL REPORT \*

JOHN F. HALSEY, Ph.D.
LABORATORY DIRECTOR

Case 1:01-cv-00773-YK   Document 157   Filed 05/16/2003   Page 98 of 100

# LABORATORY REPORT

**IBT REFERENCE LABORATORY**

Specializing In Allergy and Clinical Immunology

10463 West 84th Terrace
Lenexa, Kansas 66214
(913) 492-2224    (800) 637-0370
CLIA #17D0448989    Medicare #17L0008078

1978
Eckardt Johanning, M.D.,M.Sc.

Fungal Research Group, Inc.
650 Warren St.
Albany, NY  12208

PATIENT: **MARRONE, VIDA**

I.D.#: 193645277        ACC#: 258170

D/O/B: 05/05/1986 AGE: **16y** SEX: **Female**

SPECIMEN DATE:   01/29/2002

DATE RECEIVED:   08/28/2002

DATE OF REPORT: 08/30/2002
                          15:59

|  |  | CLASS | |
|---|---|---|---|
| **ALLERGEN SPECIFIC IgE** | **kU/L** | **NORMAL** | **ELEVATED** |
| ASPERGILLUS FUMIGATUS | < 0.10 | 0 | |
| CLADOSPORIUM/HORMODENDRUM | < 0.10 | 0 | |
| PENICILLIUM NOTATUM/CHRYSOGENM | < 0.10 | 0 | |
| CHAETOMIUM GLOBOSUM^ | < 0.10 | 0 | |
| MOUSE SERUM PROTEINS | < 0.10 | 0 | |
| RAT SERUM PROTEINS | < 0.10 | 0 | |
| PIGEON DROPPINGS | < 0.10 | 0 | |
| GERMAN COCKROACH (B germanica) | < 0.10 | 0 | |

| The test method is the Pharmacia & Upjohn | IgE CONC (kU/L) | CLASS | INTERPRETATION |
|---|---|---|---|
| ImmunoCAP allergen-specific IgE system. | <0.10 | 0 | Negative |
| When the symbol(^) is next to an allergen | 0.10 - 0.34 | 0/1 | Equivocal/Borderline |
| it indicates that the test was developed | 0.35 - 0.69 | 1 | Low Positive |
| and its performance characteristics deter- | 0.70 - 3.4 | 2 | Moderate Positive |
| mined by IBT Reference Laboratory. It has | 3.5 - 17.4 | 3 | High Positive |
| not been cleared or approved by the FDA. | 17.5 - 49.9 | 4 | Very High Positive |
|  | 50.0 - 99.9 | 5 | " " " |
|  | >100 | 6 | " " " |

| **HYPERSENSITIVITY PNEUMONITIS IgG** | **MCG/ML** | **REFERENCE RANGE** |
|---|---|---|
| Micropolyspora faeni | < 5 | < 7 |
| Thermoactinomyces spp. | < 5 | < 9 |
| Alternaria alternata | 23 | < 43 |
| Aspergillus fumigatus | 5 | < 29 |
| Aureobasidium pullulans | 20 | < 108 |
| Penicillium notatum | 15 | < 88 |
| Phoma herbarum | 10 | < 32 |
| Trichoderma viride | 6 | < 33 |

-- See Graph on Next Page --

SEP 0 4 2002

ALL SPECIMENS ARE SAVED THREE
MONTHS FOR FOLLOW-UP TESTING            * CONTINUED *                JOHN F. HALSEY, Ph.D.
                                                                    LABORATORY DIRECTOR

# LABORATORY REPORT

**IBT REFERENCE LABORATORY**

Specializing in Allergy and Clinical Immunology

10453 West 84th Terrace
Lenexa, Kansas 66214
(913) 492-2224    (800) 637-0370
CLIA #17D0448989    Medicare #17L0008078

1978
Eckardt Johanning, M.D., M.Sc.

Fungal Research Group, Inc.
650 Warren St.
Albany, NY  12208

PATIENT: MARRONE, VIDA

I.D.#: 193645277        ACC#: 258170

D/O/B: 05/05/1986 AGE: 16y SEX: **Female**

SPECIMEN DATE:   01/29/2002

DATE RECEIVED:   08/28/2002

DATE OF REPORT: 08/30/2002
                15:59

---

| HYPERSENSITIVITY PNEUMONITIS IgG   MCG/ML | REFERENCE RANGE |
|---|---|

### Hypersensitivity Pneumonitis



The characteristic serological finding in hypersensitivity pneumonitis (HP) is a
marked elevation of specific IgG, usually to more than one antigen.  However, moderate
elevations in antibody level are sometimes observed in asymptomatic individuals
who have significant environmental exposure to one of these "organic dust" antigens.
This test was developed and its performance characteristics determined by IBT
Reference Lab. It has not been cleared or approved by the FDA. Lot#4472:020100.

| STACHYBOTRYS CHARTARUM SEROLOGY | RESULT | UNITS | REFERENCE RANGE |
|---|---|---|---|
| STACHYBOTRYS IgE | < 0.10 | KU/L | < 0.35 |
| STACHYBOTRYS IgG | 2.19 | MG/L | < 20.4 |

\* **Abnormal Result**

# LABORATORY REPORT

**IBT REFERENCE LABORATORY**

Specializing in Allergy and Clinical Immunology

10453 West 84th Terrace
Lenexa, Kansas 66214
(913) 492-2224    (800) 637-0370
CLIA #17D0448989    Medicare #17L0008078

1978
Eckardt Johanning, M.D.,M.Sc.

Fungal Research Group, Inc.
650 Warren St.
Albany, NY  12208

PATIENT: **MARRONE, VIDA**

I.D.#: 193645277        ACC#: 258170

D/O/B: 05/05/1986 AGE: 16y SEX: **Female**

SPECIMEN DATE:  01/29/2002

DATE RECEIVED:  08/28/2002

DATE OF REPORT: 08/30/2002
15:59

| STACHYBOTRYS CHARTARUM SEROLOGY | RESULT | UNITS | REFERENCE RANGE |
|---|---|---|---|
| STACHYBOTRYS IgA | 1.30* | MG/L | < 1.00 |

Stachybotrys chartarum is a mold that has been implicated in a variety of illnesses associated with water damaged buildings.

These tests were developed and their performance characteristics determined by IBT Reference Lab. They have not been cleared or approved by the FDA.

IgE:  The specific IgE is generally used to confirm a diagnosis of Type I allergy to this mold.

IgG and IgA:  In those patients who have the symptoms and physical findings of hypersensitivity pneumonitis, the presence of elevated IgG and IgA responses to a mold can be used to support the diagnosis of HP. In the absence of these clinical findings, the IgG and IgA antibody responses only indicate prior exposure and immunological sensitization to antigens from S. chartarum or to cross-reacting antigens from immunochemically-related fungi. An elevated IgA response is expected to correlate with a recent exposure to antigens from this mold since the persistence of the IgA isotype is generally of shorter duration than IgG.

ALL SPECIMENS ARE SAVED THREE
MONTHS FOR FOLLOW-UP TESTING

\* FINAL REPORT \*

JOHN F. HALSEY, Ph.D.
LABORATORY DIRECTOR