*100α*

# ORIGINAL

**FILED**
HARRISBURG, PA

MAY 1 6 2003

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JACK MARRONE, KAREN MARRONE, :
both individually and in their capacity as :
parents and guardians for :  CIVIL ACTION - LAW
VIDA MARRONE, a minor, and :
MATTHEW MARRONE :
          Plaintiffs :
 :
        v. :  CASE NO.: 1:CV-01-0773
 :
 :  JURY TRIAL DEMANDED
ALLSTATE INSURANCE COMPANY, :
LINDA M. EDLEMAN, FRED SCHAFER, :
MT. GRETNA REALTY, and :  (JUDGE KANE)
HOUSEMASTER :
          Defendants :

## <u>APPENDIX IN SUPPORT OF DEFENDANT</u>
## <u>HOUSEMASTER'S RENEWED MOTION FOR SUMMARY JUDGMENT</u>

James J. Kutz, Esquire
Attorney ID No. 21589
Jennifer L. Murphy, Esquire
Attorney ID No. 76432
DUANE MORRIS LLP
305 North Front Street, 5th Floor
P.O. Box 1003
Harrisburg, PA 17108-1003
717-237-5500

Attorneys for Defendant HouseMaster

Date: May 16, 2003

HBG\114734.1

# TABLE OF CONTENTS

| Description of Documents | Tab |
|---|---|
| Plaintiff's Amended Complaint | A |
| HouseMaster's Answer and Affirmatiave Defenses to Plaintiffs' Amended Complaint | B |
| Excerpts from Deposition of Jack Marrone | C |
| Excerpts from Deposition of Karen Marrone | D |
| Excerpts from Deposition of Mathew Marrone | E |
| Excerpts from Deposition of Vida Marrone | F |
| Excerpts from Deposition of Chuck Berthoud | G |
| Excerpts from Deposition of Larry Miller | H |
| Inspection Order Agreement | I |
| HouseMaster's Express Report | J |
| Reports of Robert A. Pfromm, CIH, Dated 10/15/00 and 09/12/02 | K |
| Report of Tom Moore | L |
| Michael G. Holland, M.D.'s Report on Jack Marrone | M |
| Michael G. Holland, M.D.'s Report on Karen Marrone | N |
| Michael G. Holland, M.D.'s Report on Matthew Marrone | O |
| Michael G. Holland, M.D.'s Report on Vida Marrone | P |
| Eckardt Johanning, M.D.'s Report on Jack Marrone | Q |

HBG\114734.1

Eckardt Johanning, M.D.'s Report on Karen Marrone          R

Eckardt Johanning, M.D.'s Report on Matthew Marrone       S

Eckardt Johanning, M.D.'s Report on Vida Marrone          T

# EXHIBIT "A"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACK MARRONE, husband, KAREN MARRONE, wife, both individually and in their capacity as parents and guardians for VIDA MARRONE, a minor, and MATTHEW ADAM MARRONE, | : : : : : : | Civil Action No.   1:  RECEIVED SCRANTON |
| Plaintiffs | : | NOV - 2 2001 |
| vs. | : : | PER _____ |
| | : | DEPUTY CLERK |
| ALLSTATE INSURANCE COMPANY, LINDA M. EDLEMAN, FRED SCHAFER, MT. GRETNA REALTY, and HOUSE MASTERS | : : : : | JURY TRIAL DEMANDED |
| Defendants | : | |

### AMENDED COMPLAINT

AND NOW COMES, the Plaintiffs, by and through their counsel, Stevens & Johnson, and for their Complaint states and alleges the following:

### JURISDICTION

1.      Plaintiffs seek jurisdiction of this Court under Diversity of Citizenship pursuant to 28 U.S.C. § 1332.  Plaintiffs are citizens of the State of Missouri.  Defendant Allstate Insurance Company, is duly incorporated in the State of Delaware, with its corporate headquarters located in

Illinois. Defendant Linda M. Edleman is a citizen of Pennsylvania, Defendant, Mt. Gretna Realty

is located in Pennsylvania, Defendant Housemasters is an independently owned franchise located

in Pennsylvania.   The matter in controversy exceeds, exclusive of interests and costs, the sum

specified by 28 U.S.C. § 1332.

## PARTIES

2.      Plaintiffs, Jack Marrone and Karen Marrone, are both adults, who are husband and

wife, and reside at 11673 Highway PP, Dixon, Missouri.   They are the natural guardians of Vida

Marrone, their daughter.

3.      . Plaintiff, Vida Marrone, is a sixteen (16) year old minor, and daughter of Jack and

Karen Marrone and resides with her parents at 11673 Highway PP, Dixon, Missouri.

4.      Plaintiff, Matthew Adam Marrone, is an adult residing at 308 Sherman Avenue,

Lebanon, Missouri.

5.      Defendant, Allstate Insurance Company is a corporation, duly incorporated in the

State of Delaware, with its corporate headquarters located at Allstate Plaza, 2775 Sanders Road,

Northbrook, Illinois.

6.      Defendant, Linda M. Edleman, is an adult woman residing at 82 Norway Lane,

Lebanon, Lebanon County, Pennsylvania.

7.      Defendant, Fred Schafer, was Defendant Edleman's real estate agent and is located

at 83 Columbia Avenue, Mt. Gretna, Lebanon County, Pennsylvania.

8.      Defendant, Mt. Gretna Realty, is located at 83 Columbia Avenue, Mt. Gretna,

Lebanon County, Pennsylvania.

2

9.     Defendant, HouseMasters, is an independently owned franchise, located at 203, West Caracas Avenue, Hershey, Dauphin County, Pennsylvania.

10.    At all relative times hereto, Defendants Allstate, Mt. Gretna Realty, and HouseMasters, were acting through their respective agents, servants, employees, and ostensible agents who were acting within the course and scope of their employment with the above listed Defendants and under the exclusive control of said Defendants.

## BACKGROUND

11.    On or about June of 1999, the Plaintiffs came to Pennsylvania to look for a home.

12.    On or about July of 1999, the Plaintiffs found the home at issue, located at 354 Kimber Road, Mt. Gretna, Lebanon County, Pennsylvania, owned at that time by Defendant Linda M. Edleman.

13.    Mt. Gretna Realty, at all relevant times, acted as the agent of the seller, Linda M. Edleman, in the sale of the property at issue, and as such knew, or should have known, due to previous experience in the sale of homes in the neighborhood, of the potential for water/dampness and mold problems with the house at issue.

14.    On or about July 30, 1999, the Plaintiffs hired Defendant HouseMasters, to inspect said home, who did so through their agent, servant, employee, or ostensible agent.

15.    Said inspection was for any problems associated with the purchase of a dwelling.

16.    Said inspection noted water stains in the basement and without further inspection HouseMasters recommended to "slope soil away from house; keep down spouts clean and flowing, or consider extending spouts onto surface."

3

17.     Plaintiffs, relying on said report, complied fully with said recommendation.

18.     Defendant Allstate issued an insurance policy covering the property at issue which became effective August 25, 1999.

19.     Prior to completing the purchase, Defendant Edleman, pursuant to 68 P.S. §1024, provided a Seller's Property Disclosure Statement specifically denying any basement dampness/water problems or leakage problems.

20.     On or about August 31, 1999, Plaintiffs completed the purchase of said home and the Plaintiffs immediately took possession and occupied said property relying on the representations of all of the Defendants except Defendant Allstate.

21.     All of the contracts referred to in this suit have in addition to the other terms, the implied covenant of "good faith."

22.     On or about July of 2000, the Plaintiffs went away on vacation, and returned one (1) week later to find the basement covered in mold.  Said mold covered the walls, ceiling, floor, and furniture.  This was the first time that the Plaintiffs had any notice of this problem.

23.     Plaintiffs immediately contacted Defendant Allstate and filed an insurance claim.

24.     Defendant Allstate's agent, servant, employee, or ostensible agent, at all times acting in the course and scope of his employment, performed only a cursory and superficial inspection, and in a letter dated August 10, 2000, denied coverage claiming said damage was the result of a "preexisting condition" and therefore not covered by Plaintiffs' policy.

25.     The cause of the "so called" preexisting condition was not stated.

26.     There was also no statement that Plaintiffs should have somehow been aware of the

4

condition.

27.    Despite Defendant Allstate's involvement in similar litigation concerning the health hazards posed by mold, at no time did Defendant Allstate, or its agents, servants, employees, or ostensible agents, who now had actual knowledge of the mold problem, inform or otherwise make known to the Plaintiffs the possibility of potential health problems related to the growth of mold, or other organic toxins.

28.    Plaintiffs, being unaware of the potential catastrophic dangers created by mold remained in the home.

29.    As between Plaintiffs and Defendant Allstate, an unknown condition, does not meet the test of a preexisting condition; or in the alternative, the test for preexisting condition in this policy is either ambiguous or unenforceable.

30.    On or about August 28, 2000, the Plaintiffs had their home inspected by Advanced Applied Sciences, Inc., whose corporate headquarters is located at 4400 Linglestown Road, Harrisburg, Pennsylvania.

31.    Said inspection consisted of a bioaerosol survey.

32.    On or about September 29, 2000, as a result of a telephone conversation with Advanced Applied Sciences, Inc., the Plaintiffs learned the results of the aforementioned testing.

33.    Plaintiffs learned that there was a finding of "fungal contaminations in the house" consisting of, but not limited to, Aspergillus, Stachybotrys, Penicillium, Alternaria, Chrysosporium, Epicoccum, and Cladosporium, said inspection also revealed a relative humidity level in    the basement 21% higher than that found outside the house.

5

34.     Having learned that the toxic levels in the house were unsafe, the Plaintiffs, as a result, were forced to vacate the premises.

35.     As a direct and proximate result of exposure to said fungal toxins, Plaintiff, Jack Marrone has suffered and will continue to suffer from among other things:

(a)     memory loss

(b)     mood swings

(c)     depression

(d)     severe fatigue

(e)     sexual dysfunction

36.     As a direct and proximate result of exposure to said fungal toxins, Plaintiff, Karen Marrone has suffered and will continue to suffer from among other things:

(a)     hair loss

(b)     abdominal cramping

(c)     diarrhea

(d)     sinusitis

(e)     phlegm and coughing

(f)     fever

(g)     dry and itching skin

(h)     loss of concentration

(i)     loss of cognitive functions

(j)     severe fatigue

(k)     severe loss of voice

37.     As a direct and proximate result of exposure to said fungal toxins, Plaintiff, Vida Marrone has suffered and will continue to suffer from among other things:

(a)     hair loss

(b)     sinusitis

(c)     continuous headaches

(d)     diarrhea

(e)     cramping

(f)     severe fatigue

38.     As a direct and proximate result of exposure to said fungal toxins, Plaintiff, Matthew Adam Marrone has suffered and may continue to suffer from among other things:

(a)     severe fatigue

(b)     loss of concentration

(c)     memory loss

39.     As a direct and proximate result of exposure to said fungal toxins, the Plaintiffs have suffered and will continue to suffer embarrassment, humiliation, and psychological trauma.

40.     As a direct and proximate result of said fungal toxins, the Plaintiffs have suffered financial damages, including but not limited to, the economic loss of their home.

41.     To this date, the house at 354 Kimber Road is still standing, vacant and unsalable.

42.     At all times material hereto, the Plaintiffs have met all of their obligations acquired under all contracts mentioned below.

43.    Plaintiffs now bring this action for damages caused by the Defendants bad faith, breach of contract, misrepresentations, negligence, and violations of statutes.

## COUNT I

### PLAINTIFFS v. ALLSTATE INSURANCE COMPANY
### BAD FAITH

44.    The Plaintiffs hereby incorporate paragraphs 1 through 43 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

45.    Defendant Allstate Insurance Company failed to handle the Plaintiffs' claims in a reasonable manner by failing to perform a complete and detailed investigation as to the cause of said fungal toxins.

46.    Defendant Allstate Insurance Company violated the provisions of 42 Pa. C.S.A. §8371; the Unfair Insurance Practices Act, 40 P.S. § 1171.1 et al., and the Unfair Claims Settlement Practices, Title 31, Subsection 146.1 et al.

47.    An action for bad faith may arise from an insurer's inadequate investigations. _O'Donnell v. Allstate Insurance Co., 734 A.2d 901 (Pa. Super. 1999)._

48.    Defendant Allstate Insurance Company also acted in bad faith by failing to inform the Plaintiffs of possible health risks associated with exposure to fungal toxins, which the Defendant was or should have been aware of from such claims which were known to Defendant Allstate previously.

49.    In addition to all other monetary demands heretofore made, in order to punish Defendant Allstate Insurance Company for their bad faith and to deter other insurers from engaging

8

in similar activities, and to compensate Plaintiffs for the complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars together with attorneys' fees, interests, costs, and punitive damages in excess of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against Defendant Allstate Insurance Company for payment in excess of One Hundred Thousand ($100,000.00) Dollars, plus attorneys' fees, costs, and punitive damages in excess of One Hundred Thousand ($100,000.00) Dollars.

## COUNT II

### THE PLAINTIFFS v. ALLSTATE INSURANCE COMPANY
### BREACH OF CONTRACT

50.     The Plaintiffs hereby incorporate paragraphs 1 through 49 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

51.     The Plaintiffs, Jack and Karen Marrone, contracted with Defendant Allstate Insurance Company to provide homeowners insurance coverage for the Plaintiffs' property which included an express or implied requirement for Defendant Allstate to fairly, in good faith, and with the exercise of reasonable care, without bad faith, to adjust covered claims by Plaintiffs.

52.     Defendant Allstate, through its agents, representatives, and employees breached the contract by performing the most simple of inspections, then coming to the immediate determination

9

that the mold infestation of the house at issue was a pre-existing condition, despite the fact that there was nothing which would indicate that Plaintiffs were aware of any alleged preexisting problem.

53.     Defendant Allstate failed to properly evaluate and pay Plaintiffs' claim within a reasonable period of time, which constituted a breach of its contract with the Plaintiffs, to properly adjust claims by the Plaintiffs.

54.     Defendant Allstate also failed to warn the Plaintiffs of the potential danger associated with mold.

55.     Defendant Allstate failed to properly apply the terms and conditions of the policy.

56.     As a direct and proximate result of Defendant Allstate's breach of contract, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against Defendant Allstate Insurance Company for payment in excess of One Hundred Thousand ($100,000.00) Dollars.

## COUNT III

### PLAINTIFFS v. LINDA M. EDLEMAN
### MISREPRESENTATION

57.     The Plaintiffs hereby incorporate paragraphs 1 through 43 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

10

58.     Defendant Edleman had a duty to disclose all material defects relating to the property at issue, pursuant to the Real Estate Seller Disclosure Act (68 P.S. § 1021 et seq.).

59.     In the Seller's Property Disclosure Statement, required pursuant to 68 P.S. § 1024, Defendant Edleman intentionally misrepresented the conditions associated with the property at issue when she indicated that there was no basement dampness/water problems or leakage problems.

60.     Defendant Edleman knew, or should have known, that said basement was prone to dampness and water problems and disclosed same as required by law.

61.     At all times material hereto, the Plaintiffs relied upon the misrepresentations of Defendant Edleman.

62.     These undisclosed problems lead to the formation of the mold in July of 2000.

63.     As a direct and proximate result of Defendant Edleman's failure to disclose said information, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their  home and personal possessions, as set forth supra., and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against Defendant Edleman  for payment in excess of One Hundred  Thousand ($100,000.00) Dollars, Plaintiffs also request Rescission of the subject transaction for the sale of the property at issue and complete restitution together with a judgment ordering other incidental and consequential costs, prejudgment interest, attorneys' fees, and cost of suit.

## COUNT IV

### PLAINTIFFS v LINDA M. EDLEMAN
### NEGLIGENCE

64.    The Plaintiffs incorporate paragraphs 1 through 41 and 57 through 63 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

65.    Defendant Edleman had a legally imposed duty to disclose all known defects to the property at issue prior to settlement.

66.    Defendant Edleman knew or should have known of said defects to the property, in the form of dampness/water leakage in the basement.

67.    Defendant Edleman negligently breached this duty when she failed to disclose said information as was required by law.

68.    These undisclosed problems lead to the formation of the mold in July of 2000.

69.    As a direct and proximate result of Defendant Edleman's failure to disclose said information, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against Defendant Edleman for payment in excess of One Hundred Thousand ($100,000.00) Dollars, Plaintiffs also request Recision of the subject transaction for the sale of the property at issue and

complete restitution together with a judgment ordering other incidental and consequential costs, prejudgment interest, attorneys' fees, and cost of suit.

**COUNT V**

**PLAINTIFFS v.  LINDA M.  EDLEMAN**
**BREACH OF CONTRACT**

70.     The Plaintiffs hereby incorporate paragraphs 1 through 43 and 57 through 69 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

71.     The Plaintiffs, Jack and Karen Marrone, contracted with Defendant Edleman for the purchase of her house.

72.     When Defendant Edleman agreed to said contract, she made express or implied warranties concerning the condition of said house.

73.     Defendant Edleman breached her contract with the Plaintiffs by failing to disclose relevant information concerning the condition of the basement prior to the sales transaction.

74.     These undisclosed problems lead to the formation of the mold in July of 2000.

75.     As a direct and proximate result of Defendant Edleman's breach of contract, the Plaintiffs, Jack and Karen Marrone,  have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their  home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred  Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone and Karen Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against Defendant Edleman  for payment in

13

excess of One Hundred Thousand ($100,000.00) Dollars, Plaintiffs also request Recision of the subject transaction for the sale of the property at issue and complete restitution together with a judgment ordering other incidental and consequential costs, prejudgment interest, attorneys' fees, and cost of suit.

### COUNT VI

**PLAINTIFFS v. FRED SCHAFER AND MT. GRETNA REALTY**
**MISREPRESENTATION**

76.     The Plaintiffs incorporate paragraphs 1 through 43 of their Amended Complaint, inclusive. as though the same were set forth herein at length.

77.     Defendants Fred Schafer and Mt. Gretna Realty were at all relevant times the agent, servant, employee, or ostensible agent of Defendant Linda M. Edleman, and acted through its agents, servants, employees, and ostensible agents.

78.     Defendants Fred Schafer and Mt. Gretna Realty were, and have been an agent for, other homes in the area and as such, due to their experience and expertise, knew or should have know that the property in question, and the area was prone to said dampness/water problems.

79.     Defendants Fred Schafer and Mt. Gretna Realty had a duty to disclose, as well as a duty to make sure that the seller, their principle, disclosed all known defects in the property at issue prior to sale.

80.     Defendants Fred Schafer and Mt. Gretna Realty breached that duty by failing to disclose, and acted in concert with Defendant Edleman to not reveal said known defects relating to dampness/water.

14

81.     These undisclosed problems lead to the formation of the mold in July of 2000.

82.     As a direct and proximate result of Defendants Fred Schafer and Mt. Gretna Realtys'

failure to disclose said information, the Plaintiffs have suffered a complete disruption of their lives,

physical and emotional damage and distress, and loss of their home and personal possessions, and

therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred

Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida

Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against

Defendants Fred Schafer and Mt. Gretna Realty for payment in excess of One Hundred Thousand

($100,000.00) Dollars, Plaintiffs, Jack and Karen Marrone, also request Recision of the subject

transaction for the sale of the property at issue and complete restitution together with a judgment

ordering other incidental and consequential costs, prejudgment interest, attorneys' fees, and cost of

suit.

## COUNT VII

### PLAINTIFFS v. FRED SCHAFER AND MT. GRETNA REALTY
### UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW (UTPCPL)

83.     Plaintiffs incorporate paragraphs 1 through 43 and 76 through 82 of their Amended

Complaint, inclusive, as though the same were set forth herein at length.

84.     In view of the foregoing, the Plaintiffs believe and therefore aver that the Defendants,

Fred Schafer and Mt. Gretna Realty, have engaged in unfair and/or deceptive acts or practices as

contemplated by the Pennsylvania Unfair Trade Practice and Consumer Protection Law (hereinafter

sometimes referred to as "UTPCPL") which include but are not limited to the following:

      (a)   Using deceptive representations in connection of the condition of the aforesaid sale of subject property;

      (b)   In representing that said property was not defective when they knew, or should have known, it was not;

      (c)   Engaging in fraudulent conduct which created a likelihood of confusion and/or misunderstanding in the Plaintiffs' purchase, ownership, and maintenance of the subject property;

      (d)   Defendants engaged in the foregoing conduct for the sole purpose of concealing the seriousness and gravity of the defective conditions of said property and thus preventing any further action to rectify the serious and defective condition of the subject property which was reckless, malicious, and in gross disregard of the Plaintiffs' rights.

85.    As a direct and proximate cause of the Defendants' violation of the UTPCPL, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars, and are entitled to treble damages and attorneys' fees.

WHEREFORE, Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against the Defendants Fred Schafer and Mt. Gretna Realty, in excess of One Hundred Thousand ($100,000.00) Dollars, costs, treble damages, and punitive damages.

## COUNT VIII

## PLAINTIFFS v. HOUSEMASTERS
## NEGLIGENCE

86.     The Plaintiffs hereby incorporate paragraphs 1 through 43 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

87.     At all relative times hereto, Defendant HouseMasters acted through its agents, employees, servants, and ostensible agents, including but not limited to, Chuck Berthound, the HouseMasters inspector who inspected the Plaintiffs home.

88.     Due to concerns of the Plaintiffs regarding water spots in the basement, they contracted with and hired HouseMasters to perform an inspection of what became the fungal toxin infested house prior to their purchasing the same.

89.     On or about July 30, 1999, Defendant HouseMasters performed an inspection of the home.

90.     The HouseMasters report noted water stains in the basement, and recommended sloping the soil away from the house, keeping the down spouts clean, or to consider extending the spouts onto the surface.

91.     Defendant, HouseMasters, through its agent Mr. Berthound, was and is a professional house inspection company and therefore holds itself out as expert in said field.

92.     Defendant, HouseMasters, while noting the water stains, did not identify the source of said stains, nor did they recommend further investigation, nor did they refer the Plaintiffs to other professionals who may have been of assistance.

93.     In reliance of the HouseMasters report, which was void of any warnings of potential

17

problems, the Plaintiffs purchased the house at issue.

94.     Defendant HouseMasters had a duty to inspect said home for defects and to then notify the potential purchasers of said defects.

95.     As a direct and proximate result of Defendant HouseMasters's failure to disclose said information, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against Defendant HouseMasters for payment in excess of One Hundred Thousand ($100,000.00) Dollars, interest, and costs of this suit.

## COUNT IX

### PLAINTIFFS v. HOUSEMASTERS
### MISREPRESENTATION

96.     The Plaintiffs hereby incorporate Paragraphs 1 through 43 and 86 through 95 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

97.     Defendant HouseMasters misrepresented the conditions of the house at issue to the Plaintiffs when it failed to inform them of the source of the water damage and/or of any current or potential problems related to water damage.

98.     The Plaintiffs' justifiably relying on said information purchased the house at issue.

18

99.     As a direct and proximate result of Defendant HouseMasters's failure to disclose said information, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against Defendant HouseMasters for payment in excess of One Hundred Thousand ($100,000.00) Dollars.

### COUNT X

**PLAINTIFFS v. HOUSEMASTERS**
**BREACH OF CONTRACT**

100.    The Plaintiffs hereby incorporate paragraphs 1 through 43 and 86 through 99 of their Complaint, inclusive, as though the same were set forth herein at length.

101.    Plaintiffs, Jack and Karen Marrone, contracted with HouseMasters to perform an inspection of the property at issue, in order to determine any defects or potentially hazardous conditions on the property prior to the Plaintiffs purchasing the same.

102.    The Plaintiffs specifically contracted with HouseMasters regarding potential water/dampness problems with the house.

103.    Defendant, HouseMasters, while noting water damage, failed to identify the source of said damage, the severity of said source, nor did they identify or notify the Plaintiffs regarding any potential health problems pertaining to said water/dampness prior to the purchase of what became

19

the fungal toxin infested home.

104.     As experts in the field of home inspection, Defendant HouseMasters knew, or should have known, that fungal growth was a potential result of said water/dampness.

105.     As experts in the field of home inspection, Defendant HouseMasters knew, or should have known, that said fungal growth was potentially toxic and harmful to human health.

106.     Despite their contractual arrangement with the Plaintiffs to inform them of potential hazards associated with their prospective home, Defendant HouseMasters at no time informed them of any potential fungus or potential harm which could result therefrom.

107.     As a direct and proximate result of Defendant HouseMasters breach of contract with the Plaintiffs, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, the Plaintiffs, Jack Marrone and Karen Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against the Defendant HouseMasters in excess of One Hundred Thousand ($100,000.00) Dollars.

## COUNT XI

### PLAINTIFFS v. HOUSEMASTERS
### UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW (UTPCPL)

108.     The Plaintiffs incorporate paragraphs 1 through 43 and 86 through 107 of their Amended Complaint, inclusive, as though the same were set forth herein at length.

20

109. In view of the foregoing, the Plaintiffs believe and therefore aver that the Defendant, HouseMasters, has engaged in unfair and/or deceptive acts or practices as contemplated by the Pennsylvania Unfair Trade Practice and Consumer Protection Law (hereinafter sometimes referred to as "UTPCPL") which include but are not limited to the following:

(a)   Using deceptive representations in connection of the condition of the aforesaid sale of subject property;

(b)   In representing that said property was not defective when they knew, or should have known, it was not;

(c)   Engaging in fraudulent conduct which created a likelihood of confusion and/or misunderstanding in the Plaintiffs' purchase, ownership, and maintenance of the subject property;

(d)   Fraudulently representing to Plaintiffs that suggested repairs regarding property at issue would mitigate and/or prevent said leakage and/or other defects or damage which occurred.

(e)   Defendant engaged in the foregoing conduct for the sole purpose of concealing the seriousness and gravity of the defective conditions of said property and thus preventing any further action to rectify the serious and defective condition of the subject property which was reckless, malicious, and in gross disregard of the Plaintiffs' rights.

110. As a direct and proximate cause of the Defendant's violation of the UTPCPL, the Plaintiffs have suffered a complete disruption of their lives, physical and emotional damage and distress, and loss of their home and personal possessions, and therefore the Plaintiffs, individually, demand damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars, and are entitled to treble damages and attorneys' fees.

WHEREFORE, Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida

WHEREFORE, Plaintiffs, Jack Marrone, Karen Marrone, Matthew Marrone, and Vida Marrone, respectfully requests that this Honorable Court enter judgment in their favor and against the Defendant HouseMasters, in excess of One Hundred Thousand ($100,000.00) Dollars, costs, treble damages, punitive damages, and attorneys' fees.

STEVENS & JOHNSON

By: _____

Richard F. Stevens, Esquire
I.D. No: 08073
Attorneys for the Plaintiffs,
Jack Marrone,
Karen Marrone,
Matthew Marrone, and
Vida Marrone

740 Hamilton Mall
Allentown, Pennsylvania 18101
(610) 439-1451

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that a true and correct copy of the attached Amended

Complaint, will be served upon all parties, by placing the same in the United States Postal Service,

first class, postage prepaid, and mailed to the following upon return receipt from the U.S. District

Court for the Middle District of Pennsylvania:

James G. Nealon, III, Esquire
Nealon & Grover
2411 North Front Street
Harrisburg, PA 17110

John Flounlacker, Esquire
Thomas, Thomas & Hafer, LLP
305 North Front Street
P.O. Box 999
Harrisburg, PA 17108

Edward A. Monsky, Esquire
Fine, Wyatt & Carey, PC
425 Spruce St.
P.O. Box 590
Scranton, PA 18501-0590

Robert E. Kelly, Jr., Esquire
Duane, Morris & Heckscher, LLP
305 North Front Street, 5th Floor, .
P.O. Box 1003
Harrisburg, PA 17108-1003

Date: 11/31/01

By: _Richard F. Stevens_

Richard F. Stevens, Esquire
I.D. No: 08073
Attorneys for the Plaintiffs
Jack Marrone, Karen Marrone,
Matthew Marrone and Vida Marrone

740 Hamilton Mall
Allentown, Pennsylvania 18101
(610) 439-1451

# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FILED
HARRISBURG, PA

JAN 0 7 2002

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

JACK MARRONE, KAREN MARRONE,        :
both individually and in their capacity as    :
parents and guardians for           :
VIDA MARRONE, a minor,              :
         Plaintiffs          :   CIVIL ACTION - LAW
                             :
         v.                  :   CASE NO.: 1:CV-01-0773
                             :
                             :   JURY TRIAL DEMANDED
ALLSTATE INSURANCE COMPANY,         :
LINDA M. EDLEMAN, FRED SCHAFER,     :
MT. GRETNA REALTY, and              :   JUDGE KANE
HOUSEMASTER                         :
         Defendants          :

## ANSWER AND AFFIRMATIVE DEFENSES
## OF DEFENDANT HOUSEMASTER
## TO PLAINTIFFS' AMENDED COMPLAINT

Defendant HouseMaster, incorrectly identified in the Amended Complaint

as "HouseMasters," by and through its counsel, Duane Morris LLP, respectfully

files this Answer and Affirmative Defenses to Plaintiffs' Amended Complaint:

1.    Denied.  After reasonable investigation, HouseMaster is without

knowledge or information sufficient to form a belief as to the truth or falsity of the

allegations in Paragraph 1 and, accordingly, they are denied.

2.     Denied. After reasonable investigation, HouseMaster is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 2 and, accordingly, they are denied.

3.     Denied. After reasonable investigation, HouseMaster is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 3 and, accordingly, they are denied.

4.     Denied. After reasonable investigation, HouseMaster is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 4 and, accordingly, they are denied.

5.     Denied. After reasonable investigation, HouseMaster is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 5 and, accordingly, they are denied.

6.     Denied. After reasonable investigation, HouseMaster is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 6 and, accordingly, they are denied.

7.     Denied. After reasonable investigation, HouseMaster is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 7 and, accordingly, they are denied.

8. Denied. After reasonable investigation, HouseMaster is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 8 and, accordingly, they are denied.

9. Admitted.

10. Paragraph 10 sets forth legal conclusions to which no response is required. To the extent those allegations are deemed factual in nature, they are denied.

11. Denied. After reasonable investigation, HouseMaster is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 11 and, accordingly, they are denied.

12. Denied. After reasonable investigation, HouseMaster is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 12 and, accordingly, they are denied.

13. Denied. After reasonable investigation, HouseMaster is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 13 and, accordingly, they are denied.

14. Denied as stated. It is admitted that Plaintiffs' real estate agent, Chip Stanilla, hired Defendant HouseMaster to perform a partial home inspection and related services on said home on July 30, 1999. By way of further answer, true

3

# EXHIBIT "C"



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JACK MARRONE, HUSBAND,          :
KAREN MARRONE, WIFE, BOTH       :
INDIVIDUALLY AND IN THEIR       :
CAPACITY AS PARENTS AND         :
GUARDIANS FOR VIDA MARRONE,     :
A MINOR, AND MATTHEW ADAM       :
MARRONE,                        :
       PLAINTIFFS               :
                               :
       V                        :   NO. 1:CV-01-0773
                               :
ALLSTATE INSURANCE COMPANY,     :
LINDA M. EDLEMAN, FRED          :
SHAFER, MT. GRETNA REALTY,      :
AND HOUSE MASTERS,              :
          DEFENDANTS             :   JURY TRIAL DEMANDED

          DEPOSITION OF:  JACK MARRONE

          TAKEN BY:       DEFENDANT ALLSTATE INSURANCE
                       COMPANY

          BEFORE:         MARIA N. O'DONNELL, RPR
                       NOTARY PUBLIC

          DATE:           MAY 29, 2002, 9:21 A.M.

          PLACE:          NEALON & GOVER, PC
                       2411 NORTH FRONT STREET
                       HARRISBURG, PENNSYLVANIA

APPEARANCES:

    TARASI, TARASI & FISHMAN
    BY: LOUIS M. TARASI, JR., ESQUIRE
        GIANNI FLORO, ESQUIRE
        FOR - PLAINTIFFS



2080 Linglestown Road • Suite 103 • Harrisburg, PA 17110
717.540.0220 • Fax 717.540.0221 • Lancaster 717.393.5101

Page 10

1   A   Yes.
2   Q   You are represented by counsel today.  If you
3   want to speak to them, let me know and we will see what
4   arrangements can be made for that.  All right?
5   A   Yes.
6   Q   I suspect that this could be a long day by the
7   time we get through you and your whole family, so if you
8   want to take a break for any reason, let me know and we can
9   accommodate that as well.  All right?
10   A   Yes.
11   Q   I understand that you are on a several
12   medications.  Is that right?
13   A   Yes.
14   Q   I am not going to go through the list of them at
15   this point, but I just have a question as to whether to the
16   best of your understanding do any of those medications
17   effect your ability to give this deposition?
18   A   I don't think so.
19   Q   To the best of your knowledge, is there any
20   reason why you cannot give this deposition today?
21   A   No.
22   Q   What is your current address?
23   A   11673 Highway PP, Dixon, Missouri, 65459.
24   Q   How long have you lived there?
25   A   Nine years.

Page 11

1   Q   Okay.  There was a period of time that you moved
2   out here to Pennsylvania, is that right?
3   A   Yes, there was.
4   Q   Did you continue to maintain that home in Dixon,
5   Missouri?
6   A   Yes.
7   Q   Is that your home or family members home?
8   A   Our home.
9   Q   So when you moved out here, you continued to own
10   the property in Missouri?
11   A   Yes.
12   Q   Why was that?
13   A   Why?
14   Q   Yes.
15   A   Don't know.  Just kept the house.
16   Q   Were you even renting it?
17   A   Yes.  We rented it out.
18   Q   What is your date of birth, sir?
19   A   2-22-46.
20   Q   Your social security number?
21   A   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.
22   Q   Okay.  Briefly tell my your educational
23   background.
24   A   GED, Lyons Technical Institute, technology,
25   electrical technology.

Page 12

1   Q   Let me back up then.  How far was the -- did you
2   go in high school?
3   A   Eleven years.
4   Q   You dropped out after the eleventh grade?
5   A   Yes.
6   Q   Approximately what year was that?
7   A   Sixty-three.
8   Q   Where was the high school that you last --
9   A   Woodrow Wilson Vocational High School.  Ozone
10   Park, Queens, New York.
11   Q   Incidentally, where were you born?
12   A   Maygues, M-a-y-g-u-e-s, Puerto Rico.
13   Q   When did you get your GED then?
14   A   I got it twenty years later.
15   Q   Early eighties?
16   A   No.  I believe early '90s.
17   Q   You mentioned some technical school as well?
18   A   Lyons Technical.
19   Q   How do you spell that?
20   A   L-y-o-n-s.
21   Q   Where is that at?
22   A   It was at Erie Street in Philadelphia, PA.
23   Q   When did you attend courses there?
24   A   Can I ask my wife what year?
25   Q   No, unfortunately that's one of the ground rules

Page 13

1   too, we just want your memory.  If you don't recall --
2   A   I don't recall.
3   Q   That's fine.  What types of courses did you take
4   there?
5   A   Electrical technology.
6   Q   Okay.  Now, I am going to focus more on the
7   events leading up to the purchase of the home here in
8   Pennsylvania and your contacts with Allstate.
9       How did you decide to move to Pennsylvania?
10   A   Well, we -- my wife has MS and I was tired of
11   driving one hundred miles to the VA Hospital, and I wanted
12   more conveniences for her.
13   Q   Okay.  So you were living in Dixon, Missouri at
14   the time, is that right?
15   A   Yes, sir.
16   Q   Where was the nearest VA Hospital?
17   A   One hundred miles away.
18   Q   What town?
19   A   Columbus -- Columbia, Missouri.
20   Q   Okay.  I understand there is a Lebanon VA?
21   A   Lebanon what?
22   Q   Lebanon VA?
23   A   Lebanon VA.
24   Q   Okay.
25   A   Five miles.

## Page 14

Q  Why move near the Lebanon VA as opposed to closer to the Columbia Missouri VA, for instance?

A  Why?

Q  Yes.

A  Convenience, everything was around -- everything was around Lebanon, PA.

Q  Had you ever visited Lebanon before?

A  We lived in Lancaster.

Q  When did you live in Lancaster?

A  1984, '85.

Q  For how long?

A  Three, four years.

Q  That explains a little better.  So you were familiar with the area?

A  Right.

Q  Decided to come back because you are closer to Lebanon VA?

A  Right.

Q  Then, as I understand it, you started looking for real estate?

A  Yes.

Q  In the Lebanon area?

A  Yes.

Q  How many realtors did you contact, or did you work through a realtor?

## Page 15

A  Well, we drove around on our own for awhile.

Q  Had you ever entered into any what are sometimes called buyers agreements with the realtor for them to act as your realtor?

A  No.

Q  So you didn't have a buyers agent?

A  No.

Q  All right.  How did you find this particular house owned by Linda Edleman at the time?

A  Realty.

Q  Which realtor?

A  Remax.

Q  Okay.  How did you get to Remax?

A  Drove there.

Q  See, us lawyers often ask bad questions and that was one of them.

How did you learn of Remax to go to them, in other words --

A  Just paper I think.

MR. TARASI: You don't guess, Jack.  If don't know, you don't know.

THE WITNESS: I don't remember at the time.

BY MR. NEALON:

Q  Do you know who you dealt with at Remax?

A  Chip Stinella.

## Page 16

Q  Who had you already seen the Edleman house before you met with Chip?

A  No.

Q  Okay.  So you went to Chip to try and get some help in finding a house?

A  Yes.

Q  Do you know how many houses that you looked at with Mr. Stinella?

A  No.

Q  Okay.

A  Quite a few.

Q  Do you know how many that you actually walked through?

A  Quite a few.

Q  More than one, right?

A  Yes.

Q  Do you think more than ten?

A  Don't know.  Few quite a few.

Q  Do you know when you first met with Mr. Stinella?

A  Not offhand.  Do you want exact date and time?

Q  Well, let me -- I understand that you wouldn't know the exact date and time, it looks like the agreement of sale between you and Linda Edleman was July 7th, 1999.

Can you place it in relationship to that date?  Was it a week, a day, a month before then?

## Page 17

A  Maybe two, three, two weeks, three weeks.  I don't know, I can't recall.

Q  Do you know how you came to be looking at the Edleman property then?

A  I believe he suggested it.

Q  Okay.

A  From his listings.

Q  Do you know how many times that you went through the Edleman property prior to entering into the agreement of sale?

A  I don't recall.  Quite a few.  Maybe twice, once or twice.  I don't recall.

MR. NEALON: All right.  Let's get this marked as Marrone 1.

(Document produced and marked Marrone Exhibit Number 1.)

MR. NEALON: I am going to show you what has been marked as Marrone Exhibit No. 1, at this point I am not sure who gave that to us, but it appears to be the agreement of sale.

(Discussion held off the record.)

MR. NEALON: It looks like page four of eight might be missing.  We can add that to it.

My question -- point of questioning is more for historical timeframe than any questions about the document.

Case 1:01-cv-00773-YK    Document 164    Filed 05/16/2003    Page 36 of 100

Page 18

1 I mean we can fix that up.

2     MR. MONSKY: No problem.

3 BY MR. NEALON:

4     Q Marrone 1, Mr. Marrone, appears to be a copy

5 although it might be missing a page, of the agreement of

6 sale, with you and your wife to purchase the property from

7 Ms. Edleman.

8     Do you recall seeing that before today?

9     A I might have seen it from Chip or --

10     Q I think the last page has your signature, does it

11 not?

12     A Yes.

13     Q Okay. So I take it what you are saying is you

14 are not saying that you didn't see it before today' because

15 your signature is on it, you just don't have a

16 recollection --

17     A I don't recollect seeing it, you know.

18     Q My question was this, prior to entering into the

19 agreement of sale on July 7, 1999, had you had any contact

20 with any representative of the Allstate Insurance Company?

21     A No.

22     Q I am assuming then that Allstate didn't inspect

23 the property for you prior to the agreement of sale?

24     A True.

25     Q And nothing Allstate said or did made you want to

Page 19

1 buy or not buy this property?

2     A True.

3     Q Now, eventually you did get the policy of

4 insurance from Allstate on this property, is that right?

5     A Yes.

6     Q Okay. How did you come to choose Allstate as

7 opposed to any other company?

8     A I think my wife handled that.

9     Q Okay. So do you have any -- did you have any

10 contacts with the agent from Allstate regarding the purchase

11 of the Allstate Insurance policy?

12     A No.

13     MR. NEALON: Okay. And I -- off the record.

14     (Discussion held off the record.)

15 BY MR. NEALON:

16     Q As I understand it, Mr. Marrone, you actually

17 purchased the property on August 31, 1999, is that right?

18     A I believe so.

19     Q All right. Prior to that time, had you had

20 personally, we'll talk to your wife later, but personally

21 had you had any contact with any representative of Allstate?

22     A No.

23     Q So nothing Allstate did led you to go through

24 with the settlement after entering into agreement of sale?

25     A I don't believe so.

Page 20

1     Q To the best of your knowledge, did anyone from

2 Allstate inspect this property prior to the settlement on

3 August 31, 1999?

4     A Say that again.

5     Q To the best of your knowledge, before August 31,

6 1999 --

7     A Yes.

8     Q -- did anyone from Allstate inspect the property?

9     A I don't know.

10     MR. NEALON: Let's get this marked as Marrone 2.

11     (Document produced and marked Marrone Exhibit

12 Number 2.)

13     (Discussion held off the record.)

14     MR. FLORO: Actually this is the policy plus

15 several correspondence that we produced I believe.

16     Here is some correspondence from -- let's see

17 here. The policy is 30 pages. You have the endorsements,

18 some correspondence, declarations, I don't know if that is

19 the binder, and some more correspondence. Do you want to

20 check this?

21     MR. NEALON: I think the correspondence is just

22 sending the policy to them.

23     MR. FLORO: I don't know. There is about three

24 or four different letters attached.

25     MR. NEALON: These are your -- just letters from

Page 21

1 the Allstate saying here is your policy. These aren't any

2 letters regarding the claim.

3     All right. And, you know, you point out this is

4 what your predecessor supplied to us as having been received

5 by the Marrones because we wouldn't receive this -- these

6 letters. All right.

7 BY MR. NEALON:

8     Q Mr. Marrone, let me show you what has been marked

9 as Marrone Exhibit No. 2. And I am going to represent to

10 you that that is a series of documents that your prior

11 attorney supplied to us and it starts with a page entitled

12 Allstate Insurance Company Deluxe Plus Home Owners Policy.

13 Is that right?

14     A Yes.

15     Q All right. Did you receive a policy from

16 Allstate?

17     A Yes.

18     Q Do you recall receiving the various documents in

19 Marrone 2?

20     A I might have just glanced at it.

21     Q I am not asking if you read it and understood it,

22 at this point I am just asking if you received it?

23     A I believe so.

24     Q Do you know whose handwriting is in the upper

25 right there?

Page 74

1   Q  What about the house, any particular systems
2  within the home?
3     A  I believe so.
4     Q  Was it your understanding they would be checking
5  the roof?
6     A  I would hope so.
7     Q  Is it your understanding that they would be
8  checking the wiring in the home?
9     A  I would hope so.
10    Q  Foundation of the home?
11    A  I would hope so.
12    Q  Was it your understanding that House Masters
13  would be inspecting the basement to the property?
14    A  I would hope so.
15    Q  Up to the point that the home was inspected by
16  House Masters, I got a date here of July 30, 1999?
17    A  Okay.
18    Q  Up to that point, do you have any independent
19  recollection about anything that Ms. Edleman may have said
20  to you regarding the condition of the Mount Gretna property?
21    A  No.
22    Q  Do you recall being present while House Masters
23  inspected the Mount Gretna property?
24    A  Yes.
25    Q  Tell me what you remember about that.

Page 75

1     A  I just remember them going down in the basement.
2  I was with them.  He looked around with the flashlight here
3  and there.  And his recommendation was to -- I believe to
4  divert the downspouts, gutters and leaders and to drain soil
5  away from the home.
6     Q  That's what the --
7     A  Yes, to terrace the soil.
8     Q  I got you.
9         And that was said to you by somebody from -- the
10  inspector from House Masters?
11    A  Yes, that was his recommendation.
12    Q  And -- but just so I am clear on what you are
13  telling me, that you recall a conversation with him at the
14  home on the date of the inspection?
15    A  I don't recall when I had the conversation with
16  him.  I know it was before -- I think it was just before he
17  left.  I am not sure.
18    Q  Sir, can you find this page on Exhibit 7?  I am
19  not sure of the number.  It's the one that looks like this.
20    MR. TARASI: Down here.
21    THE WITNESS:  Okay.
22        Exactly what I said.  Slope soil away.
23    MR. TARASI: Let him ask the questions.
24  Y MR. FLOUNLACKER:
25    Q  Sir, do you see -- do you see here midway down it

Page 76

1  says water penetration?
2     A  Yes.
3     Q  Then down under water penetration there is the
4  No. 1 and it says indications of water penetration
5  conditions?
6     A  Where?  I just see water penetration.
7     Q  Right there, sir.  Do you see that?
8     A  Indications -- yes, okay, yes.
9     Q  Do you see where it is X'd off here?  It says
10  water marks/stains.  Do you see that?
11    A  Yes.
12    Q  While you were there at the property, do you
13  remember seeing anything in the basement that suggested to
14  you there were water marks or stains down there?
15    A  Just calcified, some calcification.
16    Q  What do you mean, sir?
17    A  Water stains.
18    Q  Where did you see them?
19    A  On the wall, one wall.
20    Q  Okay.  What did it look like, sir?
21    A  Water mark.
22    Q  What color was it?
23    A  White.
24    Q  Other than that, did you see anything else in the
25  basement that one would call a water mark or a stain or that

Page 77

1  you would call a water mark or a stain?
2     A  Yes, on the peg board.
3     Q  What did you see?
4     A  Black stain.
5     Q  How big was it?
6     A  Oh, by eye, maybe a foot by foot and a half, two
7  foot.
8     Q  Okay.  Did you see anything else that you saw
9  that resembled or what you would call a water mark or a
10  stain?
11    A  Not that I recall.
12    Q  Was Ms. Edleman down there in the basement with
13  you while this inspection was taking place?
14    A  I don't believe so.
15    Q  On the front of the page or the front of this
16  form it says people present for the inspection were the
17  clients, owner, and Chip Stinella.
18    A  Yes.
19    Q  Does that refresh your memory as to who was at
20  the property when the inspection was taking place?
21    A  I believe she was there, but not in the basement.
22    Q  Okay.  Other than what you have already told me,
23  sir, do you remember seeing anything else at the time of
24  this inspection that looked like a water mark or a stain in
25  the basement?

## Page 78

1    A  No.  No.
2    Q  Once again, if at any point something dawns on
3  you or you remember something additional, please let me
4  know.
5    A  Nothing.  Well, it was dark and he had a
6  flashlight.
7    Q  What time of day was it?
8    A  I believe three, 4:00 o'clock in the afternoon.
9    Q  Was there an exterior door from the basement
10  running directly outside?
11    A  Yes.
12    Q  Did the basement have lights in it?
13    A  Yes, but we were complaining it was extremely
14  dark down there, she only had one bulb.
15    Q  Was there any part of the basement that you were
16  unable to see or go into?
17    A  No.
18    Q  Did you ask any questions of Miss Edleman while
19  this inspection was taking place?
20    A  I can't recall offhand if we did or didn't.
21    Q  Do you have any recollection of anything that was
22  said at all between yourself and Miss Edleman or anyone with
23  Miss Edleman and anyone else during the course of this
24  inspection?
25    A  The only -- the only conversations that we had

## Page 79

1  were very casual conversations.
2    Q  What was discussed?
3    A  Her boyfriend -- we were in the kitchen,
4  boyfriend something.  I don't know verbatim.  It was just a
5  casual conversation.
6    Q  Fair enough.
7       Do you recall having conversations with Ms.
8  Edleman regarding the condition of her home while this
9  inspection was going on?
10    A  Not that I can recall.
11    Q  Do you see down here on line six, sir, below the
12  water stains or water marks and stains, there is some
13  handwriting next to details?
14    A  Yes.
15    Q  Your thumb is right underneath there.
16       Is it your understanding that those details were
17  recommended that were made by the House Masters' inspector
18  concerning the water marks and stains that you saw in the
19  basement?
20    A  I don't know why he said them.  He just
21  recommended it.
22    Q  You have no idea why a recommendation was made
23  that soil be sloped away from your home?
24    A  No other than he was the professional and I
25  followed his suggestion.

## Page 80

1    Q  Did you think that the details or recommendations
2  that are the details in this -- part of the report were to
3  concern themselves with the water marks or water stains?
4    A  I don't know what they were for.  I just did what
5  he told me.  I did follow his recommendations.
6    Q  It says here, does it not, to keep down spouts
7  clean and flowing?  Do you see that?
8    A  Yes.
9    Q  Do you understand -- what was your understanding
10  why the inspector recommended that down spouts be kept clean
11  and flowing?
12    A  I have no idea.
13    Q  Do you have -- see there where it says or
14  consider extending spouts onto the surface?
15    A  Where?
16    Q  The last handwritten thing in line six, details.
17    A  Extending spouts to surface.
18    Q  Do you have any idea why that is written there?
19    A  No.
20    Q  Did you have any idea or understanding any of
21  this had the possibility of water entering the basement at
22  Mount Gretna?
23    A  No.
24    Q  Did you ever ask the inspector why those
25  recommendations were being made?

## Page 81

1    A  No.
2    Q  Did you ever understand that this report
3  indicates that water may have been penetrating the basement
4  to this property and causing the water marks or stains that
5  is noted on this report?
6    A  No.  I just followed his instructions, his
7  recommendation.  I don't know -- I just followed his
8  recommendations.
9    Q  Understand.
10       The water marks or stains that you told me about
11  earlier --
12    A  Yes.
13    Q  What --
14    A  I didn't know what they were.
15    Q  How did you think they got there or what was your
16  understanding --
17    A  I had no idea.
18       MR. TARASI: Let him finish the question.
19       THE WITNESS: Oh, I know where he's going.
20  BY MR. FLOUNLACKER:
21    Q  Maybe you do, maybe you don't.
22       What was your understanding as to how the water
23  marks or stains that you told me about earlier was the cause
24  for them or how they came into existence?
25    A  I didn't even know what they were.  I asked him

Case 1:01-cv-00773-YK   Document 164   Filed 05/16/2003   Page 39 of 100

Page 82

1 what they were.
2    Q  What did he tell you?
3    A  Calcification.
4    Q  What else?
5    A  Mineral deposits I believe.
6    Q  Did he tell you where they came from?
7    A  I don't recall.
8    Q  Did you ask him where they came from?
9    A  No.
10   Q  Did you consider it a possibility that that might
11 be the result of water seeping through a basement wall?
12   A  No.
13   Q  That never dawned on you?
14   A  No.
15   Q  Did you believe that those stains were the result
16 of some accumulation of water?
17   A  I didn't know what they were.
18   Q  You had no idea or no thought that what you
19 observed on the walls might be the result of an accumulation
20 of water?
21   A  No, I did not.
22   Q  And what did you do after you got this report,
23 the one dated July 30, 18999?
24   A  Gave it to my wife.
25   Q  Did you review it?

Page 83

1    A  No.
2    Q  Did you ever read what was in the report?
3    A  No.
4       My wife told me what to do.
5    Q  What did she tell you?
6    A  Slope the soil away.
7    Q  She told you to do the things?
8    A  Follow his recommendations she said.
9    Q  But your wife gave you instructions to do the
10 things that are listed in --
11   A  Not that way, no.  She said you should follow his
12 recommendation, we should follow his recommendation.
13   Q  But the recommendations at line six on the report
14 under water penetration, do the things that are listed here?
15   A  Do the things that are listed there.
16   Q  Did you understand why you were being asked by
17 your wife to do those things?
18   A  Because the professional recommended it House
19 Masters.
20   Q  Why?
21   A  I don't know why he recommended it.  He just
22 recommended it.
23   Q  You had -- so you had no belief or understanding
24 that the things that were recommended by House Masters in
25 line six were to deal with water that might be entering the

Page 84

1 basement to the home?
2    A  No.  I had no idea.
3       MR. FLOUNLACKER:  Off the record.
4       (Discussion held off the record.)
5       MR. FLOUNLACKER:  Just for the record, counsel, I
6 believe we are in agreement that the first exhibit to
7 Mr. Marrone's deposition is a copy of the sales agreement
8 along with the sellers property disclosure statement?
9       MR. TARASI:  Right.
10      MR. FLORO:  In addition I think there is an
11 estimated buyers closing cost estimate as well as the second
12 attachment, and then the third attachment is the sellers
13 property disclosure.
14      MR. FLOUNLACKER:  Fine.
15 BY MR. FLOUNLACKER:
16   Q  Mr. Marrone, I believe your lawyer's just handed
17 you something I would like you to look at.
18   A  Marrone.
19   Q  I am sorry?
20   A  Marrone.
21   Q  Did I say it was wrong?
22   A  Marrone.
23   Q  This document is captioned sellers property
24 disclosure statement.  Do you see that?
25   A  Yes.

Page 85

1    Q  Would you agree with me that handwritten under
2 that statement it says property address, 354 Timber Road,
3 Mount Gretna?
4    A  Yes.
5    Q  Below that it says seller, Linda M. Edleman?
6    A  Yes.
7    Q  Do you have any recollection of ever seeing that
8 document prior to today?
9    A  No.
10   Q  Did you -- by that I would take it then that you
11 did not rely on what is contained within sellers property
12 disclosure statement in making your decision to buy this
13 house?
14   A  I don't know.  I relied on what people stated to
15 me, that's all, fact or fiction -- fact, you know.
16   Q  Did you have any recollection at all prior to
17 today regarding anything Miss Edleman said about the
18 condition of this property before you bought it?
19   A  No.
20   Q  As you sit here today, do you have any
21 recollection of ever relying upon anything that Miss Edleman
22 may have told you about the condition of this property prior
23 to buying it?
24   A  I don't believe she ever stated anything about
25 the condition of the home.  The only thing we ever talked

Case 1:01-cv-00773-YK   Document 164   Filed 05/16/2003   Page 40 of 100

## Page 126

1    A  I don't know what year.

2    Q  Did he move to Missouri before the time that your
3  wife described in the portion of her deposition that she
4  described?

5    A  That -- I don't know.

6    Q  She described the period of time that you were
7  away for a week, then there was, in her words, an explosion
8  of mold in July of 2000.

9        First of all, is that your recollection, that
10  there was a sudden explosion of mold?

11    A  More like an A Bomb.

12    Q  A Bomb.  All right.

13        She said that was approximately July of 2000.  Is
14  that your recollection also?

15    A  Oh, hell yes.

16    Q  Between September of 1999, let's take it up until
17  the end of June of 2000, had you seen any mold within the
18  house?

19    A  No, except what my wife showed me one time.  I
20  didn't know it was mold though, later on we found out it was
21  mold.

22    Q  What did your wife show you?

23    A  She said there was black oozy slime behind the
24  refrigerator.

25    Q  Do you recall when that was?

## Page 127

1    A  No, I don't.

2    Q  What was done with regard to that?

3    A  She cleaned it off and we went on with our life.

4    Q  In connection with when you bought the home, was
5  it closer in time to when you purchased the home as opposed
6  to the A Bomb of mold?

7    A  I don't know.  When you are asking me dates and
8  times, I --

9    Q  Right.  When your wife showed you that black oozy
10  slime, was there a great deal of it?  Can you describe how
11  much she showed you?

12    A  It all looked like -- I don't know.  Do you mean
13  measurement-wise?

14    Q  Yes.  Yes.

15    A  I don't know.  It was a big blotch of it behind
16  the refrigerator.

17    Q  How big is a big blotch?  Was it as large as the
18  outline of the refrigerator itself?

19    A  No, no, no.  It was hidden by the refrigerator,
20  let's put that way.

21    Q  In connection with the size of the refrigerator
22  what -- say what percentage of the size of the refrigerator
23  was the size of this black oozy slime?

24    A  I don't know.

25    Q  Did you clean it or your wife what?

## Page 128

1    A  I just told you, she did.

2    Q  Your wife cleaned it.  Okay.  Do you know how she
3  cleaned it?

4    A  No, I didn't ask her.

5    Q  Besides that one time that your wife showed you
6  that, you had not seen any other mold in the home until July
7  of 2000?

8    A  Not that I can recall, no.

9    Q  Now, as I understand it, you and your family were
10  away from the home for a period of time for about a week or
11  so?

12    A  We went out to -- yes, yes.

13    Q  This was when you brought the camper out to your
14  son?

15    A  Yes.

16    Q  And everyone went with you, your daughter went
17  with you?

18    A  Yes.

19    Q  How long were you back?

20    A  No, no, she did not.  She was already in Missouri
21  visiting her girlfriend.

22    Q  When you and your wife brought the camper out,
23  how long including travel time were you away from the house
24  at -- in Mount Gretna?

25    A  Pardon me?  Rephrase the question again.

## Page 129

1    Q  You and your wife took the camper and you
2  traveled -- you drove it out to Missouri and dropped it off,
3  and then did you stay in Missouri for a period of time?

4    A  Yes.

5    Q  Did you check on your other house in Dixon?

6    A  Yes.

7    Q  You dropped off the camper, your son was in
8  school near St. Joseph's, Missouri, did you say?

9    A  Springfield.

10    Q  Springfield, I am sorry, that's in the center of
11  Missouri more or less?

12    A  No, it's three hours -- southwestern part of
13  Missouri, three miles from the -- three hours from the
14  Oklahoma line.

15    Q  What part of Missouri is Dixon in?

16    A  Ozarks.  Central.

17    Q  So how long did you stay out in Missouri when you
18  brought the camper out for your son?

19    A  I guess about a week or so.

20    Q  When you left the home in Mount Gretna, did you
21  close it up during that timeframe that you were away that
22  you were out in Missouri, did you close all of the windows
23  and doors?

24    A  I don't remember.

25    Q  I assume that you locked it up before you left?

Page 130

1   A   Of course.
2   Q   Was there any ventilation in the basement?
3   A   What do you mean by ventilation in the basement?
4   Q   Were there windows in the basement?
5   A   Two windows.
6   Q   When you returned back to the home in Mount
7   Gretna after you were away for about a week in Missouri, you
8   said that when you came back it was like an A Bomb of mold.
9       Can you describe, was it you a -- who came back,
10  you, your wife, any other family members?
11  A   My daughter at that time, picking her up.
12  Q   What did you observe when you first came back
13  into the house?
14  A   Nothing, because I didn't go in the basement
15  until several days later.
16  Q   Okay. So in terms of the first floor, I take it
17  that there was no visible mold?
18  A   No.
19  Q   So you said a few days later you then went into
20  the basement?
21  A   Yes.
22  Q   And then what did you observe at that time, at
23  that point?
24  A   Green, white and black spots, stains, everything
25  all over the paneling, the floor, the carpeting, my

Page 131

1   furniture. You could almost grow mushrooms.
2   Q   And this was the first time that you ever had
3   this condition during the time that you owned and occupied
4   the home?
5   A   Yes.
6   Q   What did you do? Did you take steps to clean it
7   up when you first discovered all of this?
8   A   I didn't know what the hell to do. I told my
9   wife.
10  Q   All right. Did your wife come down and take a
11  look at it?
12  A   No.
13  Q   Did your wife ever go down into the basement?
14  A   Sure.
15  Q   After you discovered all of this mold?
16  A   No.
17  Q   She never went down?
18  A   No.
19  Q   Did you consult with anyone other than your wife?
20  A   She did just to take a peek.
21  Q   Not your wife. Did you consult with anyone as to
22  what to do about the mold?
23  A   Did i consult with anybody what to do with the
24  mold?
25  Q   Yes.

Page 132

1   A   No.
2   Q   Before the person from Allstate came out in
3   August of 2000, had you done anything to remedy or alleviate
4   the mold?
5   A   Before Allstate came out?
6   Q   There was a discussion that Mr. Miller came out
7   from Allstate, he came out around August 9th or 10th, I
8   think that you and your wife --
9   A   I didn't do anything until he came out.
10  Q   Okay. After he came out, what steps did you take
11  to take care of the mold situation?
12  A   I made it worse by tearing the whole thing apart,
13  tearing out the basement.
14  Q   That's when you started to tear down the
15  paneling?
16  A   Yes, and mildicide.
17  Q   You believe the mildicide made it worse?
18  A   No, I did -- I did -- I followed Larry Miller's
19  recommendation.
20  Q   Did Mr. Miller tell you to tear down the
21  paneling?
22  A   No, not that I know of, not that I recall, no.
23  Q   Did anyone tell you or to your knowledge your
24  wife that you should tear down the wood panelling?
25  A   No. No.

Page 133

1   Q   But at some point you decided that that is
2   something that you should do is try to take down the wood
3   paneling?
4   A   Yes, I didn't want to live in a burning house.
5   Q   Since I have never been in the home, is all of
6   the basement panelled?
7   A   Yes, except for the -- way in the back, not the
8   whole basement. Eighty percent of the basement was.
9   Q   Okay. Of the paneling in the basement, how much
10  did you take down before you stopped? Did you take down all
11  of it?
12  A   I don't remember. Just about all of it until we
13  got the phone call.
14  Q   And that's the phone call from this environmental
15  A2sr?
16  A   The laboratory, yes. I said it was -- that I was
17  taking it out, they said to stop and seal off the basement.
18  Q   Okay. How many days did you -- were you down in
19  the basement taking down the paneling?
20  A   Oh, geez. Between that and the ceiling, maybe
21  two, two weeks, three weeks. I don't know.
22  Q   You said --
23  A   I just felt helpless.
24      MR. TARASI: Listen, just answer his question.
25  We'll get out of here sometime before the millennium.

**Multi-Page™**

---

### Page 134

1 BY MR. MONSKY:

2   Q You said that you were doing something with the

3 paneling also?

4   A I tore it down.

5   Q You also took down the ceiling, ceiling tile?

6   A Yes.

7   Q What type of -- what was the ceiling covered

8 with?

9   A Drywall.

10   Q You also began to take that down as well?

11   A Yes.

12   Q Okay. Were you wearing any masks while you were

13 doing that, any type of health equipment, safety equipment?

14   A I was supposed to. Water paper thing. I wore a

15 paper -- a paper one.

16   Q How much of the ceiling did you take down?

17   A All of it.

18   Q So you took down all of the ceiling?

19   A (Witness nodding).

20   Q And took down most of the panelling, did you say?

21   A Just about two sheets were left.

22   Q Did anyone --

23   A I tore out the insulation and the tar paper.

24   Q Did anyone assist you with these projects?

25   A A couple of kids, only to dump, only to help me

---

### Page 135

1 load it up.

2   Q Would they go down in the basement with you or

3 was that when you would dump outside?

4   A No, when I dumped.

5   Q Dumped outside?

6   A Yes.

7   Q So these were neighborhood children, or who were

8 the children?

9   A I believe Vida's friends. I didn't want to

10 expose them to anything in the basement, so I let them stay

11 outside.

12   Q Do you know their names?

13   A No. My daughter does.

14   Q Vida would, okay.

15   Did either Vida or your son help you clean up the

16 basement?

17   A My son wasn't there.

18   Q Your son was in Missouri.

19   Your wife never went down in the basement while

20 you were doing this work?

21   A Hell no.

22   Q Did you notice any health problems during the two

23 or three weeks that you were doing this work in the

24 basement?

25   A I just noticed my eyes irritating me quite a bit.

---

### Page 136

1 And the kids had mentioned how bad the -- it was getting to

2 them just with the door open. They were outside.

3   Q These were the kids who were helping you?

4   A Yes.

5   Q How about Vida how was she doing?

6   A Vida was sick all of the time.

7   Q And how was your wife during this period of time?

8   A Sick, plus a lot of birds died.

9   Q You have pets?

10   A Birds, tropical birds.

11   Q Before you went out to Missouri to take out the

12 camper, how many birds were -- did the birds live in the

13 house with you?

14   A I had about twelve to fifteen birds when I left

15 Mount Gretna. I had about three left.

16   Q Did anyone ever tell you that the pets were

17 contributing to your problems in the basement?

18   A No.

19   Q The birds live on the first floor, they didn't

20 live in the basement, did they?

21   A No, the problem was they were close to the

22 basement door and we didn't know that -- what was happening.

23 They were just dying, we couldn't figure it out.

24   Q When you would take -- remove debris from the

25 basement, were there steps that you had to go up and down?

---

### Page 137

1   A Pardon me?

2   Q When you would remove debris from the basement,

3 did you have to go up and downstairs?

4   A No.

5   Q You would go directly out?

6   A Right through the patio door.

7   Q Okay.

8   A I wasn't going to expose my wife to that stuff.

9   Q Okay. Your wife indicated that she talked to

10 someone from the -- from A2SI, they told her that you should

11 stop doing what you were doing?

12   A Immediately, and sealed off the basement.

13   Q That is when you stopped?

14   A Hell yes.

15   Q Your wife had testified that she had spoken to

16 different health agencies.

17   First of all, did you speak directly with the

18 Department of Health or the EPA?

19   A Not me.

20   Q Did you speak with Chip Stinella about the --

21 what you had identified as the mold in the basement?

22   A I probably have.

23   Q Okay.

24   A I don't recall.

25   MR. TARASI: Wait a minute. I am -- why don't you

---

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
. . . . . . . . . . . . . . .
JACK MARRONE, husband,      .  Civil Action No.:
KAREN MARRONE, wife, both   .  1:CV-01-0773
individually and in their   .
capacity as parents and     .
Guardians for VIDA MARRONE  .
a minor, and MATTHEW ADAM   .
MARRONE,                    .
              Plaintiffs    .  (U.S. District Judge
                            .     Yvette Kane)
       vs.                  .
                            .
ALLSTATE INSURANCE COMPANY, .
LINDA M. EDLEMAN, FRED      .
SCHAFFER, MT. GRETNA REALTY,.
and HOUSEMASTERS,           .
              Defendants    .
. . . . . . . . . . . . . . .
```

## VOLUME II

Deposition of: JACK MARRONE

Taken by       : Defendants

Date           : June 27, 2002, 10:37 a.m.

Place          : Nealon & Gover
                 2411 North Front Street
                 Harrisburg, Pennsylvania

Before         : Ann M. Wetmore
                 Reporter - Notary Public

1   Q.   And how often would you vacuum?

2   A.   Whenever the kids made it dirty.

3   Q.   When you went on vacation in July of 2000, I

4        believe you testified that you were taking a

5        trailer out to your son in Missouri?

6   A.   Yes.

7   Q.   Do you recall the weather in Mount Gretna before

8        you left?

9   A.   I believe it was sunny and hot.  Sunny and dry, I

10       don't know.  I believe it was sunny and hot.

11  Q.   How about when you returned, do you recall the

12       weather?

13  A.   It was nice when we came back.

14  Q.   And did you notice any dampness or a musty smell

15       in the basement right before you left on vacation

16       in July of 2000?

17  A.   No, not that I recall, no.

18  Q.   After you discovered the mold in your basement

19       when you returned from your vacation in July of

20       2000, did you ever speak to anyone at HouseMaster

21       concerning the presence of mold?

22            MR. TARASI:  Excuse me, is this the time

23       frame when he came back?

24            MS. MURPHY:  That's correct.

25            MR. TARASI:  Okay.

1    A.    No.

2    BY MS. MURPHY:

3    Q.    Did you ever speak to anyone from HouseMaster to

4          register a complaint concerning the home

5          inspection that they had done after you returned

6          from your vacation in July of 2000?

7    A.    Not that I can remember.

8    Q.    Mr. Marrone, I believe you were here when your

9          wife gave some testimony last time and she

10         testified concerning a telephone conversation that

11         she had with a Mr. Pfromm from Advanced Applied

12         Sciences and she indicated at some point that she

13         was talking to him, I believe she gave the date of

14         September 29, 2000.  She was talking to him

15         concerning the results of I guess their survey of

16         the home and she indicated that they talked to

17         her, told her to seal off the lower level, and

18         that she at that time informed Mr. Pfromm that you

19         had been working in the basement.

20              Mr. Pfromm apparently, according to your

21         wife's testimony, I'm paraphrasing it, but told

22         you to stop working on the basement.  She said at

23         that time that she then handed the phone to you.

24         Do you recall having a conversation with Mr.

25         Pfromm in September?

1   A.   No, I don't.

2   Q.   You do not?

3   A.   No, I don't recall that.

4   Q.   So, you don't recall anything that was said during

5        that conversation?

6   A.   No.

7   Q.   Do you recall if you were ever told to abandon the

8        home by anyone at Advanced Applied Sciences or

9        anyone else?

10  A.   I didn't need anyone to tell me to abandon the

11       home.  If the house is not -- you know, I didn't

12       need anyone to tell me if the house is on fire to

13       get out.

14  Q.   So, you are saying that it was your own decision

15       to leave the home?

16  A.   Oh, yes.

17  Q.   Now, from the time that I guess your wife had this

18       telephone conversation on September 29th and you

19       left the home then on October 14th, 2000, I

20       believe was the testimony and then arrived in

21       Missouri on October 16th?

22  A.   Yes.

23  Q.   What did you do between September 29th and October

24       14th in the home, did you seal off the basement?

25  A.   We were already back in Missouri you mean?

1   A.   To keep the bubbles down because the spa can make

2        bubbles and it's a chemical that keeps them -- it

3        makes no bubbles.

4   Q.   So, you are saying you never left the water in

5        overnight at the spa?

6   A.   No.

7                MR. NEALON:   That's all I have.

8                     EXAMINATION

9   BY MR. McNALLY:

10  Q.   Mr. Marrone, my name is John McNally.   I represent

11       the seller of your home, Linda Edleman.   A couple

12       follow-up questions for you.   Prior to August of

13       2000, did you ever have a dehumidifier in your

14       basement?

15  A.   No.

16  Q.   Why did you not have a dehumidifier in the

17       basement?

18  A.   I didn't think I needed one.

19  Q.   What was the basis for your belief that you didn't

20       think you needed one?

21  A.   I never heard of using a dehumidifier.   Where we

22       come from, Missouri, we don't have dehumidifiers.

23  Q.   Did you ever have any water leakage, water

24       accumulation or dampness in your basement prior to

25       August 2000?

1    A.    No, just the water stains that were there.

2          MR. TARASI:  John, we're talking about the

3          house in Mount Gretna?

4          MR. McNALLY:  Correct.

5          MR. TARASI:  All right.  Okay.

6    BY MR. McNALLY:

7    Q.    Does your answer remain the same with that

8          clarification?

9    A.    Yeah.  I get confused with the house in Missouri.

10   Q.    Did you own a shop vac while you lived at Mount

11         Gretna?

12   A.    No.

13   Q.    How was the Mount Gretna house heated and cooled?

14   A.    I believe it was totally electric and two air

15         conditioners upstairs.

16   Q.    Were they window units?

17   A.    Yes.

18   Q.    So, you didn't have central air conditioning?

19   A.    No.

20   Q.    Did you ever have air conditioning in the

21         basement?

22   A.    No.

23   Q.    When you filled up your hot tub, what was the

24         source of water that you used?

25   A.    A faucet, spigot.

1   Q.   Does that include your travel time or is that

2        exclusive of the travel time?

3   A.   I don't know.  I made so many trips to the east

4        coast back and forth, I don't know.  I don't

5        remember how long it took us and how long we were

6        out there.  I think about a week and -- about

7        eight or ten days altogether.

8   Q.   You were in Missouri for a week?

9   A.   No, a couple of days.

10  Q.   Do you have any records or calendars that would

11       reflect how long you were away from your home in

12       Mount Gretna?

13  A.   I'm pretty sure my wife would have something.  I

14       don't know.

15  Q.   Did you close up your entire home in Mount Gretna

16       before you left, in other words, did you close all

17       of the windows, lock everything up?

18  A.   Oh, definitely, yeah.

19  Q.   Did you leave any air conditioning or dehumidifier

20       on?  You had no dehumidifier at that point.

21       Correct?

22  A.   No.

23  Q.   Did you leave any air conditioning on?

24  A.   No.

25  Q.   Did you do anything to prevent a buildup of heat

1           in the house while you were away in July?

2   A.    Buildup of heat?

3   Q.    Yeah.   In other words, you left your home closed

4         up?

5   A.    In July?

6   Q.    Yeah.

7   A.    No.

8   Q.    Was this the first time that you had closed up

9         your home and gone out to Missouri from the time

10        you purchased the home in Mount Gretna?

11  A.    Yes.

12  Q.    Other than that time, you had occupied it

13        continuously, other than the time you went out to

14        Missouri in July?

15  A.    Yes.

16  Q.    After you returned back when you discovered the

17        mold, did you have any contact or conversations

18        with Fred Schaeffer from Mount Gretna Realty?

19  A.    Not that I recall.

20  Q.    And as I understand it, the only time you ever met

21        him was at the closing when you signed the

22        paperwork for the property?

23  A.    I didn't even remember seeing him there either.

24        The first time I saw him was on videotape.

25  Q.    All right.   You've seen his videotaped deposition?

# EXHIBIT "D"

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JACK MARRONE, HUSBAND,           :
KAREN MARRONE, WIFE, BOTH        :
INDIVIDUALLY AND IN THEIR        :
CAPACITY AS PARENTS AND          :
GUARDIANS FOR VIDA MARRONE,      :
A MINOR, AND MATTHEW ADAM        :
MARRONE,                         :
              PLAINTIFFS         :
                                 :
        V                        :   NO. 1:CV-01-0773
                                 :
ALLSTATE INSURANCE COMPANY,      :
LINDA M. EDLEMAN, FRED           :
SHAFER, MT. GRETNA REALTY,       :
AND HOUSE MASTERS,               :
              DEFENDANTS         :   JURY TRIAL DEMANDED

DEPOSITION OF:   KAREN MARRONE

TAKEN BY:        DEFENDANT ALLSTATE INSURANCE
                 COMPANY

BEFORE:          MARIA N. O'DONNELL, RPR
                 NOTARY PUBLIC

DATE:            MAY 29, 2002, 1:14 P.M.

PLACE:           NEALON & GOVER, PC
                 2411 NORTH FRONT STREET
                 HARRISBURG, PENNSYLVANIA

APPEARANCES:

    TARASI, TARASI & FISHMAN
    BY: LOUIS M. TARASI, JR., ESQUIRE
        GIANNI FLORO, ESQUIRE
        FOR - PLAINTIFFS



HAEN
Reporting Service, Inc.

Hughes
Albright
Foltz
Natale

2080 Linglestown Road • Suite 103 • Harrisburg, PA 17110
717.540.0220 • Fax 717.540.0221 • Lancaster 717.393.5101

Case 1:01-cv-00773-YK   Document 164   Filed 05/16/2003   Page 53 of 100

## Page 30

Q  Okay. It was in between that period of time that Chip told you about this house in New Jersey?

A  Right.

Q  And what did he tell you about this house in New Jersey?

A  I called him up, I said Chip, according to Allstate, these people covered up something. And because we were still investigating, we didn't know we thought, it was within a year or so of us buying the house.

And Chip said I can't believe this, he said I just came back from the shore and the EPA condemned a house for mold. That scared me. That's when I decided to call the EPA up. And they referred me to the Department of Health. And the Department of Health said well, you can call up a lab.

Q  Did Chip tell you that this can be a health problem?

A  That I don't remember.

Q  Okay. I take it though that you thought it could be a health problem because you followed up by calling the EPA and the Department of Health?

A  Well, normally if the EPA condemns a home, there has got to be a reason for it.

Q  Like Mr. Flounlacker said, sometimes they are silly questions, but we're trying to create a record.

## Page 31

A  I understand.

Q  In any event, by the time Mr. Stinella or Spinello?

A  Stinella.

Q  Stinella?

A  Not Spinello.

Q  Chip?

A  Right.

Q  By the time Chip tells you that there is a house condemned for mold in New Jersey, you are now thinking your house has mold, is that right?

A  It was visible. I am not a biologist or -- I don't know, it had the appearance of what I have seen mold on bread to look like.

Q  And as soon as -- when did you know that -- that your house had mold?

A  When did we --

Q  First notice it? Was that right before you called Allstate?

A  What had the appearance; whether or not it was at the time, I wouldn't know without testing. I am not qualified to test it.

Q  When did you first notice what you said looked like what you have seen on bread?

A  The explosion of mold?

## Page 32

1  Q  Yes.

2  A  That was when we came back from Missouri dropping
3  the trailer off to my son.

4  Q  That was in early August?

5  A  No. That was in July, the exact date, I don't
6  remember right now.

7  Q  When was the first time that you had seen
8  anything though that looked like what you had seen on bread?

9  A  I honestly don't know.

10  Q  Take a look at the first paragraph called
11  executive summary --

12  A  Uh-huh.

13  Q  -- in that report.

14      It indicates when you initially bought the home
15  you didn't notice any problems with dampness.

16      Do you recall telling the company that?

17  A  No, I don't. I remember telling them that. We
18  did see something down as far as -- and that's why we called
19  House Masters out.

20  Q  When did you first call House Masters out?

21  A  Before we bought the house.

22  Q  Okay. All right.

23      Do you see where it says as the weather got
24  damper, you noticed some other problems?

25  A  Give me a second. Yes.

## Page 33

1  Q  Is that an accurate statement?

2  A  Actually, no.

3  Q  Why is that?

4  A  Because -- well, eventually, okay, significant
5  visible mold, okay, eventually.

6  Q  So you noticed some problems as the weather got
7  damper and over time it got worse leading you --

8  A  Yes.

9  Q  Up to the explosion?

10  A  Yes.

11  Q  Okay. Now, when the weather gets damper can mean
12  different things to different people. Are we talking the
13  spring of 2000?

14  A  I have to think when we bought the house. I
15  can't remember the weather back then. I guess the spring --

16      MR. TARASI: Don't guess.

17      THE WITNESS: Okay. I am not really sure to be
18  honest.

19      MR. TARASI: You cannot guess. If you don't know
20  the answer, you don't know.

21      THE WITNESS: I am sorry, I --

22  BY MR. NEALON:

23  Q  But from reading this report, is it fair to state
24  that the problems started sometime prior to August of 2000
25  and they gradually built up to where it became more of a

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . . .
JACK MARRONE, husband,          .   Civil Action No.:
KAREN MARRONE, wife, both       .   1:CV-01-0773
individually and in their       .
capacity as parents and         .
Guardians for VIDA MARRONE      .
a minor, and MATTHEW ADAM       .
MARRONE,                        .
                Plaintiffs  .   (U.S. District Judge
                                .     Yvette Kane)
        vs.                     .

ALLSTATE INSURANCE COMPANY,     .
LINDA M. EDLEMAN, FRED          .
SCHAFFER, MT. GRETNA REALTY,    .
and HOUSEMASTERS,               .
                Defendants  .
. . . . . . . . . . . . . . . . .


VOLUME II


Deposition of:   KAREN MARRONE

Taken by      :   Defendants

Date          :   June 27, 2002, 10:50 a.m.

Place         :   Nealon & Gover
                  2411 North Front Street
                  Harrisburg, Pennsylvania

Before        :   Ann M. Wetmore
                  Reporter - Notary Public

1    BY MR. MONSKY:

2    Q.    Yes.

3    A.    That's a little difficult for me.

4    Q.    You had used Chip Stanilla and Re/max as your

5          agent with regard to the purchase of the Edleman

6          property?

7    A.    Yes, sir.

8    Q.    Did Mr. Stanilla, did he show you other properties

9          in the Lebanon/Mount Gretna area?

10   A.    I don't know if it was in the Lebanon area.  He

11         did show us other properties, yes.  The locations,

12         I'm not good at that.

13   Q.    Do you recall how many other properties he had

14         shown you?

15   A.    I remember one with stairs, I remember one with a

16         large Florida room, and that's really all I

17         remember.

18   Q.    So, you recall at least two other properties that

19         he had shown you?

20   A.    Correct.

21   Q.    And do you recall whether they were in the Mount

22         Gretna area?

23   A.    No, they were not.

24   Q.    How many times had you gone through the Edleman

25         property before you entered into the agreement of

1          that with Mr. Berthoud?

2   A.     I pointed it out to him.

3   Q.     And what did he tell you about that?

4   A.     He didn't say anything about that spot.  Basically

5          what he told us was to slope the soil away from

6          the house and extend the gutters.

7   Q.     Did he express any concerns about the spot or tell

8          you that it demonstrated anything unusual about

9          the house?

10  A.     No.  He was very like really nonchalant.  There

11         was no big deal.  Slope the soil away, extend the

12         gutters.

13  Q.     Did he say that's a usual or unusual condition?

14  A.     No, he didn't say either.

15  Q.     Did he advise you not to purchase the house

16         because of that spot?

17  A.     No, he didn't.

18  Q.     Other than showing him that spot, did you have any

19         other discussions with him that day about moisture

20         or water?

21  A.     When we were outside, on the cinder block there's

22         some kind of black stuff and he explained that

23         that's some kind of a coating they put on during

24         construction for waterproofing.

25  Q.     This was on the exterior of the home?

1    A.    Yeah.   Because we -- I don't remember going in the

2          house and I don't remember coming out of the

3          house.   Why, I don't know.   But I remember we were

4          out at the front dirt and that's where he was

5          telling us again you got to slope the soil away,

6          extend the gutters.   And then we walked around to

7          the side and I believe it was on the corner where

8          it would have been Vida's bedroom where there was

9          some black stuff and he explained that was some

10          kind of a coating.

11   Q.    Do you have a specific recollection of being with

12          Mr. Berthoud inside the house in the basement?

13          I'm still not clear on that.

14   A.    Yes, because I pointed that out to him.

15   Q.    All right.   When you pointed that out to him, who

16          else was there, you and your husband and--

17   A.    And Chip Stanilla.

18   Q.    And Chip, okay.   Did Mr. Stanilla say anything

19          further about what you saw on the cinder block or

20          what you saw in the basement the date that you

21          were there for the inspection?

22   A.    Not that I recall.

23   Q.    Did Mr. Stanilla express any concerns or

24          reservations about you purchasing the house during

25          the inspection by Chuck Berthoud?

1   A.   No.  I think he was waiting for what Mr. Berthoud

2        had to say.

3   Q.   Mr. Berthoud indicated that he actually gave you I

4        think it's called an express report, which is his

5        report about the property, he would have given

6        that to you the date that he made the inspection.

7        Is that your recollection?

8   A.   He gave me two papers outside by our truck.

9   Q.   Did they pertain to his inspection of the house?

10  A.   Yes, sir.

11  Q.   And on one of those papers did it indicate the

12       things that you've already talked about, sloping

13       the soil away, some recommendations that he made?

14  A.   Yes, sir.

15  Q.   Do you recall what it said about whether there was

16       moisture in the basement?

17            (Mr. Nealon now present)

18  A.   I remember on the paper it said that the

19       inspection was for a structural, wet basement.  I

20       think there was something else.  I don't remember

21       right now.

22  Q.   But did he -- that's what he was inspecting for.

23       Do you recall what he told you or what was said on

24       the report with regard to whether there was any

25       wetness in the basement?

1          Re/max, and Mrs. Edleman's agent, Mount Gretna

2          Realty?

3    A.    Yes, sir.

4    Q.    When did you move into the property?

5    A.    We took possession immediately.

6    Q.    Now, from what you've indicated, you began to do

7          some cleaning at that point?

8    A.    Yes, sir.

9    Q.    When did you begin to move your things in, was it

10         that day?

11   A.    Well, we had things in our camper.  I moved a lot

12         of stuff in the camper, so we started moving those

13         things in.

14   Q.    What sort of things did you move in immediately

15         from the camper?

16   A.    Oh, we had boxes of clothes and hanging clothes

17         and food and dishware, silverware.  Some of

18         Matthew's baseball cards we brought with us, my

19         files.

20   Q.    What do you mean by your files?

21   A.    I had a filing cabinet.  Actually I had two filing

22         cabinets, but I think I only had one that we

23         brought with us.  I don't remember everything.  I

24         packed that camper tight.

25   Q.    What type of files are you referring to that you

1    Q.   There's been discussion about the hot tub or spa.

2         What was the cleanliness of that when you got to

3         the house?

4    A.   The only thing I remember about that was some just

5         not dirt dirt, but just on the bottom, not dirt

6         dirt.  I don't remember the hot tub being dirty at

7         all except for stuff that would settle I guess

8         down at the bottom.

9    Q.   When you first bought the property, you bought the

10        property on August 31 of '99, did you use the pool

11        immediately afterwards?

12   A.   No.

13   Q.   You were towards the end of the summer at that

14        point?

15   A.   Yes.

16   Q.   What else do you recall cleaning out in the

17        basement?

18   A.   Everything was dirty.

19   Q.   When you initially cleaned through the entire

20        house upstairs, downstairs, did you observe

21        anything else with -- did you make any

22        observations about mold anywhere on the property?

23   A.   At the time I did not know it was mold.  When I

24        moved the refrigerator and there was this black

25        slimy stuff, like a skin on tomato soup or hot

1       chocolate, and my family once again heard "she was

2       such a pig," and I cleaned that down with water

3       and bleach.

4    Q.  Is that different than the gook you described on

5        the gasket or the same area?

6    A.  No, totally different.  The gook in the gasket was

7        like from food and stuff like that that had never

8        been cleaned.

9    Q.  When you observed the black slimy stuff, you just

10       wiped it down, what did you do?

11   A.  I washed it down with bleach and water.

12   Q.  And after that, did you replace the refrigerator?

13   A.  Yes.  That's why we moved it out.  I wanted to

14       clean the wall and everything because we were

15       getting a new one.  So, you take that out and you

16       clean it all.

17   Q.  Do you have any records that would reflect when

18       you bought your refrigerator?  Where did you buy

19       it from?

20   A.  I think Lowe's.

21   Q.  Do you recall which Lowe's?

22   A.  Well, there was only one that was near us.

23   Q.  Which would be where?

24   A.  In Lebanon.

25   Q.  During the time frame that you were doing the

1   A.   Yes.  I believe it was only one day.

2   Q.   Now, you had mentioned that there was some

3        recommendations made about sloping the soil away

4        and the gutters.  When did your husband take care

5        of those items?

6   A.   That was shortly after we moved in.

7   Q.   Did your husband do more of the work on the

8        exterior and you were in charge of the interior?

9   A.   Yes.  I only did some stamping down and planting.

10  Q.   Do you know how your husband went about doing the

11       slope work?

12  A.   I was the one that stamped it down.

13  Q.   Do you know whether he consulted with anyone when

14       he took away some soil and added some soil?

15  A.   Well, he had soiled -- there were -- she had a

16       trampoline or something that she had originally

17       had something like that there and there was like

18       big holes.  So, he was filling soil in there too,

19       but he was taking the soil from out back which--

20  Q.   The rear of the property?

21  A.   Yeah.  We are still not sure whose property it

22       was.  And then we went and we bought soil.

23  Q.   And you heard his discussion about him putting

24       down mulch and doing some planting.  Did you have

25       anything to add or anything to correct about his

1          testimony?

2    A.    Yes.  I did the planting most of the stuff and I

3          put the mulch around.  That's my job.

4    Q.    So, you did the planting and the mulching?

5    A.    Yes, sir.

6    Q.    Did you or your husband consult with anybody about

7          how to properly do the work?

8    A.    Plant?

9    Q.    Yeah.  In other words, you just did it based on

10         your own knowledge of what you should do?

11   A.    Yes, sir.

12   Q.    Now, did your children live with you continuously

13         from '99 to 2000 when you eventually moved out of

14         the home?

15   A.    No, my son moved out in April of 2000.

16   Q.    So, he lived in the home until April of 2000?

17   A.    Correct.

18   Q.    And your daughter lived there until you and your

19         husband moved out.  Is that correct?

20   A.    Correct.

21   Q.    How often would you be down in the basement?

22   A.    To vacuum.

23   Q.    You had vacuumed the rugs?

24   A.    Yeah, it was this here, I would vacuum that up,

25         and this I would all sweep up.  (Indicating)  And

1    A.    Right.

2    Q.    That would bring one or both of the children down

3          there?

4    A.    Yes.

5    Q.    There was a television down there?

6    A.    Yes.

7    Q.    Would the children sometimes watch TV down there?

8    A.    Sometimes, but they had TVs in their rooms.

9    Q.    Of course, you had the spa in the basement.  Was

10         there anything else that would bring people down

11         to the basement on a regular basis?

12   A.    Not on a regular basis, no.

13   Q.    Until the time that you came back from Missouri in

14         July or August of 2000, did you make any

15         additional observations about marks in the

16         basement or water or moisture or mold in the

17         basement?

18   A.    Not that I remember, no.

19   Q.    How about upstairs, did you make any further

20         observations of marks or water or moisture or mold

21         in the main upstairs level?

22   A.    Well, when I moved the refrigerator, but I didn't

23         know that was mold.  I didn't know what it was.

24             MR. TARASI:  He meant other than that.

25             MR. MONSKY:  Other than that.  We've already

1    discussed that.

2         MR. TARASI:  We already went through that.

3         MR. MONSKY:  Yeah.

4    A.   Dirty windows.

5         MR. TARASI:  Just answer his question.  He is

6    only talking about something which was wet or mold

7    or something?

8    A.   Oh, no.

9    BY MR. MONSKY:

10   Q.   First of all, behind the refrigerator, do you know

11   for a fact whether that was mold?

12   A.   I don't know.

13        MR. TARASI:  I'll object.  She's been asked

14   and answered that a couple of times.  She didn't

15   know what it was.

16   BY MR. MONSKY:

17   Q.   Is that correct that you didn't know what it was?

18   A.   No, it was nasty.

19   Q.   Just black gooky stuff.  As I understand it, until

20   the time you came back from Missouri in the summer

21   of 2000, you didn't make any other observations of

22   water or moisture or mold in the house?

23   A.   No.

24   Q.   After you did the extensive cleaning of the house,

25   were you satisfied with the house from that point

1    talked to that we'll reveal in due time and we

2    don't have to reveal at the moment and I do not

3    intend to.  Don't answer that question.

4 A.    Yes. sir.

5          MR. McNALLY:  Is it protected by some sort of

6    privilege?

7          MR. TARASI:  Yes.

8          MR. MONSKY:  What is it?

9          MR. TARASI:  Well, the rules of discovery in

10   federal court do not require you to reveal your

11   experts until you are going to use them.

12          MR. McNALLY:  He's not asking her to reveal

13   the expert.

14          MR. TARASI:  Oh, yes, you are and so I am

15   instructing her not to answer the question.

16          MR. NEALON:  Even if it's her medical doctor?

17          MR. MONSKY:  Let me ask it this way.

18          MR. McNALLY:  If it's a treating physician.

19   He's asking for a treating physician, not an

20   expert.

21          MR. MONSKY:  Yeah, let me ask it this way.

22          MR. TARASI:  Why doesn't he ask the question

23   like that?

24          MR. MONSKY:  Yeah, let me try to ask it that

25   way.

1   Q.   Spring of 2000?

2   A.   Yes.

3   Q.   Do you recall the type of tree?

4   A.   No.

5   Q.   Was it a large tree, tall tree?

6   A.   Not like -- no, it was not a real big tree, no.

7   Q.   After that tree was removed, did you have any

8        moisture or drainage problems in front of your

9        house?

10  A.   No.

11  Q.   In your front yard you had grass and plants?

12  A.   Correct, and trees.

13  Q.   Then in July 2000 you went out to Missouri for I

14       think you said about a week?

15  A.   We left on Monday and I believe we returned on

16       Sunday.

17  Q.   Do you recall what week specifically that was?

18  A.   Not without a calendar.

19  Q.   With reference to the 4th of July holiday, was it

20       during or after 4th of July?

21  A.   After.

22  Q.   And what was the reason you went out to Missouri,

23       just to visit and check on your other house?

24  A.   No, to give my son the camper.

25  Q.   So, you were away from the house for a week, away

1       from the house in Mount Gretna for a week?

2  A.   Approximately, yes.

3  Q.   Was it possible that you were away for two weeks?

4  A.   No.

5  Q.   Was the house all closed up during the time you

6       were away?

7  A.   Yes, sir.

8  Q.   Matthew did not return back with you, it was just

9       you, your husband and Vida that returned back to

10      Mount Gretna?

11  A.   I don't remember if Vida came back with us or not.

12  Q.   You just recall yourself and your husband coming

13      back?

14  A.   That's all I remember right now, yes.

15  Q.   Do you recall -- I guess you don't recall what

16      specific date you came back?

17  A.   Not without a calendar, no, sir.

18  Q.   What did you observe when you first came back, was

19      there some unusual developments at the house?

20  A.   Not when I first got back, no, sir, not that I

21      know of.

22  Q.   After you first got back, when did you first

23      notice any problems or changes inside the house?

24  A.   It was a couple of days later my husband had gone

25      into the lower level.

Case 1:01-cv-00773-YK   Document 164   Filed 05/16/2003   Page 69 of 100

1    Q.    So, you were actually home with your husband for a

2          couple of days and then for the first time he went

3          down to the basement was that when--

4    A.    He went down I believe to retrieve something.

5    Q.    Do you drive?

6    A.    Yes, sir.

7    Q.    When people would park a vehicle in the garage,

8          would they then come up through the basement into

9          the main floor or what would the normal sequence

10         of events be?

11             MR. TARASI:  For the record, I think she

12         testified they couldn't park the truck in the

13         garage, but you can ask your question, sir.

14   BY MR. MONSKY:

15   Q.    When you and your husband would go to and from,

16         would you take the vehicle in and out of the

17         garage?

18   A.    No, we parked in the front.

19   Q.    Oh.  So, during those couple of days when you got

20         back, you did not go in the basement at all?

21   A.    No, sir.

22   Q.    What did your husband first tell you when he

23         noticed something in the basement?

24   A.    You are not going to believe what's down there.

25   Q.    And you then went down there?

1    A.    No.

2    Q.    Did you ever go down there?

3    A.    Yes.

4    Q.    How long after these couple of days did you go

5          down there?

6    A.    It may have been a day or so.

7    Q.    Why did you wait a day or so to go down there?

8    A.    I didn't want to see whatever it was.

9    Q.    What did he tell you was down there?

10   A.    He didn't.

11   Q.    When you finally mustered the courage to go down

12         there, what did you observe?

13   A.    Twilight zone.

14   Q.    Can you be more descriptive than that?

15   A.    Fur hair like stuff growing on everything.

16   Q.    When you say growing on everything, where was this

17         fur or hair growing?

18   A.    The walls, ceiling, the furniture, everything.

19   Q.    Was there any length to the fur or hair?  I mean,

20         I don't know, I'm trying to visualize it.

21   A.    I did not get that close to it.

22   Q.    Was it on the carpet?

23   A.    I don't remember.

24   Q.    But it was on the walls and the ceiling?

25   A.    Yes, sir.

1   A.   Yes, he did.

2   Q.   What did he do?

3   A.   He sprayed mildewcide and he bleached.

4   Q.   And who gave him the recommendation to do that?

5   A.   I asked Allstate what I could do.

6   Q.   Was that Larry Miller from Allstate?

7   A.   Yes.

8   Q.   And those were his suggestions?

9   A.   No, he just said you can use mildewcide.

10  Q.   And who mentioned about the bleach?

11  A.   Me.

12  Q.   And your husband did that throughout the basement?

13  A.   I don't know.  I wasn't there.

14  Q.   To your knowledge, did he do anything else in the

15       basement area?

16  A.   Yes, sir.

17  Q.   What else did he do?

18  A.   He started ripping everything out.

19  Q.   He ripped out paneling?

20  A.   Yes.

21  Q.   Ripped out ceilings?

22  A.   Yes.

23  Q.   Who gave him the recommendation to do that?

24  A.   Actually nobody recommended that he do it.

25  Q.   Did anybody help your husband to do that?

1   A.   I don't know.

2   Q.   Did you hire anybody to take any corrective action

3        with regard to the basement?

4   A.   I didn't hire anybody.  Wait a minute.  Yes, Carl

5        Zimmerman.

6   Q.   What did he do?

7   A.   We got a blaster.

8   Q.   What's that?

9   A.   Some kind of ozone thing.

10  Q.   And did your husband use this blaster or did Mr.

11       Zimmerman?

12  A.   No, Mr. Zimmerman did.

13  Q.   Where is Mr. Zimmerman from?

14  A.   I don't know.

15  Q.   How long did it take him to do that?

16  A.   I don't know how long it was down there.

17  Q.   Pardon me?

18  A.   I don't know how long it was down there.

19  Q.   Do you recall when he did that?

20  A.   Sometime in August.

21  Q.   Was that before or after Mr. Miller was out there?

22  A.   After.

23  Q.   Do you know specifically what the purpose of doing

24       this blasting was, using the blaster?

25  A.   It was supposed to help it smell better.

Case 1:01-cv-00773-YK   Document 164   Filed 05/16/2003   Page 73 of 100

1   A.   Well, the estimate they sent out was to rip

2        everything out and then to replace everything

3        afterwards.  So, my husband started ripping

4        everything out.

5   Q.   And was that ripping out phase, he didn't get to

6        any of the replacing phase as I understand it?

7   A.   Correct.

8   Q.   There was also an environmental company that came

9        out?

10  A.   Yes, sir.

11  Q.   And what was the circumstances that they came out,

12       who had requested that they come out?

13  A.   I did.

14  Q.   How did you get a hold of that organization?

15  A.   Through the health department.

16  Q.   Pennsylvania Department of Health.

17  A.   Yes.

18  Q.   When did they come out?

19  A.   The lab?

20  Q.   Yes.  What's the name of the organization again?

21  A.   A2S1.

22  Q.   When did they come out?

23  A.   August 28th.

24  Q.   Were you there when they did their investigation?

25  A.   I was upstairs.

1    was, we would have to seal off the lower level and

2    do something called a negative pressure and have a

3    bio team come in.

4  Q.   Did he tell you anything else when he was out

5       there about his evaluation?

6  A.   Yes.  He said on a scale from 1 to 10 ours looked

7       to be a 6 or 7, but that if it was serious they

8       would call us.

9  Q.   Would 10 be the most serious in terms of that

10      scale?

11 A.   Yes.

12 Q.   Did they then call you within three or five days?

13 A.   No.

14 Q.   When did you next hear from him or his company?

15 A.   I called them approximately two weeks after they

16      were out there.

17 Q.   Did you talk with him then?

18 A.   I don't remember who it was I spoke with.

19 Q.   What did they tell you at that point?

20 A.   They didn't have the results.

21 Q.   When did you get the results?

22 A.   Verbally I received them September 29th.

23 Q.   So, you got the verbal results about a month later

24      from the date of his inspection?

25 A.   Yes, sir.

1          did you get the dehumidifier downstairs?

2    A.   That I don't remember.

3    Q.   I think we are now up to the time where you got

4         the verbal report from the company September 29th

5         of 2000?

6    A.   Right.

7    Q.   Was that Mr. Pfromm that you spoke with?

8    A.   I don't know.  The gentleman said that the other

9         person had been on vacation, so I don't know who

10        it was I spoke with.

11   Q.   What did they tell you at that point?

12   A.   Told me what was down in the basement, what came

13        back on the samples.

14   Q.   What did they tell you?

15   A.   That we had something called Stachybotrys,

16        Penicillium, Aspergillus.  What was the name of

17        the other one?  I don't remember the name, but it

18        was something else.  That the levels on the inside

19        of the house in the lower level were much higher

20        than on the outside of the house, and that was not

21        what was it was supposed to be, and that there

22        should not have been any Stachybotrys at all.

23   Q.   Did they tell you this was only in the basement or

24        also on the first floor level, the main level?

25   A.   I don't remember speaking -- on the first floor

1    the only thing I remember was telling him I had

2    found -- after I got the results I told him about

3    the black stuff I found behind the refrigerator.

4  Q.  Did they do any sampling on the main floor?

5  A.  I remember he vacuumed and I think he had an air

6    hose thing.

7  Q.  When they told you about what they found in the

8    basement, did they make some recommendations to

9    you at that time?

10 A.  Over the phone?

11 Q.  Yes.

12 A.  I had told him my husband had been tearing it out.

13    He told him to stop immediately and seal off the

14    lower level.

15 Q.  Was your husband on the phone when you got this

16    report?

17 A.  No.  I put him on after I got that, I handed it

18    over to him.

19 Q.  Did your husband talk with the gentleman from the

20    environmental company?

21 A.  Yes.

22 Q.  After you got this advice, did your husband then

23    stop his work and seal off the basement?

24 A.  He put--

25        MR. TARASI:  Wait a minute, answer the

Case 1:01-cv-00773-YK   Document 164   Filed 05/16/2003   Page 77 of 100

1       question.

2   A.      Yes.

3   BY MR. MONSKY:

4   Q.      What did he do?

5   A.      Put tape all around like he was told.

6   Q.      How did he tape it off, what did he do

7           specifically?

8   A.      Put some kind of tape around to seal off the door

9           to the lower level.

10  Q.      That's just the one door where the steps are?

11  A.      Correct.

12  Q.      Did he do anything else with regard to the

13          basement, did he take any further actions?

14  A.      Yes.

15  Q.      What else did he do?

16  A.      He put a fan to blow out.

17  Q.      Did that blow out of one of the windows?

18  A.      The sliding glass doors that I remember.   I

19          believe that's what he said.

20  Q.      By the pool?

21  A.      Correct.

22              MR. TARASI:   That's in the basement?

23  A.      In the lower level, yes, sir.

24  BY MR. MONSKY:

25  Q.      And was that fan on continuously?

1   A.   I believe so.

2   Q.   Did your husband stop his demolition work in the

3        basement?

4   A.   Yes.

5   Q.   Did they tell you to vacate the home?

6   A.   No.

7   Q.   Did you eventually get a written report from them

8        with some recommendations?

9   A.   Yes.

10  Q.   After you got this call, is that when you made the

11       decision to vacate the home?

12  A.   Yes.

13  Q.   And how did you go about deciding that?

14  A.   My husband hung up the phone and said we're out of

15       here.

16  Q.   And did you agree with his decision?

17  A.   Yes.

18  Q.   Was your daughter, Vida, living there at the time?

19  A.   Yes.

20  Q.   Did you then make plans to move out of the home?

21  A.   Yes.

22  Q.   And I think it was a couple of weeks until you

23       actually made your move?

24  A.   October 14.

25  Q.   October 14th, about two weeks later?

1      subsequently found out that that other stuff that

2      was put up was put up in the '80s?

3   A.   Correct.

4   Q.   So, based on your own investigation, do you still

5      believe in what Mr. Miller told you?

6   A.   I do not believe that it had recently been put up,

7      but I believe that, yes, it was there hiding

8      something.

9   Q.   And what's the basis for that belief?

10  A.   Because the entire basement wasn't finished off.

11  Q.   So, there were exposed portions of the cinder

12     block?

13  A.   In the back area and it had not been completely

14     carpeted.

15  Q.   Okay.

16  A.   And because there was tar paper there.

17  Q.   Where was tar paper?

18  A.   Behind the insulation.

19  Q.   So, that would have been a vapor barrier put in?

20  A.   I have no idea what it was supposed to be for.

21  Q.   Before you purchased the property you went through

22     it on at least one occasion.  Correct?

23  A.   Correct.

24  Q.   Did you notice any dampness in the basement?

25  A.   At the time the air conditioners were on so it was

1    hard to tell anything in all honesty.

2  Q.   But my question is did you notice any dampness in

3       the basement?

4  A.   No.

5  Q.   At any time after you purchased the property and

6       before you returned from Missouri, did you notice

7       any dampness in the basement?

8  A.   Actually I had no way of telling, in all honesty,

9       if there was dampness down there.  I did not

10      perform any type of a test to find out.

11 Q.   Sure.

12 A.   To be honest, really.

13 Q.   Sure, and I'm not asking you for any scientific

14      certainty.  I'm not asking you for the relative

15      humidity of the basement, any scientific

16      measurement.  From your own experience, did you

17      notice any dampness, humidity in the basement?

18           MR. TARASI:  I'm going to object to that.

19      That's two questions.  You can ask her if she

20      noticed any dampness.

21 BY MR. McNALLY:

22 Q.   Did you notice any dampness?

23 A.   In what way?  I'm not trying to be difficult, but

24      what way?

25 Q.   Well, did the walls weep?

1   Q.   That was done after you discovered the mold.

2        Correct?

3   A.   Correct.

4   Q.   Has anybody other than your -- let me ask you

5        this.  Have any of your treating physicians told

6        you that your respiratory problems are related to

7        mold exposure?

8   A.   No.

9   Q.   I think you had testified maybe that you weren't

10       told personally.  Have you heard secondhand that

11       your respiratory problems were caused or

12       aggravated by exposure to mold?

13            MR. TARASI:  I'm going to object to that

14       question and don't answer that.  You're getting

15       into privileged information.

16  BY MR. McNALLY:

17  Q.   And certainly I don't mean to ask you to breach

18       any privilege or anything your counsel has told me

19       and I'm going to limit this to maybe anybody other

20       than any experts that may have been retained on

21       your behalf by counsel.  But have you heard

22       secondhand, be it from your husband or any of your

23       treating physicians, that mold caused or

24       contributed to any respiratory problems that you

25       had?

1   Q.    And then I apologize, that was a poor question.

2         Paragraph 21 of your complaint says:  "On or

3         about July 2000, the plaintiffs went away on

4         vacation and returned one week later to find the

5         basement covered in mold.  Said mold covered the

6         walls, ceiling, floor and furniture.  This was the

7         first time that the plaintiffs had any notice of

8         this problem."

9   A.    Correct.

10  Q.    So, other than the mold you saw behind the

11        refrigerator and the--

12  A.    I did not know that was mold.

13  Q.    Okay.  Well, other than that spot and the stain

14        that you saw downstairs, did you ever see any mold

15        in the house before July 2000?

16        MR. TARASI:  I'm going to object to that.

17        She's testified she never knew it was mold.  She

18        saw these places and she may have found out later

19        that that was mold, but at the time she did not

20        recognize it or know it was mold.

21        MR. McNALLY:  Okay.

22  BY MR. McNALLY:

23  Q.    At any time after you purchased the property

24        before 2001, did you see any mold in what you

25        identified as mold in your home?

Case 1:01-cv-00773-YK   Document 164   Filed 05/16/2003   Page 83 of 100

1    A.    Prior to--

2          MR. TARASI:  I'm going to object to that

3    again because it's very confusing and I don't

4    understand the question.  What are you asking?

5    She said in her complaint and she testified to

6    that, she didn't know until July and she came back

7    and then she found the mold problem, what she

8    found out was a mold problem.

9          MR. McNALLY:  So, the answer is she had no

10   notice of the problem before July?

11         MR. TARASI:  No, and she's testified to that.

12         MR. McNALLY:  Okay, great.

13   BY MR. McNALLY:

14   Q.    You had also indicated in your complaint that you

15         immediately called Allstate and filed a claim on

16         your insurance.  Is that correct?

17   A.    I had Allstate called, yes.

18   Q.    Isn't it true that you didn't call Allstate or

19         your husband called Allstate until August 8th of

20         2000?

21   A.    I don't believe that's correct.

22   Q.    Did you ever talk to anybody at Allstate?

23   A.    I don't remember.

24   Q.    The document that counsel has produced to me

25         today, which you premarked as Exhibit Miller 2,

Case 1:01-cv-00073-YK   Document 164   Filed 05/16/2003   Page 84 of 100

1   Q.   When was the first period of separation?

2   A.   August 1987.

3   Q.   And how long were you separated?

4   A.   I think two months.

5   Q.   And you reconciled after two months?

6   A.   Correct.

7   Q.   And when was your second period of separation?

8   A.   January 14th, 2000.

9   Q.   Why did you separate?

10  A.   Stupidity.

11  Q.   On whose fault?

12  A.   His, on my husband's part.

13  Q.   Could you explain that, please?

14  A.   It's self-explanatory.

15  Q.   How long were you separated?

16  A.   That's hard to say because we were working things

17       out so he came back.

18  Q.   Do you know when about he came back?

19  A.   I believe the first time was in March.

20  Q.   So, did you have several attempts at

21       reconciliation before?

22  A.   No, we were trying to work it out.

23  Q.   So, you say when he came back.  What do you mean

24       by that?

25  A.   He came to visit, we went out, we ate.

1  Q.   But he didn't stay?

2  A.   Maybe for a night, two nights.

3  Q.   When did you finally reconcile?

4  A.   It may have been in May.  I'm not really sure.

5  Q.   And where did your husband live during this time

6       that you were separated?

7  A.   In the camper.

8  Q.   But where did he go?

9  A.   Oh, Martinsburg, West Virginia.

10 Q.   And do you know why he went there?

11 A.   No idea.

12 Q.   So, essentially from January of 2000 through

13      approximately May of 2000, your husband was not

14      living at the Timber Road address?

15 A.   Not full time, no.

16 Q.   And you said the first that time he came back

17      during the period of separation was approximately

18      March of 2000?

19 A.   I believe so.

20 Q.   Do you know how many other times that he came back

21      before he finally came back in May?

22 A.   No, I don't.

23 Q.   Can you estimate, was it more than ten?

24 A.   I honestly, honestly can't tell you because I

25      really--

1   Q.   Now, you indicated that Chip Stanilla suggested to

2       you that you get a home inspection.  Is that

3       correct?

4   A.   Yes.

5   Q.   Were you interested in getting a home inspection

6       prior to talking to Chip?

7   A.   Yes.

8   Q.   Why is that?

9   A.   Because I saw that black spot and I didn't know

10      what it was.

11   Q.   I'm sorry, I couldn't hear you.

12   A.   I saw that black spot and didn't know what it was.

13   Q.   And how did you come to hire HouseMaster to do the

14      inspection?

15   A.   Chip.

16   Q.   Chip recommended HouseMaster?

17   A.   Yes.

18   Q.   And who set up the inspection?

19   A.   I believe Chip.

20   Q.   Do you know what the scope of the inspection was

21      to be?

22   A.   I wanted to know if there was any problems with

23      water in the basement and I also wanted the

24      foundation, the structure of it checked.

25   Q.   And you relayed those wants to Chip?

1  A.  Yes, this one I remember.  I think this was it.  I

2      thought this one was this one.  (Indicating)  Yes,

3      I remember this one.

4  Q.  Is this one of the two documents that was given to

5      you by Mr. Berthoud?

6  A.  I don't know.  It was two papers, that's all.

7  Q.  I will represent to you that Marrone 11 is

8      actually a four-page copy, but it was the front

9      and back two pages.  So, the second page was

10     actually the backside of the first.

11  A.  Okay.  All right.

12  Q.  Does that refresh your recollection as to whether

13      or not you saw this document?

14  A.  Yes, this, yes.

15  Q.  And were you given this by Mr. Berthoud on the day

16      of the home inspection?

17  A.  Yes.

18  Q.  And when did he give you this document?

19  A.  Out by the truck after the inspection was over.

20  Q.  Was there any specific conversation regarding

21      Exhibit Number 11?

22  A.  Yeah, just his recommendation, this here.

23      (Indicating)

24  Q.  And the recommendations read:  "Slope soil away

25      from the house, keep downspouts clean and flowing

1          Gretna home?

2     A.   No, I don't.

3     Q.   Was it more than five?

4               MR. TARASI:   I'm going to object to this

5          question.   She just said she does not know.

6               MS. MURPHY:   I'm going to ask her if she can

7          estimate.

8               MR. TARASI:   Well, ask her if she can

9          estimate and she can tell you she either knows or

10         doesn't know.

11    A.   I really don't know.

12    BY MS. MURPHY:

13    Q.   After July of 2000 when you returned and found

14         mold in your basement, did you ever seek out

15         anyone from HouseMaster or address your concerns

16         to anyone from HouseMaster concerning this mold?

17    A.   No.

18    Q.   Did you ever seek out anyone from HouseMaster to

19         register complaints or concerns about the home

20         inspection?

21    A.   No.

22    Q.   When was the last time that you were seen by any

23         health care professional that is not an expert for

24         a condition that you relate to mold exposure?

25              MR. TARASI:   And that's what you relate, what

# EXHIBIT "E"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
. . . . . . . . . . . .
JACK MARRONE, husband          .    Civil Action No.:
KAREN MARRONE, wife, both      .    1:CV-01-0773
individually and in their      .
capacity as parents and        .
guardians for VIDA MARRONE     .
a minor, and MATTHEW ADAM      .
MARRONE,                       .
            Plaintiffs         .
                               .
      vs.                      .    (U.S. District Judge
                               .     Yvette Kane)
ALLSTATE INSURANCE COMPANY,    .
LINDA M. EDLEMAN, FRED         .
SHAFFER, MT. GRETNA REALTY,    .
and HOUSEMASTERS,              .
            Defendants         .
. . . . . . . . . . . .
```

Deposition of:   MATTHEW ADAM MARRONE

Taken by        :   Defendants

Date            :   June 28, 2002, 11:08 a.m.

Place           :   Nealon & Gover
                    2411 North Front Street
                    Harrisburg, Pennsylvania

Before          :   Ann M. Wetmore
                    Reporter - Notary Public

1  Q.  Where do you live?

2  A.  716 Wood Street, Lebanon, Missouri.

3  Q.  How long have you lived at that address?

4  A.  Since January of this year.

5  Q.  That would be January '02.  Where did you live

6      before that?

7  A.  308 Sherman Street and that's also in Lebanon.

8  Q.  What state again?

9  A.  Missouri.

10 Q.  And what time frames did you live at that 308

11     address?

12 A.  From April of 2001 to December of 2001.

13 Q.  Where did you live before that?

14 A.  1956 South Ingram Mill Road.

15 Q.  How do you spell that?

16 A.  I-n-g-r-a-m, and that's Apartment B, as in boy,

17     29, and that is in the city of Spring Field,

18     Missouri.

19 Q.  What time frames did you live at that address?

20 A.  I lived at that address from July of 2000 until

21     summer of 2001 when I moved to Sherman Street.

22 Q.  And where did you live before the Ingram Mills

23     Road address?

24 A.  I lived in a campground as a poor college kid, of

25     course, and that was located in Strafford,

1   A.   He's a medical doctor, not an optometrist.

2   Q.   Did you inquire from that doctor or anybody else

3   who you might see within the veterans' hospitals

4   to help you with the problem that you were

5   experiencing with your eyes?

6   A.   No.

7   Q.   Has any doctor ever told you that they believe the

8   problems that you told me about that you are

9   experiencing with your eyes is related in any way

10   to the time that you lived at the Mount Gretna

11   property?

12       MR. TARASI:  For the record, I'm directing

13   the witness not to answer that question in regard

14   to any expert witnesses.  Treating physicians you

15   can ask him.

16       MR. FLOUNLACKER:  I think we straightened

17   that out the other time.

18       MR. TARASI:  Treating physicians.

19   BY MR. FLOUNLACKER:

20   Q.   You understand that?

21   A.   Yes.

22   Q.   If your lawyer has asked you to go see some

23   doctor, I'm not talking about that.  And as I

24   asked you, I'm talking about doctors that you

25   sought out.

1  A.  Treating physician, no.

2  Q.  Other than what you've already told me, is there

3      any other problem that you are or have experienced

4      with your eyesight?

5  A.  No, not to my knowledge.

6  Q.  You've told me about the entire universe of the

7      problems that you've experienced with your eyes?

8  A.  Yes.

9  Q.  I think you told me that, and just to recap, you

10     don't believe the problems with your knees are

11     related to your time living at Mount Gretna?

12 A.  Not at all.

13 Q.  What about memory loss, when did you first

14     experience what you believe was something relating

15     to a memory loss?

16 A.  It was shortly before I left Mount Gretna, which

17     would have been December or January of either 2000

18     or 2001.

19 Q.  All right.  What happened?

20 A.  I believe I was at a fraternal meeting and

21     previously had the part memorized no problem and

22     there was a few words I couldn't get out, I just

23     couldn't remember the words.

24 Q.  What are you talking about?

25 A.  Ritual work.

1    while living at the Mount Gretna property that

2    suggested there was a problem with the property or

3    the way that it was built or the way that it was

4    maintained prior to your parents buying it?

5  A.    When we first moved in, within that first week,

6    there was an extensive and I mean extensive

7    cleaning.  I didn't take part because, of course,

8    I'm a kid and rather play.  But I know that my

9    mother did spend a lot of time cleaning, a lot.

10  Q.    Anything else?

11  A.    Besides cleaning and mowing the grass and typical

12    yardwork, no.

13  Q.    During the course of the work that your mother did

14    and anybody else in your family, did they ever

15    tell you that they saw a problem with the house or

16    a problem with the way that it had been maintained

17    prior to your parents buying it?

18  A.    Yes.

19  Q.    What did they tell you?

20  A.    I believe it was the second or third day there we

21    had removed the refrigerator and there was a huge

22    black spot behind there and it was cleaned up as

23    well as the dirt and grime in the dishwasher.

24        MR. TARASI:  Wait a minute.  For the record

25    did you ask him prior to the purchase?

Case 1:01-cv-00773-YK   Document 164   Filed 05/16/2003   Page 95 of 100

1          MR. FLOUNLACKER:  What did I say?

2          (Question from Page 67, Lines 13 and 14, read

3     by the Reporter)

4  BY MR. FLOUNLACKER:

5  Q.   All right, go ahead.

6  A.   And the cleaning of the floors, of course, and the

7       walls, and the only noticeable was the black spot

8       behind the refrigerator and the unbearable dirt in

9       the oven and dishwasher.

10 Q.   So, the dishwasher was dirty, the oven was dirty

11      and there was a spot behind the refrigerator?

12 A.   Yes.

13 Q.   Was all of that stuff cleaned up?

14 A.   Yes.  My mother cleaned it up.

15 Q.   Your mom cleaned all of that stuff up?

16 A.   To the best she could, yeah.

17 Q.   Well, what do you mean by that?

18         MR. TARASI:  Did she clean it up or not?

19 A.   She did, she cleaned it.

20         MR. TARASI:  That's all you have to say.

21      Just answer his questions.

22 A.   Okay.

23 BY MR. FLOUNLACKER:

24 Q.   Do you want a drink or something?

25 A.   No, I'm okay, thank you.

1   Q.   Your parents?

2   A.   I don't know.

3   Q.   Why did you move out of the house in I think you

4        told me April of 2000?

5   A.   From Mount Gretna?

6   Q.   Right.

7   A.   To be with my girlfriend.

8   Q.   Is she here?

9   A.   She's outside.

10  Q.   Any other reason why you decided to move out in

11       April of 2000?

12  A.   Cheaper schooling out that way, so I tie it all

13       together.

14  Q.   Did you leave Mount Gretna or the Mount Gretna

15       property because of any medical problem that you

16       thought you were experiencing because you lived at

17       the house?

18  A.   No.

19  Q.   When was the first time in your life that you

20       believe you were experiencing a physical problem

21       with your body as a consequence of living at that

22       Mount Gretna property?

23  A.   I don't know because I don't know medically what

24       was tied in with that so I wouldn't know.

25  Q.   All right, I understand that.  And just to be

# EXHIBIT "F"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . .

JACK MARRONE, husband,    .  Civil Action No.:
KAREN MARRONE, wife, both  .  1:CV-01-0773
individually and in their  .
capacity as parents and  .
guardians for VIDA MARRONE  .
a minor, and MATTHEW ADAM  .
MARRONE,              .
          Plaintiffs  .
                   .
   vs.            .  (U.S. District Judge
                   .   Yvette Kane)

ALLSTATE INSURANCE COMPANY,  .
LINDA M. EDLEMAN, FRED  .
SHAFFER, MT. GRETNA REALTY,  .
and HOUSEMASTERS,  .
          Defendants  .

. . . . . . . . . . . . . .

Deposition of:  VIDA ARIELLA MARRONE

Taken by    :  Defendants

Date        :  June 28, 2002, 2:18 p.m.

Place       :  Nealon & Gover
                 2411 North Front Street
                 Harrisburg, Pennsylvania

Before      :  Ann M. Wetmore
                 Reporter - Notary Public

1  A.   All right.

2  Q.   If you can answer simple with a yes or no, please

3       do it.  If you are going to estimate something for

4       me, please tell me that you are doing that so

5       we'll all understand.  Okay?

6  A.   All right.

7  Q.   Don't let me cut you off and please don't cut me

8       off as we are going back and forth with these

9       questions.  All right?

10  A.   Understood.

11  Q.   And if you don't understand any of my questions

12       for whatever the reason, you just tell me and I'll

13       try to make it more clear for you.  All right?

14  A.   Okay.

15  Q.   Please give me your current address?

16  A.   11673 Highway PP, Dixon, Missouri  65459.

17  Q.   Now, you went and saw me go through this drill

18       with your brother.  What I'd like you to do is

19       tell me how long you've lived at that address and

20       then backtrack me through addresses until we

21       arrive at the point in your past when you lived at

22       the Mount Gretna address.  All right?  So, how

23       long have you lived at this 11673?

24  A.   Since October of 2000 I believe we moved back.

25  Q.   Where did you live before that?

1   Q.   Did you ever get anymore follow-up care for your

2        broken nose?

3   A.   No.  It's still crooked.

4   Q.   Do you feel your nose is out of whack because of

5        that?

6   A.   Out of whack, no; crooked, yes.

7   Q.   Aside from what you've told me, did you receive

8        any other further medical care from anybody for

9        any reason after June of 2000?

10  A.   No.

11  Q.   Do you have any allergies?

12  A.   I'm allergic to penicillin.  I have a bad reaction

13       to codeine, it makes me nauseous, but I don't know

14       if it's allergic or not.  And that's all I can

15       really think of at this moment.

16  Q.   Has any doctor anywhere ever told you that any of

17       the problems that you told me about earlier with

18       the memory loss, staying awake, all through to the

19       itchy eyes was related in any way to the time that

20       you spent living at Mount Gretna?

21  A.   Repeat that one more time.

22  Q.   Sure.  Has any doctor ever told you that the

23       problems you told me about earlier, staying awake

24       all through the itchy eyes, was related to or

25       caused by the time that you lived at Mount Gretna?